**2023-1762**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**IMMUNOGEN, INC.,**

**Plaintiff-Appellant**

**v.**

**KATHERINE K. VIDAL, UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,**

**Defendant-Appellee**

**Appeal from the United States District Court for the Eastern District of Virginia in Civ. No. 1:20-cv-00274 (Hon. T.S. Ellis, III, U.S. District Judge)**

---

# APPELLANT'S PRINCIPAL BRIEF

---

Michael E. Joffre
Anna G. Phillips
Eric K. Steffe
**STERNE KESSLER GOLDSTEIN & FOX PLLC**
1100 New York Avenue, NW
Washington, DC 20005 202.371.2600

*Counsel for Appellant ImmunoGen, Inc.*

Dated: July 20, 2023

**U.S. Patent Application No. 14/509,809 (the ’809 application):**

1. A method for treating a human patient having an FOLR1-expressing ovarian cancer or cancer of the peritoneum comprising

administering to the patient an immunoconjugate which binds to FOLRl polypeptide,

wherein the immunoconjugate comprises an antibody or antigen-binding fragment thereof that comprises the variable light chain (VL) complementarity determining region (CDR)-1, VL CDR-2, VL CDR-3, variable heavy chain (VH) CDR-1, VH CDR-2, and VH CDR-3 of SEQ ID NOs: 6-9, 11, and 12, respectively, and a maytansinoid, and

wherein the immunoconjugate is administered at a dose of 6 milligrams (mg) per kilogram (kg) of adjusted ideal body weight (AIBW) of the patient.

242. The method of claim 1, wherein the maytansinoid is DM4.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1762

**Short Case Caption** ImmunoGen, Inc. v. Katherine Vidal

**Filing Party/Entity** ImmunoGen, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 07/20/2023

Signature: /s/ Michael E. Joffre

Name: Michael E. Joffre

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| ImmunoGen, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| J.C. Rozendaal<br>STERNE, KESSLER, GOLDSTEIN & FOX, PLLC | Ryan Elizabeth Conkin<br>STERNE, KESSLER, GOLDSTEIN & FOX, PLLC | |
| Craig Reilly<br>Law Office of Craig C. Reilly | | |
| Alexander Vincent Alfano<br>STERNE, KESSLER, GOLDSTEIN & FOX, PLLC | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

## TABLE OF CONTENTS


RULE 47.5 STATEMENT OF RELATED CASES ............................................ vii

INTRODUCTION ..........................................................................................1

JURISDICTIONAL STATEMENT ..................................................................4

STATEMENT OF THE ISSUES......................................................................4

STATEMENT OF THE CASE.........................................................................5

A. Background ...............................................................................5

1. The ocular toxicity problem with IMGN853 .............................5

2. ImmunoGen's dosing solution ..................................................7

3. Clinical trials following the switch to AIBW dosing ................9

4. Recognition in the field of AIBW dosing ................................10

B. Original Examination ................................................................11

C. The Section 145 Action ..............................................................12

D. Trial ...........................................................................................14

E. The '379 Continuation ...............................................................16

SUMMARY OF THE ARGUMENT ............................................................16

ARGUMENT ................................................................................................19

I. STANDARD OF REVIEW ..................................................................19

II. THE CLAIMS OF THE '809 APPLICATION ARE NOT INDEFINITE. ..19

A. The district court erroneously required the claims to define "AIBW." ..........................................................................................20

B. The claims and specification—including Example 4—are drawn to a specific dosing regimen for a specific ADC. ......................................21

C. The district court rejected this Court's guidance about the role of the prosecution history. .........................................................................28

D. ImmunoGen's trial statements unmistakably define AIBW. ..............31

III. THE CLAIMS OF THE '809 APPLICATION ARE NOT OBVIOUS........33

A. There was no motivation to solve the problem of ocular toxicity because skilled artisans were not even aware of the problem............34

B. There was no motivation to use AIBW dosing or the specific AIBW formula because AIBW had never before been used to dose ADCs. .38

C. There was no motivation to use the precise dose of 6 mg/kg AIBW, and it would not have been determined by routine experimentation. .46

D. There was no reasonable expectation that the exact dose of 6 mg/kg AIBW would solve the unknown ocular toxicity problem, in part, because the field is unpredictable........................................................50

CONCLUSION ...........................................................................................55

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Lab'ys v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009) ....................27

*Alcon Research, Ltd. v. Apotex Inc.*,
687 F.3d 1362 (Fed. Cir. 2012) ....................19

*Allergan, Inc. v. Apotex Inc.*,
754 F.3d 952 (Fed. Cir. 2014) ....................51

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ....................48

*In re Armodafinil Pat. Lit. ('722 Pat. Lit.)*,
939 F. Supp. 2d 456 (D. Del. 2013)....................40

*Aylus Networks, Inc. v. Apple Inc.*,
856 F.3d 1353 (Fed. Cir. 2017) ....................31, 32

*BASF Corp. v. Johnson Matthey Inc.*,
875 F.3d 1360 (Fed. Cir. 2017) ....................19

*Boehringer Ingelheim Pharms. Inc. v. Mylan Pharms., Inc.*,
803 Fed App'x 397 (Fed. Cir. 2020) ....................48

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*,
381 F.3d 1371 (Fed. Cir. 2004) ....................37, 38

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ....................39, 52, 53

*Enzo Biochem, Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010) ....................25, 26

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys*,
918 F.3d 928 (Fed. Cir. 2019) ....................35, 36, 37

*Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*,
865 F.3d 1348 (Fed. Cir. 2017) ....................................................................47

*Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*,
401 F.3d 1367 (Fed. Cir. 2005) ....................................................................32

*Hyatt v. Hirshfeld*,
998 F.3d 1347 (Fed. Cir. 2021) ....................................................................29

*Hyatt v. Kappos*,
625 F.3d 1320 (Fed. Cir. 2010) ....................................................................29

*ImmunoGen Inc. v. Vidal*,
No. 21-1939 (Fed. Cir. 2022) ................................................................ vii, 2

*ImmunoGen, Inc. v. Hirshfeld*,
2022 WL 885774 (Fed. Cir. 2022) ..........................................................*passim*

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) ...............................................................24, 25

*Krippelz v. Ford Motor Co.*,
667 F.3d 1261 (Fed. Cir. 2012) ....................................................................32

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)......................................................................................36

*Leo Pharm. Prods., Ltd. v. Rea*,
726 F.3d 1346 (Fed. Cir. 2013) ...............................................................35, 52

*Millennium Pharms., Inc. v. Sandoz Inc.*,
862 F.3d 1356 (Fed. Cir. 2017) ....................................................................41

*Nature Simulation Sys. Inc. v. Autodesk, Inc.*,
50 F.4th 1358 (Fed. Cir. 2022) ...............................................................20, 21

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014).................................................................................20, 33

*Novartis Pharms. Corp. v. Watson Lab'ys, Inc.*,
611 F. App'x 988 (Fed. Cir. 2015) ................................................................35

*In re Oelrich*,
579 F.2d 86 (CCPA 1978) ............................................................................34

*Omega Patents LLC v. CalAmp Corp.*,
13 F.4th 1361 (Fed. Cir. 2021) ..................................................................28, 29

*Orexo AB v. Actavis Elizabeth LLC*,
903 F.3d 1265 (Fed. Cir. 2018) ..........................................................................42

*OSI Pharms., LLC v. Apotex Inc.*,
939 F.3d 1375 (Fed. Cir. 2019) ..........................................................................54

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) ..........................................................................46

*In re Packard*,
751 F.3d 1307 ......................................................................................................29

*Panduit Corp. v. Dennison Mfg. Co*.,
810 F.2d 1561 (Fed. Cir. 1987) ..........................................................................44

*Phonometrics, Inc. v. N. Telecom Inc.*,
133 F.3d 1459 (Fed. Cir. 1998) ...................................................................25, 26

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
882 F.3d 1056 (Fed. Cir. 2018) ..........................................................................43

*In re Rosuvastatin Calcium Pat. Lit.*,
703 F.3d 511 (Fed. Cir. 2012) ............................................................................40

*In re Stepan Co.*,
868 F.3d 1342 (Fed. Cir. 2017) ..........................................................................40

*Sonix Technology Co. Ltd. v. Publications International, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017) ...................................................................25, 31

*In re Spormann*,
363 F.2d 444 (CCPA 1966) .................................................................................34

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
18 F.4th 1377 (Fed. Cir. 2021) ...........................................................................51

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) ....................................................................51

*UltimatePointer, LLC v. Nintendo Co.*,
816 F.3d 816 (Fed. Cir. 2016) ......................................................................19

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
837 F.2d 1044 (Fed. Cir. 1988) ....................................................................54

*United States v. Aramony*,
166 F.3d 655 (4th Cir. 1999) ........................................................................28

*Wang Laboratories, Inc. v. America Online, Inc.*,
197 F.3d 1377 (Fed. Cir. 1999) ....................................................................26

**Statutes**

28 U.S.C. § 1295(a)(4)(C) ...............................................................................4

35 U.S.C. § 103 ...................................................................................33, 46

35 U.S.C. § 145 .................................................................................*passim*

## RULE 47.5 STATEMENT OF RELATED CASES

An appeal from the same civil action was previously before this Court, *ImmunoGen, Inc. v. Katherine K. Vidal, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*, No. 2021-1939. A panel comprising Judges Newman, Clevenger, and Stoll issued an opinion on March 25, 2022, which was not reported in the Federal Reporter, but can be found at 2022 WL 885774 (Fed. Cir. Mar. 25, 2022). The mandate issued on August 2, 2022.

U.S. Patent Application No. 17/150,379 (the '379 application) may be directly affected by a decision in this appeal. There are no other cases that may directly affect or be directly affected by this Court's decision in this appeal.

## INTRODUCTION

ImmunoGen invented a promising new treatment for ovarian and peritoneal cancer, mirvetuximab soravtansine (IMGN853). IMGN853 belongs to a class of pharmaceutical known as antibody drug conjugates (ADCs), which link anticancer agents with antibodies. The antibody portion of the ADC targets and binds to cancer cells, after which, the ADC releases its toxic payload. Thus, unlike traditional small-molecule chemotherapies, ADCs can target specific cancer cells and spare healthy, non-cancerous tissue.

During confidential clinical trials, ImmunoGen discovered that IMGN853 can cause severe ocular toxicity in humans, which threatened to end further testing. But the inventors of the ’809 application analyzed confidential clinical data to find, surprisingly, that IMGN853’s efficacy did not correlate with ocular toxicity. From this discovery, the inventors devised a novel dosing regimen for IMGN853, using a specific formula for the patient’s adjusted ideal body weight (AIBW), and determined that precisely 6 milligrams of IMGN853 per kilogram of the patient’s AIBW limited the severity of ocular side effects while also being therapeutically effective. It is this dose and this dosing regimen that is claimed in the ’809 application.

During prosecution, the Patent Trial and Appeal Board found the claims obvious based on combinations of at least six references—many unrelated to

ADCs and one that was not prior art. ImmunoGen brought suit in district court to correct those errors. Rather than defend the Board's decision, the Office abandoned its original grounds of unpatentability. For the first time, the Office argued that the claims are obvious[1] based on a new prior-art combination and that the claim term "AIBW" is indefinite. The Office sought summary judgment on these new theories, which the district court granted. This Court reversed and remanded. In petitioning for rehearing of that decision, the Office clarified that its decision to reject ImmunoGen's application was motivated by more than a simple review of the merits of the patent claims. The Office articulated a policy that ImmunoGen should not "be able to obtain additional patents [beyond those on the ADC itself], with additional term, based on the unpredictability in the art." Petition for Rehearing, *ImmunoGen Inc. v. Vidal*, No. 21-1939, at 9 (Fed. Cir. July 11, 2022) (PTO Pet.).

On remand, after a bench trial, the district court again found in favor of the Office on all grounds. As to indefiniteness, the district court concluded that the term "adjusted ideal body weight" was indefinite, even though: (1) both sides' experts agreed that the formula for AIBW is drug and application specific; (2) the

---

[1] The Office also argued that the claims are unpatentable for obviousness-type double patenting, but all parties agree that the double patenting issue rises and falls with obviousness, so this brief will not discuss it separately. Appx7 (n.106).

precise formula for dosing IMGN853 based on AIBW is provided in the specification; and (3) the applicant, an oncologist, the examiner, and the Board all understood the claim term AIBW to refer to that exact formula. The district court came to this conclusion without addressing the applicant's statements at trial, which all refer to the formula in the '809 application as the *only* formula for AIBW dosing of IMGN853 to treat ovarian and peritoneal cancer.

As to obviousness, the district court concluded that it would have been obvious for those in the art: (1) to use AIBW to dose IMGN853, even though using a patient's AIBW for dosing an ADC was unprecedented; (2) to use a specific formula for AIBW to perform that dosing, even though there are numerous potential formulas, only one will work, and both sides' experts agreed it was not obvious; (3) to solve a previously unknown problem with IMGN853, namely ocular toxicity in humans; (4) to dose IMGN853 at precisely 6 mg/kg AIBW, even though that dose was not in the prior art; (5) to do so in the unpredictable field of ADCs, where safe and effective doses are rarely found; and (6) despite strong objective indicia that AIBW dosing for IMGN853 was nonobviousness, like unexpected results.

The district court arrived at these conclusions, based largely on undisputed facts. As a matter of law, neither determination of unpatentability can be sustained.

## JURISDICTIONAL STATEMENT

ImmunoGen brought suit against the Director of the U.S. Patent and Trademark Office under 35 U.S.C. § 145. The district court issued findings of fact and conclusions of law and entered final judgment against ImmunoGen. ImmunoGen timely appealed. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(C).

## STATEMENT OF THE ISSUES

1. Whether the district court erred in finding the claim term "AIBW" is indefinite because the claims themselves do not define AIBW, where the application's specification, the prosecution history, statements made by the Office, and all the expert testimony demonstrate that AIBW for dosing IMGN853 to treat ovarian and peritoneal cancer is calculated using a precise formula provided in the specification.

2. Whether the district court erred in finding the claims of the '809 application obvious in a highly unpredictable field, where the claimed dose and dosing method had never been used before with any ADC and a skilled artisan would not have been aware of the problem that the '809 application solves.

## STATEMENT OF THE CASE

### A. Background

IMGN853 is an FDA-approved treatment for platinum-resistant ovarian and peritoneal cancer.[2] *See* Appx23 (n.54). That was not always the case.

#### 1. The ocular toxicity problem with IMGN853

At the time of filing of the '809 application, it was unknown that IMGN853 caused ocular toxicity in humans. On the contrary, the Lutz '282 reference strongly suggested this would not be a problem. Appx13078 (93:1–5) (Lutz); Appx5937–6026 ([0393–95], Table 4) (Lutz '282). Specifically, it was known that DM4—which later would be used as IMGN853's toxic payload—could cause toxicities in humans when it was attached to an antibody using an uncharged linker between the two. Appx13091–13092 (106:20–107:2) (Lutz). However, Lutz '282 sought to solve this problem by creating IMGN853 with a charged linker between the DM4 payload and antibody. *Id.* When administered in doses of 4–10 milligrams per kilogram of total body weight (TBW) during preclinical rabbit studies, IMGN853—with this charged linker—showed no ocular toxicity. Appx13079–13080 (94:16–95:15) (Lutz); *see also* Appx12178 (¶ 55). As a result, skilled artisans would have expected that the ocular toxicity associated with DM4 had

[2] "Platinum-resistant" ovarian cancer is a challenging cancer that initially responds to drugs containing platinum but then returns. Appx13065 (80:15–24) (Ponte).

been resolved. Appx13150–13153 (165:22–166:3, 167:22–168:9) (Tolcher); Appx13076–13077 (91:19–92:3) (Lutz). Lutz '282 does not discuss adjusting the dosing regimen—e.g., administering a dose based on something other than the patient's total body weight—to reduce ocular toxicity. Appx13185–13186 (200:13–201:3) (Tolcher).

It was not until the confidential Phase I study in humans that ImmunoGen unexpectedly discovered that the same doses of IMGN853 used in Lutz '282 resulted in Grade 3[3] and higher ocular toxicity. Appx13151 (166:13–25) (Tolcher). These patients received a dose of 7 mg/kg of the patient's TBW—which was then the standard dosing method. Appx13081–13082 (96:8–17, 97:5–18) (Tolcher); Appx13104 (119:9–20) (O'Malley); Appx12175 (¶ 19). ImmunoGen immediately lowered the dose, a measure that threatened the program out of concern that the dose would be too low to be effective. Appx13107–13108 (122:24–123:9) (O'Malley); Appx13623 (177:23–24) (Shah).

Had ImmunoGen stopped there, IMGN853 would have encountered the same fate as the vast majority of other ADCs: abandonment because not enough of the drug can be administered to treat cancer without causing intolerable side

[3] Grade 3 events range from significantly blurred vision to total blindness, rendering patients unable to perform daily activities. Appx13145 (160:12–15) (Tolcher).

effects. *See* Appx13107–13108 (122:20–123:9) (O'Malley); Appx13135 (150:7–12). But ImmunoGen continued and tasked two of its scientists—the inventors, Drs. Ponte and Lutz—with finding a solution. Appx13671–13672 (¶ 9); *see also* Appx13041 (56:11–21) (Ponte); Appx13047–13048 (62:20–63:2).

#### 2. ImmunoGen's dosing solution

While analyzing the Phase I data, the inventors discovered an unexpected correlation between early exposure to IMGN853—within 0–24 hours of administration—and ocular toxicity. Appx13039–13040 (54:15–56:1, 55:15–20) (Ponte). They also discovered that overall exposure to the drug (i.e., the exposure that accounts for efficacy) did not correlate with ocular toxicity. Appx13083–13084 (98:24–99:20) (Lutz). This was surprising because for most drugs, including ADCs, efficacy and toxicity are directly correlated: the more effective the dose, the more toxic. Appx13042 (57:9–12) (Ponte); Appx13356 (127:5–12) (Shah). This result was also unexpectedly consistent across the entire patient population. Appx579 ([00199]). Based on the normal variation in individuals, one would have expected to see a range of early exposure levels at which ocular toxicity occurred. *See* Appx13042 (57:9–12) (Ponte); Appx13356 (127:5–12) (Shah). But that is not what they observed.

Armed with these insights, the inventors sought to adjust early exposure levels to stay below the ocular toxicity threshold. Appx13045–13046 (60:2–61:8)

(Ponte). The approach the inventors took next was not routine. They looked outside the field of ADCs to nutritional literature for ways to adjust early drug exposure. Appx13086–13087 (101:14–102:3) (Lutz); Appx13151 (166:25–167:17) (Tolcher). They then modeled a series of dosing equations based on TBW, lean body weight, ideal body weight, body surface area, and AIBW. Appx13045–13046 (60:18–61:8) (Ponte); Appx13062–13064 (77:14–79:21); Appx13086–13087 (101:14–102:3) (Lutz). Based on this modeling, the inventors identified a specific formula for AIBW—the one recited in the '809 application—as most likely to keep overall exposure at therapeutically effective levels, while ensuring that early exposure fell below the toxicity threshold. Appx13047–13054 (62:20–63:2, 63:3–66:8, 69:2–5) (Ponte); Appx5420–5424, Appx5433. Specifically, the inventors determined that the dose to achieve both goals was 6 milligrams of IMGN853 per kilogram of the patient's AIBW—where AIBW is calculated as the patient's ideal body weight (IBW) plus 0.4 times their total (actual) body weight (TBW) minus their ideal body weight, or:

$$AIBW = IBW + 0.4(TBW - IBW).$$

Appx13039 (54:15–18) (Ponte); Appx13063–13064 (78:24–79:11) (Ponte); Appx13090 (105:7–21) (Lutz); Appx13345 (116:2–12) (Shah). The patient's ideal body weight in this formula is calculated, for males, as 0.9 times their height in centimeters minus 88 and, for females, as 0.9 times their height minus 92, or:

IBW = 0.9H – 88 (males), = 0.9H – 92 (females).

Appx13090 (105:7–21) (Lutz); Appx13345 (116:2–12) (Shah). The "0.4" is a specific correction factor for IMGN853 when used to treat ovarian and peritoneal cancer; a different correction factor would affect safety and efficacy. *See* Appx13346 (117:10–14) (Shah); Appx13546 (100:11–14) (Figg).

### 3. Clinical trials following the switch to AIBW dosing

ImmunoGen then tested 6 mg/kg AIBW in humans, even though AIBW had never been used for an ADC, was not recommended for cancer treatments, and, to the extent it had been used, was generally restricted to dosing obese patients with small molecule drugs—which have different mechanisms of action and distribution characteristics in the body. Appx13065 (80:6–9) (Ponte); Appx13109–13110 (124:16–125:12) (O'Malley); Appx13138–13139 (153:23–154:7) (Tolcher); Appx14538–14542. Given the failure of so many ADCs, there remained uncertainty whether a therapeutic window would be found for IMGN853. Appx13038 (53:4–16) (Ponte); Appx13116 (131:3–17) (O'Malley); Appx13365–13366 (136:1–2, 137:8–16) (Shah). In particular, the mechanism by which ocular toxicity occurs is not understood to this day, making any solution to it unpredictable. Appx13557 (111:7–9) (Figg). And prior attempts to address ocular side effects using corticosteroids, lubricating eye drops, and cooling pads were

only palliative and inadequate. *See* Appx13043 (58:4–8) (Ponte); Appx13122–13123 (137:25–138:8) (O'Malley).

Yet switching to a dose of 6 mg/kg AIBW worked, resulting in no further Grade 3 or higher adverse ocular events during the revised Phase I tests, while providing enough of the drug to be therapeutically effective. Appx13062–13063 (77:14–78:13) (Ponte). That dose is now approved by the FDA.

#### 4. Recognition in the field of AIBW dosing

Following the switch to AIBW dosing, IMGN853 was praised by oncologists, industry analysts, a competitor, and the Office's own expert as a promising therapy for ovarian cancer—and particularly platinum-resistant ovarian cancer—for which there is a dire need. Appx13187–13188 (202:8–14, 203:10–25) (Tolcher); Appx12175 (¶ 24); Appx14853–14868; Appx14869–14878.

Another ADC developer, Sutro Biopharma Inc., has followed ImmunoGen's example by dosing its own ADC for treating ovarian cancer (STRO-002) using AIBW. Appx13194–13195 (209:8–210:15) (Tolcher); Appx14710–14720. Sutro has praised IMGN853 as a promising treatment and repeatedly cited ImmunoGen's work that discusses AIBW dosing as mitigating ocular toxicity. Appx13194 (209:11–19) (Tolcher).

### B. Original Examination

ImmunoGen filed the ’809 application, seeking claims on this dose.[4] During examination, the claims were rejected based on anticipation and obviousness. Appx6834–6836. ImmunoGen appealed the examiner’s rejections to the Board.

With respect to anticipation, the examiner argued that ImmunoGen’s prior patents disclosing the composition of IMGN853 and its potential use for treating cancer in doses based on TBW inherently anticipated the claimed dose of 6 mg/kg AIBW. On appeal to the Board, the examiner argued that “there is a species within the dose range in the reference that reads on appellant’s dose.” Appx6842. The Board rejected the examiner’s inherency argument, explaining that ranges in the prior art based on a patient’s TBW do not inherently disclose the claimed dose based on AIBW, even if there is some possibility for overlap. *Id.* Specifically, the Board held that, while the asserted prior art reference “may teach a [total body weight] dosage that might fall within the scope of [ImmunoGen’s] AIBW dosage,” that is not invariably true and thus the claimed dose is not inherent. *Id.*

The Board nevertheless affirmed obviousness based on ImmunoGen’s own patents and four references unrelated to ADCs. Appx6846–6854. The Board did

---

[4] There is no dispute that the claimed immunoconjugate corresponds to IMGN853—as defined by the claimed “SEQ ID Nos.” Appx10; Appx12175 (¶ 18) (“IMGN853 is an embodiment of the recited immunoconjugates”). The claim term “immunoconjugate” is synonymous with ADC.

not address ImmunoGen's evidence of unexpected results. *See, e.g.*, Appx5415–5416; Appx5435–5443; Appx6232–6236.

At no point were the claims rejected for indefiniteness. The examiner, the Board, the applicant, and an oncologist all understood that the AIBW formula for dosing IMGN853 at 6 mg/kg AIBW is the one provided in the specification: AIBW = IBW + 0.4(TBW – IBW). Appx13347–13349 (118:11–120:16) (Shah); Appx5089–5117, Appx6232–6236, Appx6631, Appx6709.

### C. The Section 145 Action

ImmunoGen sought review of the Board's decision in district court.[5] Rather than defend the Board's decision, the Office raised obviousness grounds based on different art[6] and raised, for the first time, the argument that the term "AIBW" was indefinite. The district court granted summary judgment against ImmunoGen, finding the claims indefinite and obvious. Appx10774–10811. ImmunoGen appealed, and this Court vacated and remanded, holding that the district court improperly resolved numerous factual findings against ImmunoGen. *ImmunoGen, Inc. v. Hirshfeld*, 2022 WL 885774, at *3–*4 (Fed. Cir. Mar. 25, 2022).

---

[5] The claims at issue were 242, 252–255, 258–265, 300, 317–325, 329, 330, and 354. Appx12175 (¶ 17).

[6] In district court, the Office added the 2013 American Society of Clinical Oncology (ASCO) abstract and dropped Narain in its obviousness combinations. *See* Appx13713 (¶ 28); Appx10539 (n.2).

As to indefiniteness, this Court cited evidence that (1) the ’809 application does not identify any other formulas for AIBW and IBW other than those in the definitions section and Example 4; (2) the claims and specification of the ’809 application were directed to a specific dosing regimen specifically for IMGN853; (3) Example 4 describes dosing IMGN853 in accordance with the claimed method; and (4) the Office never disputed definiteness during prosecution. *Id.* at *2–*3. Regarding obviousness, this Court cited evidence that “(1) ocular toxicity is not well-understood; (2) [ADCs] have unique pharmacokinetic characteristics, making it difficult to generalize pharmacological effects; (3) it was not known that [IMGN853] would cause ocular toxicity; … (4) published results for Phase 1 testing of [IMGN853] reported no study drug-related serious adverse events or dose-limiting toxicity”; (5) determining a safe and effective dose for ADCs is difficult; and (6) the switch to AIBW dosing reduced ocular adverse events in ImmunoGen’s clinical trials. *Id.* at *4.

In short, this Court found that there were issues with the district court’s conclusions that the ’809 application is indefinite, “that the prior art taught every element of the pending claims,” and that “a skilled artisan would have been motivated to use AIBW dosing to address the ocular toxicity problems” associated with IMGN853 with a reasonable expectation of success. *Id.* at *3–*4. This Court directed the district court to conduct proceedings addressing these issues. *Id.* at *4.

After this Court issued its opinion, the Office filed a petition for rehearing, revealing its motivation for rejecting the ’809 application: to prevent pharmaceutical companies from receiving follow-on patents. While the Office noted that it only sought “rehearing sparingly,” it argued that this Court’s opinion “impacts the [Office’s] mission … to ensure our patent laws are not misused to delay getting generic, biosimilar, and more affordable versions of drugs into the hands of Americans.” PTO Pet. 1–2. The Office maintained that ImmunoGen should “not be able to obtain additional patents, with additional term, based on the unpredictability in the art.” *Id.* at 9. That is so, the Office reasoned, because “a skilled artisan in ImmunoGen’s shoes—having a promising anti-cancer drug—would continue experimenting to find a workable dose so that it could bring its drug to market.” *Id*. This Court denied the petition.

**D. Trial**

At the bench trial, the district court focused heavily on the fact that ImmunoGen already had patents on IMGN853. For example, when ImmunoGen stated that the problem of ocular toxicity in humans was unknown—and so the solution to that unknown problem is less likely to be obvious—the district court stated that ImmunoGen should not “get credit” for discovering the problem to be solved. Appx46. Specifically, the district court called it “odd” if a company has “a drug that you got a patent for [and] then in your testing, which only you can do

because you have a patent on the drug, you would get credit for all those things you found, including, if you found a problem, the solution to that problem." Appx13554 (108:12–19).

Subsequently, the district court found the '809 application to be indefinite and obvious. Appx66–67. Regarding indefiniteness, rather than consider the facts that this Court highlighted in its decision, the district court largely based its analysis on the fact that "*not one* of the claims in the '809 patent Application define AIBW." Appx29, Appx35 (emphasis original).

As for obviousness, the district court found there was a motivation to combine prior art. Specifically, the court concluded that (1) a skilled artisan "would monitor for ocular toxicity when conducting clinical trials for IMGN853," and (2) after discovering it, "would then experiment with changing the dose," and (3) would then "often start with 0.4 [correction factor] when experimenting with AIBW dosing," and (4) would then arrive at 6 mg/kg AIBW "based on routine experimentation" even though 6 mg/kg AIBW is not in the prior art. Appx43, Appx47–48. The court concluded that this experimentation to find the problem and solution would be done, in part, because "that is precisely what ImmunoGen did." Appx47. The court concluded that there would be a reasonable expectation of success in combining the prior art largely because, if ImmunoGen's arguments that the fields of ocular toxicity and ADCs are unpredictable were adopted, "*any* dosing

regimen would be patentable." Appx54 (emphasis original). Finally, the court found none of ImmunoGen's secondary indicia to be persuasive. Appx56–65.

### E. The '379 Continuation

While not believing it necessary, and in response to the Office's suggestions during summary judgment, ImmunoGen filed a continuation application to pursue claims that expressly include the formula for calculating AIBW provided in the specification. Appx13803–13810. That continuation has since been rejected by the Office on the basis of "res judicata," citing the district court's obviousness ruling. Appx13811–13848. Thus, the Office is giving the district court's obviousness findings preclusive effect.

## SUMMARY OF THE ARGUMENT

ImmunoGen's patent application claims a precise dose for its drug. Only 6 milligrams of IMGN853 per kilogram of the patient's adjusted ideal body weight—using the specific, disclosed formula for AIBW—will both treat platinum-resistant ovarian and peritoneal cancer and significantly reduce ocular toxicity in the patient population. The district court's decision holding that the '809 application was indefinite and obvious hinged on multiple legal errors.

In finding the term "AIBW" indefinite, the district court improperly required that the application define AIBW "in its claims." Appx12, Appx29, Appx35. Compounding that legal error, the district court then ignored or rejected intrinsic

evidence that this Court has already indicated is relevant to the indefiniteness analysis. *See Hirshfeld*, 2022 WL 885774, at *3. The district court ignored the fact that "the claims and specification are drawn to a specific dosing regimen for a specific" ADC, IMGN853. *Id.* It ignored the uniform expert testimony that the AIBW formula is drug-specific and the only one that would work. And the district court specifically held that it was irrelevant that the Office had no problem understanding the claim term during prosecution, even though AIBW was the focus of the obviousness analysis before the Board. This was error. The intrinsic and extrinsic evidence demonstrates that a skilled artisan would understand that AIBW in the claims meant the one and only formula that was used repeatedly in the specification and the only one shown to reduce ocular toxicity in patients.

The district court also made repeated legal errors in holding that the precise dose of IMGN853 in the claims to solve the ocular toxicity problem was obvious. This was despite the undisputed facts that: it was unknown that IMGN853 caused ocular toxicity in humans; skilled artisans thought that any toxicity issue had been "solved" due to a charged linker in the ADC (thanks to the Office's own primary obviousness reference); the public did not have the pharmacokinetic data needed to devise a therapeutic dose without side-effects; AIBW dosing had never been used with any ADC before, much less IMGN853; 6 mg/kg AIBW was not in the prior art; the fields of ADCs and ocular toxicity are highly unpredictable; and the

Office's own expert admitted that the AIBW formula used by the inventors was not obvious.

The district court held that the claims are obvious by repeatedly asserting that skilled artisans would experiment to find all of that. In other words, the district court held that the experimentation that the inventors did would lead to the experimental findings that the inventors made. Appx43, Appx47–48. That is not obviousness; it is a tautology. Worse, even though the field is highly unpredictable, the district court held that there was a reasonable expectation that skilled artisans could experiment in the field. Appx54. But the law requires that there be a reasonable expectation of making the claimed invention, not a reasonable expectation that one could perform experiments.

Ultimately, the district court's reasoning boiled down to its belief—encouraged by the Office—that, if this patent were granted, "*any* dosing regimen would be patentable." *Id.* (emphasis original). That reasoning is wrong, but it is also misguided. The district court was not permitted to ignore binding precedent out of a generalized concern that pharmaceutical companies might obtain multiple patents relating to a drug.

# ARGUMENT

## I. STANDARD OF REVIEW

This Court reviews *de novo* the determination of indefiniteness. *UltimatePointer, LLC v. Nintendo Co*., 816 F.3d 816, 826 (Fed. Cir. 2016). Underlying factual findings based on extrinsic evidence, however, are reviewed for clear error, and "[d]eterminations … about intrinsic evidence are reviewed *de novo*." *BASF Corp. v. Johnson Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). Obviousness is a question of law, which this Court reviews *de novo*, with underlying factual questions reviewed for clear error. *Alcon Research, Ltd. v. Apotex Inc*., 687 F.3d 1362, 1365 (Fed. Cir. 2012).

## II. THE CLAIMS OF THE '809 APPLICATION ARE NOT INDEFINITE.

In addressing the indefiniteness of the term "AIBW," this Court previously held that there was "intrinsic evidence a skilled artisan would consider in determining the scope of the claims," including that:

> "(1) the claims and specification are drawn to a specific dosing regimen for a specific [ADC], which is significant in light of expert testimony that the correction factor used to calculate AIBW is drug-specific;
>
> (2) Example 4 describes dosing [IMGN853] in accordance with the claimed method and uses the same AIBW and IBW formulas disclosed in the definitions section; and
>
> (3) during the prosecution of the '809 Application, the [Office] never disputed the definiteness, or gave any indication it failed to understand the meaning, of the now-allegedly indefinite term."

*Hirshfeld*, 2022 WL 885774, at *3. The district court either ignored or rejected this Court's guidance. Instead, the district court concluded that the term "AIBW" is indefinite, based largely on the fact that "*not one* of the claims in the '809 [a]pplication define AIBW or inform how to calculate a patient's AIBW"—a point the district court made repeatedly. Appx12, Appx29, Appx35 (emphasis original). That was error.

### A. The district court erroneously required the claims to define "AIBW."

The district court held that "the '809 [a]pplication is fatally indefinite because it fails to define AIBW or IBW anywhere in its claims." Appx35.[7] But it is improper to focus on the "[c]laim language, standing alone." *Nature Simulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1364 (Fed. Cir. 2022). Rather, the claims must be viewed from the perspective of a skilled artisan, in light of the specification and prosecution history. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 908 (2014).

*Nature Simulation*, 50 F.4th at 1364–68, is instructive. In that case, the district court held that there were "unanswered questions" about what was meant

[7] The district court also cited to the testimony of Dr. Figg in support. But Dr. Figg made the same error. *See* Appx29 (Dr. Figg "remained 'confused over how to calculate' AIBW because *the claims* do not provide a definition.") (emphasis added).

by the claim term “modified Watson method.” *Id.* at 1362, 1364. The district court found the claim indefinite, repeatedly noting that the definition of the term was “not contained in the claim language.” *Id.* at 1365–66. The district court also “gave no weight to the prosecution history.” *Id.* at 1367, 1371. This Court reversed, holding the district court “applied an incorrect standard” and “flawed analysis.” *Id.* at 1363. This Court then looked to the specification and prosecution history to find the term definite. *Id.*

Here, in concluding that the claims were indefinite, the district court likewise faulted the ’809 application for not defining the AIBW formula in the claims themselves and gave little regard to the specification and prosecution history. But the specification, prosecution history, and extrinsic evidence would clearly inform a skilled artisan that there is precisely one definition of AIBW that will work for IMGN853 to treat ovarian and peritoneal cancer while minimizing ocular toxicity: the formula in Example 4.

### B. The claims and specification—including Example 4—are drawn to a specific dosing regimen for a specific ADC.

In this case, “the claims and specification are drawn to a specific dosing regimen for a specific” ADC, IMGN853. *Hirshfeld*, 2022 WL 885774, at *3. That “is significant” because the experts uniformly agree that the correction factor used to calculate AIBW is drug and application specific. *Id.*; Appx13545 (99:10–12) (Figg).

The ’809 application specifies the AIBW formula in two locations: (1) in a definitions section, which introduces the terms IBW and AIBW and discusses them as broad concepts (Appx6765 ([0069]), Appx6766 ([0071])); and (2) in Example 4, which describes dosing IMGN853 at 6 mg/kg AIBW to both treat cancer and minimize adverse ocular events, as recited in the claims (Appx6800 ([00200])). In both locations, the application defines AIBW as IBW + 0.4 (TBW – IBW). Appx6766 ([0071]), Appx6800 ([00200]). Similarly, the application lists only one definition for IBW. Appx6765 ([0069]); Appx6800 ([00200]). Both sides’ experts agree that the correction factor of “0.4” is also the only AIBW correction factor recited in the application. Appx13345 (116:2–12) (Shah); Appx6574; Appx13545 (99:17–24) (Figg); *see also Hirshfeld*, 2022 WL 885774, at *2 (“The ‘0.4’ value in the AIBW formula is a specific correction factor for mirvetuximab, and is the only one presented in the ’809 [a]pplication.”). Thus, the ’809 application discloses exactly one formula to calculate a patient’s AIBW to obtain the appropriate dose of IMGN853 for the purpose of treating ovarian and peritoneal cancer. *See* Appx544–545, Appx579–580; Appx6749–6830; *see also* Appx13545 (99:10–12) (Figg); *Hirshfeld*, 2022 WL 885774, at *2 (“The ’809 Application does not identify any other formulas for calculating AIBW or IBW”).

Any other formula for AIBW would not work. As both parties’ experts agreed, the correction factor is drug-specific and can only be determined using

clinical data. Appx13346 (117:10–18) (Shah); *see also* Appx13546 (100:11–14) (Figg). And, the formula disclosed in the application, which uses a correction factor of 0.4, is the only AIBW formula that actually resulted in an effective dose of IMGN853 that minimized ocular toxicity. Appx13063–13064 (78:24–79:11) (Ponte); Appx13347 (118:3–7) (Shah).

In Example 4, the application further explains the invention underlying the AIBW dosing method and the pharmacokinetic analysis that led to the claimed dose of 6 mg/kg AIBW of IMGN853. Appx13152–13154 (167:2–17, 168:10–169:12) (Tolcher); Appx6800–6803 ([00198]–[00205], Table 2); *see also* *Hirshfeld*, 2022 WL 885774, at *3 ("Example 4 describes dosing mirvetuximab in accordance with the claimed method and uses the same AIBW and IBW formulas disclosed in the definitions section"). In particular, it explains why 6 mg/kg AIBW of IMGN853 effectively treats cancer while minimizing ocular toxicity—namely by perfectly minimizing early exposure to the drug while keeping overall exposure high. Appx13152–13154 (167:2–17, 168:10–169:12) (Tolcher); Appx6800–6803 ([00198]–[00205], Table 2).

Given all of this, a skilled artisan would know exactly which formula for AIBW applies in the claims. But the district court ignored or rejected this undisputed evidence—which was previously cited by this Court—instead requiring that the claims themselves define AIBW. *See supra* § II.A. Specifically, the district

court first held that the specification's use of "for example" and "optionally" in the definitions section "leav[es] a POSA to guess whether the formula provided is the only one covered by the '809 Application." Appx29–31. The district court then held that Example 4 was irrelevant to the question of indefiniteness because "the '809 [a]pplication contains no words expressly limiting its scope to Example 4." Appx33. Indeed, the district court presumed that the claims were indefinite before even considering Example 4. *Id.* (stating "otherwise indefinite claims of the '809 [a]pplication should not be limited by the formulas provided in Example 4."). Both holdings are error.

*First*, the definitions section provides the same formulas for IBW and AIBW as elsewhere in the '809 application, including Example 4. Appx544–555 ([0071]). And the phrases "for example" and "optionally" in relation to AIBW appear *only* in the section of the '809 application that introduces the general concepts of AIBW and IBW—which was necessary because these concepts had never before been used in dosing an ADC. Appx6759 ([0040]) ("To facilitate an understanding of the present invention, a number of terms and phrases are defined below."). Therefore, the use of "for example" in this one portion of the specification does not mean the claims are indefinite. And contrary to the district court's assertion (at Appx30–31), *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364 (Fed. Cir. 2014), does not compel a different conclusion. In *Interval*, this Court declined to "cull out a single

'e.g.' phrase from a lengthy written description to serve as the exclusive definition" of a term. 766 F.3d at 1373. But that is not the case here. Example 4 recites the AIBW formula to be applied when dosing IMGN853 as claimed, and its justification is described in detail. Appx6800 ([00200]). And the same AIBW formula is recited in the definitional section; there is nothing "singular" about its disclosure.

*Second*, the district court's dismissal of Example 4 out of a generalized concern that the application should not be limited to a single embodiment also misses the point. Example 4 is relevant to assessing the scope of AIBW in the context of the claims because it describes in detail the claimed embodiment. *See Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1466 (Fed. Cir. 1998) ("Although claims are not necessarily restricted in scope to what is shown in a preferred embodiment, neither are the specifics of the preferred embodiment irrelevant to the correct meaning of claim limitations."). For example, in *Sonix Technology Co. Ltd. v. Publications International, Ltd.,* this Court upheld as definite claims reciting the term "visually negligible," reasoning that the specification "provide[s] guidance on how to create visually-negligible indicators, and *specific examples* that provide points of comparison for the result." 844 F.3d 1370 at 1379 (emphasis added). Likewise, in *Enzo Biochem, Inc. v. Applera Corp.,* this Court held that, where the written description included examples of structures

and described procedures for selecting them, this gave adequate guidance to a skilled artisan. 599 F.3d 1325, 1332–36 (Fed. Cir. 2010).

The district court erred (at Appx31) in holding that *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.* required that it ignore Example 4. There, this Court held that the term “molecular weight” was indefinite because the patent provided “no guidance” on which measurement was to be used to determine “molecular weight.” 789 F.3d 1335, 1341–42 (Fed. Cir. 2015). Critically, the patent in *Teva* did not disclose *any* method of calculating “molecular weight.” The Court observed that “[a]ll parties agree[d] that the term ‘molecular weight’ or ‘average molecular weight’ … could refer to any of the three weight measures Mp, Mn, or Mw” and “[n]owhere in the specification are the terms Mp, Mw, or Mn used.” *Teva*, 789 F.3d at 1341. That is by no means the case here, as both Example 4 and the definition section uniformly recite the same formulas for IBW and AIBW.

In contrast, the facts here are like those in *Wang Laboratories, Inc. v. America Online, Inc.*, in which this Court construed the term “frame” as limited to frames of data generated using a character-based protocol. 197 F.3d 1377, 1381 (Fed. Cir. 1999). The claims did not expressly recite using a character-based protocol. And the background of the specification referred to other known protocols, along with the transition phrase “for example.” *Id.* However, this Court considered the fact that using character-based protocol was the only embodiment in

the specification. *Id.* at 1383. This Court also considered expert testimony on whether those in the art would limit the term to character-based protocol frames. *Id.* at 1381. The Court also considered the prosecution history and observed that "[t]his history reinforces the conclusions that the inventors focused their invention, and the description and claims directed to that invention, on a character-based system, and that a person of skill in this field reading this history would so understand." *Id.* at 1384. The same is true here. All of the intrinsic evidence is focused on one formula for AIBW that is used in the claims for a very specific purpose. *See also Abbott Lab'ys v. Sandoz, Inc.*, 566 F.3d 1282, 1289–91 (Fed. Cir. 2009) (limiting a claim term to the "only embodiment").

*Finally*, the district court gave great weight to the Green article (Appx4523–4537), which is incorporated by reference in the '809 application. The district court concluded that Green "provides multiple ways to calculate IBW and multiple correction factors that may be used for AIBW," which left skilled artisans unclear as to which equation to use in the claims. Appx30–31. But this Court already considered and dismissed this proposition, noting that "Green discloses several methods for calculating IBW and lists correction factors, *each specific to a different drug*, that can be used to adjust IBW to AIBW." *Hirshfeld*, 2022 WL 885774, at *2 (emphasis added). Far from demonstrating indefiniteness, Green supports the proposition that there is only one AIBW formula for any given drug

and application because each correction factor is drug and application specific. *See* Appx13469 (23:4–11) (Figg). A skilled artisan would understand that, for IMGN853, it is the formula found in Example 4.

### C. The district court rejected this Court's guidance about the role of the prosecution history.

It is undisputed that, during examination, "neither the examiner nor the Board rejected the claims of the '809 [a]pplication for indefiniteness." *Hirshfeld*, 2022 WL 885774, at *2. Despite this Court's clear guidance that this fact should be considered in an indefiniteness analysis, the district court decided that it would not. Specifically, the district court declined to consider the fact that neither the examiner nor Board had any confusion over the term during prosecution because that argument would "foreclose" the Office from "raising new grounds" in a § 145 action. Appx34.

As an initial matter, this holding is inconsistent with the letter and "the spirit of [this Court's] mandate." *Omega Patents LLC v. CalAmp Corp.*, 13 F.4th 1361, 1375 (Fed. Cir. 2021). Under the law of the case, the district court should have at least considered the fact that the Office never raised questions of definiteness during examination. *See also United States v. Aramony*, 166 F.3d 655, 661 (4th Cir. 1999).

This Court's decision in *Omega* is illustrative. There, in the initial appeal, this Court remanded for a new trial for the parties to present evidence on

compensatory damages. *Omega*, 13 F.4th at 1367. But during the second trial, the district court precluded a party's damages expert from testifying at all. *See id.* at 1374. This Court held, in the second appeal, that the trial court's prohibition on damages expert testimony defied the law of the case because this Court's "instruction … implied that the district court was 'to consider damages consistent with the principles set forth in the opinion.'" *Id.* Here too, the district court ignored this Court's mandate and refused to consider on remand the significance of the Office's initial acquiescence to the definiteness of AIBW.

Moreover, the district court's rationale for why it should disregard the Office's lack of confusion around the term AIBW during prosecution makes no sense. The Office may, of course, raise new grounds in a § 145 action. *See Hyatt v. Hirshfeld*, 998 F.3d 1347, 1363 (Fed. Cir. 2021). But that does not erase everything that happened prior. Rather, "the court must still consider the administrative record in making its fact findings." *Hyatt v. Kappos*, 625 F.3d 1320, 1336 (Fed. Cir. 2010). Here, that record demonstrates that no one had confusion over the term.

Specifically, the applicant, an oncologist, the examiner, and the Board all understood that AIBW—when used in the claims—means the precise formula provided in the specification. *See In re Packard*, 751 F.3d 1307 at 1312 (the "developing prosecution history" is relevant to indefiniteness, even during examination).

1. Referencing the formula in Example 4, the applicant stated during examination: “As explained in the present specification, AIBW is calculated based on a patient’s actual weight, gender, and height.” Appx5102.

2. Dr. Birrer, a clinical oncologist, explained his understanding of AIBW. Dr. Birrer declared: “AIBW is calculated according to the following formulas: AIBW = IBW + 0.4 (Actual weight in kg – IBW) For a male: IBW = 0.9H–88 (H = height in cm) For a female: IBW = 0.9H–92 (H = height in cm).” Appx13348–13349 (119:11–120:3 (Shah)); Appx6232–6236.

3. The examiner applied the same formula when rejecting the claims. Appx6631. Specifically, seeking to support an inherency rejection based on “patients where the AIBW is the same as the TBW,” the examiner proposed a hypothetical specifying that: “Equations used in this calculation are from appellant’s Example 4.” *Id.*

4. On appeal, the Board made specific findings of fact that the applicant: “[D]efines ‘[t]he term “adjusted ideal body weight” (AIBW) or “adjusted body weight” (ADJ) … [as] a size descriptor that accounts for sex, total body weight, and height …. AIBW (ADJ) can be calculated, for example, using the formula ADJ = IBW + 0.4(weight in kg – IBW).” Appx6837.

At no point during examination was any other formula cited or uncertainty expressed, despite the term AIBW being the centerpiece of examination before the Office.

As this Court observed in *Sonix*, the prosecution history can be "compelling" evidence of definiteness. 844 F.3d at 1379. In that case, this Court found the prosecution history supported definiteness because "[n]o one involved in either the first or the second reexamination had any apparent difficulty in determining the scope of 'visually negligible.'" *Id.* The same is true here. It was only after entering litigation—and after ImmunoGen can no longer amend the claims—that the Office first asserted that it cannot understand the term.

### D. ImmunoGen's trial statements unmistakably define AIBW.

In addition to the statements during examination, ImmunoGen's statements at trial clearly and unmistakably indicate that the claims are limited to the formula in Example 4. *See Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017) ("[T]o invoke the doctrine of prosecution disclaimer … such statements must 'be both clear and unmistakable.'"). It was error for the district court to ignore them.

ImmunoGen disclaimed any AIBW formula, other than the one in Example 4. During opening statements, ImmunoGen stated that the formula for AIBW is "listed in the specification" and that "there's exactly only one formula for AIBW

that will work." Appx12992 (7:3–23). Both inventors pointed to the formula in Example 4 and stated it "was the only one that worked." Appx13047 (62:2–18) (Ponte); Appx13091 (106:3–12) (Lutz). Dr. Lutz testified the formula in Example 4 "became the definition of adjusted ideal body weight for IMGN853." Appx13090 (105:7–21). ImmunoGen's expert, Dr. Dhaval Shah, testified that "a POSA will understand, to achieve the therapeutic goal of [IMGN853], one needs to look at the Example 4 which provides a formula which shows how to calculate the dose of [IMGN853] to achieve the therapeutic goal." Appx13344 (115:6–13) (Shah).

ImmunoGen's statements at trial are now a part of the prosecution history and inform the meaning of the claims. *Cf. Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1361 (Fed. Cir. 2017) (prosecution history disclaimer applied to statements made in reissue and reexamination proceedings). Statements in a § 145 action are akin to those made during reexamination proceedings and should be "considered during claim construction, in keeping with the doctrine of prosecution disclaimer." *See Krippelz v. Ford Motor Co*., 667 F.3d 1261, 1266 (Fed. Cir. 2012); *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.,* 401 F.3d 1367, 1372, (Fed. Cir. 2005) (statements in reexamination used to hold claims not indefinite). In light of these statements, it is implausible that the public would not

have "clear notice" about the meaning of the claim term "AIBW." *Nautilus*, 572 U.S. at 909.

* * *

Finally, while ImmunoGen believes the current claims are definite, should the Court find any question of definiteness remains, the proper remedy is to remand to the Office to amend the '809 application claims to explicitly recite the AIBW formula. Because the Office first raised indefiniteness during this §145 action, ImmunoGen was unable to address it during prosecution. Remanding to the Office would be equitable and serve the interest of judicial economy.

## III. THE CLAIMS OF THE '809 APPLICATION ARE NOT OBVIOUS.

A fundamental legal error permeates the district court's decision. The district court repeatedly held that, if others had experimented, they would have discovered the toxicity problem and then the solution to that problem, if only they had been sufficiently motivated. Appx43–45, Appx47–49, Appx54. Adopting the Office's new policy against pharmaceutical companies obtaining follow-on patents, the district court concluded that others had not experimented merely "because ImmunoGen was the only one who stood to gain from experimenting with its already-patented IMGN853 drug." Appx46. That reasoning is error. "The question under § 103 … is not whether one skilled in the art doing what [applicant] did would have discovered what [applicant] discovered, but whether it would have

been obvious to one of ordinary skill in the art to do what the [applicant] did." *In re Oelrich,* 579 F.2d 86, 92 (CCPA 1978). It was not.

### A. There was no motivation to solve the problem of ocular toxicity because skilled artisans were not even aware of the problem.

It is undisputed that, when the '809 application was filed, skilled artisans did not know that IMGN853 caused ocular toxicity in humans. Appx12176 (¶ 27); Appx19. Lutz '282's tests in rabbits showed that the IMGN853—with its charged linker—did not cause any toxicity. Appx13076 (91:19–25) (Lutz); Appx13080 (95:12–15) (Lutz). The Office's own expert conceded that a skilled artisan, reading Lutz '282, "thought they solved" any toxicity problem. Appx13485 (39:7–16) (Figg). And what little had been published about IMGN853's use in humans before the priority date reported "[n]o … serious adverse events" and no "dose-limiting toxicity" up to 5 mg/kg TBW. Appx16148–16149. It was ImmunoGen who first discovered that IMGN853 caused toxicity in humans while conducting confidential Phase I clinical trials using the same doses used in Lutz '282. *See Application of Spormann*, 363 F.2d 444, 448 (CCPA 1966) ("Obviousness cannot be predicated on what is unknown.").

But the district court held that the discovery of this problem for the obviousness analysis was irrelevant because "ImmunoGen does not get credit for 'discovering' the ocular toxicity associated with IMGN853" because other ADCs "containing the DM4 payload caused ocular toxicity." Appx44. The district court

rejected the notion that a skilled artisan might think toxicity was not a problem due to the rabbit studies in Lutz '282, asserting that skilled artisans would "monitor for ocular toxicity in human" experiments[8] because "side effects may occur in humans which do not appear during animal testing." Appx46. (In other words, the field is unpredictable. *But see infra* § III.D (discussing district court's decision that the unpredictability of the field was irrelevant to expectation of success).)

The district court's rationale—that if someone had experimented with IMGN853, then they would have found the problem—misses the point. "Where a problem was not known in the art, the solution to that problem may not be obvious, because 'ordinary artisans would not have thought to try at all because they would not have recognized the problem.'" *Forest Lab'ys, LLC v. Sigmapharm Lab'ys*, 918 F.3d 928, 935 (Fed. Cir. 2019); *Novartis Pharms. Corp. v. Watson Lab'ys, Inc.*, 611 F. App'x 988, 996 (Fed. Cir. 2015) ("Without the knowledge of a problem, one of skill in the art would not have been motivated to modify [the prior art]."); *see also Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1353 (Fed. Cir. 2013) (concluding that the fact that the "inventors of the [] patent recognized and solved a problem … that the prior art did not recognize" tends to prove that the

---

[8] Contrary to the district court's assertion, ImmunoGen's original protocol for the trial did not actually monitor for ocular toxicity. *Compare* Appx14900–Appx14994 (original protocol with no monitoring for ocular toxicity), *with* Appx15051 (amended protocol showing addition of ocular toxicity monitoring).

patent is not obvious). Put another way, no one would have been motivated to use an alternative dosing method, much less at a specific dose of 6 mg/kg, using the specific AIBW formula disclosed in the ’809 application to solve ocular toxicity, when no one even knew about ocular toxicity in the first place. *See KSR Int’l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007) (“it can be important *to identify a reason* that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does”) (emphasis added).

This case aligns closely with the facts in *Forest*, where this Court found that the “inventors’ discovery” constituted “recognition of an unknown problem in the art in conjunction with the discovery of the solution to that problem.” *Forest*, 918 F.3d at 935. In *Forest*, “during early clinical studies [the inventors] discovered intravenous and oral administration of asenapine resulted in severe cardiotoxic events,” and as a result “those studies were terminated prior to completion.” *Id.* Through the inventors’ analysis of these confidential data, they discovered a clear trend of increased heart effects with an oral tablet, whereas they observed no such trend with the sublingual forms, leading them to develop a sublingual dosage form solution to the toxicity problem. *Id.* This Court affirmed the finding that there was no motivation to solve the toxicity problem because, while the inventors became

aware of the toxicity issues, "[t]here was nothing in the prior art that would have indicated that the oral tablet had problems." *Id.* That is precisely the case here.

The district court distinguished *Forest*, however, on the basis that there, "the inventors discovered an entirely unknown side effect" and "the fact that the drug at issue caused cardiotoxic events was *never* disclosed in the prior art." Appx45–46 (emphasis in original). Leaving aside that *Forest* never says that cardiotoxicity is an "entirely unknown side effect," this analysis gets two things wrong. First, like the drug in *Forest*, the fact that IMGN853 causes toxicity "was never disclosed in the prior art." The district court acknowledges this, noting that, at best, ADCs "*like* IMGN853 containing the DM4 payload" caused ocular toxicity in the past. *Id.* (emphasis added). And the district court's reasoning ignores Lutz '282, based on which every expert agreed "they thought they solved" ocular toxicity for IMGN853. Appx13485 (39:7–16) (Figg). Second, it conflates the obviousness of the problem with the obviousness of the solution. "There can of course arise situations wherein identification of the problem is itself the invention." *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1377 (Fed. Cir. 2004). Contrary to the district court's belief, whether the identification of the ocular toxicity itself is obvious is not the issue—though Lutz '282 strongly suggests that it is not. The '809 application is a patent on a *solution* to that unknown problem.

Finally, the district court's holding that skilled artisans would have experimented to discover ocular toxicity is logically inconsistent with its other holdings. In analyzing indicia of non-obviousness, the district court rejected ImmunoGen's argument that there was a long-felt, but unmet, need for the invention. Appx60. Specifically, the district court defined the long-felt, but unmet, need as "a need for a dosing regimen for IMGN853 that solves the problem of ocular toxicity." *Id.* But the district court then dismissed that argument, concluding that there was no known problem of ocular toxicity associated with IMGN853 as of the priority date of the '809 application. *Id.* Either the ocular toxicity problem with IMGN853 was a need that skilled artisans were motivated to solve or it was not—it cannot be both.

### B. There was no motivation to use AIBW dosing or the specific AIBW formula because AIBW had never before been used to dose ADCs.

After deciding that a skilled artisan could, through experimentation, discover the ocular toxicity problem, the district court concluded that "the skilled artisan would then experiment with changing the dose" to solve this problem, would then "try AIBW dosing, given that AIBW dosing was well known in the prior art," and then try 0.4 for the specific correction factor in the AIBW formula because "researchers often start with 0.4 when experimenting with AIBW dosing." Appx43–44. This is contrary to law.

1. Just because AIBW preexisted the ’809 application, that does not mean it would be obvious to try—particularly when no ADC had ever been dosed using AIBW before. The district court asserted that “AIBW dosing may be used as a potential solution.” Appx44. But the district court does not explain why a skilled artisan would have chosen AIBW dosing out of numerous possibilities. *See In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063, 1072 (Fed. Cir. 2012) (“evidence … proffered in support of an obvious-to-try theory[] is insufficient unless it indicates that the possible options skilled artisans would have encountered were finite, small, or easily traversed, and that skilled artisans would have had a reason to select the route that produced the claimed invention.”) (internal quotations omitted).

And it is clear that there were numerous possibilities. To solve ocular toxicities in ADCs, others have tried changing the linker, reducing the dose, changing the frequency of dosing, and using palliatives like lubricating and steroidal eye drops. *See* Appx13150 (165:9–21) (Tolcher). This is not a small number of changes. Reducing the dose could involve trying lower doses in increments of 0.1 mg/kg TBW or 1 mg/kg TBW, as TBW was the standard dosing regimen for pre-clinical and clinical studies in October 2013. Appx13081 (96:8–17) (Lutz). Changing dosing frequency could involve dosing every few hours, days, or weeks. Moreover, even if a skilled artisan thought to dose based on

different body measurements, there are numerous options, including: body surface area, total body weight, percentage of IBW, IBW, body mass index, AIBW, lean body mass, etc. Appx13179 (194:9–15) (Tolcher). Even Dr. Figg admitted that it would not be obvious how a skilled artisan would go about it and even then, "there are different AIBWs to use." Appx13570–13571 (124:16–125:4) (Figg).

The district court, however, simply plucked AIBW dosing out of this multitude of possibilities without explaining the required motivation for selecting this particular dosing methodology. That does not amount to a showing of obvious to try, especially in an area as unpredictable as ADCs. *See In re Stepan Co.*, 868 F.3d 1342, 1347 (Fed. Cir. 2017) ("one must be motivated to do more than merely to vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result"); *In re Rosuvastatin Calcium Pat. Lit.*, 703 F.3d 511, 518 (Fed. Cir. 2012) ("[O]bviousness is not shown when what was obvious to try was to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.") (internal quotations omitted); *see also In re Armodafinil Pat. Lit. ('722 Pat. Lit.)*, 939 F. Supp. 2d 456, 501–02 (D. Del. 2013) ( "'Obvious to try' is not equivalent to obviousness … particularly where … the prior art provided at most general motivation to conduct trial and error experimentation in a decidedly unpredictable

field.") (collecting cases).

Worse, the district court confirmed that its obvious-to-try analysis relied on what the *inventors* tried, rather than looking to what was disclosed in the prior art. The district court relied on Dr. Ponte's testimony that, in working to obtain a safe and effective dose of IMGN853, he "considered body surface area, ideal body weight, lean body weight, and AIBW." Appx22, Appx53. But the inventor's actions cannot be used to justify a finding of obviousness. *See Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1367 (Fed. Cir. 2017) ("The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight.").

2. The district court found a motivation to dose ADCs with AIBW because AIBW "was well known in the prior art." Appx43. The district court apparently meant "well known" in the antibiotic, anticancer, and nutritional prior art. *See* Appx40. As an initial matter, it is unclear why antibiotics, nutritional, and small-molecule chemotherapies should be the relevant art, in light of the undisputed fact that "the pharmacology [] between [] small molecules and ADCs is different." Appx13549 (103:14–16) (Figg). The district court is silent on why these fields are relevant. *See* Appx44. And, as noted above, simply because something is "well known" does not mean its specific use in a particular circumstance (here to solve an unknown problem) is obvious—particularly when there are numerous

potential options.

More fundamentally, the district court legally erred by conflating the existence of something in the prior art with a motivation for combining the art. *Orexo AB v. Actavis Elizabeth LLC*, 903 F.3d 1265, 1272–73 (Fed. Cir. 2018) (The "mere fact that the prior art *could* be … modified would not have made the modification obvious unless the prior art suggested the desirability of the modification.") (emphasis added). For example, the district court concluded that a skilled artisan would look to "references pertaining to both large and small molecule drugs" for use in treating cancer simply because medical oncologists are familiar with such literature. Appx20, Appx43. But the court's opinion does not provide a common thread or motivation for why a skilled artisan would look to a variety of non-ADC literature to dose an ADC like IMGN853. The court merely assumed that, because AIBW dosing had been used in anticancer literature, such literature would motivate a skilled artisan to use AIBW to dose an ADC despite the differences between these particular anticancer therapies. But it is undisputed that small-molecule anticancer therapies have a different pharmacology than ADCs. Appx13549 (103:14–16) (Figg). And that ADCs distribute differently in the body—and thus have different pharmacokinetics—than small molecules. Appx13486 (40:20–21) (Figg) (stating drugs do not distribute into fatty tissue equally); Appx13546 (100:18–20) (Figg). The district court never explains why—

despite these important differences—skilled artisans would rely on small-molecule literature.[9]

A relevant example from this case may be helpful. AIBW dosing *had* been considered for small-molecule chemotherapeutics to obese individuals (though, of course, that alone does not make it "well-known" under any conventional definition of that phrase). Appx5799–5807. But, despite the fact that AIBW existed in the literature on small-molecule chemotherapy for obese patient, that fact does not mean it was obvious, even in that specific context. On the contrary, a contemporaneous ASCO publication in 2012, specifically recommended *against* AIBW dosing in favor of TBW dosing, when administering chemotherapeutics to obese cancer patients. Appx5799. This suggests that AIBW may not be obvious even in this much narrower, different field—even if it is present in the literature of that field. *See Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1069 (Fed. Cir. 2018) ("even if a reference is not found to teach away, its statements regarding preferences are relevant to" whether there is a motivation to combine).

Moreover, when other literature suggested AIBW was not a viable way to

---

[9] The district court also relies on a non-prior art reference for the proposition that "other researchers were contemporaneously motivated to try AIBW dosing in order to reduce toxic side effects." Appx44. But, as Dr. Shah testified, the article concerns a radioimmunoconjugate, which is not an ADC. Appx13388–13389 (159:23–160:1) (Shah). Radioimmunoconjugates also behave differently in the body than ADCs. Appx13389 (160:2–22) (Shah).

dose drugs, the district court discounted it as "isolated prior art disclosures." Appx49 ("Although Green ultimately recommends lean body weight[] " and "the 2012 ASCO panel only recommended TBW for chemotherapy drugs[]"). For example, the district court also cites Alffenaar, which discusses using AIBW to dose antibiotics to reduce ocular toxicity in patients. Appx18, Appx44 (discussing Appx16607–16608). But Alffenaar ultimately rejected AIBW in favor of dosing at ideal body weight.[10] Appx13498–13499 (52:11–53:25) (Figg). However, the district court disregarded this fact because it conflated the existence of AIBW dosing in the literature with a reason to actually use it for IMGN853. *See also Panduit Corp. v. Dennison Mfg. Co*., 810 F.2d 1561, 1568 (Fed. Cir. 1987) (prior art references must be considered "as a whole, including portions that would lead away from the invention in suit.").

3. Finally, even assuming a skilled artisan would have considered AIBW to dose an ADC, the district court provides no reasoning for the conclusion that a skilled artisan would be motivated to use the specific AIBW formula in the '809 application. The district court merely notes that "a skilled artisan would have been

---

[10] It is worth noting that, despite Alffenaar being in the antibiotic prior art, when working with ADCs, Lutz '282 addressed the ocular toxicity associated with DM4 by altering the molecule rather than by trying alternative dosing methods. Appx6025 (Example 8).

motivated to try the specific AIBW formula described in Example 4." Appx48. This is error.

*First*, even the Office's expert does not go this far. Dr. Figg was asked about the specific formula for IBW that should be inserted into the calculation for AIBW= IBW + 0.4(TBW–IBW), as follows:

> Q. In your opinion, as of the priority date, it would not have been obvious which of the IBW calculations you should use that are out in the prior art. Right?
>
> A. Correct. Correct.

Appx13579 (133:2–17) (Figg). Thus, not one of the experts thinks the formula in Example 4 is obvious.

*Second*, the district court's conclusion contradicts its other findings. It is undisputed that the correction factor of "0.4" is drug and application specific. Appx13346 (117:10–18) (Shah); Appx13546 (100:11–14) (Figg). Here, the 0.4 correction factor is specific to IMGN853 for the treatment of ovarian and peritoneal cancer. As the district court determined, a different correction factor would affect safety and efficacy because the "correction factor can lead to a 'huge' difference in the resulting dose." Appx14. Despite this fact, in assessing obviousness, the district court found that 0.4 is a "standard correction factor" that "researchers often start with … when experimenting with AIBW dosing." Appx48. Either the correction factor is drug and application specific—meaning there is a

unique correction factor for the administration of IMGN853 to treat ovarian and peritoneal cancer—or there is a "standard" correction factor that a skilled artisan would understand to apply to all AIBW dosing, but both cannot be true.

### C. There was no motivation to use the precise dose of 6 mg/kg AIBW, and it would not have been determined by routine experimentation.

In holding that the precise dose of 6 mg/kg AIBW was obvious, the district court again posited that experimentation would lead to the claimed invention. Specifically, the district court explained that a skilled artisan would "determine the best dose through experimentation, which is precisely what ImmunoGen's researchers did." Appx44. The district court further found that a skilled artisan would, "like ImmunoGen, determine the optimum dose based on routine experimentation" to arrive at 6 mg/kg AIBW. Appx48. These holdings contain multiple legal errors.

*First*, the district court erred by repeatedly looking to ImmunoGen's own experiments to find the exact dose obvious. "The inventor's own path itself never leads to a conclusion of obviousness; that is hindsight." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012); *see* 35 U.S.C. § 103 ("Patentability shall not be negatived by the manner in which the invention was made."). But the district court *had* to rely on the inventors' work to find 6 mg/kg

AIBW obvious because no one else had ever used AIBW dosing with an ADC before, much less arrived at the precise dose in the claims. Appx12176 (¶ 25).

*Second*, it was error for the district court to simply assert that "routine experimentation" would either lead to 6 mg/kg AIBW or that, even if such experimentation led to 6 mg/kg AIBW, such a dose would be obvious. This Court has emphasized that "routine experimentation does not necessarily preclude patentability." *Honeywell Int'l Inc. v. Mexichem Amanco Holding S.A. DE C.V.*, 865 F.3d 1348, 1356 (Fed. Cir. 2017). In *Honeywell*, the Board held a patent obvious. *Id.* at 1352. It found, due to the unpredictability of the art, a skilled artisan would "undertake efforts to find an optimal combination and thus that 'routine testing' would have led the skilled artisan to the claimed combination." *Id.* at 1355. This Court reversed, holding that the "[u]npredictability of results" and thus the need for experimentation in the first place "equates more with nonobviousness rather than obviousness." *Id.* at 1356. So too here. There was an undisputed need to experiment to find the precise dose of 6 mg/kg AIBW. As the Office's expert, Dr. Figg, conceded when asked if the dose of 6 mg/kg AIBW was obvious: "That 6, you have to do the clinical trial to determine the maximum tolerated dose. So it is not obvious 6 is plucked out." Appx13579–13580 (133:22–134:4) (Figg).

Critically, as Dr. Figg admitted, there could have been *no* dose—never mind 6 mg/kg AIBW—that actually solved the toxicity problem and been therapeutically

effective. Asked whether experimenting "with the dosage might never have led to a solution," he agreed that "does happen." Appx13563 (117:19–25) (Figg); *see also id.* 117:11–13 ("[that] happens a lot with a lot of drugs, where we can never get efficacy and have too much toxicity"). It cannot be "routine experimentation" to find the right dose when, "a lot" of the time for "a lot of drugs," no acceptable dose is ever found.

*Third*, it is undisputed that none of the prior art disclosed the use of AIBW dosing for any ADC, so none of the prior art disclosed a range of doses for IMGN853 that include 6 mg/kg AIBW. Appx12176 (¶¶ 25, 26); Appx13343 (114:6–12) (Shah). As such, the "routine optimization" cases—such as *Boehringer Ingelheim Pharms. Inc. v. Mylan Pharms., Inc.*, 803 Fed App'x 397 (Fed. Cir. 2020)—that the district court cited do not apply. *See* Appx48 (n.84). In *Boehringer*, the claims covered doses of linagliptin within a range disclosed in a prior art patent. 803 Fed App'x at 401–02. This Court affirmed the district court's findings that the doses were the predictable result of performing FDA-required dose ranging studies, looking at the lowest end of the dose range, and following FDA guidance to define the lowest therapeutic dose, which an inventor admitted was routine in the field. *Id.* at 402. But *Boehringer* starts from the premise that a claimed parameter falls within a range or genus known in the prior art. *See also In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012) (routine

optimization "is limited to cases in which the optimized variable is a 'result-effective variable.'"). No such premise exists here.

Faced with this deficiency, the district court instead pointed to the fact that Lutz '282 (Appx5937) and the ASCO poster (Appx14538–14542) focused on 5 and 6 mg/kg TBW, which would lead a skilled artisan to start "experimenting" "around 5 to 6 mg/kg AIBW." Appx47 (pointing again to fact that ImmunoGen experimented with these doses). But TBW is fundamentally different than AIBW. Appx13400–13401 (171:21–172:7) (Shah); *see* Appx12173 (¶ 10) (Office's stipulation that TBW dosing is different from AIBW dosing). And there is no testimony or evidence to the contrary. So the fact that the number "6" appears in, or is encompassed by, the TBW ranges recited in Lutz '282 is of no consequence. As an analogy, if the prior-art recipe for a loaf of bread disclosed using two teaspoons of salt per pound of flour, that would not be the same thing as a claim on two teaspoons of salt per kilogram of flour. The amounts of salt do not overlap merely because they include the number "two."

It is particularly perverse to suggest that Lutz '282's dose of 6 mg/kg TBW would have led to the dose of 6 mg/kg AIBW. That is because ImmunoGen *tried* to dose IMGN853 at 5 and 7 mg/kg TBW in its original human trials based on Lutz '282. Appx13104 (119:9–20) (O'Malley); Appx14521–14537; Appx12175 (¶ 19). And it is those doses that led to ocular toxicities, which almost shut down further

testing on the drug. Appx13104 (119:9–20) (O'Malley); Appx13623 (177:23–24) (Shah). Put bluntly, Lutz '282 taught a dose that would not work. It strains credulity to suggest that the very dose that failed demonstrates that the dose that worked is obvious.

*Finally*, the district court held that the dose of 6 mg/kg AIBW would be "easily determine[d]" based on partial quotes from the Ab '528 and Carrigan '675 prior art references. Appx48 (discussing Appx800–938 and Appx699–799). However, both prior art references came before the ocular toxicity had been discovered. And they do not address whether doses will be safe, well-tolerated, or have side effects. *See* Appx13183–13185 (198:10–200:1) (Tolcher). Therefore, they do not stand for the proposition that determining the critical dose of 6 mg/kg AIBW would have been easily discovered by a physician using only routine experimentation.

### D. There was no reasonable expectation that the exact dose of 6 mg/kg AIBW would solve the unknown ocular toxicity problem, in part, because the field is unpredictable.

In analyzing reasonable expectation of success, the district court does not actually hold that a skilled artisan had a reasonable expectation of success that a 6 mg/kg AIBW dose would solve ocular toxicity. Rather the district court held that a skilled artisan "would have a reasonable expectation of success in combining the prior art references and *experimenting* with dosing IMGN853 based on AIBW."

Appx52, Appx54 (emphasis added). The district court then discounted the uncontested fact that ADCs and ocular toxicity are unpredictable fields on the basis that "[i]f ImmunoGen's theory of reasonable expectation of success were adopted, any dosing regimen would be patentable." Appx54. This fundamentally misunderstands the law.

As an initial matter, ImmunoGen's application is not a patent on "experimenting" with doses. It covers a very specific dose of IMGN853 that solves a very specific, previously unknown problem. "[F]ailure to consider the appropriate scope of the … claimed invention in evaluating the reasonable expectation of success … constitutes a legal error." *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 966 (Fed. Cir. 2014). For example, in *Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*, the Board found that Corcept's patent claim on a dosage of mifepristone was not obvious. 18 F.4th 1377, 1380 (Fed. Cir. 2021). Teva argued that it was not required to show that there was a reasonable expectation that the specific dosage would work. *Id.* This Court disagreed, holding that "[t]he reasonable-expectation-of-success analysis must be tied to the scope of the claimed invention." *Id.* at 1381. Thus, to prove the claim obvious, Teva needed "to show a reasonable expectation of success for [the] specific mifepristone dosage." *Id.* Here, the district court did not even attempt to determine whether there was a reasonable expectation of success that 6 mg/kg AIBW would work. It

instead fell back on its view that experimenting with different options was possible.

But "even if it was obvious to experiment with [certain] options," an invention is not obvious where "there is nothing to indicate that a skilled artisan would have had a reasonable expectation that such an experiment would succeed." *Leo*, 726 F.3d at 1357. Where the "prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful," courts must "reject hindsight claims of obviousness." *In re Cyclobenzaprine*, 676 F.3d 1063 at 1071. Here, it is undisputed that no one knew which parameters might lead to the claimed solution because the data needed to make that determination was confidential.

Specifically, only ImmunoGen had the confidential pharmacokinetic data from its human studies. Appx13043 (58:11–16) (Ponte); Appx13105 (120:1–6) (O'Malley). It was only through novel pharmacokinetic modeling that the inventors were able to discover the threshold for ocular toxicity associated with IMGN853 and unexpectedly ascertain that a dose of 6 mg/kg AIBW achieved the therapeutic window. Appx13039–13064 (54:15–18, 56:11–21, 62:20–63:2, 63:3–66:8, 67:22–69:5, 78:24–79:11) (Ponte); Appx5433; Appx6749–6830. And it is undisputed that none of the prior art discloses the pharmacokinetic data for IMGN853 identifying the correlation between early exposure and ocular toxicity.

Appx12176 (¶ 28). Indeed, the Office's expert admitted that it would not have been obvious to select the precise dose of 6 mg/kg AIBW without that data. Appx13579 (133:3–7) (Figg).

The situation here is akin to *In re Cyclobenzaprine*, in which this Court overturned a district court's trial finding of obviousness for failure to consider the absence of a known pharmacokinetic profile for a modified-release formulation of cyclobenzaprine hydrochloride. 676 F.3d 1063 (Fed. Cir. 2012). This Court found that it was error to ignore that fact because "[w]ithout such a known relationship … skilled artisans could not predict whether any particular PK profile, including a bioequivalent one, would produce a therapeutically effective formulation." *Id.* at 1070. The Court observed that "[b]ecause all experts and parties agree … that skilled artisans did not know the PK/PD relationship even for the immediate-release formulation, there was no way to match the dosage for the extended-release formulation to achieve a known therapeutic effect." *Id.* That is precisely the situation here. Here, there is no dispute that the pharmacokinetic data underlying the invention is not in the prior art. Appx12176 (¶¶ 28, 30, 31). Therefore, as in *Cyclobenzaprine*, there was no data from which to optimize any parameter related to the ocular toxicity and efficacy of IMGN853 before the priority date. On the contrary, the clinical data revealed that ocular toxicity and efficacy were unexpectedly unrelated. *See, e.g.,* Appx13041–13054 (56:11–21, 62:20–63:2,

67:22–69:5) (Ponte). And that data had to be analyzed and manipulated in unorthodox ways to find a safe and effective dosing solution. Because the public had no access to the pharmacokinetic data, a skilled artisan would not have any expectation of success that interpreting that data would lead to the precise dose in the claims.

The district court also erred in discounting the unpredictability of the art. It is undisputed that most ADCs fail and that the mechanism for ocular toxicity is still unknown. Appx13175 (190:14–191:171) (Tolcher); Appx13557 (111:7–9) (Figg); Appx13563 (117:6–21) (Figg). Where the art is unpredictable, there is less of a reason to expect success. *See OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1383 (Fed. Cir. 2019) (finding no reasonable expectation of success where cancer "treatment was highly unpredictable with an over 99.5% rate of failure for drugs entering Phase II clinical studies); *Uniroyal, Inc. v. Rudkin-Wiley Corp*., 837 F.2d 1044, 1053 (Fed. Cir. 1988) (where "even an expert would be unable to predict the result … [t]his suggests nonobviousness, not routine experimentation"). The district court's argument—that, if this uncertainty were taken into account, any dosing regimen would be patentable—proves too much. *See* Appx54. It may well be that there are other areas of drug development where the uncertainty is not as high as it is with ADCs and ocular toxicity. And, in those situations, routine reductions in a given dose may be obvious. But it was error to simply ignore the

unpredictability of the field in this case when this Court's precedent demand that it be, at the very least, considered.

Finally, the district court's ultimate conclusion that there is a reasonable expectation of success contradicts the court's opinion elsewhere. The district court had repeatedly (and incorrectly) held that skilled artisans: (i) would have "monitored" human testing to discover the ocular toxicity, Appx43; (ii) would have "experiment[ed]" with changing the dosing, *id.*; (iii) would have "experiment[ed]" with AIBW dosing, *id.*; (iv) would have tried the specific AIBW formula "when experimenting with AIBW dosing," Appx48; and (v) would have found 6 mg/kg AIBW by "routine experimentation," *id.* But the district court—in rejecting the unpredictability of the field—did so on the basis that "the problem of ocular toxicity *was known*" and a "skilled artisan understood that changing the dose *was a possible solution*." Appx54 (emphasis added). All the prior hypothesized "experimentation" is removed. Ultimately, that is because the district court knows the result of those experiments. Because they were done by the inventors.

## CONCLUSION

This Court should reverse the district court's holding that the '809 application's claims are unpatentable.

Dated: July 20, 2023

Respectfully submitted,

/s/ Michael E. Joffre
Michael E. Joffre
Anna G. Phillips
Eric K. Steffe
**STERNE KESSLER GOLDSTEIN & FOX PLLC**
1100 New York Ave., N.W.
Washington, DC 20005
202.371.2600

*Counsel for Appellant ImmunoGen, Inc.*

# ADDENDUM

# TABLE OF CONTENTS

## Addendum Pursuant to Federal Circuit Rule 28(a)(11)


| Page No. | Date | Description |
|---|---|---|
| Appx1 | 01/30/2023 | Findings of Fact and Conclusions of Law |
| Appx69 | 01/30/2023 | Judgment |
| Appx141 | 03/11/2020 | ‘809 application |
| Appx5089 | 06/17/2020 | Amendment and Reply Under 37 C.F.R. § 1.114 |

**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **IMMUNOGEN, Inc.,**<br>**Plaintiff,**<br><br>**v.**<br><br>**KATHERINE VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,**<br>**Defendant.** | ) | **Case No. 1:20-cv-274** |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In this civil action to obtain a patent under 35 U.S.C. § 145, Plaintiff ImmunoGen, Inc. ("ImmunoGen") seeks a judgment that ImmunoGen is entitled to a patent for the invention specified in the claims of U.S. Patent Application Number 14/509,809 (the "'809 Application"). The '809 Application describes a dosing regimen for administering a drug that treats ovarian and peritoneal cancer. Because ImmunoGen already received a patent for the drug specified in the '809 Application, which is known as IMGN853, the '809 Application seeks only to patent a dosing regimen for administering IMGN853. Specifically, the '809 Application seeks to patent a method of dosing IMGN853 based on patients' adjusted ideal body weight ("AIBW") instead of total body weight ("TBW").

After a patent examiner at the U.S. Patent and Trademark Office (the "PTO") rejected the '809 Application and the Patent Trial and Appeal Board (the "PTAB") affirmed the rejection, ImmunoGen brought this action against Defendant Katherine Vidal in her official capacity as the Under Secretary of Commerce for Intellectual Property and Director of PTO. Pursuant to 35 U.S.C. § 145, ImmunoGen now seeks a judgment setting aside the PTO's decision that the

claims in the '809 Application are unpatentable and declaring that ImmunoGen is entitled to issuance of a patent for the invention claimed in the '809 Application. In response, the PTO argues that ImmunoGen cannot receive a patent for the '809 Application for three reasons: (1) the claims of the '809 Application are fatally indefinite; (2) the '809 Application is unpatentable because it is obvious in light of the prior art; and (3) the '809 Application is invalid under the doctrine of obviousness-type double patenting.

This matter came before the Court on November 1, 2022 for a three-day bench trial. There, the parties stipulated various undisputed facts and presented substantial testimonial and documentary evidence. After the close of evidence on November 3, 2022, the parties submitted proposed findings of fact and conclusions of law. Thereafter, at a hearing on December 15, 2022, counsel for each party presented closing arguments and the matter was taken under advisement. The matter is therefore now ripe for disposition.

Set forth below, pursuant to Rule 52, Fed. R. Civ. P., are the Court's findings of fact and conclusions of law. In short, judgment must enter in favor of the PTO because the claims at issue in ImmunoGen's '809 Application are unpatentable as indefinite and obvious. Furthermore, the '809 Application is unpatentable under the doctrine of obviousness-type double patenting.

## I. LEGAL PRINCIPLES

Before setting forth the Findings of Fact, it is appropriate to provide a brief description of the governing legal principles, which provide helpful context. These legal principles will be stated in further detail in the Conclusions of Law.

This civil action was brought under 35 U.S.C. § 145, which provides that "[a]n applicant dissatisfied with the decision of the [PTAB] . . . may . . . have remedy by civil action against the Director [of the PTO] in the United States District Court for the Eastern District of Virginia." *Id.* In a civil action pursuant to § 145, the district court has the "power to set aside any ruling

refusing a patent and determine patentability *de novo*." *Disney Enterprises, Inc. v. Rea*, 940 F. Supp. 2d 288, 291 (E.D. Va. 2013) (quoting *Hitachi Koki Co., Ltd. v. Doll*, 620 F. Supp. 2d 4, 16 (D.D.C. 2009)). In a § 145 action, the dissatisfied patent applicant challenging the decision of the PTAB ordinarily bears the burden of proof by a preponderance of the evidence. *See Dome Patent L.P. v. Lee*, 799 F.3d 1372, 1377–79 (Fed. Cir. 2015). Where the PTO raises new arguments during the § 145 action that the PTO did not raise during patent prosecution or before the PTAB, however, the PTO bears the burden of proving the newly raised defense by a preponderance of the evidence. *See Hyatt v. Iancu*, 332 F. Supp. 3d 113, 120 (D.D.C. 2018) (reversed on other grounds) (explaining that the PTO may raise new affirmative defenses in a § 145 proceeding and that the PTO bears the burden of proof on such affirmative defenses). The patent examiner and the PTAB rejected the '809 Application on the grounds of obviousness and obviousness-type double patenting. After ImmunoGen initiated this § 145 litigation, the PTO raised the additional argument that the '809 Application is fatally indefinite.

With respect to indefiniteness, the Patent Act requires that a patent specification "conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b) (emphasis added). Supreme Court precedent requires a "reasonable certainty" standard: a patent is invalid for indefiniteness "if its claims, read in light of the specification . . . and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). In determining whether a patent application is indefinite, the district court must first evaluate the language of the claims, then look to pertinent intrinsic evidence including the application's prosecution history, and

finally evaluate extrinsic evidence of indefiniteness. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1363–64 (Fed. Cir. 2018).

The Patent Act also requires that patents address "non-obvious subject matter." 35 U.S.C. § 103. The Supreme Court has explained that in determining whether a patent application is obvious, district courts must make three factual inquiries. *Graham v. John Deere Co. of Kan. City*, 383 U.S. 1, 17 (1966). The district court must first determine the level of ordinary skill in the art at the time the invention was made, then determine the scope and content of the prior art, and finally identify the differences between the prior art and the claims at issue. *Id.* If the "difference between the subject matter sought to be patented and the prior art" is "such that the subject matter as a whole would have been obvious at the time to a person skilled in the art," then the subject matter is obvious and cannot be patented. *Id.* at 15. The Supreme Court has also explained that a patent for an invention "composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Instead, the factfinder must consider (1) whether a skilled artisan would have a motivation "to combine the teachings of the prior art references to achieve the claimed invention," and (2) whether the skilled artisan "would have had a reasonable expectation of success in doing so." *Novartis Pharm. Corp. v. West-Ward Pharm. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019). As the final step in the obviousness analysis, district courts must look to objective "secondary considerations" including unexpected results, long-felt but unmet needs, failure of others, copying by competitors, and industry praise. *Graham*, 383 U.S. at 17–18; *Leo Pharm. Prods., Ltd. v. Rea*, 726 F.3d 1346, 1357–58 (Fed. Cir. 2013).

Finally, § 101 of the Patent Act forbids an individual from obtaining more than one patent on the same invention, which is known as "double patenting." *Abbvie Inc. v. Mathilda & Terrence Kennedy Inst. of Rheumatology Trust*, 764 F.3d 1366, 1372 (Fed. Cir. 2014). For this reason, courts have created the doctrine known as obviousness-type double patenting, which prohibits a patent applicant from receiving a patent for claims which are obvious in light of earlier-issued patents.

## II. FINDINGS OF FACT

The facts recited here are those found pursuant to Rule 52(a)(1), Fed. R. Civ. P., on the basis of the record as a whole, including a three-day bench trial. In the course of the bench trial, six witnesses testified in total—five for ImmunoGen and one for the PTO. ImmunoGen first presented three fact witnesses: Drs. Joseph Ponte and Robert Lutz, inventors of the '809 Application who testified as to the development of IMGN853 and the claimed dosing regimen, and Dr. David O'Malley, a medical doctor who testified about his involvement with the clinical trials of IMGN853. ImmunoGen also presented two expert witnesses: Dr. Anthony Tolcher, a clinical oncologist experienced in drug development, and Dr. Dhaval Shah, a professor of pharmaceutical sciences experienced in pharmacokinetics. Both of ImmunoGen's expert witnesses testified that the '809 Application is neither obvious nor indefinite. In response, the PTO presented one expert witness: Dr. William Figg, Associate Director of the Cancer Center at the National Cancer Institute and head of the Clinical Pharmacology Program at the National Institute of Health. Dr. Figg, who is experienced in the areas of clinical pharmacology and drug development, testified that the dosing regimen disclosed in the '809 Application is both obvious and indefinite. While ImmunoGen compensated all five of its witnesses for their time, the PTO's only witness, Dr. Figg, was not paid by the PTO for the time he spent working on the case.

## A. Parties

1. Plaintiff ImmunoGen, Inc. is a corporation organized and operating under the laws of the Commonwealth of Massachusetts with a place of business in Waltham, Massachusetts. ImmunoGen is the assignee of the '809 Application at issue in this case.

2. Defendant Katherine K. Vidal is sued in her official capacity as the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office.

## B. Development of IMGN853 and the Dosing Regimen at Issue

3. In the early 2010s, ImmunoGen researchers began developing a drug to treat certain ovarian and peritoneal cancers. Specifically, ImmunoGen researchers tried to develop an immunoconjugate drug for patients with platinum-resistant ovarian cancer, which is especially difficult to treat because it does not respond to traditional cancer therapies. Most patients diagnosed with platinum-resistant ovarian cancer die within twelve months.

4. Immunoconjugates are a type of drug that treat cancers by specifically binding to a cell of interest and delivering a toxic drug payload to that cell. Immunoconjugates, which are also known as antibody drug conjugates or "ADCs," consist of three elements: (1) an antibody or the antigen-binding portion of an antibody which targets a specific cancer tumor antigen; (2) a toxic drug payload; and (3) a chemical linker that binds the antibody portion to the drug payload.

5. Immunoconjugates are considered large molecule drugs, in contrast to small molecule drugs such as antibiotics.[1]

6. Immunoconjugates are difficult to develop because they often result in toxic side effects. For example, some immunoconjugates are known to cause ocular toxicity, which can result in symptoms such as dry eyes, blurred vision, and even blindness. Because of this, many immunoconjugates fail during the early stages of development.

7. Ocular toxicity is classified based on the National Cancer Institute Common Toxicity Criteria, which categorizes adverse ocular events from grades zero to five. Grade 0 indicates no toxicity; Grade 5 represents fatal toxicity. Grade 3 ocular toxicity is considered severe and can impair day-to-day life activities. In general, when patients experience ocular toxicity of Grade 3 and above during clinical trials, drug development is halted.

[1] Small molecule drugs generally have a molecular weight between 150 and 280 grams per mole, while immunoconjugates have a molecular weight of about 150,000 grams per mole. *See* Tr. Nov. 1, 2022 (193:9–12) (Tolcher).

8. For over twenty years, ocular toxicity has been a well-known adverse event in the administration of immunoconjugates that contain as a toxic payload the maytansinoid[2] known as DM4.

9. Dr. Lutz, a former ImmunoGen employee and one of the inventors of the '809 Application, testified that in the early 2010s, ImmunoGen originally tried to develop an immunoconjugate that contained the DM4 payload and an uncharged chemical linker. However, in both preclinical rabbit studies and human studies, that immunoconjugate caused severe ocular toxicity.

10. In response to the ocular toxicity that resulted from using an uncharged linker with the DM4 payload, Dr. Lutz and other ImmunoGen researchers developed the immunoconjugate known as mirvetuximab soravtansine or IMGN853, which uses the DM4 payload with a charged linker instead of an uncharged one.

11. IMGN853 is thus comprised of (1) an antibody known as huMov19, (2) the DM4 payload, and (3) a charged chemical linker known as a charged sulfo-SPDB linker.[3] IMGN853 functions as a cancer treatment because the antibody portion of IMGN853 targets ovarian and peritoneal cancer cells that express folate receptor 1 ("FOLR1"), and the toxic DM4 payload kills the cancer cells.

12. Preclinical studies of IMGN853 in rabbits showed no ocular toxicity despite the use of the toxic DM4 payload. Because of this, Dr. Lutz believed that implementing the charged chemical linker had eliminated the previously observed ocular toxicity. Thereafter, Dr. Lutz applied for a patent for IMGN853 and published the results of the preclinical rabbit studies in Example 8 of the patent application known as Lutz '282.[4] ImmunoGen ultimately received four patents covering IMGN853 and its use for treating cancer. *See infra* ¶¶ 102–07.

13. Based on the preclinical rabbit studies, Dr. Lutz and other ImmunoGen researchers proceeded in March 2012 to conduct human trials of IMGN853.

14. Even though the rabbit studies of IMGN853 reported no incidents of ocular toxicity, because the DM4 payload was known to cause adverse ocular side effects, ImmunoGen researchers continued to monitor for ocular toxicity during the clinical trials in humans.[5] Furthermore, both Dr. Figg and Dr. Lutz testified that even though rabbits did not experience ocular toxicity when given IMGN853, preclinical results do not always translate to clinical safety when the same drug is tested in humans.[6] Indeed, Dr. Lutz

---

[2] Maytansinoids constitute a class of antitumor agent drugs derived from the chemical maytansine.

[3] For this reason, IMGN853 is also sometimes referred to as "huMOV19-sulfo-SPDB-DM4."

[4] *See* U.S. Published Application No. 2012/0282282 (Lutz '282).

[5] Tr. Nov. 1, 2022 (110:16–22) (Lutz).

[6] Tr. Nov. 1, 2022 (113:15–16; 114:3–10) (Lutz); Tr. Nov. 3, 2022 (38:19–25; 39:1–12) (Figg).

testified that he is familiar with instances where drugs tested in animals without any apparent toxicity later caused toxic side effects in humans.[7]

15. Thus, because IMGN853 includes the DM4 payload, a person of ordinary skill in the art would understand the potential risk of ocular toxicity and would monitor for ocular toxicity when testing IMGN853 in humans—just as Dr. Lutz testified that he did during the clinical trials of IMGN853. [8]

16. ImmunoGen began the clinical trials of IMGN853 on March 1, 2012. During the initial Phase I trials in humans, IMGN853 was dosed according to the patient's total body weight ("TBW").

17. During the Phase I trials, ImmunoGen received confidential reports of ocular toxicity, just as a person of ordinary skill in the art would have expected as a possibility based on the known history of the DM4 payload, which IMGN853 contains.

18. Specifically, ImmunoGen received reports of Grade 3 adverse ocular events in patients who received a dose of IMGN853 at 7 milligrams per kilogram ("mg/kg") TBW. Three out of five patients who received IMGN853 at that dose experienced Grade 3 ocular toxicity.

19. After receiving reports of ocular toxicity in patients who received IMGN853 at a dose of 7 mg/kg TBW, ImmunoGen lowered the dose to 5 mg/kg TBW. Out of between ten to eleven patients[9] who received the 5 mg/kg TBW dose, one patient experienced Grade 3 ocular toxicity.

20. Because one patient experienced Grade 3 ocular toxicity when dosed at 5 mg/kg TBW, ImmunoGen lowered the dose to 3.3 mg/kg TBW. At that dose, the drug did not result in sufficient therapeutic efficacy.

21. There is no data on 6 mg/kg TBW dosing of IMGN853, because during Phase I studies, ImmunoGen only tested doses of 3.3 mg/kg TBW, 5 mg/kg TBW, and 7 mg/kg TBW.

22. Thereafter, Drs. Ponte and Lutz, inventors of the '809 Application and then-employees of ImmuoGen, analyzed the pharmacokinetic ("PK") data collected during the Phase I trials. In doing so, Drs. Ponte and Lutz observed a correlation between early exposure to IMGN853 and ocular toxicity. They observed that, based on the Phase I data, ocular toxicity occurred when the early exposure PK parameters exceeded a certain threshold. They also observed that, based on the data from the Phase I trials, it appeared that appropriate levels of efficacy of IMGN853 could be achieved so long as the overall exposure to the drug reached a certain level.

---

[7] Tr. Nov. 1, 2022 (114:3–10) (Lutz).

[8] Tr. Nov. 1, 2022 (110:16–22) (Lutz).

[9] Although the '809 Application reports that during the Phase I trials, ten patients received IMGN853 at a dose of 5 mg/kg TBW, ImmunoGen reported in later scientific publications that eleven patients received that dose.

23. Based on the PK data, the inventors sought a way to dose IMGN853 in order to reduce early exposure levels to stay below the ocular toxicity threshold while keeping the total overall exposure of IMGN853 above the threshold that correlated to therapeutic efficacy.

24. In looking for a manner of dosing IMGN853 to achieve a therapeutic window, Dr. Ponte found a formula for adjusted ideal body weight ("AIBW") on a nutrition website. Drs. Ponte and Lutz then conducted PK modeling of IMGN853 dosing regimens using the AIBW formula from the nutrition website. Drs. Ponte and Lutz also modeled dosing regimens using ideal body weight ("IBW") and body surface area.

25. Based on the PK modeling, Drs. Ponte and Lutz determined that AIBW dosing with the formula from the nutrition website was most likely to achieve a therapeutic window for IMGN853—that is, most likely to achieve therapeutically effective levels while remaining below the ocular toxicity threshold. Drs. Ponte and Lutz then decided to implement AIBW dosing in clinical trials of IMGN853.

26. On October 18, 2013, ImmunoGen amended its clinical trial protocol to change the dosing of IMGN853 from TBW to AIBW. Thereafter, ImmunoGen dosed IMGN853 in clinical trials at 5 mg/kg AIBW and 6 mg/kg AIBW. Seven patients received a dose of 5 mg/kg AIBW, and seven patients received a dose of 6 mg/kg AIBW. During these trials, the formula that ImmunoGen used to calculate AIBW was the same formula that Dr. Ponte found on the nutrition website.[10]

27. None of the fourteen patients dosed at either 5 mg/kg AIBW or 6 mg/kg AIBW experienced Grade 3 or higher ocular events. At this point, none of the fourteen patients received prophylactic treatment such as eye drops.

28. In October 2014, the inventors filed the '809 Application currently at issue which seeks to patent the 6 mg/kg AIBW dosing regimen for IMGN853. The '809 Application is described in detail below.

---

[10] Specifically, the AIBW equation from the nutrition website that Drs. Ponte and Lutz used to calculate AIBW during the clinical trials is as follows:

$$AIBW = IBW + 0.4\,(TBW - IBW)$$

Where IBW is calculated as below, with H indicating the patient's height in centimeters:

$$IBW = 0.9H - 88 \text{ (males)}$$

$$IBW = 0.9H - 92 \text{ (females)}$$

This is the same AIBW formula that is recited in Example 4 of the '809 Application. *See infra* ¶ 49.

## C. The ’809 Application

29. U.S. Patent Application No. 14/509,809, otherwise known as the ’809 Application, is titled “Anti-FOLR1 Immunoconjugate Dosing Regimens” and was filed on October 8, 2014.

30. ImmunoGen is the assignee of the ’809 Application.

31. The priority date for all claims of the ’809 Application is October 8, 2013.

32. The ’809 Application claims methods of treating patients with FOLR1-expressing ovarian or peritoneal cancers by administering the immunoconjugate known as mirvetuximab soravtansine or IMGN853.

33. Specifically, independent claims 1, 317, and 341 of the ’809 Application read as follows:

> 1. A method for treating a human patient having an FOLR1-expressing cancer or cancer of the peritoneum comprising administering to the patient an immunoconjugate which binds to FOLR1 polypetide,
>
> > wherein the immunoconjugate comprises an antibody or antigen-binding fragment thereof that comprises the variable light chain (VL) complementarity determining region (CDR)-1, VH CDR-2, VL CDR-3, variable heavy chain (VH) CDR-1, VH CDR-2, and VH CDR-3 of SEQ ID Nos: 6-9, 11, and 12, respectively, and a maytansinoid, and
> >
> > wherein the immunoconjugate is administered at a dose of 6 milligrams (mg) per kilogram (kg) of adjusted ideal body weight (AIBW) of the patient.
>
> 317. A method for treating a human patient having an FOLR1-expressing ovarian cancer comprising administering intravenously to the patient an immunoconjugate at a dose of 6 milligrams (mg) per kilogram (kg) of adjusted ideal body weight (AIBW) of the patient wherein the immunoconjugate comprises DM4 and an antibody comprising (i) a heavy chain comprising the same amino acid sequence as the amino acid sequence of the heavy chain encoded by the plasmid deposited with the American Type Culture Collection (ATCC) as PTA-10772 and (ii) a light chain comprising the same amino acid sequence as the amino acid sequence of the light chain encoded by the plasmid deposited with the ATCC as PTA-10774, and wherein the DM4 is linked to the antibody by sulfo-SPDB.
>
> 341. A method for treating a human patient having an FOLR1-expressing cancer of the peritoneum comprising administering intravenously to the patient an immunoconjugate at a dose of 6 milligrams (mg) per kilogram (kg) of adjusted ideal body weight (AIBW) of the patient wherein the immunoconjugate comprises DM4 and an antibody comprising (i) a heavy chain comprising the same amino

acid sequence as the amino acid sequence of the heavy chain encoded by the plasmid deposited with the American Type Culture Collection (ATCC) as PTA-10772 and (ii) a light chain comprising the same amino acid sequence as the amino acid sequence of the light chain encoded by the plasmid deposited with the ATCC as PTA-10774, and wherein the DM4 is linked to the antibody by sulfo-SPDB.

34. The aforementioned claims 1, 317, and 341 are independent claims. The remaining claims of the ’809 Application are dependent claims that incorporate by reference all of the limitations recited in their respective independent claims. The dependent claims in the ’809 Application recite a specific route of administration (i.e., claims 230, 259, and 260), a specific frequency of administration (i.e., claims 237, 238, 261, 262, 318, and 319), a specific cancer to be treated (i.e., claims 253–55, 258, 329, 330), a specific linker (i.e., claims 252, 300, 317, 341, 354), a specific maytansinoid (i.e., 242, 263–65, 320–25, 341, 349, and 354), or a specific antibody or antibody fragment (i.e., claims 266, 300, 317, 341, and 354).

35. The parties’ Joint Submission of Stipulated Facts states that the only claims at issue in this litigation are claims 242, 252–55, 258–65, 300, 317–25, 329–30, 341–49, and 354 of the ’809 Application.[11]

36. IMGN853 is the commercial embodiment within the scope of the claims of the ’809 Application.

37. Each of the independent claims of the ’809 Application at issue in this litigation requires administering IMGN853 to patients at a dose of 6 mg/kg AIBW.

38. The immunoconjugate known as IMGN853 recited in the claims of the ’809 Application was known in the art prior to October 8, 2013, as was a method of using IMGN853 to treat the cancers recited in claim 1 of the ’809 Application. The ’809 Application therefore seeks to patent only the method of dosing IMGN853 at 6 mg/kg AIBW.

## D. <u>Level of Ordinary Skill in the Art</u>

39. At the time of the ’809 Application, a person of ordinary skill in the art (a “POSA”) would have an advanced degree in clinical pharmacy or clinical pharmacology and at least two years of experience in the field of clinical pharmacy, clinical pharmacology, or drug development with an emphasis on oncology agents, or would be a clinical oncologist with experience in drug development and similar years of experience.[12]

---

[11] *See* Joint Submission of Stipulated Facts, Dkt. 127 at ¶ 17.

[12] These Findings of Fact adopt the definition of a POSA provided by the PTO’s expert witness, Dr. Figg. *See* Tr. Nov. 3, 2022 (13:9–15) (Figg). All three expert witnesses agreed, however, that their opinions would not change if they adopted the opposing side’s view of the level of ordinary skill in the art. *See* Tr. Nov. 1, 2022 (159:24) (Tolcher); Tr. Nov. 2, 2022 (114:24–25; 115:1) (Shah); Tr. Nov. 3, 2022 (13:19) (Figg).

40. The three expert witnesses who testified during the bench trial—Drs. Tolcher, Shah, and Figg—each meet or exceed the definition a POSA. They are therefore in a position to render an opinion as to what a skilled artisan would have thought and understood regarding the issues relevant to this case.

41. Although each of the three expert witnesses qualifies as a POSA, Dr. Figg's testimony was the most credible and convincing. Dr. Figg's many titles support his credibility: he serves as an associate director of the Cancer Center at the National Cancer Institute, head of all clinical pharmacology for the National Institute of Health, and he oversees all drug development for the National Cancer Institute. Dr. Figg also serves as an adjunct professor of pharmacy at Virginia Commonwealth University and an adjunct professor of medical oncology at Columbia University. Dr. Figg has participated in drug development at the National Cancer Institute for 30 years and is experienced in clinical pharmacology and pharmacokinetics. Additionally, Dr. Figg has worked on developing hundreds of anti-cancer agents, has overseen drug development for ADCs, and has received 12 patents for various drugs and genetic tests.

## E. Facts Pertaining to Indefiniteness

### 1. Intrinsic Record

42. Although the claims of the '809 Application are directed to administering IMGN853 at 6 mg/kg AIBW, none of the claims in the '809 Application specifies precisely how to calculate AIBW.

43. The "Definitions" section located in the specification of the '809 Application states that:

> The term "adjusted ideal body weight" (AIBW) or "adjusted body weight" (ADJ) refers to a size descriptor that accounts for sex, total body weight, and height. AIBW and ADJ are used interchangeably throughout the specification. AIBW (ADJ) can be calculated, ***for example***, using the formula ADJ = IBW + 0.4(weight in kg – IBW).
>
> (emphasis added).

44. With respect to ideal body weight ("IBW"), which is used to calculate AIBW, the "Definitions" section states that:

> The term "ideal body weight" (IBW) refers to a size descriptor that is unrelated to total body weight. IBW is an estimate of weight corrected for sex and height, and ***optionally frame size***. IBW can be calculated, ***for example***, using the formulas IBW = 0.9H–88 (for males) and IBW = 0.9H–92 (for females), wherein H = height in cm.
>
> (emphasis added).

45. The "Definitions" section also states that IBW and AIBW "are discussed in more detail in Green and Duffull, *British Journal of Clinical Pharmacology* 58:119–133 (2004), which is herein incorporated by reference in its entirety."

46. The Green reference that the '809 Application incorporates in its entirety contains multiple formulas for calculating IBW and lists multiple different correction factors for AIBW.

47. Later, the '809 Application includes an "Examples" section, which contains a list of examples. The examples are prefaced with the following statement:

> It is understood that the examples and embodiments described herein are for illustrative purposes only and that various modifications or changes in light thereof will be suggested to persons skilled in the art and are to be included within the spirit and purview of this application.

48. The conclusion of the "Examples" section also describes the examples as non-limiting, stating:

> The breadth and scope of the present invention should not be limited by any of the above-described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

49. Example 4 of the '809 Application describes ImmunoGen's evaluation of dosing IMGN853 using IBW and AIBW. Example 4 defines IBW and AIBW in this context as follows:

> *Ideal Body Weight (IBW)*
> IBW (male) = 0.9H–88
> IBW (fem) = 0.9H–92
> (where H = height in cm)
> . . .
> *Adjusted Ideal Body Weight (AIBW or ADJ)*
> IBW + 0.4(Actual weight in kg – IBW)

50. The PTO did not reject the claims of the '809 Application as indefinite during prosecution, and instead first raised indefiniteness in this civil action.

51. During the patent prosecution process of the '809 Application, the PTAB stated that "[ImmunoGen] defines '[t]he term "ideal body weight" (IBW) . . . [as] a size descriptor that is unrelated to total body weight. IBW is an estimate of weight corrected for sex and height, and *optionally frame size*. IBW can be calculated, *for example*, using the formulas IBW = 0.9H–88 (for males) and IBW = 0.9H–92 (for females), wherein H = height in cm.'" (emphasis added).

52. The PTAB also stated that "[ImmunoGen] defines '[t]he term "adjusted ideal body weight" (AIBW) or "adjusted body weight" (ADJ) . . . [as] a size descriptor that accounts for sex, total body weight, and height . . . AIBW (ADJ) can be calculated, *for example*, using the formula ADJ = IBW + 0.4(weight in kg – IBW).'" (emphasis added).

53. As Dr. Figg credibly testified, the claim language in the '809 Application would leave a POSA "confused over how to calculate [AIBW]" because the Application's inclusion of the term "for example" in the "Definitions" section leaves the definition of AIBW "vague."[13]

54. Nor would a POSA understand based solely on the terms of the '809 Application how to calculate IBW, which is a necessary factor in calculating AIBW. Dr. Figg credibly testified that a POSA reading the '809 Application would not know how to calculate IBW because the application's "Definitions" section expressly states that IBW can include an "optional[]" frame size correction and twice uses the term "for example."[14] Dr. Figg also testified that the '809 Application's incorporation of the Green reference would leave a POSA "unclear as to which equation to use," because Green lists various different methods for calculating AIBW and IBW.[15]

**2. Extrinsic Record**

55. Evidence extrinsic to the '809 Application and prosecution history points to multiple methods of calculating AIBW. As of the '809 Application's priority date of October 8, 2013, there were many ways to define AIBW, all of which involved a variation of the following generic formula, wherein "CF" stands for "correction factor":

AIBW = IBW + CF (weight in kg – IBW).

56. The art prior to October 8, 2013 disclosed a wide range of AIBW correction factors used for different drugs. Dr. Figg testified that although 0.4 is often used as a standard AIBW correction factor, correction factors for use in AIBW formulas can range from 0.2 to 0.9.[16] And ImmunoGen's expert, Dr. Shah, admitted that the choice in correction factor can lead to a "huge" difference in the resulting dose.[17]

57. Furthermore, some drugs have more than one reported AIBW correction factor. For example, there are at least three correction factors reported for the drug tobramycin, and two different correction factors reported for the drugs gentamicin and amikacin.

[13] Tr. Nov. 3, 2022 (24:21–25; 25:19–20) (Figg).

[14] Tr. Nov. 3, 2022 (25:21–25; 26:1–3) (Figg).

[15] Tr. Nov. 3, 2022 (26:11–15) (Figg).

[16] Tr. Nov. 3, 2022 (15:11–13) (Figg).

[17] Tr. Nov. 2, 2022 (143:8–12) (Shah).

58. The extrinsic record also makes clear that there are numerous ways to calculate IBW, which is necessary to calculate for use in the AIBW formula. As of the priority date of the ’809 Application, there were at least *eleven* formulas for calculating IBW.

59. This extrinsic evidence further leaves a POSA uncertain as to the scope of the claims in the ’809 Application. Dr. Figg credibly testified that the numerous different correction factors reported in the literature would leave a POSA uncertain as to which correction factor to use when calculating AIBW for IMGN853 pursuant to the ’809 Application. And Dr. Figg also testified that a POSA reading the ’809 Application would not know how to calculate IBW, given that the ’809 Application only provides a specific IBW formula as an “example” and there are at least eleven possible IBW formulas in the extrinsic record.[18]

60. Based on the extrinsic evidence, a POSA would not understand that the formula for AIBW should be limited to the formula listed in Example 4 of the ’809 Application. Although ImmunoGen’s expert, Dr. Shah, testified that a POSA would understand that the formula for AIBW was limited to the one listed in Example 4 of the ’809 Application,[19] Dr. Figg credibly testified that a POSA would *not* read Example 4 as limiting the definition of AIBW. This is because, as Dr. Figg explained, “the literature is filled with . . . different equations for ideal body weight and a lot of different correction factors.”[20] Furthermore, as Dr. Figg explained, Example 4 is prefaced by language stating that the examples in the ’809 Application are for illustrative purposes only.[21]

## F. <u>Facts Pertaining to Obviousness</u>

### 1. Scope and Content of the Prior Art

61. The drug IMGN853, for which ImmunoGen owns multiple patents, is an embodiment of the immunoconjugate recited in the ’809 Application. The parties do not dispute that IMGN853 was known in the art prior to October 8, 2013. IMGN853 was disclosed in the following prior art references, each of which is described in further detail below: (1) U.S. Published Application No. 2012/0282282 (“Lutz ’282”); (2) International Published Application No. WO 2011/106528 (“Ab ’528”); (3) U.S. Published Application No. 2012/0009181 (“Ab ’181”); (4) International Published Application No. WO 2012/135675 (“Carrigan ’675”); (5) U.S. Published Application No. 2012/0282175 (“Carrigan ’175”); (6) International Published Application No. WO 2012/138749; and (7) a 2013 abstract presented at the American Society of Clinical Oncology (the “2013 ASCO abstract”). Additionally, ImmunoGen ultimately received four patents covering IMGN853 and its use for treating cancer. *See infra* ¶¶ 102–07.

---

[18] Tr. Nov. 3, 2022 (15:20–25; 22:24–25; 23:2–7) (Figg).

[19] Tr. Nov. 2, 2022 (115:4, 10–13) (Shah).

[20] Tr. Nov. 3, 2022 (27:9–11) (Figg).

[21] Tr. Nov. 3, 2022 (27:21–22) (Figg).

a. Lutz ’282, a patent application for IMGN853 filed in 2012 by Dr. Lutz, discloses that IMGN853 could be used to treat FOLR1-expressing ovarian or peritoneal cancer.

b. Lutz ’282 reports that immunoconjugates like IMGN853 are known to cause ocular toxicity. Lutz ’282 reports that using a charged chemical linker reduced ocular toxicity in rabbits, but does not report any results of human testing.

c. Lutz ’282 focuses on dosing IMGN853 around 6 mg/kg TBW. Specifically, Lutz ’282 states the following:

> In one embodiment, the dose of ADC administered is **at least about 4 mg/kg**. In another embodiment, the dose is **between about 4 mg/kg and about 16 mg/kg**. In another embodiment, the dose is **between about 4 mg/kg and about 8 mg/kg**. In another embodiment, the dose is **between about 5 mg/kg and 6 mg/kg**. In another embodiment, the dose is **between about 6 mg/kg and about 8 mg/kg**. In a further embodiment, the dose is **between about 6 mg/kg and about 7 mg/kg**. In another embodiment, the dose is between about 7 mg/kg and about 8 mg/kg. In yet another embodiment, the dose is **between about 4 mg/kg and 6 mg/kg**. In a further embodiment, the dose is between about 4 mg/kg and 5 mg/kg.
>
> (emphasis added).

d. Ab ’528 describes another IMGN853 study by ImmunoGen and discloses that IMGN853 is a promising treatment for ovarian and peritoneal cancers based on mouse tumor models. In terms of dosing IMGN853, Ab ’528 discloses that the “administering physician can easily determine optimum dosages, dosing methodologies and repetition rates.”

e. Ab ’181 similarly discloses that IMGN853 shows promising activity in mouse tumor models. ImmunoGen has received U.S. Patent No. 8,557,966 based on the application published as Ab ’181.

f. Carrigan ’675 similarly describes IMGN853 as an ovarian cancer treatment and states that an “administering physician can easily determine optimum dosages, dosing methodologies and repetition rates.”

g. Carrigan ’175 also discloses IMGN853.

h. International Published Application No. WO 2012/138749 also discloses IMGN853.

i. The 2013 ASCO abstract was presented by ImmunoGen researchers at a conference in May–June 2013. The abstract describes ImmunoGen’s preliminary results from Phase I testing of IMGN853 in human patients dosed based on TBW. The abstract describes that one patient with serious ovarian cancer had an 82% reduction in tumor marker CA125 after receiving IMGN853 at a dose of 3.3

mg/kg TBW. The 2013 ASCO abstract also discloses that patients received IMGN853 at doses up to 5 mg/kg TBW and concludes that "[s]afety evaluation continues at 5 mg/kg [TBW] and dose escalation [of IMGN853] is ongoing."

62. AIBW was also well known in the prior art as a possible dosing mechanism for various treatments, including for multiple antibiotics and at least six anticancer treatments. Indeed, Dr. Figg catalogued eleven separate prior art references that teach using AIBW dosing, each of which is described below.

a. First, Dr. Figg's group published an article in 2003 which concludes that AIBW dosing decreased the variability in the clearance[22] of the anticancer drug known as COL-3.[23]

b. Fuchs *et al*. filed a patent application prior to October 2013 that teaches using AIBW to dose cyclophosphamide, an anticancer agent.[24]

c. Geraghty *et al.* also filed a patent application prior to the '809 Application's priority date which discloses using AIBW to dose thiotepa, another anticancer agent.[25]

d. An article authored by Ekhart *et al.* teaches using AIBW for administering the anticancer drug carboplatin.[26]

e. Like the Ekhart reference, an article authored by Herrington *et al.* also teaches using AIBW for administering the anticancer drug carboplatin.[27]

f. A reference authored by Topcuoglu *et al.* teaches using AIBW to determine how many CD34+ cells to transplant for treating certain cancers.[28]

---

[22] "Clearance" is a pharmacokinetic term describing the rate at which the body eliminates drug molecules.

[23] *See* Michelle A. Rudek *et al.*, *Factors Involved in the Pharmacokinetics of COL-3, a Matrix Metalloproteinase Inhibitor, in Patients with Refractory Metastatic Cancer: Clinical and Experimental Studies*, 43 J. Clinical Pharmacology 1124 (2003).

[24] *See* U.S. Published Application No. 2012/0148577.

[25] *See* U.S. Published Application No. 2009/0162374.

[26] *See* Corine Ekhart *et al.*, *Carboplatin Dosing in Overweight and Obese Patients with Normal Renal Functions, Does Weight Matter?*, 64 Cancer Chemotherapy & Pharmacology 115 (2009).

[27] *See* Jon D. Herrington *et al.*, *Prospective Evaluation of Carboplatin AUC Dosing in Patients with a BMI ≥27 or Cachexia*, 57 Cancer Chemotherapy & Pharmacology 241 (2006).

[28] *See* Pervin Topcuoglu *et al.*, *How to Calculate the Quantity of CD34+ Cells Infused? A Single Center Cohort Study Based on Actual, Ideal or Adjusted Body Weight*, 36 Transfusion and Apheresis Science 275 (2007).

g. Like the Topcuoglu reference, an article authored by Hicks *et al.* teaches using AIBW to determine how many CD34+ cells to transplant for treating certain cancers.[29]

h. The FDA-approved package insert included with the anticancer chemotherapy drug known as Busulfex recommends using AIBW dosing for obese patients.

i. Green, a reference published in 2004 and incorporated in its entirety in the ’809 Application, teaches using AIBW for dosing various antibiotics and provides various formulas for calculating IBW and AIBW.[30]

j. Similarly, Bauer, a reference published in 1983, discusses AIBW as a method for dosing various antibiotics.[31]

k. Finally, an article authored by Alffenaar & van der Werk describes ocular toxicity caused by an antibiotic known as ethambutol. The article states that the researchers considered using AIBW dosing for ethambutol to ameliorate ocular toxicity, but ultimately settled on IBW dosing.[32]

63. Based on these prior art references, a POSA as of October 2013 would have been familiar with AIBW as a dosing method used for various anticancer drugs and for at least one cell transplant therapy used to treat cancer patients. A POSA would therefore have been familiar with AIBW as a potential dosing method for immunoconjugates like IMGN853.

64. The specific AIBW formula listed in the “Definitions” section and Example 4 of the ’809 Application was also known in the prior art. Drs. Lutz and Ponte, two of the inventors of the ’809 Application, testified that they found the AIBW formula recited in Example 4 on a nutritional website.[33] Because of this, ImmunoGen’s expert Dr. Tolcher testified that “the discovery” claimed in the ’809 Application “is not the [AIBW] formula,” which was found on a nutritional website.[34]

---

[29] *See* C. Hicks *et al.*, *The Use of Adjusted Ideal Body Weight for Overweight Patients Undergoing HPC Mobilisation for Autologous Transplantation*, 91 Annals of Hematology 1795 (2012).

[30] *See* Bruce Green & Stephen B. Duffull, *What is the Best Size Descriptor to Use for Pharmacokinetic Studies in the Obese?*, 58 British J. of Clinical Pharmacology 119 (2004).

[31] *See* L.A. Bauer *et al.*, *Influence of Weight on Aminoglycoside Pharmacokinetics in Normal Weight and Morbidly Obese Patients*, 24 European J. of Clinical Pharmacology 643 (1983).

[32] *See* Jan-Willem Alffenaar & Tjip van der Werf, *Dosing Ethambutol in Obese Patients*, 54 Antimicrobial Agents & Chemotherapy 4044 (2010).

[33] Tr. Nov. 1, 2022 (73:5) (Ponte); Tr. Nov. 1, 2022 (102:21–25) (Lutz).

[34] Tr. Nov. 1, 2022 (178:8–13) (Tolcher).

65. Furthermore, the 0.4 correction factor used in the ’809 Application’s AIBW formula was not only disclosed in the prior art, but was also commonly used as a standard correction factor for AIBW dosing since the 1980s.[35]

### 2. Differences Between the Prior Art and the Claims at Issue

66. Although Lutz ’282 focuses on dosing IMGN853 at around 6 mg/kg TBW, no prior art reference discloses dosing IMGN853 at 6 mg/kg AIBW.

67. No prior art reference describes using AIBW to dose an immunoconjugate drug.

68. Most of the prior art references describe AIBW dosing for small molecule drugs, such as carboplatin, cyclophosphamide, and thiotepa. Two references, however, disclose AIBW dosing for a large molecule treatment. Topcuoglu and Hicks *et al.* both discuss AIBW dosing for CD34+ transplant cells, which are thousands of times larger than immunoconjugates.

69. The prior art focuses on using AIBW dosing in obese or overweight patients. However, the article published in 2003 by Dr. Figg’s group discusses using AIBW to dose COL-3 to treat metastatic cancer for every type of patient, independent of weight.[36]

70. Although it was well known prior to October 2013 that the DM4 payload in immunoconjugates caused ocular toxicity, no prior art reference specifically disclosed that IMGN853 caused ocular toxicity in humans.

71. The prior art does not disclose the pharmacokinetic data described in paragraphs [00195] through [00205] or Figures 1B, 2A-C, and 3-8 of the specification of the ’809 Application. Nor does the prior art disclose pharmacokinetic data for IMGN853 identifying a correlation between early exposure and ocular toxicity.

72. No prior art reference recommends using AIBW dosing in order to reduce ocular toxicity. Although Alffenaar & van der Werk’s reference describes that researchers considered using AIBW to dose ethambutol in order to reduce ocular toxicity, the researchers ultimately recommend IBW dosing instead of AIBW dosing.

### 3. Motivation to Combine

73. A POSA as of October 8, 2013 would have been motivated to combine the prior art references and try AIBW dosing as a potential dosing methodology for IMGN853 in order to eliminate ocular toxicity. This is because AIBW was a well-known dosing methodology, had been used in both small and large molecule drugs, and had even been used to dose various cancer drugs.

---

[35] Tr. Nov. 3, 2022 (46:18–19; 103:20–24) (Figg).

[36] *See* Rudek *et al.*, *supra* note 23.

74. Even though no prior art reference disclosed ocular toxicity in humans attributable to the administration of IMGN853, a POSA would nevertheless understand the potential risk of ocular toxicity from a drug that included the DM4 payload and would monitor for ocular toxicity when testing IMGN853 in humans, just as Dr. Lutz testified that he did during the clinical trials of IMGN853. [37]

75. Once a POSA observed ocular toxicity from the administration of IMGN853 in the ordinary course of human trials, it would be obvious to the skilled artisan to experiment with changing the dosing methodology to reduce toxicity while preserving the therapeutic effects. Indeed, Dr. Figg testified that when confronted with toxicities, persons of ordinary skill in the art will generally consider changing the dose.[38] And even one of ImmunoGen's experts admitted that although the "pathophysiology of the ocular toxicity" is unknown, the toxicity associated with the DM4 payload "is usually dose-related."[39]

76. In experimenting with dosing methodologies for IMGN853, a POSA would try AIBW dosing, given that AIBW dosing was well known in the prior art as a dosing strategy, including as a strategy for dosing anticancer drugs. Indeed, as Dr. Figg testified, "it is common knowledge to [use AIBW] in the field of drug development of anticancer agents."[40]

77. A POSA seeking a dosing methodology for IMGN853 would look to prior art references pertaining to both large and small molecule drugs. Even though immunoconjugates are large molecule drugs, Dr. Figg explained that medical oncologists are familiar with both small and large molecule drugs for use in treating cancer. Thus, the prior art references discussing the use of AIBW in small molecule drugs would motivate a POSA to experiment with AIBW dosing for IMGN853.[41]

78. Additionally, a POSA would be motivated to try AIBW dosing in order to reduce the ocular toxicity associated with IMGN853 because Alffenaar & van der Werk's reference describes that before October 2013, researchers had already considered using AIBW to reduce ocular toxicity in patients receiving the drug ethambutol.

79. Indeed, around the same time as Drs. Lutz and Ponte were developing the '809 Application and before October 2013, other researchers were motivated to try AIBW dosing in order to reduce toxic side effects in a clinical study on a radioimmunoconjugate[42] known as actinium-225-lintuzumab. From February 2006 to

[37] Tr. Nov. 1, 2022 (110:16–22) (Lutz).

[38] Tr. Nov. 3, 2022 (56:19–23) (Figg).

[39] Tr. Nov. 1, 2022 (164:23–25; 165:5–8) (Tolcher).

[40] Tr. Nov. 3, 2022 (41:19–20) (Figg).

[41] Tr. Nov. 3, 2022 (43:9–13; 45:11–24) (Figg).

[42] Radioimmunoconjugates are similar to immunoconjugates, but they contain a radiolabel that kills cancer cells instead of a toxic drug payload. Both radioimmunoconjugates and immunoconjugates are large molecule drugs.

March 2012, researchers tested the radioimmunoconjugate and originally dosed the drug using TBW. [43] After the researchers observed toxic side effects, however, the researchers decided to try AIBW dosing for patients above their ideal body weight. This study was not reported until 2022, so it is not prior art for the purpose of the ’809 Application.[44] However, Rosenblat *et al.* demonstrates that a POSA as of October 2013 would have been motivated to experiment with AIBW dosing, as it shows that other researchers were already doing so before the priority date of the ’809 Application.

80. In 2012, ASCO convened a panel that recommended using TBW, not AIBW, to dose chemotherapy agents (the “2012 ASCO panel”). For multiple reasons, this recommendation would not have dissuaded a POSA from experimenting with AIBW dosing for IMGN853. First, the FDA did not change its requirement of using AIBW dosing in obese patients for the chemotherapy drug Busulfex after the 2012 ASCO panel. Second, Dr. Figg testified that the 2012 ASCO panel would not have dissuaded an oncologist from using AIBW dosing when treating patients.[45] Indeed, even Dr. Tolcher testified that he “can’t disagree” with the statement that the ASCO 2012 recommendation not to use AIBW dosing “isn’t very persuasive.”[46] Finally, the 2012 ASCO panel only recommended TBW for chemotherapy drugs, and IMGN853 is not a chemotherapy drug.

81. A POSA seeking to experiment with AIBW dosing for IMGN853 would start with dosing around 6 mg/kg AIBW, because the prior art focuses on doses of about 5 to 6 mg/kg TBW. Lutz ’282 focused on doses around 6 mg/kg TBW,[47] and the 2013 ASCO Abstract instructed that doses of 5 mg/kg TBW were being tested. Thus, a skilled artisan seeking to determine the proper AIBW dose would start with doses of either 5 or 6 mg/kg AIBW and determine the best dose through routine optimization—just as ImmunoGen’s researchers did.

82. A POSA experimenting with AIBW dosing for IMGN853 would also be motivated to try the 0.4 correction factor, because as Dr. Figg testified, 0.4 has been known as a standard AIBW correction factor since the 1980s. Indeed, Dr. Figg testified that researchers often start with the 0.4 correction factor when experimenting with AIBW dosing.[48]

---

[43] *See* Todd L. Rosenblat *et al.*, *Treatment of Patients with Acute Myeloid Leukemia with the Targeted Alpha-Particle Nanogenerator Actinium-225-Lintuzumab*, 28 Clinical Cancer Research 2030 (2022).

[44] Although the Rosenblat reference is not part of the prior art in this case because it was not reported until 2022, the Federal Circuit has instructed that “independently made, simultaneous inventions” made “within a comparatively short space of time” of the claimed invention can provide “persuasive evidence that the claimed [invention] was the product only of ordinary mechanical or engineering skill.” *Geo. M. Martin Co. v. Alliance Mach. Sys. Int’l LLC*, 618 F.3d 1294, 1305 (Fed. Cir. 2010) (quoting *Concrete Appliances Co. v. Gomery*, 269 U.S. 177, 184 (1925)).

[45] Tr. Nov. 3, 2022 (54:14–19) (Figg).

[46] Tr. Nov. 1, 2022 (189:14–17) (Tolcher).

[47] *See* Tr. Nov. 3, 2022 (33:9–16) (Figg).

[48] Tr. Nov. 3, 2022 (103:20–24) (Figg).

### 4. Reasonable Expectation of Success

83. Even though developing immunoconjugates for treating certain cancers is challenging due to potential toxic side effects, a POSA would have a reasonable expectation of success in experimenting with AIBW dosing for immunoconjugates in order to reduce ocular toxicity. Although, as Dr. Figg testified, the exact mechanism by which immunoconjugates cause ocular toxicity is "not completely known,"[49] it was well understood that the DM4 payload can result in ocular toxicity. Furthermore, as Dr. Figg explained, there was no question that dose was relevant to toxicity. Thus, Dr. Figg testified that a POSA would attempt to change IMGN853's dose when confronted with ocular toxicity because it was well understood by persons of ordinary skill in the art that "[i]f you give too much, you get toxicity."[50]

84. In deciding how to alter the dose for IMGN853, a POSA would have a finite number of options to try: Dr. Figg testified that the standard methods of altering the dosing for anticancer drugs in order to reduce side effects are (1) dose reduction, (2) changing the dose frequency, or (3) assessing how to calculate the dose.[51] In terms of assessing how to calculate the dose, Dr. Figg testified that there are four options other than using total body weight, all of which are disclosed in the Green reference: (1) body surface area, (2) ideal body weight, (3) lean body weight, and (4) AIBW dosing.[52] Indeed, ImmunoGen's witness, Dr. Ponte, similarly testified that in considering alternative metrics for calculating body weight when developing the '809 Application, he considered body surface area, ideal body weight, lean body weight, and AIBW.[53]

85. A POSA would also have a reasonable expectation of success in experimenting with AIBW dosing based on the Alfenaar & van der Werk reference, which was in the prior art as of October 2013. That article states that researchers considered using AIBW dosing in order to reduce ocular toxicity associated with the antibiotic ethambutol.

86. Finally, although not part of the prior art because it was not reported until 2022, research on the radioimmunoconjugate actinium-225-lintuzumab further supports that a POSA would have a reasonable expectation of success in experimenting with AIBW dosing for IMGN853. The Rosenblat *et al.* reference demonstrates that that other researchers were contemporaneously experimenting with AIBW dosing in order to reduce ocular toxicity around the same time as ImmunoGen researchers were developing IMGN853 and the '809 Application.

---

[49] Tr. Nov. 3, 2022 (111:7–9) (Figg).

[50] Tr. Nov. 3, 2022 (56:3) (Figg).

[51] Tr. Nov. 3, 2022 (40:5–7) (Figg).

[52] Tr. Nov. 3, 2022 (40:12–13) (Figg).

[53] Tr. Nov. 1, 2022 (60:23–25; 61:1–3) (Ponte).

### 5. Secondary Indicia of Obviousness

#### i. Unexpected Results

87. ImmunoGen claims that dosing IMGN853 at 6 mg/kg AIBW unexpectedly resulted in the elimination of ocular toxicity for patients across the weight spectrum. In support, ImmunoGen points to the early Phase I results which disclosed no incidents of ocular toxicity in the small group of individuals initially given IMGN853 dosed based on AIBW. But more recent studies of AIBW dosing for IMGN853 call into question the early Phase I results and do not in fact confirm that AIBW dosing eliminates or significantly reduces incidents of ocular toxicity. Thus, as explained below, there is insufficient information based on the current record to determine whether 6 mg/kg AIBW dosing does in fact reduce ocular toxicity for IMGN853.[54]

88. First, there is only a small amount of data for patients dosed based on TBW. In a Phase I study, three out of five patients who received IMGN853 at a dose of 7 mg/kg TBW experienced Grade 3 ocular toxicity. Out of the ten to eleven patients who received IMGN853 at a dose of 5 mg/kg TBW, one patient experienced Grade 3 ocular toxicity.

89. After the researchers decided to switch to AIBW in the Phase I study, seven patients received a dose of 6 mg/kg AIBW. None of those patients experienced Grade 3 ocular toxicity. At that point, ImmunoGen did not give any of the patients prophylactic measures such as lubricating eye drops.

90. The Phase I results reporting zero incidences of Grade 3 ocular toxicity in patients who received 6 mg/kg AIBW were not confirmed in later, larger studies of IMGN853. As described below, when ImmunoGen administered the 6 mg/kg AIBW dose to larger cohorts during two later studies called the "Forward 1" and "Soraya" studies, there *were* incidents of Grade 3 ocular toxicities, *even after* the patients were given numerous prophylactic treatments such as lubricating eyedrops to minimize ocular toxicity.

91. First, the Forward 1 study reported the following Grade 3 ocular toxicities: 2% blurred vision, 1% keratopathy, and 1% dry eye. Dr. Figg explained that during the course of the Forward 1 study, ImmunoGen made important adjustments to its protocols to reduce the frequency and severity of ocular toxicity.[55] Namely, after ImmunoGen observed Grade 2 blurred vision in roughly 54% of the patients, ImmunoGen implemented procedures including excluding patients from the study with active or chronic ocular

---

[54] At the time of the bench trial, the FDA had not granted approval for IMGN853. Shortly after the trial was completed, however, the FDA granted accelerated approval, or "Fast Track" approval, for IMGN853 to be administered to patients. *See* https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/761310Orig1s000ltr.pdf (last accessed Jan. 30, 2023) (hereinafter "FDA Approval Letter"). As part of that approval, the FDA stated that ImmunoGen is required to "[c]onduct a randomized clinical trial of at least 2 dose schedules of mirvetuximab soravtansine to characterize the safety of the recommended dosage of 6 mg/kg AIBW Q3W and alternative dosing schedule(s) (i.e., modified weekly dosing regimen, where lower doses are administered at a weekly frequency, instead of every 3 weeks.)" *Id.* at 5. Thus, at this time, ImmunoGen has not carried its burden of showing that AIBW dosing for IMGN853 does in fact reduce ocular toxicity.

[55] Tr. Nov. 3, 2022 (72:16–74:9) (Figg).

conditions, advising patients experiencing eye problems to apply a warm compress at bedtime, and recommending the daytime use of sunglasses and lubricating eye drops. After ImmunoGen implemented these procedures, the percentage of patients with blurred vision dropped to around 39% and was mostly Grade 1 ocular toxicity.

92. Because of these measures—which were not implemented during the Phase I study of IMGN853—Dr. Figg explained that the ocular toxicity numbers in the Forward 1 study are "falsely lower" than they would have been had ImmunoGen applied the same protocols that it did during the Phase I studies.[56] And despite all of the added prophylactic measures used in Forward 1, Dr. Figg testified that ImmunoGen's more recent publications show that 20% of patients in the Forward 1 study needed either delayed dosing or dose reductions due to ocular toxicity, confirming that ocular toxicity remains a serious problem for IMGN853 even with AIBW dosing.[57]

93. Second, the Soraya study included all of the same prophylactic measures designed to reduce ocular toxicity as the Forward 1 study. Even with all of the additional protocols, 12 patients, or 11%, experienced Grade 3 ocular toxicity. Thus, the Soraya study does not confirm the Phase I results that AIBW dosing unexpectedly eliminates ocular toxicity in patients receiving IMGN853.

94. According to ImmunoGen, a poster from a September 2022 meeting of the European Society of Clinical Oncology ("ESMO") confirms that AIBW dosing reduced Grade 3 ocular toxicities in patients across the weight spectrum. The ESMO poster reports the results of a covariate analysis conducted using the data from ImmunoGen's Phase I studies, the Forward I study, and the Soraya study. The ESMO poster reports that AIBW was not a covariate that impacted the efficacy of IMGN853 and its dosing regimen. Dr. Shah testified that this covariate analysis means that for all patients, regardless of weight, dosing IMGN853 at 6 mg/kg AIBW results in lower incidences of toxicity. In other words, according to Dr. Shah, underweight individuals dosed with 6 mg/kg AIBW are not "getting more toxicity than overweight individual[s]."[58] On the other hand, Dr. Figg testified that the results reported in the ESMO poster indicate that "AIBW had limited impact on efficacy and safety, and [is] likely not of clinical significance."[59] Because the experts in this case had little time to review the ESMO poster,[60] very little testimony was presented about the methodology or reliability of covariate studies, and no evidence was presented about the underlying assumptions in this covariate analysis, the ESMO poster and its conclusions are afforded little weight here.

---

[56] Tr. Nov. 3, 2022 (69:8) (Figg).

[57] Tr. Nov. 3, 2022 (77:11–25) (Figg).

[58] Tr. Nov. 3, 2022 (170:23–25) (Shah).

[59] Tr. Nov. 3, 2022 (83:16–18) (Figg).

[60] The ESMO poster was only recently published in September 2022 and was not disclosed by ImmunoGen in the ordinary course of discovery. *See* Order Issued Nov. 3, 2022, Dkt. 136, at 1–2.

95. On this record, there is not enough information to determine whether AIBW dosing is safe and effective for patients of all weights. In fact, as Dr. Figg testified, AIBW dosing may be dangerous for underweight patients.[61] This is because for patients who weigh less than their ideal body weight, AIBW dosing results in the patients receiving a *higher* dose of IMGN853 than the patients would otherwise receive if they were dosed based on TBW. In contrast, patients who are overweight or obese receive a *lower* amount of IMGN853 when dosed according to AIBW than they would receive if dosed according to TBW; patients who weigh exactly their ideal body weight receive an *identical* dose of IMGN853 when dosed based on either AIBW or TBW.

96. As Dr. Figg explained, cachectic or underweight patients receive a larger amount of the toxic DM4 payload under the claimed AIBW dose for IMGN853 than they otherwise would if they were dosed based on TBW.[62] According to Dr. Figg, under the claimed AIBW dosing regimen, underweight patients may receive as much as 30 percent more drug than they would receive if dosed based on TBW.[63] Because of this, Dr. Figg testified that the persisting incidents of ocular toxicity in the Forward 1 and Soraya studies may have occurred in underweight patients who received too much of the toxic payload.[64] Of course, further studies in the future may reveal that AIBW dosing is indeed therapeutically effective for patients across the weight spectrum, but based on the evidence presented at trial, there is insufficient information upon which to draw this conclusion.

### ii. Long-felt Need

97. The ’809 Application is directed to a method of administering IMGN853 in order to reduce ocular toxicity. The ocular toxicity problems associated with the administration of IMGN853 were first observed during Phase I testing in 2012, and were not publicly disclosed until 2017. Thus, there was no publicly recognized, long-felt need for AIBW dosing for IMGN853 as of October 8, 2013.

### iii. Failure of Others

98. Other drug companies, including Sanofi, Bayer, AbbVie, and Seattle Genetics, have failed to develop immunoconjugates because they were not able to overcome toxic side effects.

### iv. Copying

99. After the filing of the ’809 Application, one of ImmunoGen’s competitors called Sutro Biopharma, Inc. adopted AIBW dosing in clinical trials for an immunoconjugate that, like IMGN853, targets FOLR1 to treat ovarian cancer.

---

[61] Tr. Nov. 3, 2022 (129:2–3) (Figg).

[62] Tr. Nov. 3, 2022 (129:5–8) (Figg).

[63] *Id.*

[64] Tr. Nov. 3, 2022 (129:8–11; 15–17) (Figg).

**v. Industry Praise**

100. ImmunoGen introduced two documents that praised IMGN853: a trade publication and an investment analyst sheet from Canaccord Genuity.[65] Although these documents praise the anticancer properties of IMGN853, neither praises AIBW dosing as a method for reducing ocular toxicity. And a trade publication and investment analyst sheet are not particularly impressive sources of praise as would be, for example, statements by experts in the field.

101. And although Dr. Figg himself praised IMGN853, emphasizing that he "hope[s] this drug gets approved" because "[w]e need more drugs for ovarian cancer," Dr. Figg made clear that none of the cited industry praise is "talking about . . . AIBW."[66]

**G. <u>Facts Pertaining to Obviousness-Type Double Patenting</u>**

102. ImmunoGen owns the '809 Application as well as U.S. Patent Nos. 8,557,966 (the "'966 patent"); 9,133,275 (the "'275 patent"); 9,598,490 (the "'490 patent); and 9,670,280 (the "'280 patent").

103. The '966 patent was granted on October 15, 2013. Claim 1 of ImmunoGen's '966 patent recites a specific kind of "humanized antibody or antigen binding fragment thereof," and IMGN853 is an embodiment of that antibody or fragment.

104. The '275 patent was granted on September 15, 2015. Claim 1 of ImmunoGen's '275 patent recites a "method of treating cancer" by "administering a therapeutically effective amount" of a specific kind of antibody, and IMGN853 is an embodiment of that antibody.

105. The '490 patent was granted on March 21, 2017. Claim 1 of ImmunoGen's '490 patent recites a specific immunoconjugate, and IMGN853 is an embodiment of that immunoconjugate.

106. The '280 patent was granted on June 6, 2017. Claim 1 of ImmunoGen's '280 patent recites a "method of treating cancer" by "administering a therapeutically effective amount" of a specific kind of antibody, and IMGN853 is an embodiment of that antibody.

---

[65] The parties also agreed in their Joint Submission of Stipulated Facts that an article co-authored by Dr. Figg stated that IMGN853 "has shown promising activity in heavily treated ovarian cancer patients" and "demonstrated a favorable benefit-risk profile." Dkt. 127, ¶ 24. Neither party, however, introduced the article into evidence.

[66] Tr. Nov. 3, 2022 (85:1–5) (Figg).

107. The ’966, ’275, ’490, and ’280 patents indicate that ImmunoGen has already received multiple patents for IMGN853 and its use for treating cancer.[67]

## III. CONCLUSIONS OF LAW

Set forth below, pursuant to Rule 52, Fed. R. Civ. P., are the Court’s conclusions of law based on the foregoing findings of fact. In short, judgment must enter in favor of the PTO for three reasons: (1) the ’809 Application is fatally indefinite; (2) the ’809 Application is obvious in light of the prior art; and (3) the ’809 Application fails under the doctrine of obviousness-type double patenting.

### A. Indefiniteness

First, the PTO argues that a patent should not issue for the ’809 Application because the application fails to define AIBW or IBW in such a way that a POSA would be informed, with reasonable certainty, as to the scope of the invention. The PTO raised this argument for the first time in this § 145 litigation; neither the PTAB nor the PTO patent examiner relied on indefiniteness as a basis for rejecting the ’809 Application. Nonetheless, the Federal Circuit has made clear that “§ 145 actions open the door to new evidence and arguments,” and that the PTO is therefore entitled “to assert its meritorious defenses under the circumstances,” even if the PTO did not present them prior to the § 145 litigation. *Hyatt v. Hirshfield*, 998 F.3d 1347, 1363 (Fed. Cir. 2021). Thus, it is appropriate to consider the PTO’s indefiniteness argument here, even though the issue was not raised during the patent prosecution process or decided by the PTAB. Because the PTO has raised the issue of indefiniteness for the first time during this litigation, however, the PTO has the burden of proof as to this issue, and must establish indefiniteness by a

[67] Because of this, any entity other than ImmunoGen that attempted to find the proper dose for IMGN853 to preserve its therapeutic effect while reducing ocular toxicity would be infringing on ImmunoGen’s patents. And even if an exception for experimental use applied allowing another entity to experiment with dosing for IMGN853, no entity other than ImmunoGen would have an incentive to do so, as only ImmunoGen could profit from use of the drug.

preponderance of the evidence. *See Iancu*, 332 F. Supp. 3d at 120 (explaining that the PTO may raise new affirmative defenses in a § 145 proceeding and that the PTO bears the burden of proof on such affirmative defenses); *Dome Patent L.P.*, 799 F.3d at 1377–79 (noting that a preponderance of the evidence standard applies in § 145 proceedings).

The PTO argues persuasively that the '809 Application is fatally indefinite. The indefiniteness analysis begins with the statutory language of § 112 of the Patent Act, which requires that a patent specification "conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b) (emphasis added). The § 112 requirement is often "given the shorthand name 'indefiniteness.'" *In re Conley*, 490 F.2d 972, 975 (C.C.P.A. 1974). And the Supreme Court has explained that the § 112 requirement exists because patents must "be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.'" *Nautilus*, 572 U.S. at 899 (quoting *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996)). As the Supreme Court has further explained, § 112 requires a "reasonable certainty" standard for indefiniteness: a patent is invalid "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 901. The Federal Circuit, in applying the *Nautilus* standard, instructs district courts first to evaluate the language of the claims to determine whether a disputed term is reasonably clear. *Berkheimer*, 881 F.3d at 1363. Next, the Federal Circuit instructs district courts to look at pertinent intrinsic evidence beyond the language of the claims, including the application's written description and prosecution history. *Id.* at 1363–64; *see also HZNP Meds. LLC v. Actavis Labs. UT, Inc.*, 940 F.3d 680, 690–91 (Fed.

Cir. 2019). Finally, the Federal Circuit instructs district courts to evaluate extrinsic evidence of indefiniteness after evaluating the intrinsic evidence. *HZNP Meds.*, 940 F.3d at 691.

These governing principles make clear that the language of the claims in the ’809 Application do not define with reasonable certainty the scope of the claimed invention. ImmunoGen does not dispute that the drug IMGN853 was taught in the prior art, and instead argues that the AIBW dosing regimen in the ’809 Application distinguishes the claimed invention. Indeed, all of ImmunoGen’s claims in the ’809 Application require administering IMGN853 to patients at a dose of 6 mg/kg based on AIBW. But *not one* of the claims in the ’809 Application define AIBW or inform how to calculate a patient’s AIBW. Thus, based on the claims of the ’809 Application, a POSA would not be reasonably certain of the metes and bounds of the claimed AIBW dosing regimen. In fact, Dr. Figg testified that in reading Claim 1 of the ’809 Application, he remained “confused over how to calculate” AIBW because the claims do not provide a definition.[68]

The Definitions section of the ’809 Application also fails to inform skilled artisans of the scope of the claimed AIBW dosing regimen. Specifically, the Definitions section states that AIBW can be calculated “*for example*, using the formula ADJ = IBW = 0.4(weight in kg – IBW).” *Supra* ¶ 43 (emphasis added). In using the phrase “for example,” the ’809 Application makes clear that there are multiple ways to calculate AIBW, thereby leaving a POSA to guess whether the formula provided is the only one covered by the ’809 Application. Indeed, Dr. Figg explained that the Application’s inclusion of the term “for example” in the “Definitions” section leaves the definition of AIBW “vague.”[69] And the Federal Circuit has made clear that “open-

[68] Tr. Nov. 3, 2022 (24:25) (Figg)

[69] Tr. Nov. 3, 2022 (25:19–20) (Figg).

ended" phrases such as "for example" are "not definitional." *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1343 (Fed. Cir. 2020). The Federal Circuit has also noted that "a person of ordinary skill in the art would not understand the 'e.g.' phrase to constitute an exclusive definition." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1374 (Fed. Cir. 2014). And, of course, "e.g.," means "for example."

Nor does the definition of IBW in the '809 Application, which is used in the AIBW calculation, eliminate the uncertainty about the scope of the claimed dosing method; indeed, it adds even more uncertainty. The Definitions section defines IBW as "an estimate of weight corrected for sex and height, and *optionally frame size*," and states that IBW "can be calculated, *for example*, using the formulas IBW = 0.9H–88 (for males) and IBW = 0.9H–92 (for females), wherein H = height in cm." *Supra* ¶ 44 (emphasis added). Thus, the definition of IBW makes clear that the formulas listed for IBW are but examples of possible methods of calculating IBW, and that a calculation of IBW may optionally account for frame size in an unspecified manner. This only further broadens the realm of possible formulas for IBW. For this reason, Dr. Figg testified that a POSA reading the '809 Application would not know how to calculate IBW because the application's "Definitions" section expressly states that IBW can include an "optional[]" frame size correction and twice uses the term "for example."[70]

Further compounding the indefiniteness of IBW and AIBW in the '809 Application is the statement in the '809 Application that "IBW . . . [is] discussed in more detail in Green and Duffull . . . which is herein incorporated by reference in its entirety." *Supra* ¶ 45. The Green reference provides multiple ways to calculate IBW and multiple correction factors that may be used for AIBW. Thus, by incorporating Green in its entirety, the '809 Application specifically

[70] Tr. Nov. 3, 2022 (25:21–25; 26:1–3) (Figg).

incorporates multiple possible formulas for AIBW and IBW. And as Dr. Figg explained, this prevents a POSA from discerning the scope of the '809 Application with the requisite reasonable certainty, because it leaves skilled artisans "unclear as to which equation to use."[71] *See IQASR LLC v. Wendt Corp.*, 825 F. App'x 900, 905 (Fed. Cir. 2020) (rejecting a claim as indefinite where it included "multiple layers of definitions . . . all open-ended and non-limiting"); *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1345 (Fed. Cir. 2015) (holding that claims were indefinite where the claims required a specific measurement and more than one measurement method could be used, but the patent provided no guidance on which specific method to use).

In addition to this intrinsic evidence, the PTO also introduced extrinsic evidence further indicating that the '809 Application fails to define AIBW and IBW with reasonable certainty. As of October 8, 2013, the prior art disclosed at least *eleven* formulas for calculating IBW. *See supra* ¶ 58. And the art also disclosed a wide range of correction factors used to calculate AIBW for different drugs: although 0.4 is often used as a standard correction factor, the correction factor values can range from 0.2 to 0.9. *See supra* ¶ 56. Even ImmunoGen's expert, Dr. Shah, admitted that the choice in correction factor can lead to a "huge" difference in the resulting dose.[72] Thus, as Dr. Figg explained, the numerous different correction factors reported in the literature would leave a POSA uncertain as to which correction factor to use when calculating AIBW for IMGN853, thereby leaving indefinite the scope of the claimed invention in the '809 Application. *See supra* ¶ 59. Further adding to this confusion and uncertain scope of the claimed invention, the record reflects that some drugs have more than one reported correction factor in

[71] Tr. Nov. 3, 2022 (26:11–15) (Figg).

[72] Tr. Nov. 2, 2022 (143:8–12) (Shah).

the literature. For example, as Dr. Figg pointed out, there are at least three correction factors for the drug tobramycin. *See supra* ¶ 57. Thus, because of the wide range of correction factors used in drug dosing for AIBW and the fact that some drugs have more than one reported correction factor for dosing, a POSA would not know whether the 0.4 correction factor used in the ’809 Application is the only correction factor for IMGN853, or whether there are other potential correction factors claimed by the ’809 Application. This extrinsic evidence therefore leaves a POSA to wonder just how many correction factors and AIBW formulas are encompassed by the ’809 Application, and thus this evidence further indicates that the ’809 Application must be rejected as impermissibly indefinite.

Seeking to avoid this conclusion, ImmunoGen argues that a POSA would understand that the definition of AIBW is limited to the specific formula provided in Example 4 of the ’809 Application. ImmunoGen argues that the formulas for AIBW and IBW set forth in Example 4 are the same AIBW and IBW formulas used “for example” in the Definitions section, used by researchers during the clinical trials of IMGN853, and referenced by the PTO during patent prosecution. Thus, ImmunoGen contends that a POSA would not be confused by the use of “for example” in the Definitions section, and would know to apply the formulas in Example 4 rather than other formulas from the literature that were never associated with IMGN853.

ImmunoGen’s argument that Example 4 clarifies the definition of AIBW and IBW fails to persuade. To begin with, the ’809 Application specifically denies that its examples limit the scope of its claims; rather, the application states that “[i]t is understood that the examples and embodiments described herein are for illustrative purposes only and that that various modifications or changes in light thereof will be suggested to persons skilled in the art.” *Supra* ¶ 47. Furthermore, the conclusion of the “Examples” section of the ’809 Application also

describes the examples as non-limiting, stating that "the breadth and scope of the present invention should not be limited by any of the above-described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents." *Supra* ¶ 48. Based on this disclaimer language and the numerous equations and correction factors disclosed in the literature, Dr. Figg explained that a POSA would not understand that the formula for AIBW listed in Example 4 was the only formula for AIBW claimed in the '809 Application.[73]

Federal Circuit precedent also makes clear that the otherwise indefinite claims of the '809 Application should not be limited by the formulas provided in Example 4. Specifically, the Federal Circuit has "repeatedly warned against confining the claims" of an application to the "specific embodiments" described in the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc). And "even if a specification has only one embodiment, its claims will not be confined to that example unless the patentee has demonstrated a clear intention to limit the claim scope using words or expression of manifest exclusion or restriction." *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1301 (Fed. Cir. 2013) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)). Not so here: the '809 Application contains no words expressly limiting its scope to Example 4, and indeed contains multiple disclaimers that the claims of the application should *not* be limited by the embodiments. ImmunoGen cannot have it both ways. As *Aria Diagnostics* teaches, a patentee in suing for infringement is not limited to the patent's embodiments; therefore, the same patentee cannot rely on the embodiments to rescue the patent or patent application from fatal indefiniteness. Thus,

[73] Tr. Nov. 3, 2022 (27:9–22) (Figg).

both Federal Circuit precedent and the ’809 Application itself preclude ImmunoGen from relying on Example 4 to limit the scope of the claimed dosing invention.

ImmunoGen also argues that the prosecution history of the ’809 Application further indicates that a POSA would understand which AIBW formula to use for IMGN853. In support of this argument, ImmunoGen points to the fact that neither the patent examiner nor the PTAB ever raised an indefiniteness rejection for the ’809 Application. This argument is plainly foreclosed by Federal Circuit caselaw making clear that the PTO is entitled to raise new grounds for rejecting a patent application during § 145 proceedings. *See Hyatt*, 998 F.3d at 1363 (“§ 145 actions open the door to new evidence and arguments.”). The fact that the PTO missed the indefiniteness issue during examination does not foreclose the issue now. Otherwise, the rule allowing the PTO to raise a new rejection in § 145 actions would be a dead letter.

ImmunoGen also contends that the prosecution history indicates that the ’809 Application is not indefinite because during examination, the patent examiner, the PTAB, ImmunoGen, and ImmunoGen’s expert all understood that AIBW meant the precise formula provided in Example 4. This argument overstates the record and fails to save the ’809 Application. To begin with, the patent examiner merely applied the Example 4 AIBW formula in proposing a hypothetical. *See* Administrative Record (“AR”) at 6102. This only demonstrates that the examiner understood that AIBW *included* the formula recited in Example 4, but by no means does this indicate that the examiner understood the Example 4 formula to be the *only* definition of AIBW claimed in the ’809 Application.

Moreover, although ImmunoGen contends that the PTAB applied the Example 4 formula, in fact, the PTAB merely quoted the Definitions section of the ’809 Application—the section which includes two uses of the term “for example” and one other use of “optionally.” *See supra*

¶ 52; AR 6180. To be sure, ImmunoGen and ImmunoGen's expert during the prosecution process referenced Example 4's formula for AIBW during the patent examination process, *see* AR 4564–92, 5703–07, but ImmunoGen's own statements during prosecution are far from dispositive on the issue of indefiniteness. Although the Federal Circuit has held that statements during prosecution by the applicant can inform the meaning of the claims and are relevant to the indefiniteness inquiry, *see Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011); *In re Packard*, 751 F.3d 1307, 1312 (Fed. Cir. 2014), these cases do not hold that such evidence is determinative on the issue. Instead, the indefiniteness analysis requires viewing the patent's claims "in light of the specification and prosecution history" as a whole, *Nautilus*, 572 U.S. at 910, which here indicates that the '809 Application encompasses many different formulas for AIBW and IBW.

In conclusion, the '809 Application is fatally indefinite because it fails to define AIBW or IBW anywhere in its claims. Furthermore, although the Definitions section lists a formula for AIBW and IBW, the formulas are preceded by the phrase "for example,"[74] and the Definitions section incorporates the Green reference, which lists various IBW formulas and AIBW correction factors. Finally, although Example 4 lists specific formulas for AIBW and IBW, the '809 Application expressly disclaims that its examples do not limit the scope of the claims. The '809 Application therefore encompasses multiple different AIBW and IBW formulas and fails to define, with the requisite certainty, the scope of the invention. Because ImmunoGen relies on the AIBW limitation to distinguish the '809 Application from the prior art, it is especially critical

[74] The plain English meaning of the phrase "for example" means that the phrase provides just one example out of many possible options. A POSA is not at liberty to ignore the plain meaning of the phrase. *See Interval Licensing LLC*, 766 F.3d at 1374 ("Had the phrase been cast as a definition instead of as an example . . . then it would help provide the clarity that the specification lacks. But as the specification is written . . . a person of ordinary skill in the art would not understand the "e.g." phrase to constitute an exclusive definition[.]").

that the application make clear the metes and bounds of the term. As demonstrated at trial, the ’809 Application plainly fails to do so, leaving skilled artisans to guess about the invention’s scope. For that reason, the ’809 Application must be rejected as indefinite.

**B. Obviousness**

Next, the parties dispute whether the patent examiner and the PTAB properly determined that the claims of the ’809 Application are obvious in light of the prior art. The PTO argues that the prior art taught using IMGN853 to treat ovarian and peritoneal cancers and taught dosing based on AIBW for a variety of drugs. According to the PTO, a POSA would have been motivated to combine the known IMGN853 drug with the known AIBW dosing methodology and would have had a reasonable expectation of success in doing so. In response, ImmunoGen argues that (i) the ’809 Application is not obvious because there are a number of differences between the prior art and the claimed invention, (ii) there was no motivation to combine the known AIBW dosing methods with IMGN853, and (iii) a POSA would not have a reasonable expectation of success in using AIBW to dose IMGN853. Finally, the parties dispute whether secondary considerations such as unexpected results, industry praise, and copying indicate that the ’809 Application is obvious.

The Patent Act requires that patents address “non-obvious subject matter.” 35 U.S.C. § 103. As the Supreme Court explained in *Graham v. John Deere Co.*, 383 U.S. 1 (1966), obviousness is a question of law based on underlying facts. *Id.* at 17–18. Specifically, *Graham* teaches that the obvious analysis consists of three factual inquiries:

(1) determining the scope and content of the prior art;

(2) ascertaining the differences between the prior art and the claims at issue; and

(3) identifying the level of ordinary skill in the art at the time the invention was made.

*Id.* at 17. If the "difference between the subject matter sought to be patented and the prior art" is "such that the subject matter as a whole would have been obvious at the time to a person skilled in the art, then the subject matter cannot be patented." *Id.* at 15. The *Graham* Court also explained that other objective "secondary considerations" or "indicia of obviousness" should be considered in the obviousness analysis, as these indicia can "give light to the circumstances surrounding the origin of the subject matter sought to be patented." *Id.* at 17–18. Such secondary considerations include "commercial success, long felt but unsolved needs, [and] failure of others." *Id.* at 17.

More recently, the Supreme Court clarified in *KSR International Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007), that a patent for an invention "composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Id.* at 418. Instead, the reviewing court must "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id.* Thus, after *KSR*, a patent claiming a combination of previously disclosed elements is not invalid for obviousness unless the reviewing court determines that a POSA would have been motivated to combine the prior art references to create the claimed invention. In other words, even though "common sense directs one to look with care at a patent application that claims as innovation the combination of two known devices," courts must take care to "identify a reason that would have prompted a person of ordinary skill . . . to combine the elements in the way the claimed new invention does," because "inventions in most, if not all, instances rely upon building blocks long since uncovered." *Id.* at 418. In applying *KSR*, the Federal Circuit has explained that the factfinder must consider whether (i) "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention," and (ii) whether "the

skilled artisan would have had a reasonable expectation of success in doing so." *Novartis Pharm. Corp. v. West-Ward Pharm. Int'l Ltd.*, 923 F.3d 1051, 1059 (Fed. Cir. 2019). Both the "presence or absence of a motivation to combine references" and the "presence or absence of a reasonable expectation of success" are "pure question[s] of fact." *Id.*

As an initial matter, it is appropriate to note that a district court can determine whether the claims within a patent application are obvious even after determining that the same claims are indefinite. The Federal Circuit has recognized that "[t]he questions [of obviousness and indefiniteness] are different" and the finding that a claim is indefinite does not "imply that it is incapable of being compared to prior art to determine if one of its alternatives is anticipated or would have been obvious on the grounds asserted." *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1360 (Fed. Cir. 2020). Thus, the indefiniteness of the '809 Application at issue here does not preclude a comparison of the '809 Application to the prior art. And for the purpose of the obviousness analysis, ImmunoGen may be taken at its word that the AIBW formula ImmunoGen intended to patent is the one in Example 4 of the '809 Application. *See id.* (holding that a court may focus on one of an application's alternatives in determining obviousness).

Each of the elements of the *Graham* and *KSR* obviousness inquiry are analyzed in turn below. In short, the patent examiner and the PTAB correctly concluded that the '809 Application is obvious. At the bench trial, the PTO persuasively demonstrated that the elements of the '809 Application were disclosed in the art prior to October 8, 2013, that a POSA would have been motivated to combine those references and dose IMGN853 at 6 mg/kg AIBW, and that in doing so, a skilled artisan would have a reasonable expectation of success. Finally, secondary considerations of obviousness weigh in the PTO's favor. Thus, ImmunoGen has failed to show

that the ’809 Application is not obvious in violation of § 103; ImmunoGen is therefore not entitled to a patent for the invention claimed in the ’809 Application. *See Disney Enterprises*, 940 F. Supp. 2d at 292 (“[The applicant] bears the burden of proving by a preponderance of the evidence that it is entitled to a . . . patent covering the pending claims in the . . . application.”).

**1. Level of Ordinary Skill in the Art**

The first step in the obviousness analysis is to identify the level of ordinary skill in the art at the time the invention was made. *See Graham*, 383 U.S. at 17. ImmunoGen and the PTO used slightly different formulations to define the qualifications of a POSA at the time the ’809 Application was filed in October 2013. Despite this, all three experts agreed that their definitions are “very similar,” and the three experts also stated that their opinions would not change if the other party’s definition were adopted.[75] It is therefore appropriate to adopt Dr. Figg’s definition of a POSA. Thus, at the time of the ’809 Application, a POSA would have an advanced degree in clinical pharmacy or clinical pharmacology and at least two years of experience in the field of clinical pharmacy, clinical pharmacology, or drug development with an emphasis on oncology agents, or would be a clinical oncologist with experience in drug development and similar years of experience. *See supra* ¶ 39.

**2. Scope and Content of the Prior Art**

The next step is to determine from the trial evidence the scope and content of the art as of October 8, 2013, the priority date of the ’809 Application. *See Graham*, 383 U.S. at 17. The prior art is set forth in detail in the above findings of fact. *See supra* ¶¶ 61–65. Simply put, not only was IMGN853 known in the art prior to October 8, 2013, but it was also known that the administration of IMGN853 had the potential to cause ocular toxicity in humans because

[75] *See* Tr. Nov. 2, 2022 (114:20-23) (Dr. Shah); Tr. Nov. 1, 2022 (15912-24) (Dr. Tolcher); Tr. Nov. 3, 2022 (13:19) (Dr. Figg).

IMGN853 contains the DM4 payload. AIBW was also known in the prior art, including as a method for dosing multiple antibiotics and at least six anticancer treatments. Furthermore, AIBW had been used to dose both large and small molecule drugs. The specific AIBW formula listed in the "Definitions" section and Example 4 of the '809 Application was also known in the prior art, as Drs. Ponte and Lutz testified that they found the formula on a nutrition website. Finally, the 0.4 correction factor used in the '809 Application's AIBW formula was not only disclosed in the prior art but also was commonly used as a standard correction factor. Based on these prior art references, a POSA would have been familiar with AIBW as a potential dosing method for immunoconjugates like IMGN853 as of October 8, 2013.

**3. Differences Between the Prior Art and the Claims at Issue**

*Graham* instructs that the next step in the obviousness analysis is to determine the differences between the prior art and the claims at issue. *See Graham*, 383 U.S. at 17. These differences are described in detail in the findings of fact set forth above, *supra* ¶¶ 66–72.

In arguing that the '809 Application is not obvious, ImmunoGen points to six differences between the prior art and the '809 Application:

(1) AIBW dosing had never been used to dose an immunoconjugate.

(2) The prior art does not specifically disclose dosing IMGN853 at 6 mg/kg AIBW.

(3) The prior art focuses on AIBW dosing in obese or overweight patients, but the '809 Application describes using AIBW dosing for all patients regardless of weight.

(4) No prior art reference discloses that IMGN853 caused ocular toxicity in humans.

(5) No prior art reference specifically recommends using AIBW dosing in order to overcome ocular toxicity.

(6) No prior art reference discloses a correlation between the PK parameters for early exposure of IMGN853 and the occurrences of ocular toxicity.

Simply put, none of these purported differences between the prior art and the '809 Application supports that the application is unobvious. First, ImmunoGen points out that AIBW dosing had never been used to dose an immunoconjugate, but the trial evidence persuasively reflects that AIBW dosing had been used in a variety of anticancer drugs before October 2013, including both large and small molecule drugs. *See supra* ¶¶ 62–63, 68. Thus, as Dr. Figg testified, a POSA would have been familiar with AIBW dosing as a potential dosing method for immunoconjugates, even though the prior art does not disclose specifically that AIBW had previously been used to dose immunoconjugates. *See supra* ¶¶ 63, 76; *see also* Tr. Nov. 3, 2022 (41:19–20) (Figg) ("[I]t is common knowledge to [use AIBW] in the field of drug development of anticancer agents.").

Second, although the prior art does not disclose dosing IMGN853 at 6 mg/kg AIBW, the prior art *does* disclose dosing IMGN853 at around 6 mg/kg TBW. As explained *infra* in Section III.B.4, a POSA would have been motivated to combine the known 6 mg/kg TBW dose with the known AIBW dosing methodology to arrive at a dose of 6 mg/kg AIBW.

Third, although most of the prior art references focus on AIBW dosing in the context of overweight or obese patients, the Rudek reference discusses using AIBW to dose an anticancer drug for every type of patient, independent of weight. *See supra* ¶ 69.

Fourth, although no prior art reference specifically discloses that IMGN853 causes ocular toxicity in humans, it was well understood that the administration of immunoconjugates containing the DM4 payload could result in ocular toxicity in human patients. *See supra* ¶¶ 8, 74.

Fifth, although no prior art reference explicitly recommends AIBW dosing to overcome ocular toxicity, the Alffenaar reference reports testing AIBW dosing as a possible solution for ocular toxicity associated with the antibiotic ethambutol. *See supra* ¶ 62. Thus, even though

Alffenaar ultimately recommended IBW dosing for ethambutol, the reference shows that AIBW dosing was disclosed in the prior art as a possible solution for ocular toxicity.

Sixth, despite the fact that the prior art does not disclose ImmunoGen's PK data for IMGN853 indicating a correlation between early exposure and ocular toxicity, Dr. Figg testified that in 2013, such PK testing was routinely conducted in the course of drug development.[76] Thus, any POSA experimenting with IMGN853 would have conducted similar PK analyses.

In summary, none of ImmunoGen's asserted differences between the prior art and the invention claimed in the '809 Application is material or indicates that the claims at issue are unobvious. And as discussed below, a POSA would have been motivated to combine the prior art references, which disclose using AIBW dosing for various drugs, to arrive at the claimed dose in the '809 Application of 6 mg/kg AIBW.

**4. Motivation to Combine the Prior Art Elements**

The Federal Circuit has made clear that an "invention is not obvious simply because all of the claimed limitations were known in the prior art at the time of the invention." *Forest Labs., LLC v. Sigmapharm Labs., LLC*, 918 F.3d 928, 934 (Fed. Cir 2019). Instead, the Federal Circuit directs district courts to ask "whether there is a reason, suggestion, or motivation in the prior art that would lead one of ordinary skill in the art to combine the references." *Id.* (quoting *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1356 (Fed. Cir. 1999)). Thus, the next issue is whether a POSA would have had a motivation to combine the prior art references in order to arrive at the AIBW dosing regimen disclosed in the '809 Application. This motivation "can be found explicitly or implicitly in the prior art references themselves, in market forces, in design incentives, or in 'any need or problem known in the field of endeavor at the time of

[76] Tr. Nov. 3, 2022 (57:4–6) (Figg).

invention and addressed by the patent.'" *Id.* (quoting *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1359 (Fed. Cir. 2017)).

Here, the trial record reflects that a POSA as of the priority date of the '809 Application would have been motivated to combine the prior art references. To begin with, a POSA would understand the potential risk of ocular toxicity given that IMGN853 contains the DM4 payload, which for over twenty years was known to cause ocular toxicity in humans. *See supra* ¶ 8. Given this knowledge, a skilled artisan would monitor for ocular toxicity when conducting clinical trials of IMGN853 because it contains the DM4 payload. Indeed, Dr. Lutz testified that he monitored for ocular toxicity during the clinical trials of IMGN853 based on the known history of the DM4 payload.[77] Once a POSA observed ocular toxicity from IMGN853 in the ordinary course of human trials, the skilled artisan would then experiment with changing the dose to reduce toxicity. *See supra* ¶ 75. Even ImmunoGen's expert, Dr. Tolcher, testified that although the exact mechanism by which the DM4 payload causes ocular toxicity is unknown, the toxicity "is usually dose-related."[78] Thus, as Dr. Figg explained, when confronted with ocular toxicity, a skilled artisan would look to changing the dose of IMGN853.[79]

Once a POSA decided to experiment with the dosing methodology for IMGN853, the skilled artisan would try AIBW dosing, given that AIBW dosing was well known in the prior art. *See supra* ¶ 76. And the skilled artisan would look to prior art references pertaining to both large and small molecule drugs, even though immunoconjugates are large molecule drugs. *See supra* ¶ 77. Thus, the prior art references discussing the use of AIBW in small molecule drugs would motivate a POSA to experiment with AIBW for IMGN853, as would the two references teaching

---

[77] Tr. Nov. 1, 2022 (110:16–22) (Lutz).

[78] Tr. Nov. 1, 2022 (164:23–25; 165:5–8) (Tolcher).

[79] Tr. Nov. 3, 2022 (56:19–23) (Figg).

the use of AIBW for the transplantation of CD34+ cells—which are thousands of times larger than immunoconjugates. *See supra* ¶¶ 68, 77. Moreover, Alffenaar and van der Werk's reference would have provided additional motivation to a POSA to try AIBW dosing in order to reduce the ocular toxicity associated with IMGN853. The Alffenaar reference describes that before the priority date of the '809 Application, researchers considered using AIBW to reduce ocular toxicity in patients receiving ethambutol. *See supra* ¶¶ 62, 78. This reference would suggest to a skilled artisan that AIBW dosing may be used as a potential solution for ocular toxicity and would provide motivation and reason for the skilled artisan to experiment with AIBW in attempting to eliminate or ameliorate the toxicities associated with IMGN853.

Once a POSA decided to experiment with AIBW dosing based on the prior art references, the skilled artisan would start with doses of around 5 mg/kg or 6 mg/kg AIBW and then determine the precise dose based on routine optimization. Lutz '282 focuses on dosing IMGN853 at around 6 mg/kg TBW, and the 2013 ASCO abstract disclosed that IMGN853 had been tested on humans at a dose of 5 mg/kg TBW. *See supra* ¶¶ 61, 81. Thus, a skilled artisan seeking to determine the proper AIBW dose would start with doses of either 5 mg/kg or 6 mg/kg AIBW and determine the best dose through experimentation, which is precisely what ImmunoGen's researchers did. *See supra* ¶ 26. Furthermore, a POSA would be motivated to use the 0.4 correction factor, because as Dr. Figg explained, 0.4 was used as a standard correction factor and hence researchers often start with 0.4 when experimenting with AIBW dosing. *See supra* ¶ 82.

Finally, the fact that other researchers were contemporaneously motivated to try AIBW dosing in order to reduce toxic side effects provides further support for the conclusion that a POSA as of October 8, 2013 would have been motivated to experiment with AIBW dosing for

IMGN853. The Rosenblat reference demonstrates that around the same time that Drs. Lutz and Ponte were developing the '809 Application, other researchers were testing AIBW dosing to ameliorate toxic side effects associated with a radioimmunoconjugate. *See supra* ¶ 79. Although the Rosenblat reference is not in the prior art because it was not published until 2022, it discloses an "independently made, simultaneous invention[]" made "within a comparatively short space of time," which the Federal Circuit has explained can provide "persuasive evidence that the claimed [invention] was the product only of ordinary mechanical or engineering skill." *Geo. M. Martin Co.*, 618 F.3d at 1305 (quoting *Concrete Appliances Co. v. Gomery*, 269 U.S. 177, 184 (1925)). The Rosenblat reference therefore provides "persuasive evidence" that a POSA would have been motivated to combine the prior art references and experiment with AIBW dosing. *Id.*

Seeking to avoid this conclusion, ImmunoGen argues that a POSA would not have been motivated to experiment with AIBW dosing for IMGN853 in order to eliminate ocular toxicity because Lutz '282 describes that IMGN853 did not result in ocular toxicity when administered to rabbits. According to ImmunoGen, based on the rabbit studies described in Lutz '282, a skilled artisan would believe that the use of the charged linker in IMGN853 solved the problem of ocular toxicity and would therefore have no reason to try AIBW dosing. In support, ImmunoGen cites Federal Circuit precedent holding that "where a problem was not known in the art, the solution to that problem may not be obvious, because 'ordinary artisans would not have thought to try at all because they would not have recognized the problem.'" *Forest Labs.*, 918 F.3d at 935 (quoting *Leo Pharm. Prods*, 726 F.3d at 1357).

This argument misinterprets *Forest Laboratories* and ignores pertinent facts in this case. In *Forest Laboratories*, the Federal Circuit explained that a drug patent disclosing a dosing method was not obvious where the inventors discovered an entirely unknown side effect—

cardiotoxic events—and developed the claimed dosing method as a solution to the problem. *Id.* In that case, the fact that the drug at issue caused cardiotoxic events was *never* disclosed in the prior art. For that reason, *Forest Laboratories* is inapposite here, where, as ImmunoGen admits, [80] it was well known for over twenty years the administration of immunoconjugates like IMGN853 containing the DM4 payload caused ocular toxicity. Unlike the researchers in *Forest Laboratories*, ImmunoGen does not get credit for "discovering" the ocular toxicity associated with IMGN853, because the discovery itself would have been obvious to a POSA given the well-known history of the DM4 payload.

Contrary to ImmunoGen's argument, the rabbit studies described in Lutz '282 do not alter the result that a POSA as of the priority date of the '809 Application would have known about the potential for ocular toxicity from IMGN853. Both Dr. Lutz and Dr. Figg testified that despite the suggestion in Lutz '282 that using a charged linker instead of an uncharged one in IMGN853 eliminated ocular toxicity when IMGN853 was tested in rabbits, it is well known that side effects may occur in humans which do not appear during animal testing. *See supra* ¶ 14. Researchers entering clinical trials of IMGN853 would therefore understand the need to monitor for ocular toxicity in human patients regardless of the results of the preclinical rabbit studies described in Lutz '282. That others did not discover the fact that IMGN853 caused ocular toxicity is presumably because ImmunoGen was the only one who stood to gain from experimenting with its already-patented IMGN853 drug. *See Acorda Therapeutics, Inc. v. Roxane Labs., Inc.*, 903 F.3d 1310, 1339 (Fed. Cir. 2018) ("[A] blocking patent diminishes possible rewards from a non-owner's . . . investment activity aimed at an invention whose commercial exploitation would be infringing[.]"); *see also supra* note 67. ImmunoGen's

[80] *See* Joint Submission of Stipulated Facts, Dkt. 127 at ¶ 29.

argument that a skilled artisan would not have been motivated to experiment with AIBW dosing based on Lutz ’282 therefore fails.

ImmunoGen next argues that even if a POSA would have recognized a need to modify the dosing in Lutz ’282, nothing in the prior art would motivate a skilled artisan to try the ’809 Application dose of 6 mg/kg AIBW using the specific AIBW formula recited in Example 4. This argument fails to persuade for two reasons. First, a POSA would have been motivated to try the recited dose of 6 mg/kg AIBW based on two prior art references: Lutz ’282 and the 2013 ASCO abstract.[81] As Dr. Figg explained, a POSA would be motivated to try a dose of 5 mg/kg AIBW because the 2013 ASCO abstract discloses that as of the priority date of the ’809 Application, patients had received IMGN853 at a dose of 5 mg/kg TBW.[82] Based on the 2013 ASCO abstract, a skilled artisan experimenting with AIBW would start by dosing around 5 mg/kg AIBW. Similarly, as Dr. Figg explained, Lutz ’282 focused on doses around 6 mg/kg TBW.[83] Thus, based on the prior art, a POSA experimenting with AIBW dosing for IMGN853 would start by dosing around 5 to 6 mg/kg AIBW and would then escalate the dose in order to find the maximum tolerated dose that would minimize ocular toxicity. Indeed, that is precisely what ImmunoGen did: 5 mg/kg and 6 mg/kg are the only two AIBW doses that ImmunoGen ever

[81] In ImmunoGen’s Response to the PTO’s Proposed Findings of Fact and Conclusions of Law, ImmunoGen argues that the PTO waived its argument that the ’809 Application is obvious in light of the 2013 ASCO abstract because the PTO did not raise the argument in its pre-trial briefs, discovery responses, or expert testimony. In support, ImmunoGen cites only a non-binding decision from the District of Delaware. *See* ImmunoGen’s Response to Defendant’s Proposed Findings of Fact and Conclusions of Law, Dkt. 144 at 3 (citing *Allergan, Inc. v. Barr Labs., Inc.*, 808 F. Supp. 2d 715, 735 (D. Del. 2011)). ImmunoGen’s waiver argument fails; the PTO did not waive its argument about the 2013 ASCO abstract. The 2013 ASCO abstract was admitted as an exhibit at trial without any objection from ImmunoGen, and Dr. Figg testified about the abstract at trial, explaining that the abstract discloses that IMGN853 was tested in humans at a dose of 5 mg/kg TBW. *See* Tr. Nov. 3, 2022 (35:1–8; 65:5–9) (Figg). And ImmunoGen even stipulated that the 2013 ASCO abstract is prior art in this case, further undermining ImmunoGen’s assertion that the PTO waived arguments about the 2013 ASCO abstract. *See* Joint Submission of Stipulated Facts, Dkt. 127 at ¶¶ 56–57.

[82] Tr. Nov. 3, 2022 (65:5–9) (Figg).

[83] Tr. Nov. 3, 2022 (33:7–16) (Figg).

tested. *See supra* ¶ 26. Moreover, Ab '528 and Carrigan '675, both of which involve IMGN853, teach that an "administering physician can easily determine optimum dosages, dosing methodologies and repetition rates." *Supra* ¶ 61. Thus, the prior art teaches that a POSA would start by dosing IMGN853 at 5 to 6 mg/kg AIBW and, like ImmunoGen, determine the optimum dose based on routine experimentation with dosing.[84]

Additionally, a skilled artisan would have been motivated to try the specific AIBW formula described in Example 4—which Drs. Lutz and Ponte did not invent, but found on a nutrition website—because the Example 4 formula follows the standard template for AIBW formulas and utilizes the most common correction factor. As Dr. Figg explained, AIBW formulas typically follow the following template, where "CF" stands for "correction factor": AIBW = IBW + CF (weight in kg – IBW). *See supra* ¶ 55.[85] The Example 4 formula follows this template, but uses 0.4 as the correction factor. As Dr. Figg testified, 0.4 has been known as a standard correction factor since the 1980s. *See supra* ¶ 82. Indeed, as Dr. Figg also explained, researchers often start with 0.4 as a correction factor when experimenting with AIBW dosing. *Id.* Thus, based on the information in the prior art, a POSA would have been motivated to try the recited dose of 6 mg/kg AIBW using the formula disclosed in Example 4 of the '809 Application.

ImmunoGen also argues that two references would dissuade a skilled artisan from experimenting with AIBW dosing for IMGN853: (i) the 2012 ASCO panel, which recommended using TBW instead of AIBW for chemotherapy agents; and (ii) the Green reference, which

---

[84] This conclusion is supported by the Federal Circuit's decision in *Boehringer Ingelheim Pharms. Inc. v. Mylan Pharms., Inc.*, 803 F. App'x 397 (Fed. Cir. 2020). There, the Federal Circuit affirmed a finding of obviousness of a dosing methodology where the district court determined that a POSA would have a reasonable expectation of arriving at the claimed doses "through routine experimentation." *Id.* at 402.

[85] *See also* Tr. Nov. 3, 2022 (14:17–21) (Figg).

discusses AIBW but ultimately recommends dosing based on lean body weight. In support, ImmunoGen cites Federal Circuit caselaw explaining that the district court must consider prior art references "that would lead away from the invention in suit." *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1568 (Fed. Cir. 1987). But the Federal Circuit has also made clear that pointing to "isolated prior art disclosures" that may lead away from the claimed invention is not sufficient: instead, the district court must determine obviousness "[v]iewing the prior art as a whole." *Merck & Cie v. Gnosis S.P.A.*, 808 F.3d 829, 834 (Fed. Cir. 2015). The 2012 ASCO panel and Green are only "isolated prior art disclosures," *id.*, and, in any event, would not discourage a skilled artisan from experimenting with AIBW dosing for IMGN853. Although Green ultimately recommends lean body weight, the reference recognizes that many drugs are in fact dosed based on AIBW. And as Dr. Figg explained, the 2012 ASCO panel would not have dissuaded an oncologist from using AIBW dosing when treating patients.[86] Even ImmunoGen's expert, Dr. Tolcher, testified that he "can't disagree" with the statement that the ASCO recommendation not to use AIBW dosing "isn't very persuasive."[87] Additionally, the 2012 ASCO panel only recommended TBW for chemotherapy drugs, and IMGN853 is not a chemotherapy drug. Finally, even after the 2012 ASCO panel, the FDA did not change its requirement of using AIBW dosing for obese patients for the chemotherapy drug Busulfex. *See supra* ¶ 80. This demonstrates that even the FDA was not persuaded by the ASCO recommendation not to use AIBW dosing. Thus, ample evidence indicates that neither Green nor the 2012 ASCO recommendation would prevent a skilled artisan from experimenting with AIBW dosing for IMGN853.

---

[86] Tr. Nov. 3, 2022 (54:14–19) (Figg).

[87] Tr. Nov. 1, 2022 (189:14–17) (Tolcher).

Finally, ImmunoGen argues that even if using AIBW dosing for *obese* patients is obvious in light of the prior art, the '809 Application is not obvious because it recites using AIBW for *all* patients regardless of weight, and nothing in the prior art suggests applying AIBW dosing to underweight or cachectic patients. This argument also fails to persuade. To begin with, ImmunoGen misreads the prior art. Although most of the prior art discusses using AIBW in the context of obese patients, the Rudek reference describes using AIBW dosing for an anticancer treatment without reference to patient body weight. *See supra* ¶ 69. Furthermore, ImmunoGen's argument that the '809 Application applies AIBW to all patients, including underweight patients, does not render the '809 Application unobvious. This is so because for patients who weigh exactly their ideal body weight, a dose of 6 mg/kg AIBW is identical to a dose of 6 mg/kg TBW. *See supra* ¶ 95. Thus, the '809 Application in effect seeks to cover a dose that was already disclosed in the prior art. And in these circumstances, the Federal Circuit has long held that claims broad enough to cover obvious subject matter are unpatentable even if they read on unobvious claims that would otherwise be patentable. *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1281 (Fed. Cir. 2015), *aff'd sub nom. Cuozzo Speed Techs., LLC v. Lee*, 579 U.S. 261 (2016) (citations omitted) ("It is a long-established rule that claims which are broad enough to read on obvious subject matter are unpatentable even though they also read on nonobvious subject matter."). This principle applies here, for as Dr. Figg testified and Drs. Shah and Tolcher admitted, when a patient weighs exactly her ideal body weight, she will receive the same amount of IMGN853 regardless of whether she is dosed based on TBW or AIBW.[88] And because dosing IMGN853 at 6 mg/kg TBW is disclosed in Lutz '282, the claims of the '809 Application, if

[88] Tr. Nov. 2, 2022 (53:22–23) (Tolcher); Tr. Nov. 2, 2022 (171:21–172:7) (Shah); Tr. Nov. 3, 2022 (29:10–16) (Figg).

patented, would prevent doctors from practicing what is already disclosed in the prior art for patients at their ideal body weight. Thus, because for patients at their ideal body weight the IMGN853 dose under the '809 Application is exactly what it would be under the TBW dosing disclosed in Lutz '282, the claims of the '809 Application "are broad enough to read on obvious subject matter" and are therefore invalid as obvious. *Cuozzo*, 793 F.3d at 1281.

In conclusion, a POSA as of October 8, 2013 would have been motivated to combine the prior art references to arrive at the '809 Application's recited dose of 6 mg/kg AIBW for IMGN853, and all of ImmunoGen's arguments to the contrary fail to persuade. Furthermore, the '809 Application is obvious and unpatentable because in circumstances where a patient weighs exactly her ideal body weight, the claims of the '809 Application cover a dose already disclosed in the prior art.

**5. Reasonable Expectation of Success**

To support a finding of obviousness, the evidence must also show that a "skilled artisan would have had a reasonable expectation of success" from "combin[ing] the teaching[s] of the prior art references to achieve the claimed invention." *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1068–69 (Fed. Cir. 2012). In other words, even if it is "obvious to experiment" by combining elements known in the prior art, a claimed invention is not obvious unless there is something in the prior art "to indicate that a skilled artisan would have had a reasonable expectation that such an experiment would succeed in being therapeutically effective." *Id.* at 1070. On the one hand, where a "skilled artisan merely pursues 'known options' from a 'finite number of identified, predictable solutions,' the resulting invention is obvious." *Id.* (quoting *KSR*, 550 U.S. at 421). But on the other hand, where the "prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful," courts must "reject hindsight claims of

obviousness." *Id.* at 1071 (quoting *In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009)). Finally, evidence of obviousness based on an "obvious-to-try" theory is "insufficient unless it indicates that the possible options skilled artisans would have encountered were 'finite,' 'small,' or 'easily traversed,' and that skilled artisans would have had a reason to select the route that produced the claimed invention." *Id.* (quoting *Ortho-McNeil Pharm., Inc. v. Mylan Labs, Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008)).

Here, the trial record reflects that a POSA would have a reasonable expectation of success in combining the prior art references and experimenting with dosing IMGN853 based on AIBW instead of TBW. The prior art indicates that a POSA faced with ocular toxicity from the administration of IMGN853 would have a "finite" number of options to try and would have a "reason to select the route that produced the claimed invention." *Id.* Even though the mechanism underlying the causation of ocular toxicity by the DM4 payload was not well understood, both Dr. Figg and Dr. Tolcher testified that skilled artisans understood that the dose was relevant to toxicity,[89] and a skilled artisan would therefore have a reasonable expectation that changing the dose would impact the resulting ocular toxicity. In deciding how to alter the dose, a POSA would have a finite number of options to try: in this regard, Dr. Figg testified that the standard methods of altering the dosing for anticancer drugs in order to reduce side effects are (1) dose reduction, (2) changing the dose frequency, or (3) assessing how to calculate the dose.[90] In terms of assessing how to calculate the dose, Dr. Figg testified that there are four options other than using total body weight, all of which are disclosed in the Green reference: (1) body surface area, (2) ideal body weight, (3) lean body weight, and (4) AIBW dosing.[91] Indeed, ImmunoGen's witness,

[89] Tr. Nov. 3, 2022 (56:19 – 23) (Figg); Tr. Nov. 1, 2022 (164:23–25; 165:5–8) (Tolcher).

[90] Tr. Nov. 3, 2022 (40:5–7) (Figg).

[91] Tr. Nov. 3, 2022 (40:12–13) (Figg).

Dr. Ponte, similarly testified that in considering alternative metrics for calculating body weight when developing the ’809 Application, he considered body surface area, ideal body weight, lean body weight, and AIBW.[92] And as Dr. Figg explained, AIBW is a standard tool in the toolkit for skilled artisans in the field of drug development.[93]

The Alffenaar reference in the prior art provides yet another reason why a POSA would have a reasonable expectation of success in using AIBW dosing for IMGN853 to reduce ocular toxicity. The Alfenaar reference discloses that prior to the ’809 Application, researchers considered using AIBW dosing as a means to reduce ocular toxicity associated with the antibiotic ethambutol. *See supra* ¶ 62. Although the researchers ultimately recommended using IBW instead of AIBW, the reference explains that AIBW is a method that the researchers considered specifically to address the problem of ocular toxicity. The reference therefore provides “direction as to which of many possible choices is likely to be successful,” *In re Cyclobenzaprine*, 676 F.3d at 1071, and provides further evidence that a POSA would have a reasonable expectation of success in experimenting with AIBW dosing for IMGN853 in order to eliminate ocular toxicity.

Finally, once a POSA chose AIBW out of the limited options for calculating body weight, the 5 mg/kg and 6 mg/kg doses disclosed in Lutz ’282 and the 2013 ASCO abstract would provide “parameters” of where to start with AIBW dosing. *In re Cyclobenzaprine*, 676 F.3d at 1071. Thus, this is not a case where ImmunoGen discovered the AIBW dosing regimen by “merely throw[ing] metaphorical darts at a board” in hopes of arriving at a successful result. *Id.* (quoting *In re Kubin*, 561 F.3d at 1359). Instead, because the prior art gave an “indication of

[92] Tr. Nov. 1, 2022 (60:23–25; 61:1–3) (Ponte).

[93] Tr. Nov. 3, 2022 (41:19–20) (Figg) (“[I]t is common knowledge to [use AIBW] in the field of drug development of anticancer agents.”).

which parameters were critical" and provided "direction as to which of many possible choices is likely to be successful," *id.*, a POSA would have a reasonable expectation of success in experimenting with AIBW dosing.

Seeking to avoid this conclusion, ImmunoGen argues that a POSA as of October 8, 2013 would not have a reasonable expectation of success in using AIBW dosing to eliminate ocular toxicity for IMGN853 because immunoconjugates are difficult to develop and often fail during human trials due to toxic side effects. Thus, according to ImmunoGen, no POSA could have a reasonable expectation of success without first conducting human testing, because without clinical trials, a POSA would be unable to predict how an immunoconjugate would perform in humans. This argument must be rejected because it misinterprets binding Federal Circuit precedent. The Federal Circuit has repeatedly emphasized that for a patent or patent application to be obvious, "the law does not require certainty," *Teva Pharm. Int'l GmbH v. Eli Lilly & Co.*, 8 F.4th 1331, 1348 (Fed. Cir. 2021), nor does it require "absolute predictability of success." *OSI Pharm. v. Apotex Inc.*, 939 F.3d 1375, 1385 (Fed. Cir. 2019). And the Federal Circuit has clearly stated that "efficacy data," though helpful, is *not* "always required for a reasonable expectation of success." *Id.* If ImmunoGen's theory of reasonable expectation of success were adopted, *any* dosing regimen would be patentable, because as ImmunoGen's expert Dr. Tolcher explained, *all* doses must undergo human trials in order to confirm their efficacy.[94] Thus, in conclusion, the fact that the field of immunoconjugates is unpredictable is not enough to defeat an obviousness determination where, as here, (i) the problem of ocular toxicity was known, (ii) skilled artisans understood that changing the dose was a possible solution for adverse side effects such as ocular

[94] Tr. Nov. 2, 2022 (96:2–5) (Tolcher).

toxicity, and (iii) the prior art disclosed AIBW dosing as a potential means to eliminate or ameliorate ocular toxicity.

**6. Secondary Indicia of Obviousness**

The final step in the obviousness analysis is to determine whether secondary considerations demonstrate that the ’809 Application is unobvious. In *Graham*, the Supreme Court identified three “secondary indicia” of obviousness that courts should consider: (i) commercial success, (ii) long-felt but unresolved needs, and (iii) failure of others to find a solution to the problem or make the invention. *Graham*, 383 U.S. at 17. Since then, the Federal Circuit has identified additional secondary considerations to be considered indicia of obviousness, including copying by competitors, unexpected results, and industry praise.[95] The Federal Circuit has explained that because objective indicia of non-obviousness are “crucial in avoiding the trap of hindsight” when reviewing what otherwise seems like “a combination of known elements,” *Leo Pharm. Prods.*, 726 F.3d at 1358, secondary objective criteria “must always be considered and given whatever weight is warranted by the evidence presented.” *Knoll Pharm. Co., Inc. v. Teva Pharm. USA, Inc.*, 367 F.3d 1381, 1385 (Fed. Cir. 2004) (per curiam). Furthermore, Federal Circuit precedent makes clear that secondary considerations such as unexpected results may arise *after* the filing date. *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1308 (Fed. Cir. 2011). Thus, even though the § 103 analysis “remains properly focused ‘at the time the invention was made,’” a patent applicant may present “relevant indicia of nonobviousness, whether or not this evidence was available or expressly contemplated at the filing of the patent application.” *Id.* Finally, “in order to accord substantial

[95] *See, e.g., Liqwd, Inc. v. L’Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019) (copying); *Millennium Pharms., Inc. v. Sandoz Inc.*, 862 F.3d 1356, 1368 (Fed. Cir 2017) (unexpected results); *Apple Inc. v. Samsung Elec. Co., Ltd.*, 839 F.3d 1034, 1053 (Fed. Cir. 2016) (en banc) (industry praise).

weight to secondary considerations, the evidence of secondary considerations must have a 'nexus' to the claims, *i.e.*, there must be a legally and factually sufficient connection between the evidence and the patented invention." *Eli Lilly & Co.*, 8 F.4th at 1360 (quoting *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019)). And importantly, the patent applicant "bears the burden of showing that a nexus exists." *Id.*

ImmunoGen argues that unexpected results, long-felt need, failure of others, copying, and industry praise demonstrate that the '809 Application is not obvious. In response, the PTO argues that the secondary indicia do not support a finding of unobviousness. Each of the disputed secondary indicia of obviousness is discussed in detail below, but in short, none of the secondary factors persuasively demonstrates that the '809 Application is unobvious.

**i. Unexpected Results**

To begin with, ImmunoGen argues that the AIBW dosing regimen described in the '809 Application unexpectedly resulted in eliminating the ocular toxicity previously associated with IMGN853. According to ImmunoGen, the reduction in severe adverse ocular events following the switch to AIBW dosing would have been unexpected to a skilled artisan, and without this reduction in adverse events, IMGN853 would not have advanced beyond the initial Phase I trials. In response, the PTO argues that ImmunoGen has failed to show the existence of unexpected results because clinical trial results do not in fact confirm that AIBW dosing reduces ocular toxicity relative to dosing based on TBW.

The Federal Circuit has explained that unexpected results are objective evidence of unobviousness because "that which would have been surprising to a person of ordinary skill in a particular art would not have been obvious." *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995). It is also well settled, however that unexpected results must be supported with "objective evidentiary support" and "factual evidence." *CFMT, Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1342 (Fed.

Cir. 2003). Here, ImmunoGen, which has the burden of proving secondary considerations, has failed to demonstrate by a preponderance of the evidence that the AIBW dosing in the ’809 Application led to the unexpected result of reducing or eliminating ocular toxicity for IMGN853. Instead, there is insufficient evidence in the record to conclude that AIBW dosing in fact reduces or eliminates ocular toxicity.

In attempting to demonstrate unexpected results, ImmunoGen relies on the early Phase I study of IMGN853, which disclosed no incidents of ocular toxicity in the small group of individuals who initially received IMGN853 dosed according to AIBW. In making this argument, ImmunoGen ignores more recent studies of AIBW dosing for IMGN853, which call into question the early Phase I results. Because district courts are permitted to look to evidence of secondary considerations that arises *after* the priority date of the application at issue, *see Genetics Inst.*, 655 F.3d at 1308, those later studies are pertinent to consider here. Specifically, as described in detail in the Findings of Fact above, *see supra* ¶¶ 87–96, the Forward 1 study and the Soraya study both undermine the Phase I results and demonstrate that even with AIBW dosing, ocular toxicity remains a problem for patients given IMGN853.

First, the Forward 1 study indicates that some patients who received IMGN853 at a dose of 6 mg/kg AIBW experienced Grade 3 ocular toxicity even after receiving prophylactic treatments such as lubricating eye drops. Furthermore, during the course of the Forward 1 study, ImmunoGen excluded patients who had active or chronic eye problems. Because of these measures, Dr. Figg explained that the ocular toxicity results reported in the Forward 1 study are “falsely lower” than they would have been had ImmunoGen applied the same protocols that it did during the Phase I studies.[96] Dr. Figg also explained that despite the added prophylactic

[96] Tr. Nov. 3, 2022 (69:8) (Figg).

measures that ImmunoGen took during the Forward 1 study, ImmunoGen's more recent publications show that 20% of the patients in the Forward 1 study needed either delayed dosing or dose reductions because the patients experienced ocular toxicity. As Dr. Figg testified, this confirms that ocular toxicity remains a serious problem for IMGN853, even with AIBW dosing.[97]

Second, the Soraya study also undermines the Phase I results for AIBW dosing of IMGN853. The Soraya study included all the same prophylactic measures designed to reduce ocular toxicity as the Forward 1 study. Despite this, 12 patients, or 11%, experienced Grade 3 ocular toxicity. Thus, the Soraya study does not confirm ImmunoGen's assertion that AIBW dosing unexpectedly eliminates ocular toxicity in patients receiving IMGN853.

Seeking to avoid this conclusion, ImmunoGen relies on the 2022 ESMO poster which reports results of a covariate analysis conducted using the data from ImmunoGen's Phase I study, the Forward 1 study, and the Soraya study. According to ImmunoGen, the 2022 ESMO poster indicates that AIBW dosing is safe and effective for all patients regardless of weight. Specifically, the ESMO poster reports that AIBW was not a covariate that impacted the efficacy of IMGN853 and its dosing regimen; Dr. Shah testified that this means dosing IMGN853 at 6 mg/kg AIBW results in lower incidences of toxicity for all patients, regardless of weight.[98] This argument is unpersuasive. First, the record reflects that the ESMO poster deserves little weight here. The ESMO poster was not disclosed in the ordinary course of discovery, and the experts had little time to review the document before testifying about it during the bench trial. Furthermore, the ESMO poster reports the results of a covariate analysis, but precious little

---

[97] Tr. Nov. 3, 2022 (77:11–25) (Figg).

[98] Tr. Nov. 3, 2022 (170:23–25) (Shah).

testimony was presented by either side about the methodology or reliability of covariate studies, and no evidence was presented about the underlying assumptions in the covariate analysis reported in the ESMO poster. Thus, on this record, there is not enough information to determine whether AIBW dosing is safe and effective for patients of all weights. And as Dr. Figg explained, AIBW dosing may in fact be *dangerous* for underweight patients, because patients who weigh less than their ideal body weight receive a higher dose of IMGN853 when dosed based on AIBW than they would receive if dosed based on TBW. *See supra* ¶ 95. Cachectic or underweight patients therefore receive a larger amount of the toxic DM4 payload under the claimed AIBW dose for IMGN853 than they otherwise would. *Id.* Because of this, Dr. Figg explained that the persisting incidents of ocular toxicity in the Forward 1 and Soraya studies may have occurred in underweight patients who received too much of the toxic payload. *See supra* ¶ 96. Of course, further studies in the future may reveal that AIBW dosing of IMGN853 is indeed therapeutically effective and reduces ocular toxicity for patients across the weight spectrum, but on this record, ImmunoGen has failed to provide information that by a preponderance of the evidence demonstrates that AIBW dosing led to the unexpected effect of reducing ocular toxicity while maintaining therapeutic efficacy for all patients.

In conclusion, ImmunoGen has failed to demonstrate that the AIBW dosing regimen claimed in the ’809 Application in fact reduces or eliminates ocular toxicity. The secondary factor of unexpected results therefore does not weigh in favor of finding the ’809 Application unobvious.

**ii. Long-Felt, Unmet Need**

ImmunoGen next argues that the AIBW dosing regimen claimed in the ’809 Application met a decades-long need for a tolerable and effective platinum-resistant ovarian cancer treatment. As with unexpected results, this argument fails to persuade. Federal Circuit precedent

teaches that "[e]vidence of a long felt but unresolved need tends to show non-obviousness because it is reasonable to infer that the need would have not persisted had the solution been obvious." *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1332 (Fed. Cir. 2016). But as with any secondary obviousness consideration, the asserted long-felt need must have a nexus to the claimed invention. *Eli Lilly & Co.*, 8 F.4th at 1360. Finally, whether there is a "long-felt need is analyzed as of the date of an articulated identified problem and evidence of efforts to solve that problem." *WBIP*, 829 F.3d at 1334 (quoting *Tex. Instruments, Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1178 (Fed. Cir. 1993)). Here, a long-felt need does not weigh in favor of finding the '809 Application unobvious for the simple reason that ImmunoGen cannot show that such a need existed as of October 8, 2013.

ImmunoGen argues that the '809 Application solves the long-felt need for a treatment for platinum-resistant ovarian cancer. But this misinterprets the requisite analysis. The '809 Application does not seek to patent the drug IMGN853, because ImmunoGen already has multiple patents for IMGN853. Instead, the '809 Application is directed to a dosing method for administering IMGN853 in order to eliminate ocular toxicity. Thus, the relevant need that ImmunoGen must show is satisfied by the '809 Application is a need for a dosing regimen for IMGN853 that solves the problem of ocular toxicity. The ocular toxicity problems associated with the administration of IMGN853 were first observed during Phase I testing in 2012, and were not publicly disclosed in 2017. Thus, as of the priority date of the '809 Application on October 8, 2013, there was no publicly recognized, long-felt need for AIBW dosing for IMGN853 at all.

Seeking to avoid this conclusion, ImmunoGen points to two Federal Circuit cases holding that a long-felt need for a safe and tolerable treatment where existing treatments had negative

side effects supported the unobviousness of a patent. *See Forest Labs.*, 918 F.3d at 936–37; *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 998 (Fed. Cir. 2009). But neither *Forest Laboratories* nor *Procter & Gamble* is apposite here. First, in *Forest Laboratories*, the Federal Circuit noted that demonstrating that a claimed drug reduced negative side effects "may *not* be a particularly strong demonstration of a long-felt need." 918 F.3d at 936–37 (emphasis added). Despite this, because the existence of a long-felt need is a question of fact, the Federal Circuit affirmed the district court's conclusion that the long-felt need weighed in favor of unobviousness because the district court "did not clearly err[]." *Id.* at 937. Thus, *Forest Laboratories* is hardly strong support for ImmunoGen's position. At best, it holds that the district court's conclusion in that case was not clear error, but demonstrates that reduction of negative side effects may not be strong evidence of a long-felt need. In this case, the evidence was insufficient for ImmunoGen to carry its burden and demonstrate that the invention claimed in the '809 Application satisfies a long-felt need. Nor is *Procter & Gamble* any help to ImmunoGen. There, the Federal Circuit affirmed the district court's finding that an osteoporosis treatment satisfied a long-felt need because at the time of the filing date, all other treatments for osteoporosis were "inadequate." *Procter & Gamble*, 566 F.3d at 998. But unlike this case, in *Procter & Gamble*, the claimed invention was the drug itself, not a dosing regimen. Thus, the district court concluded that the claimed drug solved an unmet need because it more effectively treated osteoporosis than other drugs on the market. Here, the drug—IMGN853—is already patented and no evidence at trial showed that reducing ocular toxicity caused by IMGN853 was a long-felt need.[99] Furthermore, in *Forest Laboratories* and *Procter & Gamble*, the district court

---

[99] There is no doubt that anticancer drugs are a long-felt need in other circumstances, as there will always be a need for drugs to treat serious illnesses. But because the anticancer drug described in the '809 Application has already been patented, *see supra* ¶¶ 102–07, the invention claimed in the '809 Application is limited to the AIBW dosing regimen for IMGN853. Thus, because secondary considerations must have a "nexus" to the "patented invention,"

determined that the claimed invention actually addressed the asserted need. Here, as discussed at length above, ImmunoGen has failed to show that AIBW dosing in fact reduces ocular toxicity when compared to TBW dosing. Thus, *Forest Laboratories* and *Procter & Gamble* are inapposite and unpersuasive. In conclusion, ImmunoGen has failed to show that a long-felt need supports the unobviousness of the '809 Application, because as of the priority date of the '809 Application, there was no publicly recognized long-felt need for an AIBW dosing regimen for IMGN853.

Finally, ImmunoGen points to the FDA's "Fast Track" approval of IMGN853 as evidence that the '809 Application meets the need for a safe and tolerable treatment for platinum-resistant ovarian cancer. But the FDA's grant of accelerated approval for IMGN853 does not confirm that the '809 Application meets a long-felt need. Instead, the FDA approval requires ImmunoGen to conduct additional studies of the dosing regimen for IMGN853 in order to "characterize the safety of the recommended dosage of 6 mg/kg AIBW."[100] This indicates that although the FDA views IMGN853 as valuable, the FDA seeks additional data in order to confirm whether the 6 mg/kg AIBW dosing indeed works better than other dosing methods. Thus, in conclusion, ImmunoGen has failed to carry its burden to show that IMGN853 satisfies the long-felt, unmet need for a dosing regimen for IMGN853, and the FDA "Fast Track" approval of IMGN853 does not change this result. The secondary consideration of a long-felt but unmet need therefore does not support a finding that the '809 Application is unobvious.

---

*Eli Lilly & Co.*, 8 F.4th at 1360, the long-felt need must be tailored to the dosing regimen for IMGN853. Here, ImmunoGen has only demonstrated a long-felt need for anticancer drugs and has failed to carry its burden to show persuasively a nexus to the dosing regimen claimed in the '809 Application.

[100] FDA Approval Letter at 5.

**iii. Failure of Others**

ImmunoGen also contends that failure of others to address toxicities associated with immunoconjugates supports the conclusion that the '809 application is unobvious. The Federal Circuit has explained that "[n]onobviousness is suggested by the failure of others to find a solution to the problem which the patent[] in question purport[s] to solve." *Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578–79 (Fed. Cir. 1991). At trial, ImmunoGen presented brief testimony from Dr. Tolcher that ImmunoGen's competitors, including Sanofi, Bayer, AbbVie, and Seattle Genetics have failed to develop immunoconjugates because they were not able to overcome toxic side effects.[101] This does not support the conclusion that the '809 Application is unobvious, however, because ImmunoGen is not seeking to claim a method of dosing *all* immunoconjugates. Instead, the '809 Application is narrowly directed at a dosing regimen for IMGN853 in order to reduce ocular toxicity. ImmunoGen has presented no evidence that any other drug developers have tried and failed to solve the same problem that the '809 Application purports to solve: that is, eliminating ocular toxicity associated with IMGN853.[102] Thus, failure of others does not persuasively demonstrate that the '809 Application is unobvious.

**iv. Copying**

ImmunoGen next argues that copying indicates that the '809 Application is unobvious. At trial, ImmunoGen presented testimony from Dr. Tolcher that Sutro Biopharma, one of ImmunoGen's competitors, adopted AIBW dosing in clinical trials for an immunoconjugate that treats ovarian cancer.[103] But this testimony does not support the conclusion that the '809

---

[101] Tr. Nov. 1, 2022 (157:7–12; 161:19–25) (Tolcher).

[102] Indeed, because only ImmunoGen could profit from the use of IMGN853, no other entity would have an incentive to find a dosing regimen for IMGN853 that reduced ocular toxicity. *See supra* note 67.

[103] Tr. Nov. 1, 2022 (209:8–210:15) (Tolcher).

Application is unobvious. As the Federal Circuit has explained, "[a] showing of copying is only equivocal evidence of non-obviousness in the absence of more compelling objective indicia of other secondary considerations." *Sealy Tech., LLC v. SSB Manuf. Co.*, 825 F. App'x 801, 808 (Fed. Cir. 2020) (quoting *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000)). Moreover, the Federal Circuit has explained that evidence of copying is entitled to "little weight" if the copier's "product is not identical to the claimed invention." *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 317 (Fed. Cir. 1985). ImmunoGen introduced no evidence that ImmunoGen's competitor used AIBW dosing for an immunoconjugate identical to IMGN853. Indeed, Dr. Tolcher agreed that the immunoconjugate developed by Sutro was a "different drug."[104] Thus, ImmunoGen has not satisfied its burden to demonstrate that copying by competitors supports finding the '809 Application unobvious.

**v. Industry Praise**

Finally, ImmunoGen argues that IMGN853 has been praised, citing a trade publication and an investment analyst sheet from Canaccord Genuity. Evidence of "industry praise of the claimed invention . . . weighs in favor of the non-obviousness of the claimed invention." *Apple*, 839 F.3d at 1053. But here, there is *no* industry praise in the record of the claimed invention; all of ImmunoGen's cited industry praise pertains only to the anticancer properties of IMGN853, for which ImmunoGen has already received multiple patents. As Dr. Figg made clear, none of the industry praise pertains to the claimed AIBW dosing method in the '809 Application—indeed, none of the cited praise mentions AIBW at all.[105] Thus, ImmunoGen has failed to show a nexus

[104] Tr. Nov. 1, 2022 (210:19–21) (Tolcher).

[105] Tr. Nov. 3, 2022 (85:1–5) (Figg).

between the praise and the claimed invention, and industry praise therefore cannot support a finding of unobviousness here.

In conclusion, ImmunoGen has failed to demonstrate that secondary considerations support finding that the ’809 Application is unobvious. Thus, each step of the *Graham* analysis leads to the conclusion that the ’809 Application is invalid as obvious. Put simply, the trial record persuasively reflects that (i) the elements of the ’809 Application were disclosed in the prior art, (ii) a POSA would have been motivated to combine the prior art references to arrive at the claimed AIBW dosing method, and (iii) a skilled artisan would have a reasonable expectation of success in doing so. The patent examiner and the PTAB therefore correctly determined that the ’809 Application is obvious in violation of § 103.

### C. <u>Obviousness-Type Double Patenting</u>

The final issue is whether the ’809 Application is invalid under the doctrine of obviousness-type double patenting, as both the PTO and the PTAB concluded. Obviousness-type double patenting is a judicially created doctrine grounded in § 101 of the Patent Act. *Abbvie*, 764 F.3d at 1372. Section 101 provides that “[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter . . . may obtain *a* patent therefor.” 35 U.S.C. § 101. The Federal Circuit has recognized that § 101 forbids an individual from obtaining more than one patent on the same invention, which is known as “double patenting.” *Abbvie*, 764 F.3d at 1372. Thus, under this doctrine, an inventor cannot “secur[e] a second, later expiring patent for the same invention.” *Id.* at 1373. The prohibition on receiving two patents for the same invention has existed since the inception of our patent laws: as early as 1819, Justice Story explained that “if [a patentee] can successively take out at different times new patents for the same invention, he may perpetuate his exclusive right during a century.” *Id.* (quoting *Odiorne v. Amesbury Nail Factory*, 18 F. Cas. 578, 579 (C.C.D. Mass. 1819)). The ban

on double patenting therefore "ensures that the public gets the benefit of the invention after the original period of monopoly expires." *Id.* For this reason, under the obviousness-type double patenting doctrine, a later claim that is obvious over or anticipated by an earlier claim is invalid for obviousness-type double patenting. *Id.* at 1374.

Here, the '809 Application clearly fails under the doctrine of obviousness-type double patenting. As previously described, ImmunoGen has already received *four* patents covering IMGN853 and its use for treating cancer: the '966 patent, the '275 patent, the '490 patent, and the '280 patent. *See supra* ¶¶ 102–07. The relevant question is therefore whether the claims in the '809 Application would have been obvious over the issued claims in the four earlier patents. *Abbvie*, 764 F.3d at 1374. As previously addressed in detail, the '809 Application is fatally obvious because AIBW dosing was disclosed in the prior art, and a POSA would have both a motivation to combine the prior art references and a reasonable expectation of success in doing so. [106] Allowing ImmunoGen to receive another patent for the '809 Application would therefore permit ImmunoGen to extend its patent term by obtaining a second, later expiring patent for the same invention—which is exactly what Justice Story warned against. In other words, because the '809 Application is fatally obvious, it must also fail for obviousness-type double patenting. Accordingly, the doctrine of obviousness-type double patenting provides a third reason why a patent cannot issue for the '809 Application.

* * *

In conclusion, the PTO and the PTAB properly determined that ImmunoGen is not entitled to a patent for the AIBW dosing regimen claimed in the '809 Application. The '809

---

[106] The parties both agree that the issue of obviousness-type double patenting rises or falls with the obviousness determination. *See* Pl.'s Trial Brief, Dkt. 117 at 18 ("The Office's obviousness-type double patenting contentions rise or fall with its obviousness grounds"); Tr. Nov. 1, 2022 (42:16–17) (Counsel for the PTO stated that "the obvious type double patenting . . . rises and falls with obviousness.").

Application is fatally indefinite and obvious; furthermore, the '809 Application is invalid under the doctrine of obviousness-type double patenting. Accordingly, judgment must enter in favor of the PTO.

An appropriate Order will issue.

The Clerk of the Court is directed to provide a copy of these Findings of Fact and Conclusions of Law to all counsel of record.

Alexandria, Virginia
January 30, 2023

/s/
T. S. Ellis, III
United States District Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| IMMUNOGEN, INC.,<br><br>Plaintiff,<br><br><br>v.<br><br>KATHERINE VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | 1:20-cv-00274-TSE-LRV |

## JUDGMENT

Pursuant to the order of this Court entered on January 30, 2023, and in accordance with Federal Rule of Civil Procedure 58, JUDGMENT is hereby entered in favor of the Defendant, KATHERINE VIDAL and against the Plaintiff, IMMUNOGEN, INC.

January 30, 2023
Date

FERNANDO GALINDO
Clerk

Tanya Randall
(By) Deputy Clerk

# ANTI-FOLR1 IMMUNOCONJUGATE DOSING REGIMENS

## CROSS REFERENCE TO RELATED APPLICATIONS

**[0001]** Related applications U.S. 61/888,365 (filed October 8, 2013), U.S. 61/888,337 (filed October 8, 2013), U.S. 61/948,363 (filed March 5, 2014), and U.S. 62/004,815 (filed May 29, 2014) are incorporated herein by reference in their entireties.

## REFERENCE TO A SEQUENCE LISTING SUBMITTED ELECTRONICALLY VIA EFS-WEB

**[0002]** The content of the electronically submitted sequence listing (Name: 2921.0550003_SequenceListing_ST25, Size: 16,593 bytes; and Date of Creation: September 30, 2014), filed with the application is herein incorporated by reference in its entirety.

### Field of the Invention

**[0003]** The field of the invention generally relates to methods of administering anti-FOLR1 immunoconjugates for the treatment of diseases, such as cancer. The methods provide dosing regimens that minimize unwanted side-effects.

### Background of the Invention

**[0004]** Cancer is one of the leading causes of death in the developed world, with over one million people diagnosed with cancer and 500,000 deaths per year in the United States alone. Overall it is estimated that more than 1 in 3 people will develop some form of cancer during their lifetime. There are more than 200 different types of cancer, four of which—breast, lung, colorectal, and prostate—account for over half of all new cases (Jemal et al., 2003, *Cancer J. Clin.* 53:5-26).

**[0005]** Folate Receptor 1 (FOLR1), also known as Folate Receptor-alpha, or Folate Binding Protein, is an N-glycosylated protein expressed on plasma membrane of cells. FOLR1 has a high affinity for folic acid and for several reduced folic acid derivatives. FOLR1 mediates delivery of the physiological folate, 5-methyltetrahydrofolate, to the interior of cells.

**[0006]** FOLR1 is overexpressed in vast majority of ovarian cancers, as well as in many uterine, endometrial, pancreatic, renal, lung, and breast cancers, while the expression of FOLR1 on normal tissues is restricted to the apical membrane of epithelial cells in the kidney proximal tubules, alveolar pneumocytes of the lung, bladder, testes, choroid plexus, and thyroid (Weitman SD, *et al.*, *Cancer Res* 52: 3396-3401 (1992); Antony AC, *Annu Rev Nutr* 16: 501-521 (1996); Kalli KR, *et al. Gynecol Oncol* 108: 619-626 (2008)). This expression pattern of FOLR1 makes it a desirable target for FOLR1-directed cancer therapy.

**[0007]** Because ovarian cancer is typically asymptomatic until advanced stage, it is often diagnosed at a late stage and has poor prognosis when treated with currently available procedures, typically chemotherapeutic drugs after surgical de-bulking (von Gruenigen V *et al., Cancer* 112: 2221-2227 (2008); Ayhan A *et al., Am J Obstet Gynecol* 196: 81 e81-86 (2007); Harry VN *et al., Obstet Gynecol Surv* 64: 548-560 (2009)). Thus there is a clear unmet medical need for more effective therapeutics for ovarian cancers.

**[0008]** Antibodies are emerging as a promising method to treat such cancers. In addition, immunoconjugates, which comprise an antibody conjugated to another compound, for example, a cytotoxin, are also being investigated as potential therapeutics. In particular, immunoconjugates comprising maytansinoids, which are plant derived anti-fungal and anti-tumor agents, have been shown to have some beneficial activities. The isolation of three ansa macrolides from ethanolic extracts of *Maytenus ovatus* and *Maytenus buchananii* was first reported by S. M. Kupchan *et al.* and is the subject of U.S. Pat. No. 3,896,111 along with demonstration of their anti-leukemic effects in murine models at the microgram/kg dose range. Maytansinoids, however, have unacceptable toxicity, causing both central and peripheral neuropathies, and side effects: particularly nausea, vomiting, diarrhea, elevations of hepatic function tests and, less commonly, weakness and lethargy. This overall toxicity is reduced to some extent by the conjugation of maytansinoids to antibodies because an antibody conjugate has a toxicity which is several orders of magnitude lower on antigen-negative cells compared to antigen-positive cells. However, there is still a need to identify particular dosage regimens of anti-FOLR1 immunoconjugates that are therapeutically effective in humans but avoid adverse effects.

## BRIEF SUMMARY OF THE INVENTION

**[0009]** Methods of administering an anti-FOLR1 immunoconjugate at a therapeutically effective dosing regimen that minimizes unwanted side-effects are provided herein. As described in more detail below, administration of the same dose of an anti-FOLR1 immunoconjugate to different patients results in substantial variations in the pharmacokinetics (e.g., Cmax and AUC) of the immunoconjugate. The present inventors have discovered, and the experiments provided herein demonstrate, that ocular toxicity correlates with a high Cmax and high initial AUC value. However, the high Cmax and initial AUC values are not required for efficacy. Accordingly, described herein are methods for treating a patient having cancer comprising administering to the patient an effective dose of an immunoconjugate which binds to FOLR1, wherein the immunoconjugate is administered at a dose of about 3.0 mg/kg to about 7.0 mg/kg, wherein the kilograms of body weight are adjusted to ideal body weight (IBW), lean body weight (LBW), or adjusted ideal body weight (AIBW or ADJ). The abbreviations "ADJ" and "AIBW" can be used interchangeably to refer to adjusted ideal body weight. In some embodiments, the kilograms are adjusted to AIBW (ADJ). Also, described herein are methods for treating a patient having cancer comprising

administering to the patient an effective dose of an immunoconjugate which binds to FOLR1, wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule (e.g., on days 1, 8, and 15 of a four-week schedule). Also described herein are methods for treating a patient having cancer comprising administering to the patient an effective dose of an immunoconjugate which binds to FOLR1, wherein the immunoconjugate is administered at a dose about 1 to about 7 mg/kg, wherein the kilograms are adjusted to IBW, LBW, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule (e.g., on days 1, 8, and 15 of a four-week schedule). The methods described herein can result in a decrease in toxicity, e.g., ocular toxicity.

**[0010]** In addition, described herein are methods for treating a patient having cancer comprising administering to the patient an effective dose of an immunoconjugate which binds to FOLR1, wherein the Cmax and initial AUC values that result in toxicity are not exceeded. For example, in some embodiments, the administration produces a Cmax of about 90-160 µg/mL, and in some embodiments, the administration produces a Cmax of about 110-160 µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 2785 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 2741 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 2700 hr•µg/mL. In some embodiments, the administration produces a Cmax of no more than 160 µg/mL. In some embodiments, the administration produces a Cmax of no more than 150 µg/mL.

**[0011]** In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-3500 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-3000 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-2785 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-2741 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-2700 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-2500 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 1500-3500 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 1500-3000 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 1500-2785 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 1500-2741 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 1500-2700 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1500-2500 hr•µg/mL.

**[0012]** In some embodiments, the administration produces a Cmax of 110-160 µg/mL. In some embodiments, the administration produces a Cmax of 110-150 µg/mL. In some embodiments, the administration produces a Cmax of 110-140 µg/mL. In some embodiments, the administration produces a Cmax of 120-160 µg/mL. In some embodiments, the administration produces a Cmax of about 120-150 µg/mL. In some embodiments, the administration produces a Cmax of about 120-140 µg/mL. In some

embodiments, the administration produces a Cmax of 90-160 μg/mL. In some embodiments, the administration produces a Cmax of about 90-150 μg/mL. In some embodiments, the administration produces a Cmax of about 90-140 μg/mL. In some embodiments, the administration produces a Cmax of 100-160 μg/mL. In some embodiments, the administration produces a Cmax of about 100-150 μg/mL. In some embodiments, the administration produces a Cmax of about 100-140 μg/mL.

**[0013]** The anti-FOLR1 immunoconjugate can comprise a charged linker. In some embodiments, the anti-FOLR1 immunoconjugate comprises the antibody huMov19, the linker sulfo-SPDB, and the maytansinoid DM4.

**[0014]** In some embodiments, the immunoconjugate comprises an antibody or antigen-binding fragment thereof that competitively inhibits the binding of an antibody with the variable region sequences of SEQ ID NO:3 and SEQ ID NO:5 to FOLR1. In some embodiments, the antibody or fragment thereof comprises the CDRs of huMOV19 (i.e., SEQ ID NOs: 6-10 and 12 or SEQ ID NOs: 6-9, 11, and 12). In some embodiments, the antibody or antigen-binding fragment thereof comprises the variable region sequences of huMOV19 (i.e., SEQ ID NOs: 3 and 5). In some embodiments, the antibodies or fragments do not comprise the six CDRs of murine Mov19 (i.e., SEQ ID NOs:6-9, 16, and 12). In some embodiments, the antibody is huMov19. In some embodiments, the immunoconjugate comprises a maytansinoid. In some embodiments, the maytansinoid is DM4. In some embodiments, the immunoconjugate comprises a linker that is sulfo-SPDB. In some embodiments, the immunoconjugate is IMGN853 (huMov19-sulfo-SPDB-DM4).

**[0015]** In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1 to 7 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1.1 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1.5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1.8 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 2.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 2.5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-

sulfo-SPDB-DM4) is administered at a dose of about 2.8 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 3.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 3.3 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 3.75 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 4.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 4.1 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 4.2 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 5.5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 5.6 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 6 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 6.5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 7 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, BSA, or AIBW (ADJ). In some embodiments, the kilograms of body weight are adjusted to AIBW (ADJ).

**[0016]** According to the methods described herein, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) can be administered about once every 4 weeks. In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered about once every 3 weeks. In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered about once every 2 weeks. In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered about once every 1 week.

**[0017]** In some embodiments, the immunoconjugate is administered at a dose of about 1 to 7 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the immunoconjugate is administered at a dose of about 1.5 mg/kg to about 6 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the immunoconjugate is administered at a dose of about 1.5, 2.0, 2.5, 3, 3.75, 4.0, 4.1, 4.2, 5.0, 5.5, or 6.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the immunoconjugate is administered at a dose of about 1.1, 1.8, 2.5, 3.3, or 4.2 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 1.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 1.1 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 1.5 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 1.8 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 2 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 2.5 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 2.8 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 binding agent is administered at a dose of about 3.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 3.3 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 3.75 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 binding agent is administered at a dose of about 4.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 4.1 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 4.2 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 5 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 binding agent is administered at a dose of about 5.5 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 5.6 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 binding agent is administered at a dose of about 6 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate is administered at a dose of about 6.5 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the anti-

FOLR1 immunoconjugate is administered at a dose of about 7 mg/kg once a week for three weeks on a four-week schedule.

**[0018]** In some embodiments, the immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1 to 7 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1.5 mg/kg to about 6 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1.1 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1.5 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 1.8 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 2 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 2.5 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 2.8 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 3 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 3.3 mg/kg, wherein the kilograms

are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 3.75 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 4 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 4.1 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 4.2 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 5 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 5.5 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 5.6 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 6 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 6.5 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the anti-FOLR1 immunoconjugate (e.g., huMov19-sulfo-SPDB-DM4) is administered at a dose of about 7 mg/kg, wherein the kilograms are adjusted to IBW, LBW, BSA, or AIBW (ADJ), and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule. In some embodiments, the kilograms are adjusted to AIBW (ADJ).

**[0019]** In some embodiments, the FOLR1-binding agents are administered to obtain the AUC obtained in Examples 1-6 and shown in Figures 1-2 and 7-12.

**[0020]** In some embodiments, the FOLR1-binding agents are administered to obtain the Cmax obtained in Examples 1-6 and shown in Figures 1-6 and 9-12.

**[0021]** In some embodiments, the anti-FOLR1 binding agent (e.g., huMov19-sulfo-SPDB-DM4) is administered intravenously.

**[0022]** The methods described herein can be used to treat cancer. In some embodiments, the cancer is selected from the group consisting of ovarian, brain, breast, uterine, endometrial, pancreatic, renal (e.g., renal cell carcinoma), and lung cancer (e.g., non small cell lung cancer, adenocarcinoma of the lung, or bronchioloalveolar carcinoma (BAC)). In some embodiments, the cancer is ovarian cancer or lung cancer. In some embodiments, the cancer is epithelial ovarian cancer.

**[0023]** In some embodiments, the cancer expresses FOLR1 polypeptide or nucleic acid. In some embodiments, the cancer has an increased expression level of FOLR1 polypeptide as measured by immunohistochemistry (IHC). For example, in some embodiments, the cancer is a cancer that expresses FOLR1 polypeptide at a level of 1 hetero or higher by IHC. In some embodiments, the cancer is a cancer that expresses FOLR1 polypeptide at a level of 1 homo or higher by IHC. In some embodiments, the cancer is a cancer that expresses FOLR1 polypeptide at a level of 2 hetero or higher by IHC. In some embodiments, the cancer is a cancer that expresses FOLR1 polypeptide at a level of 2 homo or higher by IHC. In some embodiments, the cancer is a cancer that expresses FOLR1 polypeptide at a level of 3 hetero or higher by IHC. In some embodiments, the cancer is a cancer that expresses FOLR1 polypeptide at a level of 3 homo or higher by IHC. In some embodiments, the cancer is a lung cancer that expresses FOLR1 polypeptide at a level of 2 hetero or higher by IHC. In some embodiments, the cancer is a lung cancer that expresses FOLR1 polypeptide at a level of 3 hetero or higher by IHC. In some embodiments, the cancer is an epithelial ovarian cancer (e.g., platinum resistant or relapsed or refractory) that expresses FOLR1 polypeptide at a level of 2 hetero or higher. In some embodiments, the cancer is an epithelial ovarian cancer (e.g., platinum resistant or relapsed or refractory) that expresses FOLR1 polypeptide at a level of 3 hetero or higher. In some embodiments, the cancer is an endometriod cancer that expresses FOLR1 polypeptide at a level of 1 hetero or higher.In some embodiments, the cancer is an endometriod cancer that expresses FOLR1 polypeptide at a level of 2 hetero or higher.

**[0024]** In some embodiments, the methods further comprise administering a steroid to the patient. The steroid can be administered as a pre-treatment, i.e., prior to the administration of the anti-FOLR1 binding agent. The steroid can be dexamethasone.

**[0025]** The methods described herein can result in a decrease in tumor size. The methods described herein can result in a decrease in CA125 levels in ovarian cancer patients. In one example, CA125 levels are measured in a sample from an ovarian cancer patient prior to treatment and then one or more times

after treatment, and a decrease in the CA125 level over time is indicative of therapeutic efficacy. The methods described herein can result in an increased time between cancer treatments. The methods described herein can result in increased progression free survival (PFS). The methods described herein can result in increased disease-free survival (DFS). The methods described herein can result in increased overall survival (OS). The methods described herein can result in increased complete response (CR). The methods described herein can result in increased partial response (PR). The methods described herein can result in increased stable disease (SD). The methods described herein can result in increased decrease in progressive disease (PD). The methods described herein can result in a reduced time to progression (TTP).

**[0026]** In particular, the dosing regiments provided herein achieve an optimal balance between efficacy (e.g., PR) and reduced toxicity as demonstrated, for instance, in Examples 1-4 and Figures 1-7.

BRIEF DESCRIPTION OF THE DRAWINGS/FIGURES

**[0027]** Figures 1A and B provide pharmacokinetic data resulting from the administration of IMGN853 (0.15 mg/kg to 7.0 mg/kg) as described in Example 1. Figure 1B provides a later summary of the pharmacokinetic data that includes the data from Figure 1A and additional data obtained from additional patients.

**[0028]** Figures 2A-C show the responses and the occurrence of ocular toxicity in patients with a range of Cmax and $AUC_{0-24}$ and $AUC_{0-168}$ values.

**[0029]** Figure 3 shows the range of Cmax values measured at various doses.

**[0030]** Figure 4 shows the dependence of Cmax on patient body weight.

**[0031]** Figure 5 shows the variance in Cmax and $AUC_{0-24}$ associated with alternate dosing approaches.

**[0032]** Figure 6 shows the projected dependence of Cmax on body weight using alternate dosing approaches.

**[0033]** Figure 7 shows a plot of the $AUC_{0-24}$ values observed in 24 patients receiving 3.3, 5, or 7 mg/kg IMGN853 based on total body weight (actual). These values are compared to projected values if all the patients had been treated with 5 mg/kg based on total body weight, (TBW 5 mg/kg) and the projected values if all of the patients were dosed at 5, 5.4, or 6 mg/kg based on adjusted ideal body weight (ADJ 5, 5.4 or 6). The actual data of 7 patients treated at 5 mg/kg by adjusted ideal body weight (5 ADJ Actual) is also shown. The percentage of patients that have or are projected to have AUC values above the ocular toxicity threshold is shown in the table below the plot.

**[0034]** Figure 8 shows $AUC_{0-24}$ values for all patients in the 3.3 - 7.0 mg/kg. TBW cohorts were used to calculate predicted $AUC_{0-24}$ values at the indicated dose levels. Actual patient $AUC_{0-24}$ data for the

indicated doses are also plotted, including patients dosed in the 5.0 and 6.0 adjusted idea body weight (AIBW) cohorts to date.

**[0035]** Figure 9 shows the anti-tumor activity, predicted plasma concentration, and other pharmacokinetic parameters of IMGN853 in mice treated with single doses of 2.8 mg/kg, 5.6 mg/kg, or 8.5 mg/kg of the immunoconjugate.

**[0036]** Figure 10 shows the anti-tumor activity, predicted plasma concentration, and other pharmacokinetic parameters of IMGN853 in mice treated with a single dose of 8.5 mg/kg, three daily doses of 2.8 mg/kg, or three doses of 2.8 mg/kg every three days.

**[0037]** Figure 11 shows the anti-tumor activity, predicted plasma concentration, and other pharmacokinetic parameters of IMGN853 in mice treated with a single dose of 5.6 mg/kg or 1.4 mg/kg daily for three days.

**[0038]** Figure 12 shows the anti-tumor activity, predicted plasma concentration, and other pharmacokinetic parameters of IMGN853 in mice treated with a single dose of 8.5 mg/kg or 2.8 mg/kg weekly for three weeks.

## DETAILED DESCRIPTION OF THE INVENTION

**[0039]** The present invention provides new dosing regimens for FOLR1 binding immunoconjugates.

### I. Definitions

**[0040]** To facilitate an understanding of the present invention, a number of terms and phrases are defined below.

**[0041]** The terms "human folate receptor 1," "FOLR1," or "folate receptor alpha (FR-α)", as used herein, refers to any native human FOLR1, unless otherwise indicated. Thus, all of these terms can refer to either a protein or nucleic acid sequence as indicated herein. The term "FOLR1" encompasses "full-length," unprocessed FOLR1 as well as any form of FOLR1 that results from processing within the cell. The term also encompasses naturally occurring variants of FOLR1, e.g., splice variants, allelic variants and isoforms. The FOLR1 polypeptides described herein can be isolated from a variety of sources, such as from human tissue types or from another source, or prepared by recombinant or synthetic methods. Examples of FOLR1 sequences include, but are not limited to NCBI reference numbers P15328, NP_001092242.1, AAX29268.1, AAX37119.1, NP_057937.1, and NP_057936.1.

**[0042]** The term "antibody" means an immunoglobulin molecule that recognizes and specifically binds to a target, such as a protein, polypeptide, peptide, carbohydrate, polynucleotide, lipid, or combinations of the foregoing through at least one antigen recognition site within the variable region of the immunoglobulin molecule. As used herein, the term "antibody" encompasses intact polyclonal antibodies, intact monoclonal antibodies, antibody fragments (such as Fab, Fab', F(ab')2, and Fv

fragments), single chain Fv (scFv) mutants, multispecific antibodies such as bispecific antibodies generated from at least two intact antibodies, chimeric antibodies, humanized antibodies, human antibodies, fusion proteins comprising an antigen determination portion of an antibody, and any other modified immunoglobulin molecule comprising an antigen recognition site so long as the antibodies exhibit the desired biological activity. An antibody can be of any the five major classes of immunoglobulins: IgA, IgD, IgE, IgG, and IgM, or subclasses (isotypes) thereof (e.g. IgG1, IgG2, IgG3, IgG4, IgA1 and IgA2), based on the identity of their heavy-chain constant domains referred to as alpha, delta, epsilon, gamma, and mu, respectively. The different classes of immunoglobulins have different and well known subunit structures and three-dimensional configurations. Antibodies can be naked or conjugated to other molecules such as toxins, radioisotopes, etc.

**[0043]** A "blocking" antibody or an "antagonist" antibody is one which inhibits or reduces biological activity of the antigen it binds, such as FOLR1. In some embodiments, blocking antibodies or antagonist antibodies substantially or completely inhibit the biological activity of the antigen. The biological activity can be reduced by 10%, 20%, 30%, 50%, 70%, 80%, 90%, 95%, or even 100%.

**[0044]** The term "anti-FOLR1 antibody" or "an antibody that binds to FOLR1" refers to an antibody that is capable of binding FOLR1 with sufficient affinity such that the antibody is useful as a diagnostic and/or therapeutic agent in targeting FOLR1. The extent of binding of an anti-FOLR1 antibody to an unrelated, non-FOLR1 protein can be less than about 10% of the binding of the antibody to FOLR1 as measured, e.g., by a radioimmunoassay (RIA). In certain embodiments, an antibody that binds to FOLR1 has a dissociation constant (Kd) of $\leq 1$ μM, $\leq 100$ nM, $\leq 10$ nM, $\leq 1$ nM, or $\leq 0.1$ nM.

**[0045]** The term "antibody fragment" refers to a portion of an intact antibody and refers to the antigenic determining variable regions of an intact antibody. Examples of antibody fragments include, but are not limited to Fab, Fab', F(ab')2, and Fv fragments, linear antibodies, single chain antibodies, and multispecific antibodies formed from antibody fragments.

**[0046]** A "monoclonal antibody" refers to a homogeneous antibody population involved in the highly specific recognition and binding of a single antigenic determinant, or epitope. This is in contrast to polyclonal antibodies that typically include different antibodies directed against different antigenic determinants. The term “monoclonal antibody” encompasses both intact and full-length monoclonal antibodies as well as antibody fragments (such as Fab, Fab', F(ab')2, Fv), single chain (scFv) mutants, fusion proteins comprising an antibody portion, and any other modified immunoglobulin molecule comprising an antigen recognition site. Furthermore, “monoclonal antibody” refers to such antibodies made in any number of manners including but not limited to by hybridoma, phage selection, recombinant expression, and transgenic animals.

**[0047]** The term "humanized antibody" refers to forms of non-human (e.g. murine) antibodies that are specific immunoglobulin chains, chimeric immunoglobulins, or fragments thereof that contain

minimal non-human (e.g., murine) sequences. Typically, humanized antibodies are human immunoglobulins in which residues from the complementary determining region (CDR) are replaced by residues from the CDR of a non-human species (e.g. mouse, rat, rabbit, hamster) that have the desired specificity, affinity, and capability (Jones et al., 1986, *Nature*, 321:522-525; Riechmann et al., 1988, *Nature*, 332:323-327; Verhoeyen et al., 1988, *Science*, 239:1534-1536). In some instances, the Fv framework region (FR) residues of a human immunoglobulin are replaced with the corresponding residues in an antibody from a non-human species that has the desired specificity, affinity, and capability. The humanized antibody can be further modified by the substitution of additional residues either in the Fv framework region and/or within the replaced non-human residues to refine and optimize antibody specificity, affinity, and/or capability. In general, the humanized antibody will comprise substantially all of at least one, and typically two or three, variable domains containing all or substantially all of the CDR regions that correspond to the non-human immunoglobulin whereas all or substantially all of the FR regions are those of a human immunoglobulin consensus sequence. The humanized antibody can also comprise at least a portion of an immunoglobulin constant region or domain (Fc), typically that of a human immunoglobulin. Examples of methods used to generate humanized antibodies are described in U.S. Pat. 5,225,539. In some embodiments, a "humanized antibody" is a resurfaced antibody.

**[0048]** A "variable region" of an antibody refers to the variable region of the antibody light chain or the variable region of the antibody heavy chain, either alone or in combination. The variable regions of the heavy and light chain each consist of four framework regions (FR) connected by three complementarity determining regions (CDRs) also known as hypervariable regions. The CDRs in each chain are held together in close proximity by the FRs and, with the CDRs from the other chain, contribute to the formation of the antigen-binding site of antibodies. There are at least two techniques for determining CDRs: (1) an approach based on cross-species sequence variability (i.e., Kabat et al. Sequences of Proteins of Immunological Interest, (5th ed., 1991, National Institutes of Health, Bethesda Md.)); and (2) an approach based on crystallographic studies of antigen-antibody complexes (Al-lazikani et al (1997) J. *Molec. Biol.* 273:927-948)). In addition, combinations of these two approaches are sometimes used in the art to determine CDRs.

**[0049]** The Kabat numbering system is generally used when referring to a residue in the variable domain (approximately residues 1-107 of the light chain and residues 1-113 of the heavy chain) (e.g., Kabat et al., Sequences of Immunological Interest. 5th Ed. Public Health Service, National Institutes of Health, Bethesda, Md. (1991)).

**[0050]** The amino acid position numbering as in Kabat, refers to the numbering system used for heavy chain variable domains or light chain variable domains of the compilation of antibodies in Kabat et al., Sequences of Proteins of Immunological Interest, 5th Ed. Public Health Service, National Institutes of Health, Bethesda, Md. (1991). Using this numbering system, the actual linear amino acid sequence can

contain fewer or additional amino acids corresponding to a shortening of, or insertion into, a FR or CDR of the variable domain. For example, a heavy chain variable domain can include a single amino acid insert (residue 52a according to Kabat) after residue 52 of H2 and inserted residues (e.g. residues 82a, 82b, and 82c, etc. according to Kabat) after heavy chain FR residue 82. The Kabat numbering of residues can be determined for a given antibody by alignment at regions of homology of the sequence of the antibody with a "standard" Kabat numbered sequence. Chothia refers instead to the location of the structural loops (Chothia and Lesk J. Mol. Biol. 196:901-917 (1987)). The end of the Chothia CDR-H1 loop when numbered using the Kabat numbering convention varies between H32 and H34 depending on the length of the loop (this is because the Kabat numbering scheme places the insertions at H35A and H35B; if neither 35A nor 35B is present, the loop ends at 32; if only 35A is present, the loop ends at 33; if both 35A and 35B are present, the loop ends at 34). The AbM hypervariable regions represent a compromise between the Kabat CDRs and Chothia structural loops, and are used by Oxford Molecular's AbM antibody modeling software.

| Loop | Kabat | AbM | Chothia |
|---|---|---|---|
| L1 | L24-L34 | L24-L34 | L24-L34 |
| L2 | L50-L56 | L50-L56 | L50-L56 |
| L3 | L89-L97 | L89-L97 | L89-L97 |
| H1 | H31-H35B | H26-H35B | H26-H32..34 |
| | | (Kabat Numbering) | |
| H1 | H31-H35 | H26-H35 | H26-H32 |
| | | (Chothia Numbering) | |
| H2 | H50-H65 | H50-H58 | H52-H56 |
| H3 | H95-H102 | H95-H102 | H95-H102 |

**[0051]** The term "human antibody" means an antibody produced by a human or an antibody having an amino acid sequence corresponding to an antibody produced by a human made using any technique known in the art. This definition of a human antibody includes intact or full-length antibodies, fragments thereof, and/or antibodies comprising at least one human heavy and/or light chain polypeptide such as, for example, an antibody comprising murine light chain and human heavy chain polypeptides.

**[0052]** The term "chimeric antibodies" refers to antibodies wherein the amino acid sequence of the immunoglobulin molecule is derived from two or more species. Typically, the variable region of both light and heavy chains corresponds to the variable region of antibodies derived from one species of mammals (e.g. mouse, rat, rabbit, etc.) with the desired specificity, affinity, and capability while the constant regions are homologous to the sequences in antibodies derived from another (usually human) to avoid eliciting an immune response in that species.

**[0053]** The term "epitope" or "antigenic determinant" are used interchangeably herein and refer to that portion of an antigen capable of being recognized and specifically bound by a particular antibody. When the antigen is a polypeptide, epitopes can be formed both from contiguous amino acids and noncontiguous amino acids juxtaposed by tertiary folding of a protein. Epitopes formed from contiguous amino acids are typically retained upon protein denaturing, whereas epitopes formed by tertiary folding are typically lost upon protein denaturing. An epitope typically includes at least 3, and more usually, at least 5 or 8-10 amino acids in a unique spatial conformation.

**[0054]** "Binding affinity" generally refers to the strength of the sum total of noncovalent interactions between a single binding site of a molecule (e.g., an antibody) and its binding partner (e.g., an antigen). Unless indicated otherwise, as used herein, "binding affinity" refers to intrinsic binding affinity which reflects a 1:1 interaction between members of a binding pair (e.g., antibody and antigen). The affinity of a molecule X for its partner Y can generally be represented by the dissociation constant (Kd). Affinity can be measured by common methods known in the art, including those described herein. Low-affinity antibodies generally bind antigen slowly and tend to dissociate readily, whereas high-affinity antibodies generally bind antigen faster and tend to remain bound longer. A variety of methods of measuring binding affinity are known in the art, any of which can be used for purposes of the present invention. Specific illustrative embodiments are described in the following.

**[0055]** "Or better" when used herein to refer to binding affinity refers to a stronger binding between a molecule and its binding partner. "Or better" when used herein refers to a stronger binding, represented by a smaller numerical Kd value. For example, an antibody which has an affinity for an antigen of "0.6 nM or better", the antibody's affinity for the antigen is <0.6 nM, i.e. 0.59 nM, 0.58 nM, 0.57 nM etc. or any value less than 0.6 nM.

**[0056]** By "specifically binds," it is generally meant that an antibody binds to an epitope via its antigen binding domain, and that the binding entails some complementarity between the antigen binding domain and the epitope. According to this definition, an antibody is said to "specifically bind" to an epitope when it binds to that epitope, via its antigen binding domain more readily than it would bind to a random, unrelated epitope. The term "specificity" is used herein to qualify the relative affinity by which a certain antibody binds to a certain epitope. For example, antibody "A" may be deemed to have a higher specificity for a given epitope than antibody "B," or antibody "A" may be said to bind to epitope "C" with a higher specificity than it has for related epitope "D."

**[0057]** By "preferentially binds," it is meant that the antibody specifically binds to an epitope more readily than it would bind to a related, similar, homologous, or analogous epitope. Thus, an antibody which "preferentially binds" to a given epitope would more likely bind to that epitope than to a related epitope, even though such an antibody may cross-react with the related epitope.

**[0058]** An antibody is said to "competitively inhibit" binding of a reference antibody to a given epitope if it preferentially binds to that epitope to the extent that it blocks, to some degree, binding of the reference antibody to the epitope. Competitive inhibition may be determined by any method known in the art, for example, competition ELISA assays. An antibody may be said to competitively inhibit binding of the reference antibody to a given epitope by at least 90%, at least 80%, at least 70%, at least 60%, or at least 50%.

**[0059]** The phrase "substantially similar," or "substantially the same", as used herein, denotes a sufficiently high degree of similarity between two numeric values (generally one associated with an antibody of the invention and the other associated with a reference/comparator antibody) such that one of skill in the art would consider the difference between the two values to be of little or no biological and/or statistical significance within the context of the biological characteristic measured by said values (e.g., Kd values). The difference between said two values can be less than about 50%, less than about 40%, less than about 30%, less than about 20%, or less than about 10% as a function of the value for the reference/comparator antibody.

**[0060]** A polypeptide, antibody, polynucleotide, vector, cell, or composition which is "isolated" is a polypeptide, antibody, polynucleotide, vector, cell, or composition which is in a form not found in nature. Isolated polypeptides, antibodies, polynucleotides, vectors, cell or compositions include those which have been purified to a degree that they are no longer in a form in which they are found in nature. In some embodiments, an antibody, polynucleotide, vector, cell, or composition which is isolated is substantially pure.

**[0061]** As used herein, "substantially pure" refers to material which is at least 50% pure (i.e., free from contaminants), at least 90% pure, at least 95% pure, at least 98% pure, or at least 99% pure.

**[0062]** The term "immunoconjugate" or "conjugate" as used herein refers to a compound or a derivative thereof that is linked to a cell binding agent (i.e., an anti-FOLR1 antibody or fragment thereof) and is defined by a generic formula: C-L-A, wherein C = cytotoxin, L = linker, and A = anti-FOLR1 antibody or antibody fragment. Immunoconjugates can also be defined by the generic formula in reverse order: A-L-C.

**[0063]** The term "IMGN853" refers to the immunoconjugate described herein containing the huMov19 antibody, the sulfoSPDB linker, and the DM4 maytansinoid. The huMov19 antibody contains a variable heavy chain with the amino acid sequence of SEQ ID NO:3 and a variable light chain with the amino acid sequence of SEQ ID NO: 5.

**[0064]** A "linker" is any chemical moiety that is capable of linking a compound, usually a drug, such as a maytansinoid, to a cell-binding agent such as an anti FOLR1 antibody or a fragment thereof in a stable, covalent manner. Linkers can be susceptible to or be substantially resistant to acid-induced cleavage, light-induced cleavage, peptidase-induced cleavage, esterase-induced cleavage, and disulfide

bond cleavage, at conditions under which the compound or the antibody remains active. Suitable linkers are well known in the art and include, for example, disulfide groups, thioether groups, acid labile groups, photolabile groups, peptidase labile groups and esterase labile groups. Linkers also include charged linkers, and hydrophilic forms thereof as described herein and know in the art.

**[0065]** The terms "cancer" and "cancerous" refer to or describe the physiological condition in mammals in which a population of cells are characterized by unregulated cell growth. Examples of cancer include, but are not limited to, carcinoma, lymphoma, blastoma, sarcoma, and leukemia. More particular examples of such cancers include squamous cell cancer, small-cell lung cancer, non-small cell lung cancer, adenocarcinoma of the lung, squamous carcinoma of the lung, cancer of the peritoneum, hepatocellular cancer, gastrointestinal cancer, pancreatic cancer, glioblastoma, cervical cancer, ovarian cancer, liver cancer, bladder cancer, hepatoma, breast cancer, colon cancer, colorectal cancer, endometrial or uterine carcinoma, salivary gland carcinoma, kidney cancer, liver cancer, prostate cancer, vulval cancer, thyroid cancer, hepatic carcinoma and various types of head and neck cancers. The cancer can be a cancer that expresses FOLR1.

**[0066]** "Tumor" and "neoplasm" refer to any mass of tissue that result from excessive cell growth or proliferation, either benign (noncancerous) or malignant (cancerous) including pre-cancerous lesions.

**[0067]** The terms "cancer cell," "tumor cell," and grammatical equivalents refer to the total population of cells derived from a tumor or a pre-cancerous lesion, including both non-tumorigenic cells, which comprise the bulk of the tumor cell population, and tumorigenic stem cells (cancer stem cells). As used herein, the term “tumor cell” will be modified by the term “non-tumorigenic” when referring solely to those tumor cells lacking the capacity to renew and differentiate to distinguish those tumor cells from cancer stem cells.

**[0068]** The term "subject" refers to any animal (e.g., a mammal), including, but not limited to humans, non-human primates, rodents, and the like, which is to be the recipient of a particular treatment. Typically, the terms "subject" and "patient" are used interchangeably herein in reference to a human subject.

**[0069]** The term "ideal body weight" (IBW) refers to a size descriptor that is unrelated to total body weight. IBW is an estimate of weight corrected for sex and height, and optionally frame size. IBW can be calculated, for example, using the formulas IBW = 0.9H-88 (for males) and IBW = 0.9H-92 (for females), wherein H=height in cm.

**[0070]** The term "lean body weight" (LBW) refers to a size descriptor that can account for fractional fat mass ($FM_{frac}$). LBW is equal to total body weight minus the product of $FM_{frac}$ and weight. LBW can be calculated, for example, using the formulas LBW = 1.10 x weight in kg – 128([weight in kg]$^2$ ⁄ [100 x height in meters]$^2$) (for males) and LBW = 1.07 x weight in kg – 148([weight in kg]$^2$ ⁄ [100 x height in meters]$^2$) (for females).

**[0071]** The term "adjusted ideal body weight" (AIBW) or "adjusted body weight" (ADJ) refers to a size descriptor that accounts for sex, total body weight, and height. AIBW and ADJ are used interchangeably throughout the specification. AIBW (ADJ) can be calculated, for example, using the formula ADJ = IBW + 0.4(weight in kg – IBW).

**[0072]** IBW, LBW, and AIBW (ADJ) are discussed in more detail in Green and Duffull, *British Journal of Clinical Pharmacology 58*: 119-133 (2004), which is herein incorporated by reference in its entirety.

**[0073]** Administration "in combination with" one or more further therapeutic agents includes simultaneous (concurrent) and consecutive administration in any order.

**[0074]** The term "pharmaceutical formulation" refers to a preparation which is in such form as to permit the biological activity of the active ingredient to be effective, and which contains no additional components which are unacceptably toxic to a subject to which the formulation would be administered. The formulation can be sterile.

**[0075]** An "effective amount" of an antibody or immunoconjugate as disclosed herein is an amount sufficient to carry out a specifically stated purpose. An "effective amount" can be determined empirically and in a routine manner, in relation to the stated purpose.

**[0076]** The term "therapeutically effective amount" refers to an amount of an antibody or other drug effective to "treat" a disease or disorder in a subject or mammal. In the case of cancer, the therapeutically effective amount of the drug can reduce the number of cancer cells; reduce the tumor size; inhibit (i.e., slow to some extent and in a certain embodiment, stop) cancer cell infiltration into peripheral organs; inhibit (i.e., slow to some extent and in a certain embodiment, stop) tumor metastasis; inhibit, to some extent, tumor growth; relieve to some extent one or more of the symptoms associated with the cancer; and/or result in a favorable response such as increased progression-free survival (PFS), disease-free survival (DFS), or overall survival (OS), complete response (CR), partial response (PR), or, in some cases, stable disease (SD), a decrease in progressive disease (PD), a reduced time to progression (TTP), a decrease in CA125 in the case of ovarian cancer, or any combination thereof.

**[0077]** See the definition herein of "treating." To the extent the drug can prevent growth and/or kill existing cancer cells, it can be cytostatic and/or cytotoxic. In certain embodiments, identification of increased FOLR1 levels allows for administration of decreased amounts of the FOLR1-targeting therapeutic to achieve the same therapeutic effect as seen with higher dosages. A "prophylactically effective amount" refers to an amount effective, at dosages and for periods of time necessary, to achieve the desired prophylactic result. Typically but not necessarily, since a prophylactic dose is used in subjects prior to or at an earlier stage of disease, the prophylactically effective amount will be less than the therapeutically effective amount.

**[0078]** The term "respond favorably" generally refers to causing a beneficial state in a subject. With respect to cancer treatment, the term refers to providing a therapeutic effect on the subject. Positive therapeutic effects in cancer can be measured in a number of ways (*See*, W.A. Weber, J. Nucl. Med. 50:1S-10S (2009)). For example, tumor growth inhibition, molecular marker expression, serum marker expression, and molecular imaging techniques can all be used to assess therapeutic efficacy of an anti-cancer therapeutic. With respect to tumor growth inhibition, according to NCI standards, a T/C ≤ 42% is the minimum level of anti-tumor activity. A T/C <10% is considered a high anti-tumor activity level, with T/C (%) = Median tumor volume of the treated / Median tumor volume of the control x 100. A favorable response can be assessed, for example, by increased progression-free survival (PFS), disease-free survival (DFS), or overall survival (OS), complete response (CR), partial response (PR), or, in some cases, stable disease (SD), a decrease in progressive disease (PD), a reduced time to progression (TTP), a decrease in CA125 in the case of ovarian cancer or any combination thereof.

**[0079]** PFS, DFS, and OS can be measured by standards set by the National Cancer Institute and the U.S. Food and Drug Administration for the approval of new drugs. See Johnson et al, (2003) J. Clin. Oncol. 21(7):1404-1411.

**[0080]** "Progression free survival" (PFS) refers to the time from enrollment to disease progression or death. PFS is generally measured using the Kaplan-Meier method and Response Evaluation Criteria in Solid Tumors (RECIST) 1.1 standards. Generally, progression free survival refers to the situation wherein a patient remains alive, without the cancer getting worse.

**[0081]** "Time to Tumor Progression" (TTP) is defined as the time from enrollment to disease progression. TTP is generally measured using the RECIST 1.1 criteria.

**[0082]** A "complete response" or "complete remission" or "CR" indicates the disappearance of all signs of tumor or cancer in response to treatment. This does not always mean the cancer has been cured.

**[0083]** A "partial response" or "PR" refers to a decrease in the size or volume of one or more tumors or lesions, or in the extent of cancer in the body, in response to treatment.

**[0084]** "Stable disease" refers to disease without progression or relapse. In stable disease there is neither sufficient tumor shrinkage to qualify for partial response nor sufficient tumor increase to qualify as progressive disease.

**[0085]** "Progressive disease" refers to the appearance of one more new lesions or tumors and/or the unequivocal progression of existing non-target lesions. Progressive disease can also revert to a tumor growth of more than 20 percent since treatment began, either due to an increases in mass or in spread of the tumor.

**[0086]** "Disease free survival" (DFS) refers to the length of time during and after treatment that the patient remains free of disease.

**[0087]** "Overall Survival" (OS) refers to the time from patient enrollment to death or censored at the date last known alive. OS includes a prolongation in life expectancy as compared to naive or untreated individuals or patients. Overall survival refers to the situation wherein a patient remains alive for a defined period of time, such as one year, five years, etc., e.g., from the time of diagnosis or treatment.

**[0088]** A "decrease in CA125 levels" can be assessed according to the Gynecologic Cancer Intergroup (GCIG) guidelines. For example, CA125 levels can be measured prior to treatment to establish a baseline CA125 level. CA125 levels can be measured one or more times during or after treatment, and a reduction in the CA125 levels over time as compared to the baseline level is considered a decrease in CA125 levels.

**[0089]** Terms such as "treating" or "treatment" or "to treat" or "alleviating" or "to alleviate" refer to therapeutic measures that cure, slow down, lessen symptoms of, and/or halt progression of a diagnosed pathologic condition or disorder. Thus, those in need of treatment include those already diagnosed with or suspected of having the disorder. In certain embodiments, a subject is successfully "treated" for cancer according to the methods of the present invention if the patient shows one or more of the following: a reduction in the number of or complete absence of cancer cells; a reduction in the tumor size; inhibition of or an absence of cancer cell infiltration into peripheral organs including, for example, the spread of cancer into soft tissue and bone; inhibition of or an absence of tumor metastasis; inhibition or an absence of tumor growth; relief of one or more symptoms associated with the specific cancer; reduced morbidity and mortality; improvement in quality of life; reduction in tumorigenicity, tumorigenic frequency, or tumorigenic capacity, of a tumor; reduction in the number or frequency of cancer stem cells in a tumor; differentiation of tumorigenic cells to a non-tumorigenic state; increased progression-free survival (PFS), disease-free survival (DFS), or overall survival (OS), complete response (CR), partial response (PR), stable disease (SD), a decrease in progressive disease (PD), a reduced time to progression (TTP), a decrease in CA125 in the case of ovarian cancer, or any combination thereof.

**[0090]** Prophylactic or preventative measures refer to therapeutic measures that prevent and/or slow the development of a targeted pathologic condition or disorder. Thus, those in need of prophylactic or preventative measures include those prone to have the disorder and those in whom the disorder is to be prevented.

**[0091]** The terms "pre-treat" and "pre-treatment" refer to therapeutic measures that occur prior to the administration of an anti-FOLR1 therapeutic. For example, as described in more detail herein, a prophylactic such as a steroid can administered within about a week, about five days, about three days, about two days, or about one day or 24 hours prior to the administration of the anti-FOLR1 therapeutic. The prophylactic can also be administered prior to the anti-FOLR1 therapeutic on the same day as the anti-FOLR1 therapeutic.

**[0092]** The term "maximum concentration" (Cmax) refers to the highest concentration of drug in the blood that is measured after a dose of the drug.

**[0093]** The term "area-under-the-curve" (AUC) refers to the overall amount of drug in the bloodstream after a dose of the drug. The AUC can be defined over a particular time period. Thus, for example, the $AUC_{0-\infty}$ refers to the overall amount of drug in the bloodstream for an infinite time after a dose of the drug. In another example, the $AUC_{0-24}$ refers to the overall amount of drug in the bloodstream for a period of 24 hours after a dose of the drug. In another example, the $AUC_{0-168}$ refers to the overall amount of drug in the bloodstream for a period of 168 hours (or 1 week) after a dose of the drug.

**[0094]** The "apparent volume of distribution at steady state" ($V_{ss}$) refers to the ratio of the total amount of drug in the body to the concentration of the drug in the plasma, or the "apparent" volume necessary to contain the entire amount of a drug, if the drug in the entire body were in the same concentration as in the plasma.

**[0095]** A "chemotherapeutic agent" is a chemical compound useful in the treatment of cancer, regardless of mechanism of action. Chemotherapeutic agents include, for example, antagonists of CD20 such as Rituximab and cyclophosphamide, doxorubicin, vincristine, predinisone, fludarabine, etoposide, methotrexate, lenalidomide, chlorambucil, bentamustine and/or modified versions of such chemotherapeutics.

**[0096]** The terms "polypeptide," "peptide," and "protein" are used interchangeably herein to refer to polymers of amino acids of any length. The polymer can be linear or branched, it can comprise modified amino acids, and it can be interrupted by non-amino acids. The terms also encompass an amino acid polymer that has been modified naturally or by intervention; for example, disulfide bond formation, glycosylation, lipidation, acetylation, phosphorylation, or any other manipulation or modification, such as conjugation with a labeling component. Also included within the definition are, for example, polypeptides containing one or more analogs of an amino acid (including, for example, unnatural amino acids, etc.), as well as other modifications known in the art. It is understood that, because the polypeptides of this invention are based upon antibodies, in certain embodiments, the polypeptides can occur as single chains or associated chains.

**[0097]** The terms "identical" or percent "identity" in the context of two or more nucleic acids or polypeptides, refer to two or more sequences or subsequences that are the same or have a specified percentage of nucleotides or amino acid residues that are the same, when compared and aligned (introducing gaps, if necessary) for maximum correspondence, not considering any conservative amino acid substitutions as part of the sequence identity. The percent identity can be measured using sequence comparison software or algorithms or by visual inspection. Various algorithms and software are known in the art that can be used to obtain alignments of amino acid or nucleotide sequences. One such non-limiting example of a sequence alignment algorithm is the algorithm described in Karlin et al, 1990,

*Proc. Natl. Acad. Sci.*, 87:2264-2268, as modified in Karlin et al., 1993, *Proc. Natl. Acad. Sci.*, 90:5873-5877, and incorporated into the NBLAST and XBLAST programs (Altschul et al., 1991, *Nucleic Acids Res.*, 25:3389-3402). In certain embodiments, Gapped BLAST can be used as described in Altschul et al., 1997, *Nucleic Acids Res.* 25:3389-3402. BLAST-2, WU-BLAST-2 (Altschul et al., 1996, *Methods in Enzymology*, 266:460-480), ALIGN, ALIGN-2 (Genentech, South San Francisco, California) or Megalign (DNASTAR) are additional publicly available software programs that can be used to align sequences. In certain embodiments, the percent identity between two nucleotide sequences is determined using the GAP program in GCG software (e.g., using a NWSgapdna.CMP matrix and a gap weight of 40, 50, 60, 70, or 90 and a length weight of 1, 2, 3, 4, 5, or 6). In certain alternative embodiments, the GAP program in the GCG software package, which incorporates the algorithm of Needleman and Wunsch (*J. Mol. Biol.* (48):444-453 (1970)) can be used to determine the percent identity between two amino acid sequences (e.g., using either a Blossum 62 matrix or a PAM250 matrix, and a gap weight of 16, 14, 12, 10, 8, 6, or 4 and a length weight of 1, 2, 3, 4, 5). Alternatively, in certain embodiments, the percent identity between nucleotide or amino acid sequences is determined using the algorithm of Myers and Miller (CABIOS, 4:11-17 (1989)). For example, the percent identity can be determined using the ALIGN program (version 2.0) and using a PAM120 with residue table, a gap length penalty of 12 and a gap penalty of 4. Appropriate parameters for maximal alignment by particular alignment software can be determined by one skilled in the art. In certain embodiments, the default parameters of the alignment software are used. In certain embodiments, the percentage identity "X" of a first amino acid sequence to a second sequence amino acid is calculated as 100 x (Y/Z), where Y is the number of amino acid residues scored as identical matches in the alignment of the first and second sequences (as aligned by visual inspection or a particular sequence alignment program) and Z is the total number of residues in the second sequence. If the length of a first sequence is longer than the second sequence, the percent identity of the first sequence to the second sequence will be longer than the percent identity of the second sequence to the first sequence.

**[0098]** As a non-limiting example, whether any particular polynucleotide has a certain percentage sequence identity (e.g., is at least 80% identical, at least 85% identical, at least 90% identical, and in some embodiments, at least 95%, 96%, 97%, 98%, or 99% identical) to a reference sequence can, in certain embodiments, be determined using the Bestfit program (Wisconsin Sequence Analysis Package, Version 8 for Unix, Genetics Computer Group, University Research Park, 575 Science Drive, Madison, WI 53711). Bestfit uses the local homology algorithm of Smith and Waterman, *Advances in Applied Mathematics* 2: 482 489 (1981), to find the best segment of homology between two sequences. When using Bestfit or any other sequence alignment program to determine whether a particular sequence is, for instance, 95% identical to a reference sequence according to the present invention, the parameters are set such that the percentage of identity is calculated over the full length of the reference nucleotide sequence and that gaps in homology of up to 5% of the total number of nucleotides in the reference sequence are allowed.

**[0099]** In some embodiments, two nucleic acids or polypeptides of the invention are substantially identical, meaning they have at least 70%, at least 75%, at least 80%, at least 85%, at least 90%, and in some embodiments at least 95%, 96%, 97%, 98%, 99% nucleotide or amino acid residue identity, when compared and aligned for maximum correspondence, as measured using a sequence comparison algorithm or by visual inspection. Identity can exist over a region of the sequences that is at least about 10, about 20, about 40-60 residues in length or any integral value there between, and can be over a longer region than 60-80 residues, for example, at least about 90-100 residues, and in some embodiments, the sequences are substantially identical over the full length of the sequences being compared, such as the coding region of a nucleotide sequence for example.

**[00100]** A "conservative amino acid substitution" is one in which one amino acid residue is replaced with another amino acid residue having a similar side chain. Families of amino acid residues having similar side chains have been defined in the art, including basic side chains (e.g., lysine, arginine, histidine), acidic side chains (e.g., aspartic acid, glutamic acid), uncharged polar side chains (e.g., glycine, asparagine, glutamine, serine, threonine, tyrosine, cysteine), nonpolar side chains (e.g., alanine, valine, leucine, isoleucine, proline, phenylalanine, methionine, tryptophan), beta-branched side chains (e.g., threonine, valine, isoleucine) and aromatic side chains (e.g., tyrosine, phenylalanine, tryptophan, histidine). For example, substitution of a phenylalanine for a tyrosine is a conservative substitution. In some embodiments, conservative substitutions in the sequences of the polypeptides and antibodies of the invention do not abrogate the binding of the polypeptide or antibody containing the amino acid sequence, to the antigen(s), i.e., the FOLR1 to which the polypeptide or antibody binds. Methods of identifying nucleotide and amino acid conservative substitutions which do not eliminate antigen binding are well-known in the art (see, e.g., Brummell et al., *Biochem.* 32: 1180-1 187 (1993); Kobayashi et al. *Protein Eng.* 12(10):879-884 (1999); and Burks et al. *Proc. Natl. Acad. Sci. USA* 94:.412-417 (1997)).

**[00101]** As used in the present disclosure and claims, the singular forms "a," "an," and "the" include plural forms unless the context clearly dictates otherwise.

**[00102]** It is understood that wherever embodiments are described herein with the language "comprising," otherwise analogous embodiments described in terms of "consisting of" and/or "consisting essentially of" are also provided.

**[00103]** The term "and/or" as used in a phrase such as "A and/or B" herein is intended to include both "A and B," "A or B," "A," and "B." Likewise, the term "and/or" as used in a phrase such as "A, B, and/or C" is intended to encompass each of the following embodiments: A, B, and C; A, B, or C; A or C; A or B; B or C; A and C; A and B; B and C; A (alone); B (alone); and C (alone).

## II. FOLR1 binding agents

**[00104]** The methods described herein provide methods of administering agents (e.g., antibodies or antigen-binding fragments thereof or polypeptides) that specifically bind FOLR1 ("FOLR1 binding

agents"). In certain embodiments, the FOLR1 binding agents are antibodies, immunoconjugates or polypeptides. The amino acid and nucleotide sequences for human FOLR1 are known in the art and are also provided herein as represented by SEQ ID NO:1 and SEQ ID NO:2. Thus, in some embodiments, the FOLR1 binding agents can bind to an epitope found within SEQ ID NO:1.

**[00105]** Examples of therapeutically effective anti-FOLR1 antibodies can be found in US Appl. Pub. No. US 2012/0009181 which is herein incorporated by reference. An example of a therapeutically effective anti-FOLR1 antibody is huMov19 (M9346A). The polypeptides of SEQ ID NOs: 3-5 comprise the variable domain of the heavy chain of huMov19 (M9346A), and the variable domain light chain version 1.00, the variable domain light chain version 1.60 of huMov19, respectively. In certain embodiments, the huMov19 anti-FOLR1 antibody is comprised of a variable domain heavy chain represented by SEQ ID NO:3 and a variable domain light chain represented by SEQ ID NO:5 (version 1.60 of huMov19). In certain embodiments, the huMov19 (M9346A) antibody is encoded by the plasmids deposited with the American Type Culture Collection (ATCC), located at 10801 University Boulevard, Manassas, VA 20110 on April 7, 2010 under the terms of the Budapest Treaty and having ATCC deposit nos. PTA-10772 and PTA-10773 or 10774. Examples of FOLR1 immunoconjugates useful in the therapeutic methods of the invention are provided below.

**[00106]** In some embodiments, the FOLR1 binding agents are humanized antibodies or antigen-binding fragments thereof. In some embodiments, the humanized antibody or fragment is a resurfaced antibody or antigen-binding fragment thereof. In other embodiments, the FOLR1 binding agent is a fully human antibody or antigen-binding fragment thereof.

**[00107]** In certain embodiments, the FOLR1-binding agents have one or more of the following effects: induce stable disease, inhibit proliferation of tumor cells, reduce the tumorigenicity of a tumor by reducing the frequency of cancer stem cells in the tumor, inhibit tumor growth, increase survival, trigger cell death of tumor cells, differentiate tumorigenic cells to a non-tumorigenic state, or prevent metastasis of tumor cells.

**[00108]** In certain embodiments, a FOLR1-binding agent that is an antibody that has antibody-dependent cellular cytotoxicity (ADCC) activity.

**[00109]** In some embodiments, the FOLR1-binding agents are capable of reducing tumor volume. The ability of a FOLR1-binding agent to reduce tumor volume can be assessed, for example, by measuring a %T/C value, which is the median tumor volume of treated subjects divided by the median tumor volume of the control subjects. In certain embodiments, immunoconjugates or other agents that specifically bind human FOLR1 trigger cell death via a cytotoxic agent. For example, in certain embodiments, an antibody to a human FOLR1 antibody is conjugated to a maytansinoid that is activated in tumor cells expressing the FOLR1 by protein internalization. In certain embodiments, the FOLR1-binding agents are capable of inhibiting tumor growth. In certain embodiments, the FOLR1-binding

agents are capable of inhibiting tumor growth *in vivo* (e.g., in a xenograft mouse model and/or in a human having cancer).

**[00110]** The FOLR1 binding molecules can be antibodies or antigen binding fragments that specifically bind to FOLR1 that comprise the CDRs of huMov19 (M9346A) with up to four (i.e. 0, 1, 2, 3, or 4) conservative amino acid substitutions per CDR, e.g., wherein the antibodies or fragments do not comprise the six CDRs of murine Mov19 (i.e., SEQ ID NOs:6-9, 16, and 12). Polypeptides can comprise one of the individual variable light chains or variable heavy chains described herein. Antibodies and polypeptides can also comprise both a variable light chain and a variable heavy chain.

**[00111]** In some embodiments, the FOLR1 binding molecule is an antibody or antigen-binding fragment comprising the sequences of SEQ ID NOs:6-10 and the sequence of SEQ ID NO:12. In some embodiments, the FOLR1 binding molecule is an antibody or antigen-binding fragment comprising the sequences of SEQ ID NOs:6-9 and the sequences of SEQ ID NOs:11 and 12

**[00112]** Also provided are polypeptides that comprise a polypeptide having at least about 90% sequence identity to SEQ ID NO:3, SEQ ID NO:4 or SEQ ID NO:5. In certain embodiments, the polypeptide comprises a polypeptide having at least about 95%, at least about 96%, at least about 97%, at least about 98%, or at least about 99% sequence identity to SEQ ID NO:3, SEQ ID NO:4 or SEQ ID NO:5 Thus, in certain embodiments, the polypeptide comprises (a) a polypeptide having at least about 95% sequence identity to SEQ ID NO:3 and/or (b) a polypeptide having at least about 95% sequence identity to SEQ ID NO:4 or SEQ ID NO:5. In certain embodiments, the polypeptide comprises (a) a polypeptide having the amino acid sequence of SEQ ID NO:3; and/or (b) a polypeptide having the amino acid sequence of SEQ ID NO:4 or SEQ ID NO:5. In certain embodiments, the polypeptide is an antibody and/or the polypeptide specifically binds FOLR1. In certain embodiments, the polypeptide is a murine, chimeric, or humanized antibody that specifically binds FOLR1. In certain embodiments, the polypeptide having a certain percentage of sequence identity to SEQ ID NO:3, SEQ ID NO:4 or SEQ ID NO:5 differs from SEQ ID NO:3, SEQ ID NO:4 or SEQ ID NO:5 by conservative amino acid substitutions only.

**[00113]** Polypeptides can comprise one of the individual light chains or heavy chains described herein. Antibodies and polypeptides can also comprise both a light chain and a heavy chain.

**[00114]** Monoclonal antibodies can be prepared using hybridoma methods, such as those described by Kohler and Milstein (1975) Nature 256:495. Using the hybridoma method, a mouse, hamster, or other appropriate host animal, is immunized as described above to elicit the production by lymphocytes of antibodies that will specifically bind to an immunizing antigen. Lymphocytes can also be immunized *in vitro*. Following immunization, the lymphocytes are isolated and fused with a suitable myeloma cell line using, for example, polyethylene glycol, to form hybridoma cells that can then be selected away from unfused lymphocytes and myeloma cells. Hybridomas that produce monoclonal antibodies directed specifically against a chosen antigen as determined by immunoprecipitation, immunoblotting, or by an *in*

*vitro* binding assay (e.g. radioimmunoassay (RIA); enzyme-linked immunosorbent assay (ELISA)) can then be propagated either *in vitro* culture using standard methods (Goding, Monoclonal Antibodies: Principles and Practice, Academic Press, 1986) or *in vivo* as ascites tumors in an animal. The monoclonal antibodies can then be purified from the culture medium or ascites fluid as described for polyclonal antibodies above.

**[00115]** Alternatively monoclonal antibodies can also be made using recombinant DNA methods as described in U.S. Patent 4,816,567. The polynucleotides encoding a monoclonal antibody are isolated from mature B-cells or hybridoma cell, such as by RT-PCR using oligonucleotide primers that specifically amplify the genes encoding the heavy and light chains of the antibody, and their sequence is determined using conventional procedures. The isolated polynucleotides encoding the heavy and light chains are then cloned into suitable expression vectors, which when transfected into host cells such as E. coli cells, simian COS cells, Chinese hamster ovary (CHO) cells, or myeloma cells that do not otherwise produce immunoglobulin protein, monoclonal antibodies are generated by the host cells. Also, recombinant monoclonal antibodies or fragments thereof of the desired species can be isolated from phage display libraries expressing CDRs of the desired species as described (McCafferty et al., 1990, Nature, 348:552-554; Clackson et al., 1991, Nature, 352:624-628; and Marks et al., 1991, J. Mol. Biol., 222:581-597).

**[00116]** The polynucleotide(s) encoding a monoclonal antibody can further be modified in a number of different manners using recombinant DNA technology to generate alternative antibodies. In some embodiments, the constant domains of the light and heavy chains of, for example, a mouse monoclonal antibody can be substituted 1) for those regions of, for example, a human antibody to generate a chimeric antibody or 2) for a non-immunoglobulin polypeptide to generate a fusion antibody. In some embodiments, the constant regions are truncated or removed to generate the desired antibody fragment of a monoclonal antibody. Site-directed or high-density mutagenesis of the variable region can be used to optimize specificity, affinity, etc. of a monoclonal antibody.

**[00117]** In some embodiments, the monoclonal antibody against the human FOLR1 is a humanized antibody. In some embodiments, the humanized antibody is a resurfaced antibody. In certain embodiments, such antibodies are used therapeutically to reduce antigenicity and HAMA (human anti-mouse antibody) responses when administered to a human subject. Humanized antibodies can be produced using various techniques known in the art. In certain alternative embodiments, the antibody to FOLR1 is a human antibody.

**[00118]** Human antibodies can be directly prepared using various techniques known in the art. Immortalized human B lymphocytes immunized *in vitro* or isolated from an immunized individual that produce an antibody directed against a target antigen can be generated (See, e.g., Cole et al., Monoclonal Antibodies and Cancer Therapy, Alan R. Liss, p. 77 (1985); Boemer et al., 1991, J. Immunol., 147 (1):86-95; and U.S. Patent 5,750,373). Also, the human antibody can be selected from a phage library, where

that phage library expresses human antibodies, as described, for example, in Vaughan et al., 1996, Nat. Biotech., 14:309-314, Sheets et al., 1998, Proc. Nat'l. Acad. Sci., 95:6157-6162, Hoogenboom and Winter, 1991, J. Mol. Biol., 227:381, and Marks et al., 1991, J. Mol. Biol., 222:581). Techniques for the generation and use of antibody phage libraries are also described in U.S. Patent Nos. 5,969,108, 6,172,197, 5,885,793, 6,521,404; 6,544,731; 6,555,313; 6,582,915; 6,593,081; 6,300,064; 6,653,068; 6,706,484; and 7,264,963; and Rothe et al., 2007, J. Mol. Bio., doi:10.1016/j.jmb.2007.12.018 (each of which is incorporated by reference in its entirety). Affinity maturation strategies and chain shuffling strategies (Marks et al., 1992, Bio/Technology 10:779-783, incorporated by reference in its entirety) are known in the art and can be employed to generate high affinity human antibodies.

**[00119]** Humanized antibodies can also be made in transgenic mice containing human immunoglobulin loci that are capable upon immunization of producing the full repertoire of human antibodies in the absence of endogenous immunoglobulin production. This approach is described in U.S. Patents 5,545,807; 5,545,806; 5,569,825; 5,625,126; 5,633,425; and 5,661,016.

**[00120]** This invention also encompasses bispecific antibodies that specifically recognize a FOLR1. Bispecific antibodies are antibodies that are capable of specifically recognizing and binding at least two different epitopes. The different epitopes can either be within the same molecule (e.g. the same FOLR1) or on different molecules such that both, for example, the antibodies can specifically recognize and bind a FOLR1 as well as, for example, 1) an effector molecule on a leukocyte such as a T-cell receptor (e.g. CD3) or Fc receptor (e.g. CD64, CD32, or CD16) or 2) a cytotoxic agent as described in detail below.

**[00121]** The polypeptides of the present invention can be recombinant polypeptides, natural polypeptides, or synthetic polypeptides comprising an antibody, or fragment thereof, against a human FOLR1.

**[00122]** The polypeptides and analogs can be further modified to contain additional chemical moieties not normally part of the protein. Those derivatized moieties can improve the solubility, the biological half life or absorption of the protein. The moieties can also reduce or eliminate any desirable side effects of the proteins and the like. An overview for those moieties can be found in REMINGTON'S PHARMACEUTICAL SCIENCES, 20th ed., Mack Publishing Co., Easton, PA (2000).

**[00123]** Methods known in the art for purifying antibodies and other proteins also include, for example, those described in U.S. Patent Publication No. 2008/0312425, 2008/0177048, and 2009/0187005, each of which is hereby incorporated by reference herein in its entirety.

## III. Immunoconjugates

**[00124]** Methods for administering conjugates comprising the anti-FOLR1 antibodies, antibody fragments, and their functional equivalents as disclosed herein, linked or conjugated to a drug or prodrug (also referred to herein as immunoconjugates) are also described herein. Suitable drugs or prodrugs are known in the art. The drugs or prodrugs can be cytotoxic agents. The cytotoxic agent used in the

cytotoxic conjugate of the present invention can be any compound that results in the death of a cell, or induces cell death, or in some manner decreases cell viability, and includes, for example, maytansinoids and maytansinoid analogs. Other suitable cytotoxic agents are for example benzodiazepines, taxoids, CC-1065 and CC-1065 analogs, duocarmycins and duocarmycin analogs, enediynes, such as calicheamicins, dolastatin and dolastatin analogs including auristatins, tomaymycin derivaties, leptomycin derivaties, methotrexate, cisplatin, carboplatin, daunorubicin, doxorubicin, vincristine, vinblastine, melphalan, mitomycin C, chlorambucil and morpholino doxorubicin.

**[00125]** Such conjugates can be prepared by using a linking group in order to link a drug or prodrug to the antibody or functional equivalent. Suitable linking groups are well known in the art and include, for example, disulfide groups, thioether groups, acid labile groups, photolabile groups, peptidase labile groups and esterase labile groups.

**[00126]** The drug or prodrug can, for example, be linked to the anti-FOLR1 antibody or fragment thereof through a disulfide bond. The linker molecule or crosslinking agent comprises a reactive chemical group that can react with the anti-FOLR1 antibody or fragment thereof. The reactive chemical groups for reaction with the cell-binding agent can be *N*-succinimidyl esters and *N*-sulfosuccinimidyl esters. Additionally the linker molecule comprises a reactive chemical group, which can be a dithiopyridyl group that can react with the drug to form a disulfide bond. Linker molecules include, for example, *N*-succinimidyl 3-(2-pyridyldithio) propionate (SPDP) (see, e.g., Carlsson et al., *Biochem. J.*, *173:* 723-737 (1978)), *N*-succinimidyl 4-(2-pyridyldithio)butanoate (SPDB) (see, e.g., U.S. Patent No. 4,563,304), *N*-succinimidyl 4-(2-pyridyldithio)2-sulfobutanoate (sulfo-SPDB) (see US Publication No. 20090274713) , *N*-succinimidyl 4-(2-pyridyldithio) pentanoate (SPP) (see, e.g., CAS Registry number 341498-08-6), 2-iminothiolane, or acetylsuccinic anhydride. For example, the antibody or cell binding agent can be modified with crosslinking reagents and the antibody or cell binding agent containing free or protected thiol groups thus derived is then reacted with a disulfide- or thiol-containing maytansinoid to produce conjugates. The conjugates can be purified by chromatography, including but not limited to HPLC, size-exclusion, adsorption, ion exchange and affinity capture, dialysis or tangential flow filtration.

**[00127]** In another aspect of the present invention, the anti-FOLR1 antibody is linked to cytotoxic drugs via disulfide bonds and a polyethylene glycol spacer in enhancing the potency, solubility or the efficacy of the immunoconjugate. Such cleavable hydrophilic linkers are described in WO2009/0134976. The additional benefit of this linker design is the desired high monomer ratio and the minimal aggregation of the antibody-drug conjugate. Specifically contemplated in this aspect are conjugates of cell-binding agents and drugs linked via disulfide group (-S-S-) bearing polyethylene glycol spacers ($(CH_2CH_2O)_{n=1-14}$) with a narrow range of drug load of 2-8 are described that show relatively high potent biological activity toward cancer cells and have the desired biochemical properties of high conjugation yield and high monomer ratio with minimal protein aggregation.

**[00128]** Antibody-maytansinoid conjugates with non-cleavable linkers can also be prepared. Such crosslinkers are described in the art (see US Publication No. 20050169933) and include but are not limited to, *N*-succinimidyl 4-(maleimidomethyl) cyclohexanecarboxylate (SMCC). In some embodiments, the antibody is modified with crosslinking reagents such as succinimidyl 4-(N-maleimidomethyl)-cyclohexane-1-carboxylate (SMCC), sulfo-SMCC, maleimidobenzoyl-N-hydroxysuccinimide ester (MBS), sulfo-MBS or succinimidyl-iodoacetate, as described in the literature, to introduce 1-10 reactive groups (Yoshitake et al, Eur. J. Biochem., 101:395-399 (1979); Hashida et al, J. Applied Biochem., 56-63 (1984); and Liu et al, Biochem., 18:690-697 (1979)). The modified antibody is then reacted with the thiol-containing maytansinoid derivative to produce a conjugate. The conjugate can be purified by gel filtration through a Sephadex G25 column or by dialysis or tangential flow filtration. The modified antibodies are treated with the thiol-containing maytansinoid (1 to 2 molar equivalent/maleimido group) and antibody-maytansinoid conjugates are purified by gel filtration through a Sephadex G-25 column, chromatography on a ceramic hydroxyapatite column, dialysis or tangential flow filtration or a combination of methods thereof. Typically, an average of 1-10 maytansinoids per antibody are linked. One method is to modify antibodies with succinimidyl 4-(N-maleimidomethyl)-cyclohexane-1-carboxylate (SMCC) to introduce maleimido groups followed by reaction of the modified antibody with a thiol-containing maytansinoid to give a thioether-linked conjugate. Again conjugates with 1 to 10 drug molecules per antibody molecule result. Maytansinoid conjugates of antibodies, antibody fragments, and other proteins are made in the same way.

**[00129]** In another aspect of the invention, the FOLR1 antibody is linked to the drug via a non-cleavable bond through the intermediacy of a PEG spacer. Suitable crosslinking reagents comprising hydrophilic PEG chains that form linkers between a drug and the anti-FOLR1 antibody or fragment are also well known in the art, or are commercially available (for example from Quanta Biodesign, Powell, Ohio). Suitable PEG-containing crosslinkers can also be synthesized from commercially available PEGs themselves using standard synthetic chemistry techniques known to one skilled in the art. The drugs can be reacted with bifunctional PEG-containing cross linkers to give compounds of the following formula, $Z-X_l-(-CH_2-CH_2-O-)_n-Y_p-D$, by methods described in detail in US Patent Publication 20090274713 and in WO2009/0134976, which can then react with the cell binding agent to provide a conjugate. Alternatively, the cell binding can be modified with the bifunctional PEG crosslinker to introduce a thiol-reactive group (such as a maleimide or haloacetamide) which can then be treated with a thiol-containing maytansinoid to provide a conjugate. In another method, the cell binding can be modified with the bifunctional PEG crosslinker to introduce a thiol moiety which can then be treated with a thiol-reactive maytansinoid (such as a maytansinoid bearing a maleimide or haloacetamide), to provide a conjugate.

**[00130]** Examples of suitable PEG-containing linkers include linkers having an *N*-succinimidyl ester or *N*-sulfosuccinimidyl ester moiety for reaction with the anti-FOLR1 antibody or fragment thereof, as

well as a maleimido- or haloacetyl-based moiety for reaction with the compound. A PEG spacer can be incorporated into any crosslinker known in the art by the methods described herein.

**[00131]** In some embodiments, the linker is a linker containing at least one charged group as described, for example, in U.S. Patent Publication No. 2012/0282282, the contents of which are entirely incorporated herein by reference. In some embodiments, the charged or pro-charged cross-linkers are those containing sulfonate, phosphate, carboxyl or quaternary amine substituents that significantly increase the solubility of the modified cell-binding agent and the cell-binding agent-drug conjugates, especially for monoclonal antibody-drug conjugates with 2 to 20 drugs/antibody linked. Conjugates prepared from linkers containing a pro-charged moiety would produce one or more charged moieties after the conjugate is metabolized in a cell. In some embodiments, the linker is selected from the group consisting of: N-succinimidyl 4-(2-pyridyldithio)-2-sulfopentanoate (sulfo-SPP) and N-succinimidyl 4-(2-pyridyldithio)-2-sulfobutanoate (sulfo-SPDB).

**[00132]** Many of the linkers disclosed herein are described in detail in U.S. Patent Publication Nos. 2005/0169933, 2009/0274713, and 2012/0282282, and in WO2009/0134976; the contents of which are entirely incorporated herein by reference.

**[00133]** The present invention includes aspects wherein about 2 to about 8 drug molecules ("drug load"), for example, maytansinoid, are linked to an anti-FOLR1 antibody or fragment thereof. "Drug load", as used herein, refers to the number of drug molecules (e.g., a maytansinoid) that can be attached to a cell binding agent (e.g., an anti-FOLR1 antibody or fragment thereof). In one aspect, the number of drug molecules that can be attached to a cell binding agent can average from about 2 to about 8 (e.g., 1.9, 2.0, 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 2.7, 2.8, 2.9, 3.0, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 4.0, 4.1, 4.2, 4.3, 4.4, 4.5, 4.6, 4.7, 4.8, 4.9, 5.0, 5.1, 5.2, 5.3, 5.4, 5.5, 5.6, 5.7, 5.8, 5.9, 6.0, 6.1, 6.2, 6.3, 6.4, 6.5, 6.6, 6.7, 6.8, 6.9, 7.0, 7.1, 7.2, 7.3, 7.4, 7.5, 7.6, 7.7, 7.8, 7.9, 8.0, 8.1). N2'-deacetyl-N2'-(3-mercapto-1-oxopropyl)-maytansine (DM1) and N2'-deacetyl-N2'-(4-mercapto-4-methyl-1-oxopentyl) maytansine (DM4) can be used.

**[00134]** Thus, in one aspect, an immunoconjugate comprises 1 maytansinoid per antibody. In another aspect, an immunoconjugate comprises 2 maytansinoids per antibody. In another aspect, an immunoconjugate comprises 3 maytansinoids per antibody. In another aspect, an immunoconjugate comprises 4 maytansinoids per antibody. In another aspect, an immunoconjugate comprises 5 maytansinoids per antibody. In another aspect, an immunoconjugate comprises 6 maytansinoids per antibody. In another aspect, an immunoconjugate comprises 7 maytansinoids per antibody. In another aspect, an immunoconjugate comprises 8 maytansinoids per antibody.

**[00135]** In one aspect, an immunoconjugate comprises about 1 to about 8 maytansinoids per antibody. In another aspect, an immunoconjugate comprises about 2 to about 7 maytansinoids per antibody. In another aspect, an immunoconjugate comprises about 2 to about 6 maytansinoids per antibody. In another

aspect, an immunoconjugate comprises about 2 to about 5 maytansinoids per antibody. In another aspect, an immunoconjugate comprises about 3 to about 5 maytansinoids per antibody. In another aspect, an immunoconjugate comprises about 3 to about 4 maytansinoids per antibody.

**[00136]** In one aspect, a composition comprising immunoconjugates has an average of about 2 to about 8 (e.g., 1.9, 2.0, 2.1, 2.2, 2.3, 2.4, 2.5, 2.6, 2.7, 2.8, 2.9, 3.0, 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 4.0, 4.1, 4.2, 4.3, 4.4, 4.5, 4.6, 4.7, 4.8, 4.9, 5.0, 5.1, 5.2, 5.3, 5.4, 5.5, 5.6, 5.7, 5.8, 5.9, 6.0, 6.1, 6.2, 6.3, 6.4, 6.5, 6.6, 6.7, 6.8, 6.9, 7.0, 7.1, 7.2, 7.3, 7.4, 7.5, 7.6, 7.7, 7.8, 7.9, 8.0, 8.1) drug molecules (e.g., maytansinoids) attached per antibody. In one aspect, a composition comprising immunoconjugates has an average of about 1 to about 8 drug molecules (e.g., maytansinoids) per antibody. In one aspect, a composition comprising immunoconjugates has an average of about 2 to about 7 drug molecules (e.g., maytansinoids) per antibody. In one aspect, a composition comprising immunoconjugates has an average of about 2 to about 6 drug molecules (e.g., maytansinoids) per antibody. In one aspect, a composition comprising immunoconjugates has an average of about 2 to about 5 drug molecules (e.g., maytansinoids) per antibody. In one aspect, a composition comprising immunoconjugates has an average of about 3 to about 5 drug molecules (e.g., maytansinoids) per antibody. In one aspect, a composition comprising immunoconjugates has an average of about 3 to about 4 drug molecules (e.g., maytansinoids) per antibody.

**[00137]** In one aspect, a composition comprising immunoconjugates has an average of about 2 ± 0.5, about 3 ± 0.5, about 4 ± 0.5, about 5 ± 0.5, about 6 ± 0.5, about 7 ± 0.5, or about 8 ± 0.5 drug molecules (e.g., maytansinoids) attached per antibody. In one aspect, a composition comprising immunoconjugates has an average of about 3.5 ± 0.5 drug molecules (e.g., maytansinoids) per antibody.

**[00138]** The anti-FOLR1 antibody or fragment thereof can be modified by reacting a bifunctional crosslinking reagent with the anti-FOLR1 antibody or fragment thereof, thereby resulting in the covalent attachment of a linker molecule to the anti-FOLR1 antibody or fragment thereof. As used herein, a "bifunctional crosslinking reagent" is any chemical moiety that covalently links a cell-binding agent to a drug, such as the drugs described herein. In another method, a portion of the linking moiety is provided by the drug. In this respect, the drug comprises a linking moiety that is part of a larger linker molecule that is used to join the cell-binding agent to the drug. For example, to form the maytansinoid DM1, the side chain at the C-3 hydroxyl group of maytansine is modified to have a free sulfhydryl group (SH). This thiolated form of maytansine can react with a modified cell-binding agent to form a conjugate. Therefore, the final linker is assembled from two components, one of which is provided by the crosslinking reagent, while the other is provided by the side chain from DM1.

**[00139]** The drug molecules can also be linked to the antibody molecules through an intermediary carrier molecule such as serum albumin.

**[00140]** As used herein, the expression "linked to a cell-binding agent" or "linked to an anti-FOLR1 antibody or fragment" refers to the conjugate molecule comprising at least one drug derivative bound to a cell-binding agent anti-FOLR1 antibody or fragment via a suitable linking group, or a precursor thereof. Exemplary linking groups are SPDB or sulfo-SPDB.

**[00141]** In certain embodiments, cytotoxic agents useful in the present invention are maytansinoids and maytansinoid analogs. Examples of suitable maytansinoids include esters of maytansinol and maytansinol analogs. Included are any drugs that inhibit microtubule formation and that are highly toxic to mammalian cells, as are maytansinol and maytansinol analogs.

**[00142]** Examples of suitable maytansinol esters include those having a modified aromatic ring and those having modifications at other positions. Such suitable maytansinoids are disclosed in U.S. Patent Nos. 4,424,219; 4,256,746; 4,294,757; 4,307,016; 4,313,946; 4,315,929; 4,331,598; 4,361,650; 4,362,663; 4,364,866; 4,450,254; 4,322,348; 4,371,533; 5,208,020; 5,416,064; 5,475,092; 5,585,499; 5,846,545; 6,333,410; 7,276,497 and 7,473,796.

**[00143]** In a certain embodiment, the immunoconjugates of the invention utilize the thiol-containing maytansinoid (DM1), formally termed $N^{2'}$-deacetyl-$N^{2'}$-(3-mercapto-1- oxopropyl)-maytansine, as the cytotoxic agent. DM1 is represented by the following structural formula (I):




(I)

**[00144]** In another embodiment, the conjugates of the present invention utilize the thiol-containing maytansinoid $N^{2'}$-deacetyl-$N^{2'}$(4-methyl-4-mercapto-1- oxopentyl)-maytansine (e.g., DM4) as the cytotoxic agent. DM4 is represented by the following structural formula (II):




(II)

**[00145]** Another maytansinoid comprising a side chain that contains a sterically hindered thiol bond is $N^{2'}$-deacetyl-$N$-$^{2'}$(4-mercapto-1-oxopentyl)-maytansine (termed DM3), represented by the following structural formula (III):




(III)

**[00146]** Each of the maytansinoids taught in US Patent No. 5,208,020 and 7,276,497, can also be used in the conjugate of the present invention. In this regard, the entire disclosure of 5,208,020 and 7,276,697 is incorporated herein by reference.

**[00147]** Many positions on maytansinoids can serve as the position to chemically link the linking moiety. For example, the C-3 position having a hydroxyl group, the C-14 position modified with hydroxymethyl, the C-15 position modified with hydroxy and the C-20 position having a hydroxy group are all expected to be useful. In some embodiments, the C-3 position serves as the position to chemically link the linking moiety, and in some particular embodiments, the C-3 position of maytansinol serves as the position to chemically link the linking moiety.

**[00148]** Structural representations of some conjugates are shown below:




Ab-PEG-Mal-DM1/DM4

(IV)




Ab-PEG4-Mal-DM1

(V)




Ab-PEG-SIA-DM1/DM4

(VI)




Ab-SMCC-DM1

(VII)




Ab-SIA-DM1

(VIII)




Ab-SPP-DM1

(IX)




Ab-SPDB-DM4

(X)




Ab-sulfo-SPDB-DM4

(XI)

**[00149]** Also included in the present invention are any stereoisomers and mixtures thereof for any compounds or conjugates depicted by any structures above.

**[00150]** Several descriptions for producing such antibody-maytansinoid conjugates are provided in U.S. Patent Nos. 6,333,410, 6,441,163, 6,716,821, and 7,368,565, each of which is incorporated herein in its entirety.

**[00151]** In general, a solution of an antibody in aqueous buffer can be incubated with a molar excess of maytansinoids having a disulfide moiety that bears a reactive group. The reaction mixture can be quenched by addition of excess amine (such as ethanolamine, taurine, etc.). The maytansinoid-antibody conjugate can then be purified by gel filtration.

**[00152]** The number of maytansinoid molecules bound per antibody molecule can be determined by measuring spectrophotometrically the ratio of the absorbance at 252 nm and 280 nm. The average number of maytansinoid molecules/antibody can be, for example, 1-10 or 2-5. The average number of maytansinoid molecules/antibody can be, for example about 3 to about 4. The average number of maytansinoid molecules/antibody can be about 3.5.

**[00153]** Conjugates of antibodies with maytansinoid or other drugs can be evaluated for their ability to suppress proliferation of various unwanted cell lines *in vitro*. For example, cell lines such as the human lymphoma cell line Daudi and the human lymphoma cell line Ramos, can easily be used for the assessment of cytotoxicity of these compounds. Cells to be evaluated can be exposed to the compounds for 4 to 5 days and the surviving fractions of cells measured in direct assays by known methods. $IC_{50}$ values can then be calculated from the results of the assays.

**[00154]** The immunoconjugates can, according to some embodiments described herein, be internalized into cells. The immunoconjugate, therefore, can exert a therapeutic effect when it is taken up by, or internalized, by a FOLR1-expressing cell. In some particular embodiments, the immunoconjugate comprises an antibody, antibody fragment, or polypeptide, linked to a cytotoxic agent by a cleavable linker, and the cytotoxic agent is cleaved from the antibody, antibody fragment, or polypeptide, wherein it is internalized by a FOLR1-expressing cell.

**[00155]** In some embodiments, the immunoconjugates are capable of reducing tumor volume. For example, in some embodiments, treatment with an immunoconjugate results in a %T/C value that is less than about 50%, less than about 45%, less than about 40%, less than about 35%, less than about 30%, less than about 25%, less than about 20%, less than about 15%, less than about 10%, or less than about 5%. In some particular embodiments, the immunoconjugates can reduce tumor size in a KB, OVCAR-3, IGROV-1, and/or OV-90 xenograft model. In some embodiments, the immunoconjugates are capable of inhibiting metastases.

### III. Methods of administering FOLR1-binding agents

**[00156]** The FOLR1-binding agents (including antibodies, immunoconjugates, and polypeptides) of the invention are useful in a variety of applications including, but not limited to, therapeutic treatment methods, such as the treatment of cancer. In certain embodiments, the agents are useful for inhibiting tumor growth, inducing differentiation, inhibiting metastases, reducing tumor volume, and/or reducing the tumorigenicity of a tumor. The methods of use can be *in vivo* methods.

**[00157]** According to the methods described herein, the FOLR1-binding agents can be administered at particular dosages. For example, the FOLR1-binding agents (e.g., IMGN853) can be administered at a dose of about 0.15 mg/kg to about 7 mg/kg, wherein the kilograms of body weight are adjusted to ideal body weight (IBW), lean body weight (LBW), or adjusted ideal body weight (AIBW or ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at a dose of about 3.0 mg/kg to about 6.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at a dose of about 3.3 mg/kg to about 6.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at

about 0.15 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 0.5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.1 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.8 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 2.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 2.5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 2.8 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 3.0 mg/kg, wherein the kilograms of body weight are adjusted IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 3.3 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 3.75 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 4.2 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 4.5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 4.8 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 5.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 5.5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 5.6 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g.,

IMGN853) are administered at about 6.1 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.2 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.3 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.4 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.5 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.6 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.7 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.8 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.9 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 7.0 mg/kg, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the kilograms of body weight are adjusted to AIBW (ADJ).

**[00158]** Furthermore, the FOLR1-binding agents can be administered at particular dose interval. For example, the FOLR1-binding agents can be administered from about four times a week to about once every four weeks. Thus, in some embodiments, the FOLR1-binding agents are administered about once every three weeks. In some embodiments, the FOLR1-binding agents are administered about once every two and a half weeks. In some embodiments, the FOLR1-binding agents are administered about once every two weeks. In some embodiments, the FOLR1-binding agents are administered about once every ten days. In some embodiments, the FOLR1-binding agents are administered about once every week.

**[00159]** The FOLR1-binding agents can also be administered in an about 3-week (i.e. about 21-day) cycle. For example, the FOLR1-binding agents can be administered twice in about 3 weeks. Thus, in some embodiments, the FOLR1-binding agents can be administered at about days 1 and 8 of a 21-day cycle. In other embodiments, the FOLR1-binding agents can be administered three times in about 3 weeks. Thus, in some embodiments, the FOLR1-binding agents can be administered at about days 1, 8, and 15 of a 21-day cycle.

**[00160]** The FOLR1-binding agents can also be administered in an about 4-week (i.e. about 28-day) cycle. For example, the FOLR1-binding agents can be administered three times in about 4 weeks. Thus,

in some embodiments, the FOLR1-binding agents can be administered at about days 1, 8, and 15 of a 28-day cycle.

**[00161]** According to the methods described herein, the FOLR1-binding agents can be administered at particular dosages. For example, the FOLR1-binding agents (e.g., IMGN853) can be administered at a dose of about 0.15 mg/kg to about 7 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at a dose of about 3.0 mg/kg to about 6.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at a dose of about 3.3 mg/kg to about 6.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 0.15 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 0.5 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.1 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.5 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.8 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 2.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 2.5 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 2.8 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 3.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 3.3 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 3.75 mg/kg once a week for three weeks on a four-week schedule.. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 4.2 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 4.5 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 4.8 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 5.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 5.5 mg/kg once a week for three weeks on a four-week

schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 5.6 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.0 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.1 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.2 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.3 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.4 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.5 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.6 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.7 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.8 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.9 mg/kg once a week for three weeks on a four-week schedule. In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 7.0 mg/kg once a week for three weeks on a four-week schedule.

**[00162]** According to the methods described herein, the FOLR1-binding agents (e.g., IMGN853) can be administered at a dose of about 0.15 mg/kg to about 7 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to ideal body weight (IBW), lean body weight (LBW), or adjusted ideal body weight (AIBW or ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at a dose of about 3.0 mg/kg to about 6.0 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at a dose of about 3.3 mg/kg to about 6.0 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 0.15 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 0.5 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.0 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW

(ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.1 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.5 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 1.8 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 2.0 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 2.5 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 2.8 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 3.0 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 3.3 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 3.75 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 4.2 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 4.5 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 4.8 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 5.0 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 5.5 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 5.6 mg/kg once a week for three weeks on a four-week schedule,

wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.0 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.1 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.2 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.3 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.4 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.5 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.6 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.7 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.8 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 6.9 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the FOLR1-binding agents (e.g., IMGN853) are administered at about 7.0 mg/kg once a week for three weeks on a four-week schedule, wherein the kilograms of body weight are adjusted to IBW, LBW, or AIBW (ADJ). In some embodiments, the kilograms of body weight are adjusted to AIBW (ADJ).

**[00163]** In some embodiments, the FOLR1-binding agents can be administered at a dose that results in a particular Cmax. For example, in some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 110 to about 160 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 110 to about 150 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 110 to about 140 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that

results in a Cmax of about 120 to about 160 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 120 to about 150 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 120 to about 140 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 90 to about 160 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 90 to about 150 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 90 to about 140 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 100 to about 160 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 100 to about 150 µg/mL. In some embodiments, the FOLR1-binding agents are administered at a dose that results in a Cmax of about 100 to about 140 µg/mL.

**[00164]** In certain embodiments, the FOLR1-binding agents can be administered at a dose that results in a particular AUC. For example, in certain embodiments, the FOLR1-binding agents are administered at a dose that results in a $AUC_{0-24}$ of no more than 2785 hr•µg/mL. In certain embodiments, the FOLR1-binding agents are administered at a dose that results in a $AUC_{0-24}$ of no more than 2741 hr•µg/mL. In certain embodiments, the FOLR1-binding agents are administered at a dose that results in a $AUC_{0-24}$ of no more than 2700 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-3500 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-3000 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-2785 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-2741 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-2700 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1000-2500 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 1500-3500 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 1500-3000 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 1500-2785 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 1500-2741 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of no more than 1500-2700 hr•µg/mL. In some embodiments, the administration produces an $AUC_{0-24}$ of about 1500-2500 hr•µg/mL.

**[00165]** In certain embodiments, the disease treated with the FOLR1-binding agent or antagonist (e.g., an anti-FOLR1 antibody) is a cancer. In certain embodiments, the cancer is characterized by FOLR1 expressing cells to which the FOLR1-binding agent (e.g., antibody) binds. In certain embodiments, a tumor overexpresses the human FOLR1.

**[00166]** The present invention provides for methods of treating cancer comprising administering a therapeutically effective amount of a FOLR1-binding agent to a subject (e.g., a subject in need of treatment). Cancers that can be treated by the methods encompassed by the invention include, but are not

limited to, neoplasms, tumors, metastases, or any disease or disorder characterized by uncontrolled cell growth. The cancer can be a primary or metastatic cancer. Specific examples of cancers that can be treated by the methods encompassed by the invention include, but are not limited to ovarian cancer, lung cancer, colorectal cancer, pancreatic cancer, liver cancer, breast cancer, brain cancer, kidney cancer, prostate cancer, gastrointestinal cancer, melanoma, cervical cancer, bladder cancer, glioblastoma, endometrial cancer, and head and neck cancer. In certain embodiments, the cancer is ovarian cancer. In certain embodiments, the cancer is endometrial cancer. In certain embodiments, the cancer is lung cancer. In certain embodiments, the lung cancer is non small cell lung cancer. In certain embodiments, the non-small cell lung cancer is adenocarcinoma of the lung.

**[00167]** In some embodiments, the cancer is a cancer that expresses FOLR1 (polypeptide or nucleic acid). In some embodiments, the FOLR1-binding agent is administered to a patient with an increased expression level of FOLR1, for example, as described in U.S. Published Application No. 2012/0282175 or International Published Application No. WO 2012/135675, both of which are incorporated by reference herein in their entireties. Thus, in some embodiments, the FOLR1 expression is measured by immunohistochemistry (IHC) and given a staining intensity score and/or a staining uniformity score by comparison to controls (e.g., calibrated controls) exhibiting defined scores (e.g. an intensity score of 3 is given to the test sample if the intensity is comparable to the level 3 calibrated control or an intensity of 2 is given to the test sample if the intensity is comparable to the level 2 calibrated control). A staining uniformity that is heterogeneous or homogeneous is also indicative of increased FOLR1 expression. The staining intensity and staining uniformity scores can be used alone or in combination (e.g., 2 homo, 2 hetero, 3 homo, 3 hetero, etc.). In another example, an increase in FOLR1 expression can be determined by detection of an increase of at least 2-fold, at least 3-fold, or at least 5-fold) relative to control values (e.g., expression level in a tissue or cell from a subject without cancer or with a cancer that does not have elevated FOLR1 values).

**[00168]** In some embodiments, the cancer is a cancer that expresses FOLR1 at a level of 1 hetero or higher by IHC. In some embodiments, the cancer is a cancer that expresses FOLR1 at a level of 2 hetero or higher by IHC. In some embodiments, the cancer is a cancer that expresses FOLR1 at a level of 3 hetero or higher by IHC. In some embodiments, the cancer is a lung cancer that expresses FOLR1 at a level of 2 hetero or higher by IHC. In some embodiments, the cancer is a lung cancer that expresses FOLR1 at a level of 3 hetero or higher by IHC. In some embodiments, the cancer is a ovarian cancer that expresses FOLR1 at a level of 2 hetero or higher by IHC. In some embodiments, the cancer is a ovarian cancer that expresses FOLR1 at a level of 3 hetero or higher by IHC. In some embodiments, the cancer is an endometriod cancer that expresses FOLR1 at a level of 1 hetero or higher by IHC. In some embodiments, the cancer is a endometriod cancer that expresses FOLR1 at a level of 2 hetero or higher by IHC.

**[00169]** In certain embodiments, the method of inhibiting tumor growth comprises administering to a subject a therapeutically effective amount of a FOLR1-binding agent. In certain embodiments, the subject is a human. In certain embodiments, the subject has a tumor or has had a tumor removed.

**[00170]** In addition, the invention provides a method of reducing the tumorigenicity of a tumor in a subject, comprising administering a therapeutically effective amount of a FOLR1-binding agent to the subject. In certain embodiments, the tumor comprises cancer stem cells. In certain embodiments, the frequency of cancer stem cells in the tumor is reduced by administration of the agent.

**[00171]** The present invention further provides pharmaceutical compositions comprising one or more of the FOLR1-binding agents described herein. In certain embodiments, the pharmaceutical compositions further comprise a pharmaceutically acceptable vehicle. These pharmaceutical compositions find use in inhibiting tumor growth and treating cancer in human patients.

**[00172]** In certain embodiments, formulations are prepared for storage and use by combining a purified antibody or agent of the present invention with a pharmaceutically acceptable vehicle (e.g. carrier, excipient) (Remington, The Science and Practice of Pharmacy 20th Edition Mack Publishing, 2000). Suitable pharmaceutically acceptable vehicles include, but are not limited to, nontoxic buffers such as phosphate, citrate, and other organic acids; salts such as sodium chloride; antioxidants including ascorbic acid and methionine; preservatives (e.g. octadecyldimethylbenzyl ammonium chloride; hexamethonium chloride; benzalkonium chloride; benzethonium chloride; phenol, butyl or benzyl alcohol; alkyl parabens, such as methyl or propyl paraben; catechol; resorcinol; cyclohexanol; 3-pentanol; and m-cresol); low molecular weight polypeptides (e.g. less than about 10 amino acid residues); proteins such as serum albumin, gelatin, or immunoglobulins; hydrophilic polymers such as polyvinylpyrrolidone; amino acids such as glycine, glutamine, asparagine, histidine, arginine, or lysine; carbohydrates such as monosaccharides, disaccharides, glucose, mannose, or dextrins; chelating agents such as EDTA; sugars such as sucrose, mannitol, trehalose or sorbitol; salt-forming counter-ions such as sodium; metal complexes (e.g. Zn-protein complexes); and non-ionic surfactants such as TWEEN or polyethylene glycol (PEG).

**[00173]** The pharmaceutical compositions described herein can be administered in any number of ways for either local or systemic treatment. Administration can be topical (such as to mucous membranes including vaginal and rectal delivery) such as transdermal patches, ointments, lotions, creams, gels, drops, suppositories, sprays, liquids and powders; pulmonary (e.g., by inhalation or insufflation of powders or aerosols, including by nebulizer; intratracheal, intranasal, epidermal and transdermal); oral; or parenteral including intravenous, intraarterial, subcutaneous, intraperitoneal or intramuscular injection or infusion; or intracranial (e.g., intrathecal or intraventricular) administration. In some particular embodiments, the administration is intravenous.

**[00174]** An antibody or immunoconjugate can be combined in a pharmaceutical combination formulation, or dosing regimen as combination therapy, with a second compound. In some embodiments, the second compound is a steroid. In some embodiments, the methods encompass administration of a steroid and an immunoconjugate that results in a reduction of headaches as compared to administration of the immunoconjugate alone.

**[00175]** The steroid can be administered at the same time as the immunoconjugate, prior to the administration of the immunoconjugate, and/or after the administration of the immunoconjugate. In some embodiments, the steroid is administered within about a week, about five days, about three days, about two days, or about one day or 24 hours prior to the administration of the immunoconjugate. In some embodiments, the steroid is administered within one day of the administration of the immunoconjugate. In some embodiments, the steroid is administered multiple times. In some embodiments, the steroid is administered about one day prior to the administration of the immunoconjugate and on the same day as the administration of the immunoconjugate. The steroid can be administered via any number of ways, including for example, topical, pulmonary, oral, parenteral, or intracranial administration. In some embodiments, the administration is oral. In some embodiments, the administration is intravenous. In some embodiments, the administration is both oral and intravenous.

**[00176]** An antibody or immunoconjugate can also be combined in a pharmaceutical combination formulation, or dosing regimen as combination therapy, with an analgesic, or other medications that prevent or treat headaches. For example, acetaminophin and/or dephenhydramine can be administered in addition to the administration of the antibody or immunoconjugate. The analgesic can be administered prior to, at the same time, or after the administration of the immunoconjugate and can be via any appropriate administration route. In some embodiments, the analgesic is administered orally.

**[00177]** In some embodiments, the methods comprise administration of a first compound that is an antibody or immunoconjugate, a second compound that is a steroid, and a third compound that is an analgesic. In some embodiments, the methods comprise administration of a first compound that is IMGN388, a second compound that is dexamethasone, and a third compound that is acetaminophin and/or diphenydramine.

**[00178]** An antibody or immunoconjugate can be combined in a pharmaceutical combination formulation, or dosing regimen as combination therapy, with a second compound having anti-cancer properties. The second compound of the pharmaceutical combination formulation or dosing regimen can have complementary activities to the ADC of the combination such that they do not adversely affect each other. Pharmaceutical compositions comprising the FOLR1-binding agent and the second anti-cancer agent are also provided.

**[00179]**

* * *

**[00180]** Embodiments of the present disclosure can be further defined by reference to the following non-limiting examples, which describe in detail preparation of certain antibodies of the present disclosure and methods for using antibodies of the present disclosure. It will be apparent to those skilled in the art that many modifications, both to materials and methods, can be practiced without departing from the scope of the present disclosure.

## Examples

**[00181]** It is understood that the examples and embodiments described herein are for illustrative purposes only and that various modifications or changes in light thereof will be suggested to persons skilled in the art and are to be included within the spirit and purview of this application

## Example 1

### IMGN853 Dosing Trial in Human Cancer Patients

**[00182]** IMGN853 is an antibody-drug conjugate (ADC) comprising a folate receptor 1 (FOLR1)-binding antibody and the potent maytansinoid, DM4. IMGN853 has been previously described in International Published Application Nos. WO 2011/106528, WO 2012/135675, and WO 2012/138749, and U.S. Published Application Nos. 2012/0009181, 2012/0282175, and 2012/0282282, each of which is incorporated by reference herein in its entirety. IMGN853 is huMov19-sSPDB-DM4, and the huMov19 antibody contains a variable heavy chain with the amino acid sequence of SEQ ID NO:3 and a variable light chain with the amino acid sequence of SEQ ID NO: 5. FOLR1 protein is expressed at elevated levels on many solid tumors, particularly epithelial ovarian cancer (EOC), endometrial cancer, non-small cell lung cancer (NSCLC), and clear-cell renal cell cancer.

**[00183]** A study to determine the maximum tolerated dose (MTD) and recommended phase 2 dose (RP2D) as well as to evaluate the safety, pharmacokinetics (PK), pharmacodynamics (PD), and efficacy of IMGN853 was initiated. The study includes two components: an accelerated dose titration component, where the IMGN853 immunoconjugate was administered to patients with any type of FOLR1-expressing refractory solid tumors including epithelial ovarian cancer (EOC) and other FOLR1-positive solid tumors, and a dose expansion component.

**[00184]** For the accelerated titration portion of the study, IMGN853 was given intravenously (IV) on Day 1 of each 21-day (3 week) cycle. Twenty-nine patients have been enrolled across seven dose levels ranging from 0.15 to 7.0 mg/kg IMGN853 in the accelerated portion of the clinical trial and there are safety data currently available for 23 patients. There were no study drug-related AEs of any grade reported in patients treated in the first 4 dose cohorts. At doses up to 5.0 mg/kg, IMGN853 related AEs

have been mild to moderate. At the 5.0 and 7.0 mg/kg dose levels, 4 of 10 and 5 of 5 patients, respectively, have reported ocular toxicity.

Table 1: Enrollment by Tumor Type

**Enrollment and FOLR1 Expression by Tumor Type**
**N=29**

| **Diagnosis** | **FOLR1 Expression Level** | | | | | |
|---|---|---|---|---|---|---|
| | 2 Hetero | 2 Homo | 3 Hetero | 3 Homo | Other | Totals |
| Ovarian Cancer | **2** | **2** | **7** | **4** | **1** | **16** |
| Serous | 1[1] | | 6[1] | 3 | | 10 |
| Transitional Cell | | | 1[2] | | | 1 |
| Clear Cell | 1 | 1 | | 1 | | 3 |
| Carcinosarcoma | | 1 | | | **1[4]** | 1 |
| Endometrial | **2** | **0** | **5** | **1** | **0** | **8** |
| Serous | | | 3[3] | 1 | | 4 |
| Endometrioid | 2 | | | | | 2 |
| Adenosquamous | | | 1 | | | 1 |
| Mixed | | | 1 | | | 1 |
| NSCLC Adenocarcinoma | **1** | | | | | **1** |
| Renal Cell | **0** | **2** | | | **2[5]** | **4** |
| Clear Cell | | 2 | | | 2[5] | 4 |

[1]CA125 response in 1 patient each at 3.3 mg/kg, 5.0 mg/kg, and 7.0 mg/kg

[2]Confirmed partial response

[3]Unconfirmed partial response and confirmed CA125 response in 1 patient at 5.0 mg/kg

[4]Focal

[5]Negative

**[00185]** Drug exposure was measured in 23 patients and found to generally increase linearly, with a half-life at doses $\geq$ 2.0 mg/kg of approximately 5 days. One patient with serous endometrial cancer also had a CA125 response and an unconfirmed partial response at 5 mg/kg. Three patients with ovarian cancer have reported confirmed CA125 response (one each at 7 mg/kg, 5 mg/kg and one at 3.3 mg/kg). Patients receiving IMGN853 at doses greater than or equal to 5.0 mg/kg received dexamethasone, 10 mg

IV (or similar steroid equivalent), 30 to 60 minutes prior to anti-FOLR1 immunoconjugate (e.g., IMGN853) administration.

**[00186]** The pharmacokinetic (PK) parameters are reported for Cycle 1 (first cycle of dosing for each patient only) of the IMGN853 Phase 1 trial. (Figures 1A and B.) The clearance of IMGN853 is shown to be rapid at low doses (CL= 1.1 mL/hr/kg) with a half life of approximately 35.4 hours or 1.5 days. The clearance decreases (CL= 0.4 mL/her/kg) at the higher doses, and the half-life increases to about 4 days or about 5 days at doses ≥ 2.0 mg/kg. The exposure (AUC) and the Cmax are shown to generally increase at the higher doses as well.

**[00187]** At the 7.0 mg/kg dose, all 5 patients experienced ocular toxicity. One patient was reported with Grade 3, dose-limiting punctate keratitis and Grade 2 blurred vision that were deemed definitely related to study treatment. Additionally, there was one patient each with Grade 3, Grade 2, and Grade 1 blurred vision; all events were deemed possibly or definitely related to IMGN853 treatment. As a result, the maximum tolerated dose on this schedule of administration (i.e., once every three weeks) was deemed to have been exceeded at the 7.0 mg/kg dose level, and all patients remaining at the 7.0 mg/kg dose level were dose reduced to the previous dose level (5.0 mg/kg) and 7 additional patients were evaluated at the 5 mg/kg dose. Together with the 3 patients treated previously, 10 patients were treated at a dose of 5 mg/kg. Of the total of 10 patients at the 5 mg/kg level, 3 had blurred vision, including 1 patient with grade 3 blurred vision, and 2 patients had corneal changes. Other related grade 3 adverse events included elevated alkaline phosphatase and grade 3 hypophosphatemia. Additional patients were enrolled to the 3.3 mg/kg dose level to further explore and confirm the safety profile seen with the 3 patients originally assigned to this dose. Safety review of the additional 6 patients currently being treated at the 3.3 mg/kg is ongoing and IMGN853 is well tolerated. To date, three of the nine patients treated at the 3.3 mg/kg dose level have reported IMGN853-related AEs, including grade 2 peripheral neuropathy (1 patient), grade 2 nausea, fatigue and AST elevation (1 patient), and 1 patient with grade 2 vomiting.

**[00188]** Once the MTD is defined, the study will proceed to the dose expansion phase. Three expansion cohorts will evaluate patients with FOLR1 protein positive (1) platinum resistant epithelial ovarian cancer; (2) relapsed or refractory epithelial ovarian cancer, and (3) relapsed or refractory non small cell lung cancer (NSCLC). Cohorts 2 and 3 will have IMGN853 PD assessment by pre-and post-dose tumor biopsy and/or by FLT-PET imaging, respectively. IMGN853 will be administered at a dose of at least 3.3 mg/kg and may include doses of 5.0 mg/kg or as high as 6.0 mg/kg or even 7.0 mg/kg. Initially IMGN853 should be administered at a rate of 1 mg/min; after 30 minutes, the rate can be increased to 3 mg/min if well tolerated. If well tolerated after 30 minutes at 3 mg/min, the rate may be increased to 5 mg/min. Subsequent infusions can be delivered at the tolerated rate.

**[00189]** For all IMGN853 dosing at 3.3 mg/kg or higher, prophylactic steroid treatment will be included using the protocols described in Example 2 (e.g., steroid treatment is included at 10 mg

dexamethasone IV (or similar steroid equivalent) 30 to 60 minutes prior to IMGN853 administration is required and prophylactic diphenhydramine HCl and acetaminophen is recommended prior to IMGN853 administration). Cycles are repeated until (i) the patient's disease worsens, (ii) the patient experiences unacceptable toxicity, (iii) the patient withdraws consent, (iv) the patient develops a comorbid condition that would preclude further study treatment or (v) the patient is discontinues due to non-compliance or administrative reasons.

**[00190]** Responses are assessed using RECIST and Gynecologic Cancer Intergroup (GCIG) criteria (as appropriate).

Example 2

IMGN853 Steroid-Based Prophylaxis for Infusion Reaction

**[00191]** In order to decrease the likelihood of infusion reaction, any of the following steroid-based prophylaxis protocols can be used.

**[00192]** (1) Patients receive dexamethasone, 10 mg IV (or similar steroid equivalent), 30 to 60 minutes prior to anti-FOLR1 immunoconjugate (e.g., IMGN853) administration.

**[00193]** (2) Patients receive dexamethasone, 10 mg IV (or similar steroid equivalent) and diphenhydramine HCl (25-50 mg IV or PO), with or without acetaminophen (325-650 mg IV or PO), 30 to 60 minutes prior to anti-FOLR1 immunoconjugate (e.g., IMGN853) administration. This prophylactic protocol is recommended and at the discretion of each investigator.

**[00194]** (3) Patients receive dexamethasone 8 mg (or similar steroid equivalent) by mouth BID on the day prior to administration of anti-FOLR1 immunoconjugate (e.g., IMGN853). On the day of administration of anti-FOLR1 immunoconjugate (e.g., IMGN853), 30-60 mins prior to anti-FOLR1 immunoconjugate (e.g., IMGN853) administration, patients receive dexamethasone, 10 mg IV (or similar steroid equivalent), diphenhydramine HCl (25-50 mg IV or PO), with or without acetaminophen (325-650 mg IV or PO)

(4) Within 24 hours prior to infusion steroids (e.g., dexamethasone) are administered orally.

Example 3

Relationship of IMGN853 Exposure with Ocular Toxicity

**[00195]** For each patient treated with the IMGN853 protocol described in Examples 1 and 2, the plasma concentration of IMGN853 was measured at various time points across each cycle, beginning at end of infusion and continuing to day 21. Pharmacokinetic (PK) parameter analysis identified an apparent association between Cmax and the occurrence of ocular toxicity, which is characterized by corneal

deposits and loss of visual acuity. The statistically significant correlation was also observed with early exposure levels as measured by area under the curve in the first 24 hrs ($AUC_{0-24}$). (See Figures 2A-2C.)

**[00196]** In the 3.3 to 7.0 mg/kg cohorts, ocular toxicity was observed in 9/10 patients with Cmax values at or above 147.7 µg/ml, indicated by the dotted line in Figure 2A. No patients with Cmax values below 147.7 µg/ml developed ocular toxicity. All (9/9) patients with an $AUC_{0-24}$ at or above 2785 hr*µg/ml, indicated by the dotted line in Figure 2B, developed ocular toxicity, whereas none below had any eye toxicity. Efficacy signals were observed at doses ≥ 3.3 mg/kg and did not correlate with reports of ocular toxicity. The lowest Cmax value in patients that have had signals of activity was 91.25 µg/ml.

**[00197]** After 24 patients were treated with either 3.3 mg/kg, 5.0 mg/kg, or 7.0 mg/kg IMGN853, a Cmax value above threshold correlated with (reversible) ocular toxicity using Fisher's exact test, $p = 0.00004$. An $AUC_{0-24}$ value above the threshold level of 2,741 hr*µg/ml also correlated with (reversible) ocular toxicity using Fisher's exact test, $p = 0.00001$. Based on these results and calculations using nominal time and concentration values, it was determined that patients having a Cmax greater than about 150 µg/ml or an $AUC_{0-24}$ value greater than 2785 hr*µg/ml were most likely to have an increased rate of ocular toxicity, and patients having signals of activity had a Cmax level of at least about 90 µg/mg. Strategies were developed to modify the dosing in order to reduce the variability seen within each dose level and to achieve a Cmax level for optimal efficacy and minimal toxicity at each patient weight.

Example 4

IMGN853 Alternate Dosing Approaches

**[00198]** As described in Example 3, above, a correlation between Cmax values over 150 µg/ml or $AUC_{0-24}$ values over 2785 hr*µg/ml and incidence of ocular toxicity was observed across all dose levels. In addition, initial PK parameter analysis demonstrated that although Cmax increased proportionally with the dose of IMGN853, there was a significant variation in Cmax, $AUC_{0-24}$ and volume of distribution within dose levels (Figure 3).

**[00199]** The variation in Cmax was particularly striking in the 5 mg/kg cohort, where PK was analyzed in 10 patients. There was no apparent intra-patient Cmax variability across cycles, and infusion times were similar between patients and were not associated with Cmax variation. Covariate analysis demonstrated a correlation between weight and Cmax. (Figure 4).

**[00200]** Volume of distribution ($V_{ss}$) is indicative of plasma volume for biologics and does not increase linearly with weight. When Cmax values were normalized by Vss, the variation was reduced. These data suggest that exploring alternate dosing approaches other than based on total body weight could produce more uniform dosing across cohorts. To this end, Cmax values were estimated using alternative dosing calculations for all patients treated in the 3.3 (n=3), 5.0 (n=10), and 7 mg/kg (n=5) dose groups.

Calculated Cmax values were normalized to a 5 mg/kg dose level and compared to Cmax values observed from total body weight (TBW) dosing. Body surface area (BSA) was also considered; however, Cmax values based on BSA dosing decreased the Cmax, but the variability was only minimally impacted and a positive correlation between weight and Cmax was still observed though to a lesser extent. Three additional alternate formulas were evaluated: (1) Ideal Body Weight (IBW), Lean Body Weight (LBW), and Adjusted Body Weight (ADJ). The formula for each of IBW, LBW, AIBW (ADJ), and BSA is provided below:

*Ideal Body Weight (IBW)*

IBW (male) = 0.9H-88

IBW (fem) = 0.9H-92

(where H=height in cm)

*Lean Body Weight (LBW)*

Men = 1.10 x weight in kg – 128([weight in kg]$^2$/[100 x height in meters]$^2$)

Women = 1.07 x weight in kg – 148([weight in kg]$^2$/[100 x height in meters]$^2$)

*Adjusted Ideal Body Weight (AIBW or ADJ)*

IBW + 0.4(Actual weight in kg – IBW)

*Body Surface Area (BSA) - Mosteller Formula*

BSA (m$^2$) = (Height(cm) x Weight(kg) / 3600)$^{½}$

*Body Surface Area (BSA) - Boyd Formula*

BSA (m$^2$) = (0.0003207 x Height(cm)$^{0.3}$ x Weight(grams)$^{(0.7285 - ( 0.0188 \times LOG(grams))}$)]

**[00201]** Average Cmax values were 93.06, 82.72, 110.77 and 137.46 µg/ml for IBW, LBW, AIBW (ADJ) and TBW, respectively. Additionally, all three alternate metrics reduced the standard deviation in Cmax (21.7, 20.5, 22.9 vs. 33.7 µg/ml for TBW). (See Figure 5.)

**[00202]** As mentioned above, a positive correlation was observed for TBW versus Cmax. Correlation analysis of the IBW and LBW versus weight plots demonstrated a negative correlation versus weight. Dosing by AIBW (ADJ) body weight had the least body weight dependence (see Figure 6), similar to BSA but with less PK variability.

**[00203]** Dosing by IBW, LBW, or AIBW (ADJ) results in less weight dependence compared to TBW dosing. Based on the current data, dosing by AIBW (ADJ) weight results in the least variance in Cmax.

**[00204]** $AUC_{0-24}$ values were observed in 24 patients who received 3.3, 5, or 7 mg/kg of IMGN853 based on total body weight (see Figure 7 "TBW Actual"). In addition, $AUC_{0-24}$ values were also observed in 7 patients who received 5 mg/kg of IMGN853 based on adjusted ideal body weight (see Figure 7 "5 ADJ Actual"). These actual values obtained with the 24 patients were compared with the projected values that would have been obtained with those same patients if they had all been treated with 5 mg/kg based on total body weight (Figure 7 "TBW 5 mg/kg") or if they had all been treated with 5, 5.4, or 6 mg/kg based on adjusted ideal body weight (Figure 7 "ADJ 5 mg/kg," "ADJ 5.4 mg/kg," and "ADJ 6 mg/kg.") As shown in the table in Figure 7, administering 5 mg/kg IMGN853 based on AIBW (ADJ) minimizes the number of patients who are projected to exceed the threshold level of $AUC_{0-24}$ 2741 hr*µg/ml associated with ocular toxicity. In addition, only 14% of the 7 patients who received 5 mg/kg IMGN853 based on AIBW (ADJ) reached $AUC_{0-24}$ levels above 2741 hr*µg/ml, whereas 38% of the patients who received 3.3, 5, or 7 mg/kg of IMGN853 based on TBW exceeded this level. The original analysis of $AUC_{0-24}$ was calculated using nominal time and concentration values and resulted in a value of 2785 hr* µg/ml. When recalculated using actual time, the result was a slight modification to the $AUC_{0-24}$ values and a determination of a threshold value of 2741 hr* µg/ml.

**[00205]** Patients were then treated with either 5 mg/kg based on adjusted ideal body weight, 6 mg/kg based on adjusted ideal body weight, 5 mg/kg based on total body weight, or 7 mg/kg based on total body weight. The observed $AUC_{0-24}$ values in these patients are shown in Figure 8 ("Acutal"), and these values are compared with the projected values ("Proj") that would have been obtained if all of these patients had been treated with 5 mg/kg based on adjusted ideal body weight, 6 mg/kg based on adjusted ideal body weight, 5 mg/kg based on total body weight, or 7 mg/kg based on total body weight. Dosing based on adjusted ideal body weight decreased the variability in early exposure levels and decreased ocular adverse events as shown in Table 2 below. In particular, only one patient receiving 5 mg/kg based on adjusted ideal body weight experienced Grade 1 visual disturbance and three patients receiving 6 mg/kg based on adjusted ideal body weight experienced Grade 1-2 ocular toxicity. In contrast, doses of 5 mg/kg or more based on total body weight were associated with more patients having ocular adverse events and with the occurance of Grade 3 ocular adverse events.

Table 2: Ocular Adverse Events (OAE) Reported with Dosing based on Adjusted Idead Body Weight (All Reversible)

| IMGN853 (mg/kg adusted ideal body weight) | Cohort Size | Patients with Any Grade OAE | OAEs | | DLTs |
|---|---|---|---|---|---|
| | | | Grade 1-2 | Grade 3[1] | |
| 5.0 | 7 | 1 | 1[2] | 0 | 0 |
| 6.0 | 7 | 3 | 5[3] | 0 | 0 |

[1]There were no Grade 4 adverse events.

[2]One patient reported visual disturbance.

[3]Grade 2 blurred vision and punctate keratitis in 1 patient; Grade 2 retinopathy in one patient; and Grade 1 blurred vision and floaters in 1 patient.

Example 5

IMGN853 Alternate Schedules

**[00206]** A population PK model based on rich and sparse (peak and through) concentration-time profiles of IMGN853 following Q3W dosing (escalating dose) was developed. The PK of IMGN853 as stated above appears to be linear over the dose range studied.

**[00207]** This model was used to simulate steady-state exposure to IMGN853 for the following candidate regimens:

1 to 2.5 mg/kg QW (10 dose levels at 0.15 mg/kg increments)

2 to 5 mg/kg Q2W (10 dose levels at 0.3 mg/kg increments)

1 to 2.5 mg/kg QWx4 then Q2Wx4 (10 dose levels at 0.15 mg/kg increments)

1 to 2.5 mg/kg QWx3 in 4W (10 dose levels at 0.15 mg/kg increments)

**[00208]** The QWx4 then Q2Wx4 dosing regimen resulted in the least accumulation (i.e., accumulation index of 1) over time, while the QW dosing regimen resulted in the highest accumulation (i.e., accumulation index of 1.97). QWx3 in 4W allowed overall exposure increases up to ~3-fold while limiting Cmax to levels below that observed with ocular toxicity (Table 3).

Table 3

| Schedule | Dose (mg/kg) | Cmax (μg/ml) | Cmin (μg/ml) | Cavg (μg/ml) | $AUC_{12W}$ (h*mg/ml) |
|---|---|---|---|---|---|
| Q3W | 4.2 | 112 | 7.8 | 30 | 32 |
| Q2W | 4.1 | 119 | 18 | 44 | 84 |
| QWx3 in 4W | 3.3 | 119 | 20 | 52 | 105 |

**[00209]** The population PK model was also used to simulate a hypothetical population of 500 patients via Monte Carlo resampling. Descriptive statistics were derived in order to determine a dosing regimen with the percentage of subjects with $C_{max} < 150$ μg/ml to optimize the safety profile of IMGN853. For the QWx3 in 4W regimen, the 1.5, 2.0 and 2.5 mg/kg dose levels resulted in 99%, 95% and 90% of the population with a $C_{max} < 150$ μg/ml, respectively.

Example 6

*In Vivo* Antitumor Activity and Predicted Pharmacokinetics of Multi-dose IMGN853

**[00210]** The plasma concentrations of intact IMGN853 conjugate administered intravenously at a dose of 10 mg/kg in female CD-1 mice was determined by ELISA at various time points post injection. Pharmacokinetic (PK) analyses were performed using the standard algorithms of the non-compartmental pharmacokinetic analysis program (201), WinNonlin, Professional version 6.1 (Pharsight, Mountain View, CA). The maximal concentration (Cmax), the total area under the concentration-time curve ($AUC_{0-\infty}$), the half-life ($t_{1/2}$) in terminal elimination phase, the total blood clearance (CL) and the volume of distribution at steady-state (Vss) were estimated. The values of the first order rate constant for determining conjugate $t_{1/2}$ were evaluated by using the concentration data from 1 to 28 days post-administration. The values of the first order rate constant for determining antibody $t_{1/2}$ were evaluated by using the concentration data from 1 to 28 days post-administration. Based on the measured values generated at the 10 mg/kg dose, PK simulations were performed with WinNonlin using various dose levels, with both single and multi-dose schedules. The resulting parameters were evaluated in comparison to the anti-tumor activity of IMGN853 at various dose levels and schedules in NCI-H2110 (non-small cell lung cancer, NSCLC) xenografts in female SCID mice.

**[00211]** When IMGN853 was administered as a single injection, dose-dependent antitumor activity was observed in the NCI-H2110 model. All dose levels (2.8, 5.6, and 8.5 mg/kg) were highly active with T/C values <10%, yet there were an increase in numbers of complete tumor regressions (CR) with increased IMGN853 dose. The predicted plasma PK parameters also showed a dose-dependent increase in Cmax (maximal plasma concentration), Cavg (average plasma concentration), and exposure ($AUC_{0-540}$ hrs). Thus, the activity of single doses of IMGN853 was shown to be dose-dependent and predictable based on plasma PK parameters, as shown in Figure 9.

**[00212]** In contrast to the single-dose activity, multi-dose schedules of IMGN853 show that activity does not depend on Cmax (Figure 10). IMGN853 administered at a dose of 2.8 mg/kg x 3, either daily or every 3 days schedule (total dose of 8.4 mg/kg) had similar activity to single-dose IMGN853 at 8.5 mg/kg. Interestingly, total exposure (AUC) and average plasma concentration (Cavg) of conjugate was comparable among the treatment groups, while the Cmax was highest in the 8.5 mg/kg single-dose group. The activity observed with multi-dose schedules suggests that this method of dosing has greater activity, as there were tumor-free animals remaining at the end of the study, versus no tumor-free animals in the single high dose group.

**[00213]** Additional IMGN853 dose levels and schedules were evaluated for activity against NCI-H2110 xenografts, with results consistently demonstrating that multi-dose administration is equally active or has better activity than single-dose IMGN853. The predicted average plasma concentration of IMGN853 administered as a single-dose of 5.6 mg/kg IMGN853 was comparable to that of a 1.4 mg/kg

daily for 3 days. Despite having a lower total dose (4.2 mg/kg), Cmax and exposure (AUC $_{0\text{-}540}$) the 1.4 mg/kg qd x3 had comparable antitumor activity in vivo (Figure 11). These results suggest that maintenance of a certain minimal plasma concentration is critical for activity.

**[00214]** A weekly schedule of IMGN853 with matched total dose to a single high dose of IMGN853 were also found to have comparable activity in vivo (Figure 12). Again, maintenance of an average plasma concentration above a minimum threshold was required for activity, with the single-dose IMGN853 (8.5 mg/kg) resulting in a slightly higher Cavg and AUC but with comparable overall activity. The key difference in predicted pharmacokinetic parameters with single versus multi-dose schedule is the dramatic reduction in Cmax. The weekly dosing Cmax is predicted to be almost 60% lower than the Cmax of single-dose IMGN853. As there is no apparent activity benefit of reaching a higher Cmax, avoiding high plasma concentrations can be beneficial in reducing toxicity.

****

**[00215]** It is to be appreciated that the Detailed Description section, and not the Summary and Abstract sections, is intended to be used to interpret the claims. The Summary and Abstract sections sets forth one or more, but not all, exemplary embodiments of the present invention as contemplated by the inventor(s), and thus, are not intended to limit the present invention and the appended claims in any way.

**[00216]** The present invention has been described above with the aid of functional building blocks illustrating the implementation of specified functions and relationships thereof. The boundaries of these functional building blocks have been arbitrarily defined herein for the convenience of the description. Alternate boundaries can be defined so long as the specified functions and relationships thereof are appropriately performed.

**[00217]** The foregoing description of the specific embodiments will so fully reveal the general nature of the invention that others can, by applying knowledge within the skill of the art, readily modify and/or adapt for various applications such specific embodiments, without undue experimentation, without departing from the general concept of the present invention. Therefore, such adaptations and modifications are intended to be within the meaning and range of equivalents of the disclosed embodiments, based on the teaching and guidance presented herein. It is to be understood that the phraseology or terminology herein is for the purpose of description and not of limitation, such that the terminology or phraseology of the present specification is to be interpreted by the skilled artisan in light of the teachings and guidance.

**[00218]** The breadth and scope of the present invention should not be limited by any of the above-described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents.

**SEQUENCES**

SEQ ID NO:1 - human folate receptor 1
MAQRMTTQLLLLLVWVAVVGEAQTRIAWARTELLNVCMNAKHHKEKPGPEDKLHEQ
CRPWRKNACCSTNTSQEAHKDVSYLYRFNWNHCGEMAPACKRHFIQDTCLYECSPNLG
PWIQQVDQSWRKERVLNVPLCKEDCEQWWEDCRTSYTCKSNWHKGWNWTSGFNKCA
VGAACQPFHFYFPTPTVLCNEIWTHSYKVSNYSRGSGRCIQMWFDPAQGNPNEEVARFY
AAAMSGAGPWAAWPFLLSLALMLLWLLS

SEQ ID NO:2 - human folate receptor 1 nucleic acid sequence
atggctcagcggatgacaacacagctgctgctccttctagtgtgggtggctgtagtaggggaggctcagacaaggattgcatgggccagga
ctgagcttctcaatgtctgcatgaacgccaagcaccacaaggaaaagccaggccccgaggacaagttgcatgagcagtgtcgaccctgga
ggaagaatgcctgctgttctaccaacaccagccaggaagcccataaggatgtttcctacctatatagattcaactggaaccactgtggagag
atggcacctgcctgcaaacggcatttcatccaggacacctgcctctacgagtgctcccccaacttggggccctggatccagcaggtggatc
agagctggcgcaaagagcgggtactgaacgtgcccctgtgcaaagaggactgtgagcaatggtgggaagattgtcgcacctcctacacct
gcaagagcaactggcacaagggctggaactggacttcagggtttaacaagtgcgcagtgggagctgcctgccaacctttccatttctacttc
cccacacccactgttctgtgcaatgaaatctggactcactcctacaaggtcagcaactacagccgagggagtggccgctgcatccagatgtg
gttcgacccagcccagggcaaccccaatgaggaggtggcgaggttctatgctgcagccatgagtggggctgggccctgggcagcctggc
ctttcctgcttagcctggccctaatgctgctgtggctgctcagc

SEQ ID NO:3 - huMov19 vHC
QVQLVQSGAEVVKPGASVKISCKASGYTFTGYFMNWVKQSPGQSLEWIGRIHPYDGDT
FYNQKFQGKATLTVDKSSNTAHMELLSLTSEDFAVYYCTRYDGSRAMDYWGQGTTVT
VSS

SEQ ID NO:4 - huMov19 vLCv1.00
DIVLTQSPLSLAVSLGQPAIISCKASQSVSFAGTSLMHWYHQKPGQQPRLLIYRASNLEA
GVPDRFSGSGSKTDFTLNISPVEAEDAATYYCQQSREYPYTFGGGTKLEIKR

SEQ ID NO:5 - huMov19 vLCv1.60
DIVLTQSPLSLAVSLGQPAIISCKASQSVSFAGTSLMHWYHQKPGQQPRLLIYRASNLEA
GVPDRFSGSGSKTDFTLTISPVEAEDAATYYCQQSREYPYTFGGGTKLEIKR

SEQ ID NO:6 - huMov19 vLC CDR1
KASQSVSFAGTSLMH

SEQ ID NO:7 - huMov19 vLC CDR2
RASNLEA

SEQ ID NO:8 - huMov19 vLC CDR3
QQSREYPYT

SEQ ID NO:9 - huMov19 vHC CDR1
GYFMN

SEQ ID NO:10 - huMov19 vHC CDR2 – Kabat Defined
RIHPYDGDTFYNQKFQG

SEQ ID NO:11 – huMov19 vHC CDR2 – Abm Defined
RIHPYDGDTF

SEQ ID NO:12 - huMov19 vHC CDR3
YDGSRAMDY

SEQ ID NO:13 - huMov19 HC amino acid sequence
QVQLVQSGAEVVKPGASVKISCKASGYTFTGYFMNWVKQSPGQSLEWIGRIHPYDGDT
FYNQKFQGKATLTVDKSSNTAHMELLSLTSEDFAVYYCTRYDGSRAMDYWGQGTTVT
VSSASTKGPSVFPLAPSSKSTSGGTAALGCLVKDYFPEPVTVSWNSGALTSGVHTFPAVL
QSSGLYSLSSVVTVPSSSLGTQTYICNVNHKPSNTKVDKKVEPKSCDKTHTCPPCPAPEL
LGGPSVFLFPPKPKDTLMISRTPEVTCVVVDVSHEDPEVKFNWYVDGVEVHNAKTKPRE
EQYNSTYRVVSVLTVLHQDWLNGKEYKCKVSNKALPAPIEKTISKAKGQPREPQVYTLP
PSRDELTKNQVSLTCLVKGFYPSDIAVEWESNGQPENNYKTTPPVLDSDGSFFLYSKLTV
DKSRWQQGNVFSCSVMHEALHNHYTQKSLSLSPGK

SEQ ID NO:14 - huMov19 LCv1.00
DIVLTQSPLSLAVSLGQPAIISCKASQSVSFAGTSLMHWYHQKPGQQPRLLIYRASNLEA
GVPDRFSGSGSKTDFTLNISPVEAEDAATYYCQQSREYPYTFGGGTKLEIKRTVAAPSVFI
FPPSDEQLKSGTASVVCLLNNFYPREAKVQWKVDNALQSGNSQESVTEQDSKDSTYSLS
STLTLSKADYEKHKVYACEVTHQGLSSPVTKSFNRGEC

SEQ ID NO:15 - huMov19 LCv1.60
DIVLTQSPLSLAVSLGQPAIISCKASQSVSFAGTSLMHWYHQKPGQQPRLLIYRASNLEA
GVPDRFSGSGSKTDFTLTISPVEAEDAATYYCQQSREYPYTFGGGTKLEIKRTVAAPSVFI
FPPSDEQLKSGTASVVCLLNNFYPREAKVQWKVDNALQSGNSQESVTEQDSKDSTYSLS
STLTLSKADYEKHKVYACEVTHQGLSSPVTKSFNRGEC
SEQ ID NO:16 – muMov19 vHC CDR2 – Kabat Defined
RIHPYDGDTF<u>YNQNFKD</u>

WHAT IS CLAIMED IS:

1. A method for treating a human patient having an FOLR1-expressing cancer comprising administering to the patient an immunoconjugate which binds to FOLR1 polypeptide, wherein the immunoconjugate is administered at a dose of about 3.0 to about 7 milligrams (mg) per kilogram (kg) of body weight of the patient, wherein the kilograms of body weight of the patient are adjusted to adjusted ideal body weight (AIBW).

2. The method of claim 1, wherein the administration produces a Cmax of about 90-160 µg/mL.

3. The method of claim 2, wherein the administration produces a Cmax of about 90-150 µg/mL.

4. The method of any one of claims 1-3, wherein the administration produces an area-under-the-curve $(AUC)_{0\text{-}24}$ of no more than 2700 hr•µg/mL.

5. The method of any one of claims 1-4, wherein the immunoconjugate is administered at a dose of about 5.0 mg/kg.

6. The method of any one of claims 1-4, wherein the immunoconjugate is administered at a dose of about 6.0 mg/kg.

7. The method of any one of claims 1-4, wherein the immunoconjugate is administered at a dose of about 6.5 mg/kg.

8. The method of any one of claims 1-7, wherein the immunoconjugate is administered once every three weeks.

9. The method of any one of claims 1-4, wherein the immunoconjugate is administered once every week.

10. A method for treating a human patient having an FOLR1-expressing cancer comprising administering to the patient an immunoconjugate which binds to FOLR1 polypeptide, wherein the immunoconjugate is administered at a dose of about 3.0 to about 7 milligrams (mg) per kilogram (kg) of body weight of the patient, and wherein the administration produces a Cmax of about 110-160 µg/mL.

11. The method of claim 10, wherein the administration produces a Cmax of about 110-150 µg/mL.

12. A method for treating a human patient having an FOLR1-expressing cancer comprising administering to the patient an immunoconjugate which binds to FOLR1 polypeptide, wherein the

immunoconjugate is administered at a dose of about 3.0 to about 7 milligrams (mg) per kilogram (/kg) of body weight of the patient, and wherein the administration produces an $AUC_{0-24}$ of no more than 2700 hr•µg/mL.

13. The method of any one of claims 1-12, wherein immunoconjugate comprises an antibody or antigen-binding fragment thereof that comprises the CDRs of SEQ ID NOs: 6-9, 11, and 12.

14. The method of claim 13, wherein the antibody is huMov19.

15. The method of any one of claims 1-14, wherein the immunoconjugate comprises a maytansinoid.

16. The method of claim 15, wherein the maytansinoid is DM4.

17. The method of any one of claims 1-16, wherein the immunoconjugate comprises the linker sulfo-SPDB.

18. The method of any one of claims 1-17, wherein the immunoconjugate is IMGN853.

19. The method of any one of claims 1-18, wherein the immunoconjugate is administered intravenously.

20. The method of any one of claims 1-19, wherein said cancer is selected from the group consisting of ovarian, brain, breast, uterine, endometrial, pancreatic, renal, and lung cancer.

21. The method of claim 20, wherein the lung cancer is non small cell lung cancer.

22. The method of claim 21, wherein the non small cell lung cancer is adenocarcinoma.

23. The method of claim 20, wherein the ovarian cancer is epithelial ovarian cancer.

24. The method of claim 23, wherein the ovarian cancer is platinum resistant, relapsed, or refractory.

25. The method of claim 20, wherein the cancer is endometrial cancer.

26. The method of any one of claims 1-25, wherein a sample obtained from the patient exhibits FOLR1 expression as measured by immunohistochemistry (IHC).

27. The method of claim 26, wherein the sample has a staining intensity of at least 2 hetero.

28. The method of claim 26, wherein the sample has a staining intensity of at least 2 homo.

29. The method of claim 26, wherein the sample has a staining intensity of at least 3 hetero.

30. The method of claim 26, wherein the sample has a staining intensity of at least 3 homo.

31. The method of any one of claims 1-30, further comprising administering a steroid to the patient.

32. The method of claim 31, wherein the steroid is dexamethasone.

33. The method of any one of claims 1-32, wherein the administration results in a decrease in tumor size.

34. The method of any one of claims 1-20, 23, 24, and 26-33, wherein the cancer is ovarian cancer and wherein the administration results in a decrease in CA125.

35. The method of any one of claims 1-34, wherein the administration results in a decrease in toxicity.

36. The method of claim 35, wherein the toxicity is ocular toxicity.

37. The method of any one of claims 1-36, further comprising administering a second compound having anti-cancer properties.

38. The method of any one of claim 1-3, 5-11, and 13-37 wherein the administration produced an $AUC_{0\text{-}24}$ of no more than 2785 hr•µg/mL.

39. The method of any one of claim 1-3, 5-11, and 13-37, wherein the administration produced an $AUC_{0\text{-}24}$ of no more than 2741 hr•µg/mL.

40. A method for treating a human patient having an FOLR1-expressing cancer comprising administering to the patient an effective dose of an immunoconjugate which binds to FOLR1 polypeptide, wherein the administration produces an $AUC_{0\text{-}24}$ of no more than 2741 hr•µg/mL.

41. The method of claim 40, wherein the administration produces a Cmax of no more than 160 µg/mL.

42. The method of claim 41, wherein the administration produces a Cmax of no more than 150 µg/mL.

43. The method of any one of claims 40-42, wherein immunoconjugate comprises an antibody or antigen-binding fragment thereof that comprises the CDRs of SEQ ID NOs: 6-9, 11, and 12.

44. The method of claim 43, wherein the antibody is huMov19.

45. The method of any one of claims 40-44, wherein the immunoconjugate comprises a maytansinoid.

46. The method of claim 45, wherein the maytansinoid is DM4.

47. The method of any one of claims 40-46, wherein the immunoconjugate comprises the linker sulfo-SPDB.

48. The method of any one of claims 40-47, wherein the immunoconjugate is IMGN853.

49. The method of any one of claims 40-48, wherein the immunoconjugate is administered intravenously.

50. The method of any one of claims 40-49, wherein said cancer is selected from the group consisting of ovarian, brain, breast, uterine, endometrial, pancreatic, renal, and lung cancer.

51. The method of claim 50, wherein the lung cancer is non small cell lung cancer.

52. The method of claim 51, wherein the non small cell lung cancer is adenocarcinoma.

53. The method of claim 50, wherein the ovarian cancer is epithelial ovarian cancer.

54. The method of claim 53, wherein the ovarian cancer is platinum resistant, relapsed, or refractory.

55. The method of claim 50, wherein the cancer is endometrial cancer.

56. The method of any one of claims 40-55, wherein a sample obtained from the patient exhibits FOLR1 expression as measured by immunohistochemistry (IHC).

57. The method of claim 56, wherein the sample has a staining intensity of at least 2 hetero.

58. The method of claim 56, wherein the sample has a staining intensity of at least 2 homo.

59. The method of claim 56, wherein the sample has a staining intensity of at least 3 hetero.

60. The method of claim 56, wherein the sample has a staining intensity of at least 3 homo.

61. The method of any one of claims 40-60, further comprising administering a steroid to the patient.

62. The method of claim 61, wherein the steroid is dexamethasone.

63. The method of any one of claims 40-62, wherein the administration results in a decrease in tumor size.

64. The method of any one of claims 40-50, 53, 54, and 56-63, wherein the cancer is ovarian cancer and wherein the administration results in a decrease in CA125.

65. The method of any one of claims 40-64, wherein the administration results in a decrease in toxicity.

66. The method of claim 65, wherein the toxicity is ocular toxicity.

67. The method of any one of claims 40-66, further comprising administering a second compound having anti-cancer properties.

68. A method for treating a human patient having a FOLR1-expressing cancer comprising administering to the patient an immunoconjugate which binds to FOLR1 polypeptide, wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule.

69. The method of claim 68, wherein the immunoconjugate is administered on days 1, 8, and 15 of a four-week schedule.

70. The method of claim 68 or 69, wherein the administration produces a Cmax of about 90-160 μg/mL.

71. The method of claim 70, wherein the administration produces a Cmax of about 90-150 μg/mL.

72. The method of claim 68 or 69, wherein the administration produces a Cmax of about 110-160 μg/mL.

73. The method of claim 72, wherein the administration produces a Cmax of about 110-150 μg/mL.

74. The method of any one of claims 68-73, wherein the administration produces an $AUC_{0\text{-}24}$ of no more than 2700 hr•μg/mL.

75. The method of any one of claims 68-74, wherein the immunoconjugate is administered at a dose of about 1.5 to about 6 mg/kg.

76. The method of claim 75, wherein the immunoconjugate is administered at a dose of about 1.5, 2.0, 2.5, 3, 3.3, 4.0, 4.1, 4.2, 5.0, 5.5, or 6.0 mg/kg.

77. The method of any one of claims 68-76, wherein the immunoconjugate comprises an antibody or antigen-binding fragment thereof that comprises the CDRs of SEQ ID NOs: 6-9, 11, and 12.

78. The method of claim 77, wherein the antibody is huMov19.

79. The method of any one of claims 68-78, wherein the immunoconjugate comprises a maytansinoid.

80. The method of claim 79, wherein the maytansinoid is DM4.

81. The method of any one of claims 68-80, wherein the immunoconjugate comprises the linker sulfo-SPDB.

82. The method of any one of claims 68-81, wherein the immunoconjugate is IMGN853.

83. The method of any one of claims 68-82, wherein the immunoconjugate is administered intravenously.

84. The method of any one of claims 68-83, wherein said cancer is selected from the group consisting of ovarian, brain, breast, uterine, endometrial, pancreatic, renal, and lung cancer.

85. The method of any one of claims 68-84, further comprising administering a steroid to the patient.

86. The method of claim 85, wherein the steroid is dexamethasone.

87. The method of any one of claims 68-86, wherein the administration results in a decrease in tumor size.

88. The method of any one of claims 68-87, wherein the cancer is ovarian cancer and wherein the administration results in a decrease in CA125.

89. The method of any one of claims 68-88, wherein the administration results in a decrease in toxicity.

90. The method of claim 89, wherein the toxicity is ocular toxicity.

91. The method of any one of claims 68-90, further comprising administering a second compound having anti-cancer properties.

92. A method for treating a human patient having an FOLR1-expressing cancer comprising administering to the patient an immunoconjugate which binds to FOLR1 polypeptide, wherein the immunoconjugate is administered at a dose of about 1 to about 7 milligrams (mg) per kilogram (kg) of body weight of the patient, wherein the kilograms of body weight of the patient are adjusted to adjusted ideal body weight and wherein the immunoconjugate is administered once a week for three weeks on a four-week schedule.

93. The method of claim 92, wherein the immunoconjugate is administered on days 1, 8, and 15 of the four-week schedule.

94. The method of claim 92 or 93, wherein the immunoconjugate is administered at a dose of about 1.1 mg/kg.

95. The method of claim 92 or 93, wherein the immunoconjugate is administered at a dose of about 1.8 mg/kg.

96. The method of claim 92 or 93, wherein the immunoconjugate is administered at a dose of about 2.5 mg/kg.

97. The method of claim 92 or 93, wherein the immunoconjugate is administered at a dose of about 3.3 mg/kg.

98. The method of any one of claims 92-97, wherein the administration produces a Cmax of about 90-160 μg/mL.

99. The method of claim 98, wherein the administration produces a Cmax of about 90-150 μg/mL.

100. The method of any one of claims 92-99, wherein the administration produces a Cmax of about 110-160 μg/mL.

101. The method of claim 100, wherein the administration produces a Cmax of about 110-150 μg/mL.

102. The method of any one of claims 92-101, wherein the administration produces an $AUC_{0-24}$ of no more than 2700 hr•μg/mL.

103. The method of any one of claims 92-102, wherein the immunoconjugate comprises an antibody or antigen-binding fragment thereof that comprises the CDRs of SEQ ID NOs: 6-9, 11, and 12.

104. The method of claim 103, wherein the antibody is huMov19.

105. The method of any one of claims 92-104, wherein the immunoconjugate comprises a maytansinoid.

106. The method of claim 105, wherein the maytansinoid is DM4.

107. The method of any one of claims 92-106, wherein the immunoconjugate comprises the linker sulfo-SPDB.

108. The method of any one of claims 92-107, wherein the immunoconjugate is IMGN853.

109. The method of any one of claims 92-108, wherein the immunoconjugate is administered intravenously.

110. The method of any one of claims 92-109, wherein said cancer is selected from the group consisting of ovarian, brain, breast, uterine, endometrial, pancreatic, renal, and lung cancer.

111. The method of claim 110, wherein the lung cancer is non small cell lung cancer.

112. The method of claim 111, wherein the non small cell lung cancer is adenocarcinoma.

113. The method of claim 110, wherein the ovarian cancer is epithelial ovarian cancer.

114. The method of claim 113, wherein the epithelial ovarian cancer is platinum resistant, relapsed, or refractory.

115. The method of claim 110, wherein the cancer is endometrial cancer.

116. The method of any one of claims 92-115, wherein a sample obtained from the patient exhibits FOLR1 expression as measured by immunohistochemistry (IHC).

117. The method of claim 116, wherein the sample has a staining intensity of at least 2 hetero.

118. The method of claim 116, wherein the sample has a staining intensity of at least 2 homo.

119. The method of claim 116, wherein the sample has a staining intensity of at least 3 hetero.

120. The method of claim 116, wherein the sample has a staining intensity of at least 3 homo.

121. The method of any one of claims 92-120, further comprising administering a steroid to the patient.

122. The method of claim 121, wherein the steroid is dexamethasone.

123. The method of any one of claims 92-122, wherein the administration results in a decrease in tumor size.

124. The method of any one of claims 92-110, 113, 114, and 116-123, wherein the cancer is ovarian cancer and wherein the administration results in a decrease in CA125.

125. The method of any one of claims 92-124, wherein the administration results in a decrease in toxicity.

126. The method of claim 125, wherein the toxicity is ocular toxicity.

127. The method of any one of claims 92-126, further comprising administering a second compound having anti-cancer properties.

128. The method of any one of claims 92, 93, and 98-127, wherein the immunoconjugate is administered at a dose of about 2.8 mg/kg.

129. The method of any one of claims 92, 93, and 98-127, wherein the immunoconjugate is administered at a dose of about 3.0 mg/kg.

130. The method of any one of claims 92, 93, and 98-127, wherein the immunoconjugate is administered at a dose of about 3.75 mg/kg.

131. The mtheod of any one of claims 92-101 and 103-130, wherein the administration produces an $AUC_{0-24}$ of no more than 2785 hr•µg/mL

132. The method of any one of claims 92-101 and 103-130, wherein the administration produces an $AUC_{0-24}$ of no more than 2741 hr•µg/mL.

ABSTRACT

Methods of administering immunoconjugates that bind to FOLR1 are provided. The methods comprise administering an anti-FOLR1 immunoconjugate to a person in need thereof, for example, a cancer patient, at a therapeutically effective dosing regimen that results in minimal adverse effects.

Appx210

1/13

## Figure 1A

IMGN853 Pharmacokinetic Results

| Dose (mg/kg) | 0.15 (n=2) | 0.5 (n=1) | 1.0 (n=1) | 2.0 (n=1) | 3.3 (n=3) | 5.0 (n=3) | 7.0 (n=4) |
|---|---|---|---|---|---|---|---|
| Cmax (ug/mL) | 2.9 | 10.5 | 22.1 | 65.7 | 96.6 (16.4) | 108 (32.7) | 179 (21.8) |
| Half-life (hr) | 35.4 | 41.2 | 70.1 | 69.9 | 99.5 (15.7) | 105 (4.4) | 87.6 (11.5) |
| Half-life (d) | 1.5 | 1.7 | 2.9 | 2.9 | 4.1 (0.65) | 4.4 (1.0) | 3.6 (0.5) |
| $AUC_{(0-inf)}$ (hr*ug/mL) | 150.9 | 596.6 | 1779 | 6505 | 12188 (2581) | 12708(2112) | 17559(2850) |
| $AUC_{(0-168)}$(hr*ug/mL) | 104.6 | 496.6 | 1678 | 5330 | 8178 (1129) | 8254 (1771) | 12177(1621) |
| CL (mL/hr/kg) | 1.1 | 0.8 | 0.6 | 0.3 | 0.3 (0.06) | 0.4 (0.07) | 0.4 (0.06) |
| Vss (mL/kg) | 51.8 | 46.7 | 54.9 | 28.2 | 38.6 ( 5.2) | 61.2 (16.1) | 52.8 (8.3) |

**Figure 1B**

# IMGN853 Pharmacokinetic Results

| Cohort Dose (mg/kg) | N | $C_{Max}$ (µg/ml) | $T_{1/2}$ (days) | Cl (ml/hr/kg) | $V_{ss}$ (ml/kg) | $AUC_{0_\infty}$ (hr*µg/ml) |
|---|---|---|---|---|---|---|
| **0.15** | 2 | 2.90 (± 0.47) | 1.5 (± 0.2) | 1.08 (± 0.38) | 53.2 (± 11.2) | 149 (± 52) |
| **0.5** | 1 | 10.55 | 3.2 | 0.58 | 59.2 | 865 |
| **1** | 1 | 22.09 | 3.4 | 0.56 | 57.0 | 1,777 |
| **2** | 1 | 65.73 | 5.0 | 0.30 | 32.4 | 6,757 |
| **3.3** | 3 | 96.64 (± 16.39) | 4.7 (± 0.3) | 0.26 (± 0.05) | 36.82 (± 5.7) | 12,915 (± 2,056) |
| **5** | 10 | 141.90 (± 41.63) | 4.9 (± 1.2) | 0.35 (± 0.08) | 51.9 (± 17.0) | 15,079 (± 3,740) |
| **7** | 5 | 172.98 (± 23.58) | 6.2 (± 1.3) | 0.36 (± 0.08) | 65.7 (± 8.9) | 20,146 (± 4,099) |

Appx212

3/13

## Figure 2A-C



**Figure 3**


Cmax vs Dose
250
200
150
100
50
0
$C_{Max}$ (μg/ml)
0.15
0.5
1
2
3.3
5
7
Dose IMGN853 (mg/kg)


$C_{Max}$ vs Weight
Weight (Kg)
$C_{Max}$ (µg/ml)
240
200
160
120
80
0
50
100
150

Figure 4

# Figure 5


$C_{Max}$
All Patients at 5 mg/kg
$C_{Max}$ (μg/ml)
300
200
100
0
TBW
IBW
LBW
ADJ
BSA
AUC 0-24
All Patients at 5 mg/kg
AUC 0-24 (hr*ug/ml) IMGN853
5000
4000
3000
2000
1000
0
TBW
IBW
LBW
ADJ
BSA

## Figure 6


5 mg/kg TBW
5 mg/kg LBW
5 mg/kg IBW
5 mg/kg ADJ
185 mg/m2 BSA
CMax (μg/ml)
Weight (Kg)
0
50
100
150
200
250

**Figure 7**




| | | | Percent of Patients Above Threshold | | | | | |
|---|---|---|---|---|---|---|---|---|
| Readout | PK Parameter | Threshold (hr*ug/ml) | TBW Actual | TBW 5 mg/kg | ADJ 5 mg/kg | ADJ 5.4 mg/kg | ADJ 6 mg/kg | 5 ADJ Actual |
| Ocular Toxicity | AUC_0-24 | >2741 | 38% | 29% | 0% | 13% | 25% | 14%* |

* - Patient @ 2749 hr*ug/ml

8/13


AUC0-24 Projected vs Actual Data
AUC 0-24 (hr*ug/ml) IMGN853
6000
4000
2000
0
5 mg/kg TBW Proj
5 mg/kg TBW Actual
5 mg/kg AIBW Proj
5 mg/kg AIBW Actual
6 mg/kg AIBW Proj
6 mg/kg AIBW Actual
7 mg/kg TBW Proj
7 mg/kg TBW Actual

Figure 8

# Figure 9




| Dose (mg/kg) | Schedule | T/C (%) | Log cell kill | CR | Cmax (µg/ml) | Cavg (µg/ml) | AUC 0-540 (hr*µg/ml) |
|---|---|---|---|---|---|---|---|
| 2.8 | Single | 3 | 1.5 | 2/6 | 43 | 7 | 3740 |
| 5.6 | Single | 0 | 2.7 | 4/6 | 86 | 15 | 7481 |
| 8.5 | Single | 0 | 3.9 | 6/6 | 131 | 23 | 11354 |

## Figure 10







| Dose (mg/kg) | Schedule | Total dose (mg/kg) | T/C (%) | Log cell kill | CR | Tumor-free (Day 120) | Cmax (μg/ml) | Cavg (μg/ml) | AUC 0-540 (hr*μg/ml) |
|---|---|---|---|---|---|---|---|---|---|
| 8.5 | Single | 8.5 | 0 | 3.9 | 6/6 | 0/6 | 131 | 23 | 11354 |
| 2.8 | qd x 3 | 8.4 | 0 | 4.6 | 6/6 | 1/6 | 85 | 28 | 10961 |
| 2.8 | q3d x 3 | 8.4 | 0 | 4.1 | 6/6 | 2/6 | 75 | 21 | 10762 |

**Figure 11**







| Dose (mg/kg) | Schedule | Total Dose (mg/kg) | T/C (%) | Log cell kill | CR | Cmax (µg/ml) | Cavg (µg/ml) | AUC 0-540 (hr*µg/ml) |
|---|---|---|---|---|---|---|---|---|
| 5.6 | Single | 5.6 | 0 | 2.7 | 4/6 | 86 | 15 | 7481 |
| 1.4 | qd x 3 | 4.2 | 0 | 2.5 | 4/6 | 43 | 14 | 5480 |

12/13

## Figure 12




| Dose (mg/kg) | Schedule | Total Dose (mg/kg) | T/C (%) | Log cell kill | CR | Cmax (µg/ml) | Cavg (µg/ml) | AUC 0-540 (hr*µg/ml) |
|---|---|---|---|---|---|---|---|---|
| 8.5 | Single | 8.5 | 0 | 3.9 | 6/6 | 131 | 23 | 11354 |
| 2.8 | qw x 3 | 8.4 | 0 | 3.0 | 6/6 | 55 | 15 | 9614 |

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Inventors: LUTZ *et al.* | Confirmation No.: 8465 |
| Applicant: ImmunoGen, Inc. | Art Unit: 1643 |
| Application No.: 14/509,809 | Examiner: Huff, Sheela Jitendra |
| Filing Date: October 8, 2014 | Atty. Docket: 2921.0550003/EKS/CLD |

Title: **Anti-FOLR1 Immunoconjugate Dosing Regimens**

## Amendment and Reply Under 37 C.F.R. § 1.114

***Mail Stop RCE***

Commissioner for Patents
PO Box 1450
Alexandria, VA 22313-1450

Commissioner:

In reply to the Office Action dated December 9, 2015, Applicant submits the following Amendment and Remarks. This Reply is accompanied by a Request for Continued Examination (RCE) Under 37 C.F.R. § 1.114 for the captioned application.

Amendments to the Claims are reflected in the listing of claims which begins on page 2 of this paper.

Remarks and Arguments begin on page 13 of this paper.

It is not believed that extensions of time are required beyond those that may otherwise be provided for in documents accompanying this paper. However, if additional extensions of time are necessary to prevent abandonment of this application, then such extensions of time are hereby petitioned under 37 C.F.R. § 1.136(a), and any additional fees required to continue prosecution or appeal of this application (including issue fee, fees for net addition of claims or forwarding to appeal) are hereby authorized to be charged to our Deposit Account No. 19-0036.

## *Amendments to the Claims*

This listing of claims will replace all prior versions, and listings, of claims in the application.

1. (Currently Amended) A method for treating a human patient having an FOLR1-expressing ovarian cancer or cancer of the peritoneum comprising administering to the patient an immunoconjugate which binds to FOLR1 polypeptide,

wherein the immunoconjugate comprises an antibody or antigen-binding fragment thereof that comprises the variable light chain (VL) complementarity determining region (CDR)-1, VL CDR-2, VL CDR-3, variable heavy chain (VH) CDR-1, VH CDR-2, and VH CDR-3 of SEQ ID NOs: 6-9, 11, and 12, respectively, and a maytansinoid, and

wherein the immunoconjugate is administered at a dose of 6 [[3.0 to 7]] milligrams (mg) per kilogram (kg) of adjusted ideal body weight (AIBW) of the patient, ~~wherein the kilograms of body weight of the patient are adjusted to adjusted ideal body weight (AIBW)~~.

2-224. (Canceled)

225. (New) The method of claim 1, wherein the cancer is ovarian cancer.

226. (New) The method of claim 225, wherein the ovarian cancer is epithelial ovarian cancer.

227. (New) The method of claim 226, wherein the ovarian cancer is platinum resistant, relapsed, or refractory.

228. (New) The method of claim 1, wherein the cancer is cancer of the peritoneum.

229. (New) The method of claim 1, wherein the administration of the immunoconjugate is intravenous.

230. (New) The method of claim 1, wherein the administration of the immunoconjugate is parenteral.

231. (New) The method of claim 1, wherein a sample obtained from the patient exhibits FOLR1 expression as measured by immunohistochemistry (IHC).

232. (New) The method of claim 231, wherein the sample has a staining intensity of at least 2 hetero.

233. (New) The method of claim 231, wherein the sample has a staining intensity of at least 2 homo.

234. (New) The method of claim 231, wherein the sample has a staining intensity of at least 3 hetero.

235. (New) The method of claim 231, wherein the sample has a staining intensity of at least 3 homo.

236. (New) The method of claim 1, wherein the administration results in a decrease in tumor size.

237. (New) The method of claim 1, wherein the immunoconjugate is administered once every three weeks.

238. (New) The method of claim 1, wherein the immunoconjugate is administered once every four weeks.

239. (New) The method of claim 1, wherein the immunoconjugate comprises 1-10 maytansinoid molecules.

240. (New) The method of claim 1, wherein the immunoconjugate comprises 2-5 maytansinoid molecules.

241. (New) The method of claim 1, wherein the immunoconjugate comprises 3-4 maytansinoid molecules.

242. (New) The method of claim 1, wherein the maytansinoid is DM4.

243. (New) The method of claim 242, wherein the ovarian cancer is epithelial ovarian cancer.

244. (New) The method of claim 243, wherein the ovarian cancer is platinum resistant, relapsed, or refractory.

245. (New) The method of claim 242, wherein the administration of the immunoconjugate is intravenous.

246. (New) The method of claim 242, wherein the administration of the immunoconjugate is parenteral.

247. (New) The method of claim 242, wherein the immunoconjugate is administered once every three weeks.

248. (New) The method of claim 242, wherein the immunoconjugate is administered once every four weeks.

249. (New) The method of claim 242, wherein the immunoconjugate comprises 1-10 DM4 maytansinoid molecules.

250. (New) The method of claim 242, wherein the immunoconjugate comprises 2-5 DM4 maytansinoid molecules.

251. (New) The method of claim 242, wherein the immunoconjugate comprises 3-4 DM4 maytansinoid molecules.

252. (New) The method of claim 242, wherein the immunoconjugate comprises the linker sulfo-SPDB.

253. (New) The method of claim 252, wherein the cancer is ovarian cancer.

254. (New) The method of claim 253, wherein the ovarian cancer is epithelial ovarian cancer.

255. (New) The method of claim 254, wherein the ovarian cancer is platinum resistant, relapsed, or refractory.

256. (New) The method of claim 255, wherein the ovarian cancer is platinum resistant.

257. (New) The method of claim 255, wherein the ovarian cancer is relapsed or refractory.

258. (New) The method of claim 252, wherein the cancer is cancer of the peritoneum.

259. (New) The method of claim 252, wherein the administration of the immunoconjugate is intravenous.

260. (New) The method of claim 252, wherein the administration of the immunoconjugate is parenteral.

261. (New) The method of claim 252, wherein the immunoconjugate is administered once every three weeks.

262. (New) The method of claim 252, wherein the immunoconjugate is administered once every four weeks.

263. (New) The method of claim 252, wherein the immunoconjugate comprises 1-10 DM4 maytansinoid molecules.

264. (New) The method of claim 252, wherein the immunoconjugate comprises 2-5 DM4 maytansinoid molecules.

265. (New) The method of claim 252, wherein the immunoconjugate comprises 3-4 DM4 maytansinoid molecules.

266. (New) The method of claim 1, wherein the antibody or antigen-binding fragment thereof comprises a variable heavy chain domain comprising SEQ ID NO:3 and a variable light chain domain comprising SEQ ID NO:4 or SEQ ID NO:5.

267. (New) The method of claim 266, wherein the ovarian cancer is epithelial ovarian cancer.

268. (New) The method of claim 267, wherein the ovarian cancer is platinum resistant, relapsed, or refractory.

269. (New) The method of claim 266, wherein the administration of the immunoconjugate is intravenous.

270. (New) The method of claim 266, wherein the administration of the immunoconjugate is parenteral.

271. (New) The method of claim 266, wherein the immunoconjugate is administered once every three weeks.

272. (New) The method of claim 266, wherein the immunoconjugate is administered once every four weeks.

273. (New) The method of claim 266, wherein the immunoconjugate comprises 1-10 maytansinoid molecules.

274. (New) The method of claim 266, wherein the immunoconjugate comprises 2-5 maytansinoid molecules.

275. (New) The method of claim 266, wherein the immunoconjugate comprises 3-4 maytansinoid molecules.

276. (New) The method of claim 266, wherein the maytansinoid is DM4.

277. (New) The method of claim 276, wherein the ovarian cancer is epithelial ovarian cancer.

278. (New) The method of claim 277, wherein the ovarian cancer is platinum resistant, relapsed, or refractory.

279. (New) The method of claim 276, wherein the administration of the immunoconjugate is intravenous.

280. (New) The method of claim 276, wherein the administration of the immunoconjugate is parenteral.

281. (New) The method of claim 276, wherein the immunoconjugate is administered once every three weeks.

282. (New) The method of claim 276, wherein the immunoconjugate is administered once every four weeks.

283. (New) The method of claim 276, wherein the immunoconjugate comprises 1-10 DM4 maytansinoid molecules.

284. (New) The method of claim 276, wherein the immunoconjugate comprises 2-5 DM4 maytansinoid molecules.

285. (New) The method of claim 276, wherein the immunoconjugate comprises 3-4 DM4 maytansinoid molecules.

286. (New) The method of claim 276, wherein the immunoconjugate comprises the linker sulfo-SPDB.

287. (New) The method of claim 286, wherein the cancer is ovarian cancer.

288. (New) The method of claim 287, wherein the ovarian cancer is epithelial ovarian cancer.

289. (New) The method of claim 288, wherein the ovarian cancer is platinum resistant, relapsed, or refractory.

290. (New) The method of claim 289, wherein the ovarian cancer is platinum resistant.

291. (New) The method of claim 289, wherein the ovarian cancer is relapsed or refractory.

292. (New) The method of claim 286, wherein the cancer is cancer of the peritoneum.

293. (New) The method of claim 286, wherein the administration of the immunoconjugate is intravenous.

294. (New) The method of claim 286, wherein the administration of the immunoconjugate is parenteral.

295. (New) The method of claim 286, wherein the immunoconjugate is administered once every three weeks.

296. (New) The method of claim 286, wherein the immunoconjugate is administered once every four weeks.

297. (New) The method of claim 286, wherein the immunoconjugate comprises 1-10 DM4 maytansinoid molecules.

298. (New) The method of claim 286, wherein the immunoconjugate comprises 2-5 DM4 maytansinoid molecules.

299. (New) The method of claim 286, wherein the immunoconjugate comprises 3-4 DM4 maytansinoid molecules.

300. (New) The method of claim 1, wherein the immunoconjugate is IMGN853.

301. (New) The method of claim 300, wherein the ovarian cancer is epithelial ovarian cancer.

302. (New) The method of claim 301, wherein the ovarian cancer is platinum resistant, relapsed, or refractory.

303. (New) The method of claim 302, wherein the ovarian cancer is platinum resistant.

304. (New) The method of claim 302, wherein the ovarian cancer is relapsed or refractory.

305. (New) The method of claim 300, wherein the administration of the immunoconjugate is parenteral.

306. (New) The method of claim 300, wherein a sample obtained from the patient exhibits FOLR1 expression as measured by immunohistochemistry (IHC).

307. (New) The method of claim 306, wherein the sample has a staining intensity of at least 2 hetero.

308. (New) The method of claim 306, wherein the sample has a staining intensity of at least 2 homo.

309. (New) The method of claim 306, wherein the sample has a staining intensity of at least 3 hetero.

310. (New) The method of claim 306, wherein the sample has a staining intensity of at least 3 homo.

311. (New) The method of claim 306, wherein the administration results in a decrease in tumor size.

312. (New) The method of claim 300, wherein the immunoconjugate is administered once every three weeks.

313. (New) The method of claim 300, wherein the immunoconjugate is administered once every four weeks.

314. (New) The method of claim 300, wherein the immunoconjugate comprises 1-10 DM4 maytansinoid molecules.

315. (New) The method of claim 300, wherein the immunoconjugate comprises 2-5 DM4 maytansinoid molecules.

316. (New) The method of claim 300, wherein the immunoconjugate comprises 3-4 DM4 maytansinoid molecules.

317. (New) A method for treating a human patient having an FOLR1-expressing ovarian cancer comprising administering intravenously to the patient IMGN853 at a dose of 6 milligrams (mg) per kilogram (kg) of adjusted ideal body weight (AIBW) of the patient.

318. (New) The method of claim 317, wherein the immunoconjugate is administered once every three weeks.

319. (New) The method of claim 317, wherein the immunoconjugate is administered once every four weeks.

320. (New) The method of claim 317, wherein the immunoconjugate comprises 1-10 DM4 maytansinoid molecules.

321. (New) The method of claim 317, wherein the immunoconjugate comprises 2-5 DM4 maytansinoid molecules.

322. (New) The method of claim 317, wherein the immunoconjugate comprises 3-4 DM4 maytansinoid molecules.

323. (New) The method of claim 318, wherein the immunoconjugate comprises 1-10 DM4 maytansinoid molecules.

324. (New) The method of claim 318, wherein the immunoconjugate comprises 2-5 DM4 maytansinoid molecules.

325. (New) The method of claim 318, wherein the immunoconjugate comprises 3-4 DM4 maytansinoid molecules.

326. (New) The method of claim 319, wherein the immunoconjugate comprises 1-10 DM4 maytansinoid molecules.

327. (New) The method of claim 319, wherein the immunoconjugate comprises 2-5 DM4 maytansinoid molecules.

328. (New) The method of claim 319, wherein the immunoconjugate comprises 3-4 DM4 maytansinoid molecules.

329. (New) The method of claim 317, wherein the ovarian cancer is epithelial ovarian cancer.

330. (New) The method of claim 318, wherein the ovarian cancer is epithelial ovarian cancer.

331. (New) The method of claim 319, wherein the ovarian cancer is epithelial ovarian cancer.

332. (New) The method of claim 320, wherein the ovarian cancer is epithelial ovarian cancer.

333. (New) The method of claim 321, wherein the ovarian cancer is epithelial ovarian cancer.

334. (New) The method of claim 322, wherein the ovarian cancer is epithelial ovarian cancer.

335. (New) The method of claim 323, wherein the ovarian cancer is epithelial ovarian cancer.

336. (New) The method of claim 324, wherein the ovarian cancer is epithelial ovarian cancer.

337. (New) The method of claim 325, wherein the ovarian cancer is epithelial ovarian cancer.

338. (New) The method of claim 326, wherein the ovarian cancer is epithelial ovarian cancer.

339. (New) The method of claim 327, wherein the ovarian cancer is epithelial ovarian cancer.

340. (New) The method of claim 328, wherein the ovarian cancer is epithelial ovarian cancer.

341. (New) A method for treating a human patient having an FOLR1-expressing cancer of the peritoneum comprising administering intravenously to the patient IMGN853 at a dose of 6 milligrams (mg) per kilogram (kg) of adjusted ideal body weight (AIBW) of the patient.

342. (New) The method of claim 341, wherein the immunoconjugate is administered once every three weeks.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1762

**Short Case Caption:** ImmunoGen, Inc. v. Katherine Vidal

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- ☑ the filing has been prepared using a proportionally-spaced typeface and includes 12,329 words.
- ☐ the filing has been prepared using a monospaced typeface and includes ______ lines of text.
- ☐ the filing contains ______ pages / ______ words / ______ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ______).

Date: 07/20/2023

Signature: /s/ Michael E. Joffre

Name: Michael E. Joffre