2023-1762

UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

IMMUNOGEN, INC.,
*Plaintiff-Appellant*

v.

KATHERINE K. VIDAL, Under Secretary of Commerce for Intellectual Property and Director of the USPTO
*Defendant-Appellee*

Appeal from the United States District Court for the Eastern District of Virginia, Civ. No. 1:20-cv-00274 (Hon. T.S. Ellis, III, U.S. District Judge)

# BRIEF FOR DEFENDANT-APPELLEE

THOMAS W. KRAUSE
*Solicitor*

PETER J. AYERS
*Senior Counsel for Patent Law & Litigation*

DANIEL KAZHDAN
MARY L. KELLY
*Associate Solicitors*

Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

JESSICA D. ABER
*United States Attorney*

MATTHEW J. MEZGER
*Assistant United States Attorney*

Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, VA 22314
(703) 299-3741

*Attorneys for the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office*

September 22, 2023

## REPRESENTATIVE CLAIM 242

<u>United States Patent application No. 14/509,809</u>

1. A method for treating a human patient having an FOLRl-expressing ovarian cancer or cancer of the peritoneum comprising administering to the patient an immunoconjugate which binds to FOLRl polypeptide,

> wherein the immunoconjugate comprises an antibody or antigen-binding fragment thereof that comprises the variable light chain (VL) complementarity determining region (CDR)-1, VL CDR-2, VL CDR-3, variable heavy chain (VH) CDR-1, VH CDR-2, and VH CDR-3 of SEQ ID NOs: 6-9, 11, and 12, respectively, and a maytansinoid, and

> wherein the immunoconjugate is administered at a dose of 6 milligrams (mg) per kilogram (kg) of adjusted ideal body weight (AIBW) of the patient.

242. The method of claim 1, wherein the maytansinoid is DM4.

Appx6574; Appx6575.

# TABLE OF CONTENTS

Statement of the Issues......................................................................................1

Statement of the Case........................................................................................2

A. The ’809 application ..................................................................2

B. The Prior Art ...............................................................................6

C. The USPTO proceedings ..........................................................15

D. The Summary Judgment proceedings........................................16

E. The trial and subsequent district court decision .......................16

Summary of the argument...............................................................................20

Argument...........................................................................................................21

I. Standard of review.............................................................................21

II. The district court properly found ImmunoGen’s claims indefinite as to AIBW.........................................................................21

A. The intrinsic record shows that the term “AIBW” is intended to encompass numerous formulas.............................23

B. The unrebutted extrinsic evidence shows that “AIBW” could be calculated in many different ways..............................32

C. The statute does not permit a remand for ImmunoGen to amend its claims...................................................................33

III. The district court did not clearly err in finding that the claimed dosing method would have been obvious.............................34

A. The prior art teaches a narrow range that includes the claimed dose..........................................................................36

B. Separately, it would have been obvious to dose IMGN853 using the for-example AIBW formula ...................38

C. The bulk of ImmunoGen's arguments are inconsistent with *KSR* ....................52

IV. The claims are unpatentable for obviousness-type double patenting ....................53

Conclusion ....................53

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Laboratories v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009) ....................30

*Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*,
903 F.3d 1310 (Fed. Cir. 2018) ....................49

*Alcon Rsch., Ltd. v. Apotex Inc.*,
687 F.3d 1362 (Fed. Cir. 2012) ....................52

*Allergan Sales, LLC v. Sandoz, Inc.*,
935 F.3d 1370 (Fed. Cir. 2019) ....................23

*Altera Corp. v. PACT XPP Techs., AG*,
No. 14-CV-02868-JD, 2015 WL 4999952 (N.D. Cal. Aug. 21, 2015) ....................22

*Amgen Inc. v. Sandoz Inc.*,
66 F.4th 952 (Fed. Cir. 2023) ....................21, 41, 47

*Amgen, Inc. v. Chugai Pharm. Co.*,
927 F.2d 1200 (Fed. Cir. 1991) ....................22

*In re Antor Media Corp.*,
689 F.3d 1282 (Fed. Cir. 2012) ....................50

*Apple, Inc. v. Corephotonics, Ltd.*,
No. 22-1350, --- F.4th ----, 2023 WL 5838695 (Fed. Cir. Sept. 11, 2023) ....................24

*Aria Diagnostics, Inc. v. Sequenom, Inc.*,
726 F.3d 1296 (Fed. Cir. 2013) ....................26

*Bayer Schering Pharma AG v. Barr Labs Inc.*,
575 F.3d 1341 (Fed. Cir. 2009) ....................47

*Boehringer Ingelheim Pharms. Inc. v. Mylan Pharms., Inc.*,
803 F. App'x 397 (Fed. Cir. 2020) .......... 47

*Burlington Indus., Inc. v. Quigg*,
822 F.2d 1581 (Fed. Cir. 1987) .......... 22

*In re Clarke*,
809 F. App'x 787 (Fed. Cir. 2020) .......... 31

*Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*,
958 F.3d 1348 (Fed. Cir. 2020) .......... 34

*Concrete Appliances Co. v. Gomery*,
269 U.S. 177 (1925) .......... 42

*CoNKwest, Inc. v. Lee*,
2015 WL 13628157 (E.D. Va. Sept. 2, 2015) .......... 22

*In re Conley*,
490 F.2d 972 (C.C.P.A. 1974) .......... 21

*In re Copaxone Consol. Cases*,
906 F.3d 1013 (Fed. Cir. 2018) .......... 48

*In re Cuozzo Speed Techs., LLC*,
793 F.3d 1268 (Fed. Cir. 2015) .......... 36, 44

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) .......... 48, 52

*Dome Pat. L.P. v. Lee*,
799 F.3d 1372 (Fed. Cir. 2015) .......... 21

*Enzo Biochem, Inc. v. Applera Corp.*,
599 F.3d 1325 (Fed. Cir. 2010) .......... 28

*Finjan LLC v. ESET, LLC*,
51 F.4th 1377 (Fed. Cir. 2022) .......... 25

*Forest Laboratories, LLC v. Sigmapharm Laboratories*,
918 F.3d 928 (Fed. Cir. 2019) .......... 39, 40, 41

*Genentech, Inc. v. Sandoz Inc.*,
55 F.4th 1368 (Fed. Cir. 2022) ....................47

*Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*,
618 F.3d 1294 (Fed. Cir. 2010) ....................42

*Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*,
57 F.4th 1001 (Fed. Cir. 2023) ....................21

*Graham v. John Deere Co.*,
383 U.S. 1 (1966) ....................53

*Halliburton Energy Servs., Inc. v. M-I LLC*,
514 F.3d 1244 (Fed. Cir. 2008) ....................23

*Hewlett-Packard Co. v. Mustek Sys.*,
340 F.3d 1314 (Fed. Cir. 2003) ....................36

*Hyatt v. Hirshfeld*,
998 F.3d 1347 (Fed. Cir. 2021) ....................30

*HZNP Medicines LLC v. Actavis Lab'ys UT, Inc.*,
940 F.3d 680 (Fed. Cir. 2019) ....................52

*ImmunoGen, Inc. v. Hirshfeld*,
No. 2021-1939, 2022 WL 885774 (Fed. Cir. Mar. 25, 2022) ....................*passim*

*Immunogen, Inc. v. Iancu*,
523 F. Supp. 3d 773 (E.D. Va. 2021), *vacated and remanded*, 2022 WL 885774 (Fed. Cir. Mar. 25, 2022) ....................2, 16

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ....................34, 51, 52

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ....................30

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014) ....................21

*Novartis Pharm. v. West-Ward Pharm.*,
923 F.3d 1051 (Fed. Cir. 2019) ....................52

*Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*,
909 F.3d 1355 (Fed. Cir. 2018) ....................21

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) ....................49

*In re Packard*,
751 F.3d 1307 (Fed. Cir. 2014) ....................22

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) ....................46

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) ....................46, 47

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................26

*Phonometrics, Inc. v. N. Telecom Inc.*,
133 F.3d 1459 (Fed. Cir. 1998) ....................28

*Samsung Elecs. Co. v. Apple, Inc.*,
No. 16-1102 (U.S. Oct. 4, 2017)....................52

*Sonix Tech. Co. v. Publ'n Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017) ....................28

*SunRace Roots Enter. Co. v. SRAM Corp.*,
336 F.3d 1298 (Fed. Cir. 2003) ....................29

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
299 F.3d 1313 (Fed. Cir. 2002) ....................29

*Tempo Lighting, Inc. v. Tivoli, LLC*,
742 F.3d 973 (Fed. Cir. 2014) ....................31

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) ....................32, 33

*Teva Pharms. USA, Inc. v. Corcept Therapeutics, Inc.*,
18 F.4th 1377 (Fed. Cir. 2021) ....................48, 52

*Unwired Planet, LLC v. Google, Inc.*,
841 F.3d 995 (Fed. Cir. 2016) ........................................................................36

*Valeant Pharmaceuticals v. Mylan Pharmaceuticals*,
955 F.3d 25 (Fed. Cir. 2020) ..........................................................................43

*Wang Laboratories, Inc. v. AOL, Inc.*,
197 F.3d 1377 (Fed. Cir. 1999) ...................................................................28, 29

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
683 F.3d 1356 (Fed. Cir. 2012) ......................................................................34

**Statutes**

35 U.S.C. § 103 ..........................................................................................34

35 U.S.C. § 112 ..........................................................................................21

35 U.S.C. § 145 .....................................................................................*passim*

**Other Authorities**

Christopher A. Cotropia, *Predictability and Nonobviousness in Patent Law After* KSR, 20 MICH. TELECOMM. & TECH. L. REV. 391 (2014)..................52

## STATEMENT OF RELATED CASES

Aside from the case and application identified in ImmunoGen's "Rule 47.5 Statement of Related Cases," the USPTO is unaware of any case or application that will directly affect or that will be directly affected by the Court's decision in this appeal.

## STATEMENT OF THE ISSUES

ImmunoGen seeks to patent a method of treating patients with certain cancers using specific immunoconjugates (e.g., IMGN853) at doses of "6 milligrams (mg) per kilogram (kg) of adjusted ideal body weight (AIBW) of the patient." The prior art teaches using IMGN853 to treat the recited cancers with doses of around 6 mg/kg based on total body weight (TBW), and, separately, numerous prior art references teach the benefits of AIBW dosing across a range of clinical applications. ImmunoGen's purported invention is applying AIBW dosing to IMGN853 and finding the 6 mg/kg AIBW dose. This appeal raises three issues:

1. The specification lists an "example" of a formula for AIBW but expressly contemplates other "option[s]." In light of the intrinsic and extrinsic evidence, did the district court properly find that the claims are indefinite, insofar as a skilled artisan would not be reasonably certain which of the numerous prior art "AIBW" formulas are covered by the claims?

2. The idea of using AIBW was well known. It had been previously used for both smaller drugs and larger cells, and, contemporaneous with this invention, another research group was using it for dosing a different immunoconjugate. Given AIBW's prevalence and the unappealed fact that ImmunoGen has not shown that AIBW dosing reduces toxicity or improves the efficacy of IMGN853 over the prior art's dosing methodology, did the district court properly find that it would have been obvious to dose IMGN853 according to the claimed AIBW dosing regimen?

3. Both parties agree that the question of obviousness-type double patenting rises and falls with the question of obviousness. The last issue is whether the

district court properly found the claims unpatentable under the judicial doctrine of obviousness-type double patenting?

## STATEMENT OF THE CASE

The USPTO rejected all the pending claims of U.S. Patent application No. 14/509,809. Appx6832-6862. ImmunoGen brought a civil action pursuant to Section 145 to challenge that rejection. The trial court originally granted summary judgment in favor of the USPTO, concluding that the claims were indefinite and obvious, but this Court vacated and remanded finding that there were potentially relevant and disputed factual issues. Appx10774-10811, *reported in Immunogen, Inc. v. Iancu*, 523 F. Supp. 3d 773 (E.D. Va. 2021), *vacated and remanded*, 2022 WL 885774 (Fed. Cir. Mar. 25, 2022). On remand, the district court held a trial and ultimately found the claims to be unpatentable for (a) indefiniteness, (b) obviousness, and (c) obviousness-type double patenting. Appx1-67. ImmunoGen now appeals.

### A. The ’809 application

The specification is generally directed to methods of administering a class of drugs called immunoconjugates (or antibody drug conjugates (ADCs))—particularly IMGN853—to treat certain cancers. Appx15; Appx188. Immunoconjugates are drugs that contain an antibody or antibody fragment conjugated to another compound such as an anti-tumor agent. Appx142 [0008]. In the claimed invention, the antibody targets the FOLR-1 protein, which is overexpressed in certain cancer cells, and the antibody is linked to the known anticancer-drug DM4. *See* Appx141 [0005-0006]; Appx142 [0008].

The specification admits that these drugs are not new and have "been previously described" in numerous patent applications. Appx188 [00182]. Instead, the purported invention is how to determine the dose of the immunoconjugates; specifically, the claims recite administering the claimed immunoconjugates at doses of 6 mg/kg AIBW. *See* Appx6574-6584. At issue in this case is whether the claimed "AIBW" dosing is indefinite in this context and whether the claimed dose would have been obvious even assuming ImmunoGen's construction.

Particularly relevant to the indefiniteness part of this case are the "Definitions" and "Examples" sections of the specification.

<u>Definitions</u>: The detailed description of the invention begins with a "Definitions" section. Appx151 [0040] ("To facilitate an understanding of the present invention, a number of terms and phrases are defined below."). That section first defines IBW through an "optionally" and a "for example," and it then defines AIBW in terms of IBW while adding yet another "for example":

> [0069] The term "ideal body weight" (IBW) refers to a size descriptor that is unrelated to total body weight. IBW is an estimate of weight corrected for sex and height, and **optionally** frame size. IBW can be calculated, **for example**, using the formulas IBW = 0.9H-88 (for males) and IBW = 0.9H-92 (for females), wherein H=height in cm.
>
> . . .
>
> [0071] The term "adjusted ideal body weight" (AIBW) or "adjusted body weight" (ADJ) refers to a size descriptor that accounts for sex, total body weight, and height. AIBW and ADJ are used interchangeably throughout the specification. AIBW (ADJ) can be calculated, **for example**, using the formula ADJ = IBW + 0.4 (weight in kg - IBW).

Appx157–158 (emphases added). The specification further explains that "IBW . . . and AIBW (ADJ) are discussed in more detail in [the] Green [reference], which [it] incorporated by reference in its entirety." Appx158 [0072]. (The Green reference is discussed below.)

Examples: The specification also has an "Examples" section, but the specification repeatedly and expressly states that the examples described in this section should not be used to limit the claims: The section opens by cautioning that the examples are "non-limiting." Appx188 [0180]. It reiterates this in the next paragraph, declaring that "the examples and embodiments described herein are for illustrative purposes only." Appx188 [0181]. And the section concludes by repeating that "[t]he breadth and scope of the present invention should not be limited by any of the above-described exemplary embodiments, but should be defined only in accordance with the following claims and their equivalents." Appx197 [0218].

Example 4 of the specification is directed to "IMGN853 Alternate Dosing Approaches." Appx192. This example evaluates several different dosing strategies, including IBW and AIBW. Appx193 [0200]. For the IBW and AIBW strategies, Example 4 applies the for-example formulas from above:

> *Ideal Body Weight (IBW)*
> IBW (male) = 0.9H-88
> IBW (fem) = 0.9H-92
> (where H=height in cm)
> . . .
> *Adjusted Ideal Body Weight (AIBW or ADJ)*
> IBW + 0.4 (Actual weight in kg - IBW)

Appx193 [0200]. Example 4 then reports results from using this AIBW formula to dose two cohorts—each of seven patients. According to the specification, in these cohorts, AIBW dosing had better results than total body weight (TBW) dosing because TBW dosing was "associated with more patients having ocular adverse events and with the occurance [*sic*] of Grade 3 ocular adverse events." Appx194 [0205]. (In light of the data from ImmunoGen's post-filing clinical testing on many more patients, the district court found that there is insufficient evidence to determine whether, in fact, the change from TBW-to-AIBW dosing reduces toxicity. Appx23-26. ImmunoGen has not appealed that finding.)

Claims: The claims on appeal[1] focus on AIBW dosing, but none provide any guidance on how AIBW should be calculated. Instead, independent claims 1, 317, and 341 recite administering the claimed immunoconjugates at a dose of 6 mg/kg "AIBW" without elaboration. Appx6574; 6580; Appx6582. Claim 242 is representative of the claims on appeal and (together with Claim 1 from which it depends) recites:

> 1. A method for treating a human patient having an FOLRl-expressing ovarian cancer or cancer of the peritoneum comprising administering to the patient an immunoconjugate which binds to FOLRl polypeptide,
>
>> wherein the immunoconjugate comprises an antibody or antigen-binding fragment thereof that comprises the variable light chain (VL) complementarity determining region (CDR)-1, VL CDR-2, VL CDR-3, variable heavy chain (VH) CDR-1, VH CDR-2, and VH CDR-3 of SEQ ID NOs: 6-9, 11, and 12, respectively, and a maytansinoid, and

[1] Claims 242, 252-255, 258-265, 300, 317-325, 329-330, and 354 of the '809 application. Appx12175 (¶ 17).

> wherein the immunoconjugate is administered at a dose of 6 milligrams (mg) per kilogram (kg) of adjusted ideal body weight (AIBW) of the patient.

242. The method of claim 1, wherein the maytansinoid is DM4.

Appx6574; Appx6575.

Additionally, the claims are not limited to a single immunoconjugate. The claims on appeal all require that the immunoconjugate use the anti-cancer drug DM4, but even the narrowest dependent claims do not recite an exact DM4-to-ADC ratio. *See* Appx6575 (claim 241 reciting "3-4 maytansinoid molecules"). And the claims leave various choices for the antibody/antibody fragment and linkers. *See generally* Appx11 (¶ 34); Appx12174-12175 (¶ 16).

The parties agree that IMGN853 is an embodiment of the immunoconjugate recited in the claims. Appx11 (¶ 36); Appx12175 (¶ 18).

## B. The Prior Art

The relevant prior art in this case can be categorized into two groups: (1) references that teach using immunoconjugates similar to IMGN853 to treat the recited cancers and (2) references that teach AIBW dosing.

### 1. The prior art taught using the claimed immunoconjugates to treat the recited cancers

It is undisputed that "IMGN853 was known in the [prior] art" and that "[a] method of using IMGN853 to treat FOLR1-expressing ovarian cancer or peritoneum cancer was known in the [prior] art." Appx12176 (¶¶ 33-34); *see* Appx11 (¶ 38). Indeed, the '809 application admits that IMGN853 was "previously described" in several of ImmunoGen's prior art references including (a) U.S.

Patent Publication No. 2012/0282282 (Lutz); (b) two references by Ab: WO 2011/106528 (Ab '528) and U.S. Patent Publication No. 2012/0009181 (Ab '181); and (c) two references by Carrigan: WO 2012/135675 (Carrigan '675) and U.S. Patent Publication No. 2012/0282175 (Carrigan '175). Appx188 [00182].

(d) Additionally, a prior art ASCO Abstract teaches using IMGN853 as an anti-ovarian cancer drug. ImmunoGen agrees that these are all prior art to the '809 application. *See* Appx12176-Appx12177 (¶¶ 35-36); Appx12178 (¶ 57).

a. Lutz

In 2012, Dr. Robert J. Lutz[2] (one of the '809 application's named inventors) and another ImmunoGen researcher applied for a patent on their work on various DM4-containing immunoconjugates, including IMGN853. Appx5937; Appx6025 [0393]. By way of background to Lutz, it is undisputed that "[o]cular toxicity is a well-known adverse event in the administration of ADCs with DM4 and MMAF[3] payloads, and has been for the last 20+ years." Appx12176 (¶ 29). Lutz is addressed to this well-known problem. *See* Appx5937; Appx5994 [0065]. As Lutz explains, the problem with existing DM4-containing immunoconjugates is that there is a limit on the maximum tolerated dose because of "ocular toxicity." Appx6006 [0264]. Lutz reports that, in rabbits, one can reduce the ocular toxicity caused by these immunoconjugates by including a charged linker. Appx5937. As

---

[2] For the sake of clarity, this brief uses "Dr. Lutz" to refer to the person and "Lutz" to refer to the prior-art U.S. Patent Publication No. 2012/0282282.

[3] MMAF is a payload used in some drugs. *See* Appx13149 (ll.2-4).

the district court explained (Appx16), the following passage from Lutz shows that Lutz focuses on doses around 6 mg/kg based on a subject's TBW:

> In one embodiment, the dose of ADC administered is **at least about 4 mg/kg**. In another embodiment, the dose is **between about 4 mg/kg and about 16 mg/kg**. In another embodiment, the dose is **between about 4 mg/kg and about 8 mg/kg**. In another embodiment, the dose is **between about 5 mg/kg and 6 mg/kg**. In another embodiment, the dose is **between about 6 mg/kg and about 8 mg/kg**. In a further embodiment, the dose is **between about 6 mg/kg and about 7 mg/kg**. In another embodiment, the dose is *between about 7 mg/kg and about 8 mg/kg*. In yet another embodiment, the dose is **between about 4 mg/kg and 6 mg/kg**. In a further embodiment, the dose is *between about 4 mg/kg and 5 mg/kg*.

Appx5991 [0008] (emphases added: the bolded portions include 6 mg/kg and the italicized portions exclude it); Appx5991-5992 [0010] (same). Lutz is assigned to ImmunoGen. Appx5937.

Dr. Lutz himself testified at trial. While the Lutz publication asserts that using a charged linker reduced ocular toxicity in **rabbits** in preclinical studies, Dr. Lutz admitted that "[p]reclinical safety doesn't always unfortunately translate to the clinical experience," so, even with the results reported in the Lutz reference, there remained a "potential risk" of ocular toxicity. Appx13098 (ll.15-20). Accordingly, Dr. Lutz testified that, at the priority date, it would have been "standard practice" to test for the ocular toxicity of IMGN853, "because the particular payload," i.e., DM4, "had that history [of ocular toxicity] with other linkers." Appx13095-13096.

Lutz says nothing, encouraging or discouraging, about other means of reducing ocular toxicity for IMGN853.

b. The Ab references

Ab ’181 describes IMGN853 studies by other ImmunoGen researchers. Appx7064. According to Ab ’181, research in mouse models suggests that IMGN853 is a promising treatment for various cancers including peritoneal cancer. Appx7093 [0086]; Appx7122 [0297]; *see also* Appx7123 [0300] (“anti-FOLR1 immunoconjugates containing sulfo-SPDB are highly active in tumor models”). In terms of dosing, Ab ’181 discloses that an “administering physician can easily determine optimum dosages, dosing methodologies and repetition rates.” Appx7115 [0263]. Ab ’181 then discloses one embodiment where the dose ranges “from 0.01 μg to 100 mg per kg” TBW and another where it ranges from “from about 0.1 mg to about 20 mg per kg” TBW. Appx7115 [0263]. In 2013, ImmunoGen received U.S. Patent No. 8,557,966 based on the application that published as Ab ’181. Appx16.

Ab ’528 discloses largely the same information as Ab ’181. *See* Appx800. ImmunoGen is the applicant for Ab ’528. Appx800.

c. The Carrigan references

Carrigan ’175 likewise presents results of ImmunoGen’s research on IMGN853.[4] Appx7194. Like the Ab references, Carrigan ’175 discloses treating ovarian cancer by administering the same immunoconjugate taught in the Ab references, which Carrigan ’175 refers to as “IMGN853.” Appx7235 [0162]. Like the Ab references, Carrigan ’175 also discloses the results of *in vivo* experiments using IMGN853 to inhibit ovarian tumor growth in certain animals. Appx7237

[4] The Carrigan and Ab references share a named inventor.

[0182]-Appx7239 [0192]. Like the Ab references, Carrigan ’175 explains that an “administering physician can easily determine optimum dosages, dosing methodologies and repetition rates.” Appx7235–7236 [166]. And, like the Ab references, Carrigan ’175 discloses one embodiment where the dose ranges “from 0.01 µg to 100 mg per kg” TBW and another where it ranges from “from about 0.1 mg to about 20 mg per kg” TBW. Appx7236 [166].

Carrigan ’675 discloses largely the same information as Carrigan ’175, and ImmunoGen is also the applicant for Carrigan ’675. Appx699.

d. The 2013 ASCO Abstract

At a conference in May–June of 2013, ImmunoGen researchers presented an abstract describing preliminary results from their Phase 1 testing of IMGN853 in human patients. Appx16149. The results were promising: at doses of 3.3 mg IMGN853 per kilogram TBW, “one patient with ser[i]ous [epithelial ovarian cancer] had an 82% reduction in CA125 (confirmation pending).” Appx16149. (CA125 is a cancer antigen known to be “indicative of therapeutic efficacy.” Appx150 [0025]; *see* Appx13481 (ll.1-8).) The 2013 ASCO Abstract concludes that “[s]afety evaluation continues at 5 mg/kg and dose escalation is ongoing.” Appx16149.

e. ImmunoGen’s own issued patents

ImmunoGen has received several patents that cover the claimed immunoconjugate. For example, the ’809 application and the aforementioned ’966 patent are commonly owned, and the first claim of the ’966 patent recites a specific “humanized antibody or antigen binding fragment,” which is found in IMGN853.

Appx12180 (¶¶ 75-77). U.S. Patents Nos. 9,133,275, 9,598,490, and 9,670,280 are similar. *See* Appx12180 (¶¶ 78-83).

**2. The prior art taught using AIBW for a variety of therapeutic applications**

a. References that tout AIBW dosing

AIBW is a well-known concept that takes into account a patient's TBW (total body weight, i.e., the weight shown on a scale) and the patient's IBW (the patient's ideal body weight), and adjusts the two based on a correction factor. The formula is:

$$AIBW = IBW + CF * (TBW - IBW)$$

where "CF" is some correction factor, and IBW is some metric for "ideal body weight." Appx13460 (ll.15-21); Appx4525; Appx16592-16598. The USPTO's expert Dr. William Figg showed eleven separate prior art references that teach using AIBW for therapeutic purposes. *See* Appx17-18; Appx13486-13501.

(1) Green: In 2004, Bruce Green and Stephen Duffull wrote an article analyzing the advantages of various dosing methodologies. *See* Appx4523-4537. Green explains that failure to properly adjust doses based on a patient's body size can lead to incorrect dosing, and it reviews the literature on nine different dosing descriptors—including IBW and AIBW. Appx4523-4527. Green explains that, for obese patients, AIBW is helpful for normalizing the exposure of drugs that do not distribute completely into adipose tissue. Appx4527. Green further teaches using AIBW for a variety of antibiotics and drugs. Appx4527; Appx4535-4536.

Green itself references three ways to calculate IBW. According to Green, IBW can be determined directly from tables published by the Metropolitan Life Insurance Company of New York; it can be calculated based on Devine's formula, where IBW = "45.4 + 0.89 x (HT (cm) – 152.4 + 4.5 (if male))"; or it can be calculated from a table published by Blackburn. Appx4525-4526. Green also notes that there are various correction factors that can be used to adjust IBW to arrive at AIBW. *See* Appx4527. Because of its relevance, the '809 application "incorporated [Green] by reference in its entirety." Appx158 [0072].

(2) Rudek *et al.*: In 2003, Dr. Figg's group published an article concluding that only AIBW decreases the variability in the clearance of the anticancer drug COL-3. Appx16221-16232. In assessing AIBW, Rudek looked to various pharmacokinetic parameters like AUC, Cmax, and clearance. Appx16221-16232.

(3) Bauer *et al.* teach using AIBW dosing to administer various antibiotics. Appx16159-16163. Bauer notes that there are various correction factors that can be used to arrive at AIBW. *See* Appx16161.

(4) Fuchs *et al.*'s patent publication teaches using AIBW dosing for administering the anticancer drug cyclophosphamide. Appx16142 [0120].

(5) Geraghty and Lee's patent publication teaches using AIBW dosing for administering the anticancer drug thiotepa. Appx16112[0084].

Both (6) Ekhart *et al.* (Appx16234-16241), and (7) Herrington *et al.* (Appx16243-16249) teach using AIBW dosing for administering the anticancer drug carboplatin.

Both (8) Topcuoglu *et al.* (Appx16259-16264) and (9) Hicks *et al.* (Appx16251-16257) teach using AIBW for determining how many CD34+ cells to transplant when treating certain cancers. CD34+ cells are much larger than immunoconjugates. *See* Appx13383 (ll.3-8); Appx13492 (ll.8-11).

(10) Alffenaar & van der Werf reports that concerns with the ocular toxicity caused by the antibiotic ethambutol led the authors to consider a number of dosing options, including AIBW dosing, as a means to reduce ocular toxicity. Ultimately, however, they settled on IBW dosing. Appx16607-16608.

(11) Busulfex® Package Insert: The 2011 package insert included with the anticancer drug Busulfex® (Appx16165-16200) recommends using AIBW dosing for obese patients. Appx16182.

All eleven of these prior art references disclose using AIBW.

Additionally, Rosenblat *et al.* published an article in 2022 (i.e., well after the ’809 application’s priority date) describing a clinical study conducted from February 2006 to March 2012 (i.e., completed before the priority date) on the radioimmunoconjugate $^{225}$Ac-lintuzumab. Appx16599-16606. Rosenblat reports that their group initially dosed the radioimmunoconjugate based on patients’ TBW, but they later changed to AIBW dosing (with a correction factor of 0.4) for patients above IBW because of toxicity concerns. Appx16601. Rosenblat mentions the TBW-to-AIBW shift without any fanfare; it does not suggest that dosing the immunoconjugate based on AIBW was somehow novel.

b. The prior art taught various formulas for calculating AIBW

All AIBW formulas start with the following generic formula:

AIBW = IBW + CF * (TBW – IBW)

As shown at trial (Appx13371-13372; Appx13461-13470), the prior art applied different correction factors and, separately, used different IBW formulas. The choice of correction factor and IBW formula mattered. Appx13372 (ll.8-12).

Different correction factors: The art taught a range of possible correction factors for different drugs. ImmunoGen's expert Dr. Shah testified that he saw correction factors ranging from 0.25 to 0.5. Appx13371 (ll.19-25). The USPTO's expert, Dr. Figg, testified that he had seen correction factors ranging from 0.2 to 0.9 (Appx13461 (ll.10-13)), and the district court credited this testimony (Appx14). Moreover, as the district court found (Appx14), different references sometimes report different correction factors for the same drug, Appx13469 (ll.2-17). For example, Rebecca Wurtz *et al.* report two different correction factors for the drug tobramycin depending on a patient's age: the standard is 0.58, but the correction factor for children is 0.40. Appx16594. The Green reference gives a correction factor of 0.37 for tobramycin, which is still a third correction factor. Appx4527. Wurtz and Green also provide different correction factors for gentamicin (0.43 vs. 0.45) and amikacin (0.38 vs. 0.42). *Compare* Appx16594, *with* Appx4527.

To be sure, when a patient is at her IBW, the choice of correction factor has no effect, and there is no difference between TBW, IBW, and AIBW dosing.[5] *See* Appx13282 (ll.18-23); Appx13400-13401; Appx13462-13463. However, as a patient's TBW diverges from her IBW, the choice of correction factor can have, as ImmunoGen's expert admitted, a "huge" effect on the amount of drug being administered. Appx13372 (ll.8-12) (Dr. Shah); *see* Appx13469-13470.

Different IBW formulas: In general, "IBW . . . is an estimate of a patient's weight corrected for sex and height, and optionally frame size." Appx12173 (¶ 8). As the district court found, there were at least eleven different formulas for calculating IBW. Appx15; Appx13461 (ll.23-25); *see* Appx13463-13468. The Green reference alone provides three ways to calculate IBW. *See supra* at p.12. Robinson, Miller, and Hammond all propose still other formulas. *See* Appx16462; Appx16454; Appx16443. Peterson, which is not itself prior art, catalogues "several [prior art] IBW equations [that had] been developed over the past few decades." Appx16156. Notably, the choice of formula can affect the calculated IBW of patients who are between 5 and 6 feet by almost 20 pounds. Appx13468 (ll.9-17).

### C. The USPTO proceedings

ImmunoGen filed the '809 application in 2014, claiming priority to several provisional patent applications, the earliest of which it filed on October 8, 2013. Appx520; Appx525. The examiner rejected the claims of the '809 application on

---

[5] This is because the definition of AIBW is IBW + CF * (TBW – IBW), and when TBW = IBW (i.e., when a patient is at her IBW), the "TBW – IBW" parenthetical is zero. That is why, for patients at their IBW, there is no difference between TBW, IBW, and AIBW.

various grounds, including that they were anticipated and obvious over various ImmunoGen prior art references that disclose the use of IMGN853—including Lutz, the Ab references, and the Carrigan references—and that the claims were unpatentable for obviousness-type double patenting. Appx6497-6527. ImmunoGen appealed to the Patent Trial and Appeal Board, where ImmunoGen continued to focus on the 6 mg/kg AIBW dose. *See* Appx6691 (ll.10-12) (conceding that the claimed "immunoconjugate itself [was] known in the art"). The Board reversed the examiner's anticipation rejection, but it upheld the obviousness and obviousness-type double patenting rejections. Appx6832-6862.

### D. The Summary Judgment proceedings

ImmunoGen then brought a civil action in the Eastern District of Virginia pursuant to 35 U.S.C. § 145. Appx433. The USPTO answered and argued that the claims were both obvious and invalid for obviousness-type double patenting, as the Board found, and it also added a new indefiniteness argument. Appx501; Appx511. The district court granted summary judgment, finding the claims indefinite and, separately, obvious. Appx10774-10811. ImmunoGen appealed, and this Court vacated and remanded, holding that there remained disputed questions of material fact. *ImmunoGen*, No. 2021-1939, 2022 WL 885774 (Fed. Cir. Mar. 25, 2022).

### E. The trial and subsequent district court decision

On remand, the district court held a three-day trial. ImmunoGen presented five witnesses: three fact witnesses and two expert witnesses. Inventors Dr. Robert Lutz and Dr. Jose Ponte testified about the development of the claimed invention,

and Dr. O'Malley testified about some of the IMGN853 clinical trials. ImmunoGen's two expert witnesses, Drs. Anthony Tolcher and Dhaval Shah, testified that the claims of the '809 application were not indefinite and would not have been obvious. The USPTO presented only one witness, Dr. William D. Figg of the National Institutes of Health and the National Cancer Institute, who gave his expert opinion that the claims of the '809 application are indefinite and obvious to a person having ordinary skill in the art. Appx13455-13456. While ImmunoGen paid its witnesses for their time, Dr. Figg was not compensated for the time he spent working on the case, which the district court found notable. Appx5; Appx13531-13532.

At the close of trial, the district court issued an opinion finding each of ImmunoGen's claims unpatentable as indefinite, obvious over the prior art, and obvious over some of ImmunoGen's earlier-issued claims (i.e., unpatentable for obviousness-type double patenting). The district court found the testimony of the USPTO's expert Dr. Figg to be "the most credible and convincing." Appx12.

As to indefiniteness, the district court credited Dr. Figg's testimony that both the intrinsic and extrinsic evidence show the term AIBW is indefinite. The court credited Dr. Figg's testimony that the '809 application "would leave a POSA 'confused over how to calculate AIBW'" because the Definitions section:

(a) includes the term "for example" when it offers a formula for AIBW;

(b) includes the term "for example" when it offers a formula for the underlying formula for IBW;

(c) expressly contemplates an "optional[]" frame size correction for the underlying IBW, which ImmunoGen argued could not be an option; and

(d) incorporates Green by reference, and Green lists various methods for calculating IBW and AIBW. Appx14 (internal quotes to Dr. Figg's testimony).

The court also credited Dr. Figg's testimony that a skilled artisan would not view Example 4 as limiting both because "'the literature is filled with . . . different equations for ideal body weight and a lot of different correction factors'" and because the specification is explicit that the examples are not limiting. Appx15 (internal quotes to Dr. Figg's testimony). The district court rejected ImmunoGen's attempts to use the prosecution history to limit its claims to the for-example formula. Appx13-14. As to the extrinsic evidence, the district court agreed with Dr. Figg that "the numerous different correction factors reported in the literature would leave a POSA uncertain as to which correction factor to use when calculating AIBW for IMGN853 pursuant to the '809 Application." Appx15; *see* Appx28-36.

In terms of obviousness, the district court found that the AIBW formula listed in the Definitions section and Example 4, including the 0.4 correction factor, was taught in the prior art. Appx18-19. In doing so, the court emphasized the admission of Dr. Tolcher (ImmunoGen's expert), that "'the discovery' claimed in the '809 Application 'is not the AIBW formula.'" Appx18. The relevant question was whether a skilled artisan would think to apply AIBW dosing to immunoconjugates, and the district court found the artisan would. *See* Appx19. Briefly, the district court found:

(a) those skilled in the art would necessarily look for, and thus find, ocular toxicity, Appx19-20;

(b) at that point, those skilled in the art would understand that, since toxicity is usually dose related, it would be natural to experiment with changes to the dosing—including using AIBW dosing that was a known dosing strategy for anticancer drugs, Appx20 (crediting Dr. Figg's testimony);

(c) because of the prior art's focus on doses of 5 or 6 mg/kg TBW, the skilled artisan switching from TBW to AIBW dosing would experiment with doses around 6 mg/kg AIBW, and the correction factor of 0.4 was relatively standard, Appx21; and

(d) a skilled artisan would have a reasonable expectation of success because that was a standard way to attempt and reduce toxicity. *See* Appx38-55.

At trial, there was extensive testimony and discussion of whether ImmunoGen had shown relevant secondary considerations. The district court found that no secondary considerations supported non-obviousness. Specifically, it found:

- "ImmunoGen has failed to demonstrate that the AIBW dosing regimen claimed in the '809 Application in fact reduces or eliminates ocular toxicity." Appx59.

- "[A]s of the priority date of the '809 Application, there was no publicly recognized long-felt need for an AIBW dosing regimen for IMGN853." Appx62.

- "ImmunoGen has presented no evidence that any other drug developers have tried and failed to solve the same problem that the '809 Application purports to solve." Appx63.

- "ImmunoGen has not satisfied its burden to demonstrate that copying by competitors supports finding the '809 Application unobvious." Appx64.
- "[A]ll of ImmunoGen's cited industry praise pertains only to the anticancer properties of IMGN853, for which ImmunoGen has already received multiple patents." Appx64.

ImmunoGen has not appealed any of the district court's findings on secondary considerations.

Finally, the district court found the claims unpatentable for obviousness-type double patenting, explaining: "ImmunoGen has already received **four** patents covering IMGN853 and its use for treating cancer," and "[a]llowing ImmunoGen to receive another patent for the '809 Application would therefore permit ImmunoGen to extend its patent term by obtaining a second, later expiring patent for the same invention." Appx66.

## SUMMARY OF THE ARGUMENT

ImmunoGen's claims are not patentable for three reasons. (1) In the Definitions section, the specification deliberately tries to capture multiple formulas for calculating AIBW. The fact that the claimed AIBW dosing can be calculated using one of many formulas means that a skilled artisan would lack reasonable certainty as to which formula to apply, and the claims are therefore indefinite. (2) The claimed dose would have been obvious. At the outset, the claims are to administering a specific dose, and, for patients at their IBW, the ultimate dose that ImmunoGen claims is unchanged from the dose that a physician reading the prior art would find obvious to administer, so allowing ImmunoGen to patent the claimed dose would prevent doctors from practicing what would be obvious over

the prior art. Additionally, AIBW dosing was a standard dosing methodology, and a skilled artisan would have found it obvious to experiment with AIBW dosing (and the particular 6 mg/kg recited in the claims) and would have had a reasonable expectation of success in doing so. (3) The parties agree that the question of obviousness-type double patenting rises and falls with the question of statutory obviousness. Thus, for similar reasons, the claims are unpatentable under the doctrine of obviousness-type double patenting.

## ARGUMENT

### I. Standard of review

After a Section 145 trial, this Court reviews legal conclusions de novo and factual findings, including those underlying legal questions, for clear error. *Dome Pat. L.P. v. Lee*, 799 F.3d 1372, 1379-80 (Fed. Cir. 2015). This principle applies to all three issues on appeal—indefiniteness, obviousness, and obviousness-type double patenting—because they are all legal conclusions based on underlying facts. *See Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) (indefiniteness); *Amgen Inc. v. Sandoz Inc.*, 66 F.4th 952, 960 (Fed. Cir. 2023) (obviousness); *Novartis Pharms. Corp. v. Breckenridge Pharm. Inc.*, 909 F.3d 1355, 1361 (Fed. Cir. 2018) (obviousness-type double patenting).

### II. The district court properly found ImmunoGen's claims indefinite as to AIBW

By statute, patent claims must "particularly point[] out and distinctly claim[]" the invention. 35 U.S.C. § 112(b). This requirement is often "given the

shorthand name 'indefiniteness.'" *In re Conley*, 490 F.2d 972, 975 (C.C.P.A. 1974). "[A] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).

In civil actions brought under section 145, "the claims in a patent application must be given their broadest reasonable interpretation consistent with the specification." *CoNKwest, Inc. v. Lee*, 2015 WL 13628157, at *8 (E.D. Va. Sept. 2, 2015) (citations omitted); *see Burlington Indus., Inc. v. Quigg*, 822 F.2d 1581, 1583 (Fed. Cir. 1987). As a result, the standard for finding a claim indefinite in a section 145 action is the same as that applied during prosecution, and it "may effectively [be] lower" than *Nautilus*'s "reasonable certainty" standard. *In re Packard*, 751 F.3d 1307, 1323 (Fed. Cir. 2014) (Plager, J., concurring); *see Altera Corp. v. PACT XPP Techs., AG*, No. 14-CV-02868-JD, 2015 WL 4999952, at *14 (N.D. Cal. Aug. 21, 2015) ("the examiner may issue an indefiniteness rejection to clarify a proposed claim, even if a court examining the claim post-issuance would not necessarily find it invalid").

Here, ImmunoGen's claims each require administering a drug at a dose of "6 milligrams (mg) per kilogram (kg)" AIBW. *See* Appx6574-6584. ImmunoGen admits that IMGN853 and its use in treating the recited cancers was known, Appx12176-12177 (¶¶ 33-37); instead, ImmunoGen has always argued that the **AIBW dosing regimen** is what distinguishes the claimed method from the prior art that used the same drug to treat the same types of cancers. *See, e.g.*, Appx953

(arguments to the examiner); Appx6546-6547 (arguments to the Board); Appx434 (¶ 5) (arguments to the district court); Br.38-46 (arguments to this Court). As the district court explained, "[b]ecause ImmunoGen relies on the AIBW limitation to distinguish the '809 Application from the prior art, it is especially critical that the application make clear the metes and bounds of the term." Appx35-36; *see Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1218 (Fed. Cir. 1991); *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1252-53 (Fed. Cir. 2008). Here, a skilled artisan reading the claims, specification, and prosecution history and familiar with the extrinsic evidence, would not be reasonably certain of the metes and bounds of the critical AIBW dosing.

### A. The intrinsic record shows that the term "AIBW" is intended to encompass numerous formulas

#### 1. ImmunoGen's claims provide no guidance on the meaning of AIBW

"Claim construction must begin with the words of the claims themselves." *Allergan Sales, LLC v. Sandoz, Inc.*, 935 F.3d 1370, 1373 (Fed. Cir. 2019) (citations omitted). ImmunoGen's claims require administering to a patient 6 milligrams of the recited immunoconjugates per kilogram of the patient's "AIBW," but the claims say nothing about how to determine AIBW. *See* Appx6574-6584. The district court credited Dr. Figg's testimony that even an expert in the field would be "'confused over how to calculate' AIBW because the claims do not provide a definition." Appx29; *see* Appx14.

ImmunoGen repeatedly asserts that the district court's indefiniteness finding was "largely" premised on the fact that the claims themselves do not define the

term AIBW (Br.15, 20-21), but that is inaccurate. In the section of the findings of facts devoted to indefiniteness, the district court devotes only one of nineteen paragraphs to the fact that the claims themselves do not include a definition for the term. *See* Appx12-15. The remainder of the section walks through all the relevant intrinsic and extrinsic evidence establishing indefiniteness. Appx12-15. The analysis in the conclusions of law is similarly comprehensive. Appx28-36. All the district court did was **begin** with the language of the claims themselves, as this Court itself "often do[es]." *Apple, Inc. v. Corephotonics, Ltd.*, No. 22-1350, --- F.4th ----, 2023 WL 5838695, at *4 (Fed. Cir. Sept. 11, 2023).

#### 2. The "Definitions" section of the specification expressly allows for multiple ways of calculating AIBW

As the district court explained, the "Definitions" section "makes clear that there are multiple ways to calculate AIBW" (Appx29), which is consistent with the multiple formulas for AIBW described in the art (Appx31-32). There are three paragraphs in the specification in particular that demonstrate that ImmunoGen intended to capture multiple AIBW formulas. *First*, the Definitions section provides that AIBW can be calculated "**for example**, using the formula ADJ = IBW = 0.4(weight in kg – IBW)." Appx29; Appx158 [0071]. The district court credited Dr. Figg's testimony that the phrase "for example" would leave the definition "vague," because it implies that other formulas are also envisioned. Appx29; *see* Appx29-30 (citing this Court's precedent that "for example" is not limiting). *Second*, the Definitions section defines the underlying IBW as "an estimate of weight corrected for sex and height, and **optionally frame size**" and

states that IBW "can be calculated, **for example**, using the formulas IBW = 0.9H–88 (for males) and IBW = 0.9H–92 (for females), wherein H = height in cm." Appx30; Appx157 [0069]. The district court credited Dr. Figg's testimony "that a POSA reading the '809 Application would not know how to calculate IBW because the application's 'Definitions' section expressly states that IBW can include an 'optional' frame size correction and . . . uses the term 'for example'" again. Appx30 (some citations omitted). *Third*, the Definitions section "incorporated" the Green reference "in its entirety." Appx30; Appx158 [0072]. As the district court explained, "[t]he Green reference provides multiple ways to calculate IBW and multiple correction factors that may be used for AIBW. Thus, by incorporating Green in its entirety, the '809 Application specifically incorporates multiple possible formulas for AIBW and IBW." Appx30-31; *see Finjan LLC v. ESET, LLC*, 51 F.4th 1377, 1382 (Fed. Cir. 2022) ("[D]efinitions in any incorporated . . . references are a part of the host patent."). The district court thus credited Dr. Figg that, by incorporating Green, the '809 application "prevents a POSA from discerning the scope of the '809 Application with the requisite reasonable certainty." Appx31. ImmunoGen does not seem to dispute that, if these statements in the Definitions section are applied to the recited AIBW, the claims are indefinite. Instead, as discussed below, ImmunoGen's argument is that these statements in the Definitions section should not be seen as definitional.

#### 3. The district court correctly rejected ImmunoGen's attempts to convert its "Definitions" into examples and its "Examples" into definitions

The district court properly rejected ImmunoGen's attempts to cabin the claimed AIBW to the formula introduced in the Definitions section with "for example" and applied in Example 4. Appx32-34. The court agreed with Dr. Figg that, because the specification repeatedly instructs its reader not to limit the claims to its examples, "a POSA would not understand that the formula for AIBW listed in Example 4 was the only formula for AIBW claimed in the '809 Application." Appx33. The district court noted that this is consistent with this Court's precedents that claims should not be "confin[ed]" to the "specific embodiments" described in the specification. Appx33 (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc)). "'[E]ven if a specification has only one embodiment, its claims will not be confined to that example unless the patentee has demonstrated a clear intention to limit the claim scope using words or expression of manifest exclusion or restriction.'" Appx33 (quoting *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1301 (Fed. Cir. 2013)). There is no such clear intention to limit the claim scope here. Appx33. None of this dismisses Example 4 as "irrelevant," as ImmunoGen asserts (Br.24); it simply recognizes that Example 4 is not dispositive.

<u>Skilled artisans would understand that other AIBW formulas might work too</u>: ImmunoGen asserts that "[a]ny other formula," aside from the for-example formula, "would not work." Br.22; *see* Br.27 (using the same argument to

distinguish Green). That is (a) premised on a mistake of fact, (b) does not correctly apply the (mistaken) premise, and (c) would still not limit the claims.

(a) Citing Dr. Shah's testimony, ImmunoGen asserts that, because "the correction factor is drug-specific," only one formula would work. Br.23 (citing Appx13346). That is not Dr. Shah's testimony. Instead, he testified that a correction factor that works for one drug might not work for another drug. Appx13346. That does not mean that, once you know that one correction factor works, no other correction would work. Indeed, as the district court noted, "some drugs have more than one reported AIBW correction factor." Appx14; Appx31-32.[6] As such, and because other formulas were not tested (*see* Appx13068 (ll.7-13); Appx13096 (ll.15-16); Appx13119 (ll.4-6)), the district court reasonably found that "a POSA would not know whether the 0.4 correction factor used in the '809 Application is the only correction factor for IMGN853, or whether there are other potential correction factors claimed by the '809 Application." Appx32. Dr. Shah himself admitted that we "don't know one way or the other whether [other AIBW formulas] would work." Appx13347 (ll.8-10); Appx13375-13376. This is confirmed by the prosecution history. ImmunoGen's original claims recited dosing the immunoconjugate at a range of about 3-7 mg/kg (Appx200), showing

[6] That fact had not been established as undisputed at the time of summary judgment, so this Court reasonably assumed that each drug could have only one correction factor when it vacated summary judgment. *See ImmunoGen, Inc. v. Hirshfeld*, No. 2021-1939, 2022 WL 885774, at *2 (Fed. Cir. Mar. 25, 2022). Now, though, the USPTO has established that the same drug can have multiple correction factors.

that, at the time of filing, ImmunoGen itself did not believe that the precise 6.0 mg/kg AIBW dose was critical.

(b) Even were it true that drugs had only one correction factor, that would be irrelevant here because the claims are not limited to a single drug. The claims allow for a variety of immunoconjugates. *See generally* Appx11 (¶ 34); Appx12174-12175 (¶ 16); Appx6574-6584.

(c) A skilled artisan would still apply the expansive definitions found in the Definitions section in interpreting the claims.

<u>The cases ImmunoGen cites fail to support its attempts to ignore its own definition</u>: ImmunoGen cites a host of cases to support its attempt to convert its examples into definitions (Br.25-27), but none are on point. Not one involves an express definition that an applicant or patentee narrowed by pointing to examples. Also, none of the cases involves applying the broadest reasonable interpretation.

Consider *Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459 (Fed. Cir. 1998), which ImmunoGen claims supports its attempt to use Example 4 to confine the claims to a specific AIBW formula. Br.25. In *Phonometrics*, all the evidence—other portions of the claims, the specification, and the prosecution history—supported a single construction. *See id.* at 1464-67. Here, by contrast, the specification's definitions expressly point to an array of possible formulas. Appx157-158. ImmunoGen is trying to use Example 4 to override the express breadth of its own Definitions section. That is improper.

Or take *Sonix Tech. Co. v. Publ'n Int'l, Ltd.*, 844 F.3d 1370 (Fed. Cir. 2017), and *Enzo Biochem, Inc. v. Applera Corp.*, 599 F.3d 1325 (Fed. Cir. 2010), which

ImmunoGen also cites as supporting its attempt to confine the claims to Example 4. Br.25-26. In both cases, the Court looked to the examples to help delineate terms of "degree" recited in the claims, but this line of cases is irrelevant here. The problem with "AIBW" is not that it is a term of degree; it is that the '809 application expressly tries to capture multiple very specific ways to calculate AIBW.

*Wang Laboratories, Inc. v. AOL, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999) (cited in Br.26-27), is no more helpful. Wang accused AOL and Netscape of infringing its patent for processing and analyzing "frames." *Id.* at 1380. At the time, there were two general protocols for processing and displaying data: (1) bit-mapped protocols (which the defendants were using), and (2) character-based protocols (which the defendants were not). In that context, *Wang* looked to the examples to help narrow the claims. However, Wang is distinguishable for at least three reasons. *First*, as this Court has since explained, "the intrinsic evidence [in *Wang*] did not describe bit-mapped protocols as included in the invention, and a person skilled in the art would not have understood bit-mapped protocols to be included." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) (analyzing *Wang*). By contrast, ImmunoGen's Definitions section expressly allows IBW and AIBW to account for another "optional" factor, and it describes the IBW and AIBW formulas as mere "example[s]." *Second*, Wang's "patent . . . described the preferred embodiment as the invention itself." *SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1305 (Fed. Cir. 2003) (analyzing *Wang*). Here, the specification is explicit that its for-example formulas are merely examples. *Third*,

as ImmunoGen itself notes, in *Wang*, "[t]his Court also considered expert testimony on whether those in the art would limit the term to character-based protocol frames." Br.27. Here, the district court credited the USPTO's expert's testimony that a skilled artisan would not limit the claims to Example 4. Appx33. At bottom, "*Wang* . . . does not stand for the proposition that if a patent specification describes only a particular embodiment, the claims must be limited to that subject matter." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 907 (Fed. Cir. 2004). That appears to be how ImmunoGen wants this Court to read *Wang*.

In passing, ImmunoGen (Br.27) cites *Abbott Laboratories v. Sandoz, Inc.*, 566 F.3d 1282 (Fed. Cir. 2009), but *Abbott* affirmatively hurts ImmunoGen's case. As *Abbott* explained, a "specification's recitation of [a particular example] as its sole embodiment does not alone justify the trial court's limitation of claim scope to that single disclosed embodiment." *Abbott*, 566 F.3d at 1290. That is what ImmunoGen seeks to do. The *Abbott* Court was willing to limit the claims to an embodiment only because Abbott made specific changes to the specifications in its priority chain, and this "strongly suggested" that Abbott was "intentionally exclud[ing]" other embodiments. *Id.* Unlike Abbott, ImmunoGen has made no changes to its specification or to its claims to warrant such a construction.

#### 4. The prosecution history does not undo the specification's definition

The district court made two points concerning the prosecution history. *First*, the fact that the USPTO did not issue an indefiniteness rejection during

prosecution does not mean that, as a matter of law, the USPTO is foreclosed from doing so now. "Otherwise, the rule allowing the PTO to raise a new rejection in § 145 actions would be a dead letter." Appx34; *cf. Hyatt v. Hirshfeld*, 998 F.3d 1347, 1363 (Fed. Cir. 2021) (permitting the USPTO to assert prosecution laches for the first time in a Section 145 proceeding). ImmunoGen agrees. Br.29. *Second*, while the USPTO missed the indefiniteness problem during prosecution, the district court found that there was no evidence that the USPTO actually believed that the for-example formula was "the **only** definition of AIBW claimed in the '809 Application." Appx34. The examiner assumed the for-example formula was "**included**" in the claims and the Board "merely quoted the Definitions section," including the two uses of "for example" and one use of "optionally." Appx34-35. The district court considered the fact that ImmunoGen and its expert "referenced Example 4's formula for AIBW during the patent examination process," but it found that this one fact did not outweigh the other evidence of record. Appx35.

On appeal, ImmunoGen makes two arguments. *First*, it asserts that the district court did not "consider" the absence of a rejection. Br.28. That is incorrect. As detailed above, the district court found that the examiner's failure to issue an indefiniteness rejection does not indicate that the USPTO understood AIBW to be limited to a single formula. *Second*, ImmunoGen reiterates that it and its experts assumed the for-example formula, that the examiner applied the for-example formula, and that the Board quoted the Definitions section. Br.30-31. The district court fully addressed these points and found them unconvincing.

ImmunoGen invokes prosecution history disclaimer based on statements it made in trial (Br.31-33), but this Court has explained that patent **applicants** do not "receive the benefit . . . of a prosecution history disclaimer." *In re Clarke*, 809 F. App'x 787, 794 (Fed. Cir. 2020); *see Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 978 (Fed. Cir. 2014) ("[T]he PTO is under no obligation to accept a claim construction proffered as a prosecution history disclaimer, which generally only binds the patent owner."). The cases ImmunoGen cites all involve issued patents.

### B. The unrebutted extrinsic evidence shows that "AIBW" could be calculated in many different ways

The district court devoted a whole subsection to the "Extrinsic Record" relevant to indefiniteness. Appx14-15; *see also* Appx31-32. Critically, the extrinsic evidence showed that "there were many ways to define AIBW." Appx14. Correction factors ranged from 0.2 to 0.9 and "there were at least **eleven** formulas for calculating IBW," which underlies any AIBW formula. Appx14-15. ImmunoGen's brief ignores this evidence.

* * * * *

At bottom, the Definitions section expressly allows for multiple AIBW formulas—consistent with the many AIBW formulas known in the art—and the various examples and the prosecution history do not undo that express definition. As the district court explained, the claims of the '809 application are analogous to claims this Court found indefinite in *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335 (Fed. Cir. 2015). *See* Appx31. The *Teva* Court held that the

claim term "molecular weight" rendered claims indefinite because "more than one measurement method could be used, but the patent provided no guidance on which specific method to use." Appx31 (summarizing *Teva*). ImmunoGen now tries to distinguish *Teva* because, it asserts, "the patent in *Teva* did not disclose any method of calculating 'molecular weight,'" whereas, here, "both Example 4 and the definition section uniformly recite the same formulas for IBW and AIBW." Br.26. But ImmunoGen ignores that the Definition section also recites that IBW "optionally" accounts for frame size, while the for-example formula does not allow for a frame-size correction. Appx157 [0069]. Rather, the multiple possible AIBW formulas make this only more analogous to *Teva*, where this Court explained that one of the problems was that the applicant had set out different tests for the claim term "molecular weight." *See* 789 F.3d at 1345 ("[T]he patentee in one instance stated that it was $M_w$ and in the other stated it was $M_p$.").

### C. The statute does not permit a remand for ImmunoGen to amend its claims

ImmunoGen claims that it would be unfair to allow the district court to issue an indefiniteness rejection once it can "no longer amend the claims." Br.31. ImmunoGen therefore asks that, if this Court finds the pending claims are indefinite, it remand to the USPTO to allow for further amendments. Br.33. That would be improper. This is a Section 145 proceeding, and, by statute, the court may decide only whether the "applicant is entitled to receive a patent for his invention, as specified in any of his **claims involved in the decision of the Patent Trial and Appeal Board**. . . ." 35 U.S.C. § 145 (emphasis added). ImmunoGen is

asking that this Court adjudge the patentability of claims different than those involved in the decision of the Patent Trial and Appeal Board. The statute does not allow for that.

Instead, the proper course to address the indefiniteness problem is for ImmunoGen to do exactly what it has done: file a continuation application with definite claims. *See* Appx13803-13810.

## III. The district court did not clearly err in finding that the claimed dosing method would have been obvious

A party cannot receive a patent "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious." 35 U.S.C. § 103. The Supreme Court has explained that "simple substitution of one known element for another" is obvious, and the prior art need not lay out the "precise teachings directed to the specific subject matter of the challenged claim." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417, 418 (2007). Thus, a claimed invention would have been obvious if it involves "a combination of elements that were all known in the prior art, and all that was required to obtain that combination was to substitute one well-known . . . agent for another." *Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1364 (Fed. Cir. 2012). Here, even limiting AIBW to the for-example formula of the specification,[7] all of ImmunoGen's claims would have been obvious.

---

[7] As the district court explained, even though the claims are indefinite, they are still capable "'of being compared to prior art to determine if one of [their] alternatives is anticipated or would have been obvious.'" Appx38 (quoting *Cochlear Bone Anchored Sols. AB v. Oticon Med. AB*, 958 F.3d 1348, 1360 (Fed. Cir. 2020). One of the alternatives for understanding the claimed AIBW is the for-example

It is undisputed that "[a] method of using IMGN853 to treat FOLR1-expressing ovarian cancer or peritoneum cancer was known in the art prior to October 8, 2013." Appx12176 (¶ 34). Thus, the only purported invention in the '809 application is using AIBW dosing. As the district court found, that would have been obvious for two separate reasons. *First*, the prior art Lutz reference teaches dosing the claimed immunoconjugate using ranges around 6 mg/kg **TBW** to treat the recited cancers. *See* Appx5991-5992 [0008, 0010]. While ImmunoGen's claims recite a different formula (AIBW) to determine the proper dose, it is undisputed that, for a patient at her IBW, there is no difference between AIBW and TBW (and the difference is small for patients whose TBW is close to their IBW). Thus, the change from the prior art's TBW dosing to the claimed AIBW dosing has no effect on the dose administered to some patients.

*Second*, since AIBW dosing was a known method for dosing drugs, the simple substitution of AIBW dosing for the prior art's TBW dosing would have been obvious. ImmunoGen's choice of the particular 6 mg/kg AIBW dose would have been reached through routine optimization given the prior art's focus on doses around 6 mg/kg of TBW.

Finally, ImmunoGen has abandoned all arguments of secondary considerations on appeal, so many of the district court's findings remain unchallenged.

---

formula, so, for purposes of analyzing obviousness, this brief will apply that formula.

### A. The prior art teaches a narrow range that includes the claimed dose

It is undisputed that Lutz discloses using IMGN853 for some of the claimed indications. *See* Appx12178 (¶¶ 52, 55). Additionally, as the district court found, Lutz "focuses on dosing IMGN853 around 6 mg/kg TBW." Appx16. Specifically, nearly all of the doses Lutz discloses include 6 mg/kg:

> In one embodiment, the dose of ADC administered is **at least about 4 mg/kg**. In another embodiment, the dose is **between about 4 mg/kg and about 16 mg/kg**. In another embodiment, the dose is **between about 4 mg/kg and about 8 mg/kg**. In another embodiment, the dose is **between about 5 mg/kg and 6 mg/kg**. In another embodiment, the dose is **between about 6 mg/kg and about 8 mg/kg**. In a further embodiment, the dose is **between about 6 mg/kg and about 7 mg/kg**. In another embodiment, the dose is *between about 7 mg/kg and about 8 mg/kg*. In yet another embodiment, the dose is **between about 4 mg/kg and 6 mg/kg**. In a further embodiment, the dose is *between about 4 mg/kg and 5 mg/kg*.

Appx5991 [0008] (emphases added: the bolded portions include 6 mg/kg and the italicized portions exclude it); Appx5991-5992 [0010] (same); Appx16. The only potential difference between Lutz's dosing method and the claimed method is that the claims recite AIBW dosing where Lutz uses TBW dosing.

For a patient at her IBW, however, there is no difference between the dose a patient would receive using AIBW dosing and the dose she would receive under TBW dosing. *See* Appx25; Appx50; Appx13282 (ll.18-23); Appx13400-13401; Appx13462-13463. Consequently, as the USPTO argued (Appx13732-13733) and the district court found (Appx50-51), ImmunoGen's claims "are broad enough to read on obvious subject matter"—administering an identical dose for patients at their IBW—so they are unpatentable even if "they also read on nonobvious subject

matter." *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1281 (Fed. Cir. 2015) (citations omitted). Put differently, the prior art "combination would sometimes perform all the method steps," and this renders the claim obvious. *Unwired Planet, LLC v. Google, Inc.*, 841 F.3d 995, 1002 (Fed. Cir. 2016); *see Hewlett-Packard Co. v. Mustek Sys.*, 340 F.3d 1314, 1326 (Fed. Cir. 2003) ("[A] prior art product that sometimes, but not always, embodies a claimed method nonetheless teaches that aspect of the invention."). However the legal problem with such a patent is phrased, the district court eloquently summarized the essence of the problem: "the claims of the '809 Application, if patented, would prevent doctors from practicing what is already disclosed in the prior art for patients at their ideal body weight." Appx50-51.

This Court's previous remand decision touched on this issue. The Court wrote:

> the district court [in the summary judgment decision] found that switching from 6 mg/kg of [TBW] dosing to 6 mg/kg AIBW dosing does not significantly change the dose for patients who are not significantly overweight or underweight, even though the '809 Application and other evidence show that this switch to AIBW dosing reduced adverse ocular events in Phase 1 clinical trials.

*ImmunoGen*, No. 2021-1939, 2022 WL 885774, at *4 (citations omitted). To be clear, for patients at their IBW, there is zero difference between the prior art's TBW dosing and the claimed AIBW dosing—the administered dose is exactly identical, and the claims cover those situations as well. Separately, ImmunoGen does not appeal the district court's finding that "there is insufficient information based on the current record to determine whether 6 mg/kg AIBW dosing does in

fact reduce ocular toxicity for IMGN853." Appx23; *see* Appx59 ("ImmunoGen has failed to demonstrate that the AIBW dosing regimen claimed in the '809 Application in fact reduces or eliminates ocular toxicity."). So, it is no longer proper to assume that the switch to AIBW dosing reduces adverse ocular events. As such, dosing patients whose TBW is near their IBW should also be obvious.

ImmunoGen's appeal brief simply ignores this independent problem with its claims, but it is a fatal problem.

### B. Separately, it would have been obvious to dose IMGN853 using the for-example AIBW formula

The specific choice of AIBW dosing would also have been obvious because (1) a skilled artisan would naturally have experimented with known dosing methodologies and (2) AIBW was a known dosing methodology. Given that IMGN853 had shown promise, there would be a reasonable expectation of success.

#### 1. A skilled artisan would have necessarily observed that IMGN853 causes ocular toxicity

It is undisputed that "[o]cular toxicity is a well-known adverse event in the administration of ADCs with DM4 and MMAF payloads, and has been for the last 20+ years." Appx12176 (¶ 29). The claims on appeal all require a DM4 payload, and IMGN853 has that payload. *See* Appx6574-6584; Appx12176 (¶ 32). Thus, a skilled artisan experimenting with IMGN853 would necessarily have tested, and thus observed, that IMGN853 causes ocular toxicity in humans—notwithstanding Lutz's initial promising results when using charged linkers in rabbits. It is not just the USPTO's expert who said this. *See* Appx7-8. Even Dr. Lutz, the author of the

Lutz reference, acknowledged the "unfortunate" reality that "[p]reclinical safety doesn't always . . . translate to the clinical experience." Appx13098 (ll.15-16). As a result, while Dr. Lutz of course knew that his own publication suggested that the ocular toxicity had been solved in rabbits, he testified that, nonetheless it would have been "standard practice" to test for the ocular toxicity of IMGN853 at the priority date, "because the particular payload," i.e., DM4, "had that history [of ocular toxicity] with other linkers." Appx13095-13096. The district court thus properly found that, "because IMGN853 includes the DM4 payload, a person of ordinary skill in the art would understand the potential risk of ocular toxicity and would monitor for ocular toxicity when testing IMGN853 in humans." Appx8. As the district court explained, it is not that people can never get a patent for discovering a heretofore unknown problem, it's that "ImmunoGen does not get credit for 'discovering'" this particular problem because this particular problem would have been readily discovered (or observed) "given the well-known history of the DM4 payload." Appx46.

On appeal, ImmunoGen continues to argue that the fact that it was the one to observe ocular toxicity is itself a patentable invention. Br.34-37. But the district court's reasoning stands: it would have been standard practice to test for that ocular toxicity. ImmunoGen just ran the experiments and trials that anyone seeking to bring IMGN853 to market would run, and observed toxicities that anyone doing this would observe.

ImmunoGen (Br.34-37) analogizes this case to *Forest Laboratories, LLC v. Sigmapharm Laboratories*, 918 F.3d 928 (Fed. Cir. 2019), but, as the district court

explained, *Forest* is not analogous. By way of background, Forest held a patent on a sublingual form of the known drug asenapine. *Id.* at 931-32. During development of the drug, the inventors discovered that intravenous and oral administration of asenapine resulted in severe cardiotoxic events, while sublingual administration of the drug did not. *Id.* at 935. Forest ultimately sued a number of generic drug companies for infringing its patent, and they answered that the claims would have been obvious. The district court upheld the patent, finding that Forest deserved a patent for "recognition of an unknown problem in the art in conjunction with the discovery of the solution to that problem." *Id.* at 935. Specifically, Forest found that "intravenous and oral administration of asenapine resulted in severe cardiotoxic events," and "'there was nothing in the prior art that would have indicated that the oral tablet had [cardiotoxicity] problems.'" *Id.* (quoting the *Forest* district court). On appeal, this Court found no clear error. *Id.* at 935-36.

There are three important distinctions between *Forest* and this case. *First*, as the district court explained, the prior art here taught that it was likely that IMGN853 might cause ocular toxicity so it would have been "standard practice" to test for ocular toxicity. There is no evidence of a similar teaching in *Forest*. Appx46. *Forest* itself is clear on this point. This kind of solution to a previously unknown problem is non-obvious only if "ordinary artisans . . . would not have recognized the problem." *Forest*, 918 F.3d at 935 (citations omitted). Here, as the district court found, the evidence is undisputed that an ordinary artisan seeking to bring IMGN853 to market would necessarily have recognized the ocular toxicity problem.

*Second*, as the district court explained in its analysis of long-felt but unmet need, "in *Forest* . . . the district court determined that the claimed invention actually addressed the asserted need. Here, . . . ImmunoGen has failed to show that AIBW dosing in fact reduces ocular toxicity when compared to TBW dosing." Appx61-62. ImmunoGen does not appeal the district court's finding that there is no evidence its claimed dosing methodology solved the ocular toxicity problem. *Third*, the standard of review in *Forest* favored the patentee—both because issued patents are presumed valid and because the district court had upheld the patent—whereas the standard of review hurts ImmunoGen here.

Next, ImmunoGen unfairly criticizes the district court for "conflat[ing] the obviousness of the problem with the obviousness of the solution," because the claims recite a "solution" to the problem. Br.37 (emphasis omitted). Not so. The district court decision begins by noting that observing the problem would have been obvious (Appx43; Appx45-47), and it then, separately, analyzes the obviousness of the solution (Appx43-45; Appx47-48). Also, again, the district court's unappealed finding is that there is no evidence ImmunoGen actually solved the problem at all (Appx59), so ImmunoGen should not be credited with finding a solution to the problem.

ImmunoGen argues that the district court's finding that ocular toxicity would be a real possibility is inconsistent with its finding that there was no long-felt need for a solution because the toxicity had not been observed. There is no contradiction. A skilled artisan would know to test IMGN853 for ocular toxicity

because of the art's recognition that DM4 causes ocular toxicity, but the need for a solution did not start until the toxicity was confirmed.

**2. A skilled artisan would have experimented with AIBW dosing**

"[V]arying a dose in response to the occurrence of side effects is a well-known, standard medical practice that may well lead to a finding of obviousness." *Amgen Inc. v. Sandoz Inc.*, 66 F.4th 952, 968 (Fed. Cir. 2023). The district court found that, once a skilled artisan found ocular toxicity, the artisan would experiment with ways to vary the dose that patients receive. Appx43. The district court credited Dr. Figg's testimony that this would have been standard (Appx20), and even ImmunoGen's expert admitted that "the toxicity associated with the DM4 payload 'is usually dose-related.'" Appx20 (quoting Appx13150 (ll.7-8)); *see also* Appx6006 [0264] (the Lutz reference explaining that ocular toxicity is correlated with the dose).

The district court then found that a skilled artisan would consider trying AIBW dosing as that was one of the standard tools in artisans' toolkits. Appx43. As the district court explained, AIBW dosing had been used in a whole slew of contexts: it had been used with drugs much smaller than immunoconjugates, it had been used with CD34+ cells that are thousands of times larger, it had been proposed as a means to reduce the ocular toxicity of the drug ethambutol; and a post-priority date article by Rosenblat reported that it had been used before the priority date to reduce the toxicity of a different immunoconjugate.[8] Appx19-21;

[8] The district court explained that, although Rosenblat's use of AIBW to dose a different immunoconjugate is not part of the prior art, this Court's caselaw

Appx43-45. The motivation to experiment with dosing methodologies (e.g., AIBW) was only enhanced by the fact that the prior art taught that an "administering physician can easily determine optimum . . . dosing methodologies" for IMGN853. Appx16 (quoting Appx7115 [0263]; Appx7235–7236 [166]); Appx48. ImmunoGen argues that the district court failed to "explain why a skilled artisan would have chosen AIBW dosing out of numerous possibilities," Br.39, but, as summarized above, the district court did explain its reasoning. Thoroughly.

ImmunoGen also emphasizes that there were other possible solutions (Br.39), but dose optimization is routine and certainly obvious to try. This Court's decision in *Valeant Pharmaceuticals v. Mylan Pharmaceuticals*, 955 F.3d 25 (Fed. Cir. 2020), provides useful guidance. Valeant sued Mylan for infringing a patent claiming a stable methylnaltrexone pharmaceutical preparations with a pH of "between about 3.0 and about 4.0." *Id.* at 27. Mylan argued that the claimed pH range would have been obvious to try, but the district court rejected the argument (a) because the range between 3.0 and 4.0 contains an infinite number of options and (b) because the evidence did not show that "'adjusting pH would be the first variable formulators would consider to improve stability.'" *Id.* at 30 (quoting district court opinion). On appeal, this Court reversed. It found that there were at most one hundred possibilities between 3.0 and 4.0 and "there is no requirement

instructs that "'independently made, simultaneous inventions' made 'within a comparatively short space of time' of the claimed invention can provide 'persuasive evidence that the claimed [invention] was the product only of ordinary mechanical or engineering skill.'" Appx21 n.44 (quoting *Geo. M. Martin Co. v. Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1305 (Fed. Cir. 2010) (itself quoting *Concrete Appliances Co. v. Gomery*, 269 U.S. 177, 184 (1925))).

that for a variable to be obvious to try, it must be the first variable a person of skill would alter." *Id.* at 34. ImmunoGen's list of numerous other options in this case and its insinuation that skilled artisans might change something else first should fare no better than Valeant's.

ImmunoGen next tries to dismiss AIBW as limited to other contexts (Br.41-43), but it ignores some of the district court's findings and elides over the others.

1. ImmunoGen argues that AIBW was used only with small molecules (Br.42), but it ignores the district court's finding that both Topcuoglu *et al.* and Hicks *et al.* teach using AIBW to assess how many CD34+ cells to transfer to patients—even though CD34+ cells are thousands of times larger than immunoconjugates. Appx19.

2. ImmunoGen asserts that AIBW had been used only for obese patients (Br.43). The district court noted that some literature teaches using AIBW for all patients (Appx41), and ImmunoGen has not challenged that finding. Moreover, because ImmunoGen's claims read on obese patients, where AIBW dosing is standard, they are unpatentable even assuming "they also read on nonobvious subject matter." *Cuozzo*, 793 F.3d at 1281 (citations omitted).

ImmunoGen similarly points to a 2012 ASCO panel recommending against AIBW dosing but does not address the district court's reasons for finding this unpersuasive. Both parties' experts agreed that the ASCO recommendation would not stop skilled artisans from using AIBW. Appx49. Correspondingly, both before and after the 2012 ASCO panel, the FDA-approved label for Busulfex required

AIBW dosing for obese patients—the FDA did not “change its requirement” based on the ASCO panel’s recommendation. Appx49. Also, the ASCO panel “only recommended TBW for chemotherapy drugs, and IMGN853 is not a chemotherapy drug.” Appx49.

3. ImmunoGen tries to write off the numerous references applying AIBW dosing in smaller drugs, Rosenblat’s use of AIBW dosing with a radioimmunoconjugate, and Alffenaar’s initial proposal to use AIBW to reduce ocular toxicity as all being somehow distinguishable from the claimed use of AIBW. But Occam’s Razor supports the district court’s decision to credit Dr. Figg that all these varied uses and proposed uses confirm that AIBW was just a standard dosing methodology. *See* Appx41-45.

#### 3. The choice of a specific AIBW formula would have been obvious

As the district court found, “ImmunoGen’s expert Dr. Tolcher testified that ‘the discovery’ claimed in the ’809 Application ‘is not the [AIBW] formula.’” Appx18 (quoting Appx13163 (ll.10-13)) (alterations in original). Now, however, ImmunoGen argues that it should be entitled to a patent because of the choice of the “specific AIBW formula in the ’809 application” from among the various AIBW choices. Br.44. In support, ImmunoGen cites Dr. Figg’s statement that “it would not have been obvious which of the IBW calculations you should use that are out in the prior art” (Br.45; Appx13579), but ImmunoGen ignores Dr. Figg’s further explanation that it would be obvious to experiment with the varying formulas (Appx13604 (ll.9-10)). In other words, it would be obvious to try.

ImmunoGen also argues that the specific correction factor of 0.4 cannot be obvious (Br.44), but, as the district court explained, this was a "standard correction factor," so it would be at least obvious to try (Appx44). ImmunoGen asserts that if 0.4 is a standard correction factor, then the claims cannot be indefinite (Br.45), but that does not follow. 0.4 is a standard correction factor, but the Definitions section of the specification makes clear that the claimed AIBW dosing covers other correction factors and other IBW formulas.

### 4. The choice of 6 mg/kg AIBW would have been obvious

"The reasonable expectation of success requirement for obviousness does not necessitate an absolute certainty for success." *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1198 (Fed. Cir. 2014). As the district court correctly found, a skilled artisan looking to test AIBW dosing would experiment with doses of around 6 mg/kg because Lutz discloses doses of around 6 mg/kg based on TBW, and the 2013 ASCO Abstract studied doses of 5 mg/kg TBW. Appx44; Appx47.

On appeal, ImmunoGen argues that there "there could have been **no** dose—never mind 6 mg/kg AIBW—that actually solved the toxicity problem," citing Dr. Figg's testimony that a skilled artisan would need to conduct clinical trials. Br.47. According to ImmunoGen, "[i]t cannot be routine experimentation to find the right dose when, a lot of the time for a lot of drugs, no acceptable dose is ever found." Br.48; *see* Br.51 (the claims "cover[] a very specific dose of IMGN853 that solves a very specific, previously unknown problem"). Again, ImmunoGen runs headlong into the unchallenged district court finding that there is no evidence that the claimed dosing method "actually solved the toxicity problem." Appx59.

Regardless, while ImmunoGen is right that there was no absolute certainty of success for the claimed method, that is not required. This Court's decision in *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007), is illustrative. Pfizer asserted its patent on amlodipine besylate tablets. The active ingredient, amlodipine, was taught in the prior art, and the question was whether it would have been obvious to use the besylate salt. The district court ruled that the salt would not have been obvious because "there was no reliable way to predict the influence of a particular salt species on the active part of the compound." *Id.* at 1364. This Court accepted the district court's factual finding as true, but it still reversed because the district court was improperly "equating unpredictability to patentability." *Id.* Likewise, in *Bayer*, this Court found that a drug composition would have been obvious because, even though there was uncertainty regarding whether the claimed formulation would work, it would have been considered a "viable option." *Bayer Schering Pharma AG v. Barr Labs Inc.*, 575 F.3d 1341, 1348 (Fed. Cir. 2009). Here, too, a 6 mg/kg AIBW dose would have been considered viable, and that is all that is required to show obviousness. ImmunoGen should not be permitted to equate unpredictability with patentability.

Moreover, were ImmunoGen right that "[i]t cannot be routine experimentation to find the right dose when, a lot of the time for a lot of drugs, no acceptable dose is ever found," Br.48, then any dose of any prior art drug would be non-obvious. Appx54. That is not the law. As this Court has repeatedly ruled, "varying a dose in response to the occurrence of side effects" is obvious. *Amgen*, 66 F.4th 968 (citing *Genentech, Inc. v. Sandoz Inc.*, 55 F.4th 1368, 1376-77 (Fed.

Cir. 2022)). For example, in *Boehringer*, this Court found that the specific linagliptin dose claimed there would have been found "through routine experimentation." *Boehringer Ingelheim Pharms. Inc. v. Mylan Pharms., Inc.*, 803 F. App'x 397, 402 (Fed. Cir. 2020) (analyzed by the district court at Appx48 n.84). ImmunoGen argues that *Boehringer* is inapposite because the idea of using AIBW dosing in the specific context of immunoconjugates that are not radioimmunoconjugates was not taught anywhere. Br.48. As shown above, though, the fact that AIBW had not yet been used under these exact circumstances does not render the dosing non-obvious.

ImmunoGen's reliance on *Teva Pharmaceuticals USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377 (Fed. Cir. 2021), is equally misplaced. In *Corcept*, this Court affirmed a Board decision that found that Teva had failed to show that the claimed mifepristone dose would have been obvious, but the facts in *Corcept* are meaningfully different from those here. Mifepristone's initial label "warned against using mifepristone 'with strong CYP3A inhibitors' and limited the 'mifepristone dose to 300 mg per day when used with strong CYP3A inhibitors.'" *Id.* at 1379. Corcept then conducted trials that showed that mifepristone could be dosed at 600 mg per day even with strong CYP3A inhibitors, and this Court upheld the claims to that dose. *Id.* at 1380. There are two important differences between *Corcept* and this case. *First*, there was an explicit warning against the claimed mifepristone dose, which is absent here. *Second*, the *Corcept* court reviewed a finding of non-obviousness, whereas this Court is reviewing a finding of obviousness. The deference on factual findings matters.

Relying on *Cyclobenzaprine*, ImmunoGen argues that its claims cannot be obvious because "there was no data from which to optimize any parameter related to the ocular toxicity and efficacy of IMGN853 before the priority date." Br.53 (citing *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063 (Fed. Cir. 2012)). ImmunoGen overreads *Cyclobenzaprine*. As this Court has since explained, *Cyclobenzaprine* does not create a "rigid rule categorically precluding obviousness findings without pk/pd data." *See In re Copaxone Consol. Cases*, 906 F.3d 1013, 1028 (Fed. Cir. 2018). To the contrary, where "expert and other evidence indicates that a person of skill in the present context **can** draw reasonable inferences about the likelihood of success," the claims will be obvious "even without a perfectly designed clinical trial." *Acorda Therapeutics, Inc. v. Roxane Lab'ys, Inc.*, 903 F.3d 1310, 1334 (Fed. Cir. 2018) (distinguishing *Cylobenzaprine*). Those are our facts. To the extent that cases like *Corcept* and *Cyclobenzaprine* are read as establishing broader requirements for predictability, they are inconsistent with *KSR*. *See infra* at p. 52.

The obviousness is especially clear here because, as the district court explained, the recited dose of 6 mg/kg AIBW is a natural starting point given Lutz's focus on dosing IMGN853 at around 6 mg/kg TBW. Appx53. ImmunoGen argues that TBW "is fundamentally different than AIBW" analogizing to the difference between "two teaspoons . . . per pound" and "two teaspoons . . . per kilogram" (Br.49), but that is a facile analogy. AIBW is a way to correct a person's TBW to account for the difference between their TBW and their IBW. As noted above, at p.15, for patients at their IBW, there is no difference at all, and for

patients near their IBW, the difference is small. That both doses use 6 mg/kg is more than mere coincidence; it reflects the fact that AIBW is a correction to TBW based on how different a patient's actual weight is from their IBW.

ImmunoGen also claims that the district court "repeatedly look[ed] to ImmunoGen's own experiments to find the exact dose obvious." Br.46. Not so. The district court merely noted that ImmunoGen itself just tested the most natural doses. Put differently, while ImmunoGen is correct that the "'inventor's own path'" cannot lead to a conclusion of obviousness (Br.46 (quoting *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012))), the inventor's own path may still be the obvious path.

Finally, ImmunoGen argues that "Lutz '282 taught a dose that would not work. It strains credulity to suggest that the very dose that failed demonstrates that the dose that worked is obvious." Br.50. There are three problems with this argument. *First*, ImmunoGen again assumes that the claimed dose had less toxicity than the 6 mg/kg TBW dose of Lutz did. And again we note the district court's unappealed finding that "ImmunoGen has failed to demonstrate that the AIBW dosing regimen claimed in the '809 Application in fact reduces or eliminates ocular toxicity." Appx59. *Second*, it is too simplistic to say that the Lutz "dose . . . failed." Lutz's dose had ocular toxicity when administered to humans, but it showed promise. *Third*, even if Lutz's dosing strategy exhibits levels of ocular toxicity that would not pass FDA muster, Lutz's disclosure still supports a finding of obviousness. *See In re Antor Media Corp.*, 689 F.3d 1282, 1292 (Fed. Cir. 2012)

(holding that a "not enabling" reference "can still qualify as prior art in determining obviousness.").

**5. ImmunoGen does not appeal the district court's finding that its evidence of secondary considerations is not probative**

The district court extensively analyzed ImmunoGen's claims of secondary considerations and found that they do not support a finding of non-obviousness. Appx55-65. ImmunoGen has not appealed the district court's findings on that score. As such, ImmunoGen is conceding that "there is insufficient information based on the current record to determine whether 6 mg/kg AIBW dosing does in fact reduce ocular toxicity for IMGN853" relative to the prior art TBW dosing. Appx23; *see* Appx59.

To be sure, ImmunoGen's brief contains vestigial statements, particularly in the opening sections, that suggest that ImmunoGen once intended to challenge the district court's findings of no meaningful secondary considerations. *See, e.g.*, Br.1 ("[P]recisely 6 milligrams of IMGN853 per kilogram of the patient's AIBW limited the severity of ocular side effects while also being therapeutically effective. . . ."); Br.3 (The claimed dosing "solve[d] a previously unknown problem with IMGN853, namely ocular toxicity in humans."); Br.3 (there were "strong objective indicia that AIBW dosing for IMGN853 was nonobviousness [*sic*]"); Br.10, Br.16-17. But those isolated statements do not add up to an argument. If ImmunoGen wanted to challenge the district court's findings on secondary considerations, it needed to do so head on. It did not, and so the district court's findings remain.

### C. The bulk of ImmunoGen's arguments are inconsistent with *KSR*

ImmunoGen devotes a whole section of its brief to the point that "the field is unpredictable" so a skilled artisan would not know what to expect. Br.50-55. For the reasons explained above, this argument fails under this Court's binding caselaw.

If this Court's caselaw is read as favoring ImmunoGen, though, the cases are inconsistent with Supreme Court precedent. *KSR* held that an invention that is "obvious to try" can be obvious if "there are a finite number of identified, predictable solutions." 550 U.S. at 421. As Christopher A. Cotropia has explained, this means that an invention is obvious if "the inventor used the prior art in a predictable manner to create the invention"—even if the result is not predictable. *Predictability and Nonobviousness in Patent Law After* KSR, 20 MICH. TELECOMM. & TECH. L. REV. 391, 391 (2014); *see id.* at 402-06. So, here, if it would have been natural for an inventor to use AIBW dosing for IMGN853, the claims of the '809 application should be found obvious even if the result of that predictable trial would have been uncertain.

Since *KSR*, several decisions from this Court appear to treat this "predictability" requirement as a rigid rule requiring that the result be predictable. *See* U.S. Amicus Br., *Samsung Elecs. Co. v. Apple, Inc.*, No. 16-1102 at 16-17 (U.S. Oct. 4, 2017) (citing cases). In particular, this Court routinely cites the unpredictability of the pharmaceutical arts as a basis for upholding follow-on pharmaceutical patents. *See ImmunoGen*, No. 21-1939, 2022 WL 885774, at *4; *Corcept*, 18 F.4th at 1381; *HZNP Medicines LLC v. Actavis Lab'ys UT, Inc.*, 940

F.3d 680, 704 (Fed. Cir. 2019); *Alcon Rsch., Ltd. v. Apotex Inc.*, 687 F.3d 1362, 1370 (Fed. Cir. 2012); *Cyclobenzaprine*, 676 F.3d at 1070; *Novartis Pharm. v. West-Ward Pharm.*, 923 F.3d 1051, 1060-62 (Fed. Cir. 2019).

This case illustrates the problem with such an approach. It should be enough to find that a skilled artisan in ImmunoGen's shoes—having received a patent on IMGN853 and methods of using it to treat certain cancers—would experiment to find a workable dose so it could obtain FDA approval and monetize IMGN853. And, once so motivated, the skilled artisan would naturally experiment with various dosing methodologies including AIBW. The idea of trying AIBW dosing is, therefore, not an "invention[] which would not be disclosed or devised but for the inducement of a patent." *Graham v. John Deere Co.*, 383 U.S. 1, 11 (1966). ImmunoGen should not be able to use "[u]npredictability" as talisman for getting a patent. Otherwise, drug companies may be able to get patent protection on any follow-on pharmaceutical development no matter how obvious to try—because the results of pharmaceutical experiments are nearly always somewhat unpredictable.

## IV. The claims are unpatentable for obviousness-type double patenting

Both parties agree that if the claims are obvious, they are also unpatentable for obviousness-type double patenting. *See* Br.2 n.1.

## CONCLUSION

The district court properly found that the claims of the '809 application are indefinite, would have been obvious, and are unpatentable for obviousness-type double patenting. Its judgment should be affirmed.

Dated: September 22, 2023

Respectfully,

*/s/ Daniel Kazhdan*

Thomas W. Krause
*Solicitor*

Daniel Kazhdan
Mary L. Kelly
*Associate Solicitors*
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035

Jessica D. Aber
*United States Attorney*

Matthew J. Mezger
*Assistant U.S. Attorney*
2100 Jamieson Avenue
Alexandria, Virginia 22314

*Attorneys for the Director of the United States Patent and Trademark Office*

## CERTIFICATE OF COMPLIANCE

I certify pursuant to Federal Rule of Appellate Procedure 32(a)(7) that the foregoing BRIEF FOR APPELLEE—DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE complies with the type volume limitation. The total number of words in the foregoing brief, excluding the items listed in Federal Rule of Appellate Procedure 32(f) and Federal Circuit Local Rule 32(b)(2) is 13,746 as measured by the word-processing software used to prepare this brief.

Dated: September 22, 2023

Respectfully,

/s/ *Daniel Kazhdan*
Daniel Kazhdan
Associate Solicitor
Office of the Solicitor
U.S. Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313
(571) 272-9035