**2023-1762**

---

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

**IMMUNOGEN, INC.,**

**Plaintiff-Appellant**

**v.**

**KATHERINE K. VIDAL, UNDER SECRETARY OF COMMERCE FOR INTELLECTUAL PROPERTY AND DIRECTOR OF THE UNITED STATES PATENT AND TRADEMARK OFFICE,**

**Defendant-Appellee**

**Appeal from the United States District Court for the Eastern District of Virginia in Civ. No. 1:20-cv-00274 (Hon. T.S. Ellis, III, U.S. District Judge)**

---

# APPELLANT'S REPLY BRIEF

---

Michael E. Joffre
Anna G. Phillips
Eric K. Steffe
**STERNE KESSLER GOLDSTEIN & FOX PLLC**
1101 K Street, N.W.
10th Floor
Washington, DC 20005
202.371.2600
*Counsel for Appellant ImmunoGen, Inc.*

Dated: October 27, 2023

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 23-1762

**Short Case Caption** ImmunoGen, Inc. v. Katherine Vidal

**Filing Party/Entity** ImmunoGen, Inc.

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 10/27/2023

Signature: /s/ Michael E. Joffre

Name: Michael E. Joffre

FORM 9. Certificate of Interest

Form 9 (p. 2)
March 2023

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| ImmunoGen, Inc. | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☑ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☐ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| J.C. Rozendaal<br>STERNE, KESSLER, GOLDSTEIN & FOX, PLLC | Ryan Elizabeth Conkin<br>STERNE, KESSLER, GOLDSTEIN & FOX, PLLC | |
| Craig Reilly<br>Law Office of Craig C. Reilly | | |
| Alexander Vincent Alfano<br>STERNE, KESSLER, GOLDSTEIN & FOX, PLLC | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☑ Yes (file separate notice; see below) ☐ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases**. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

I. THE CLAIMS OF THE ’809 APPLICATION ARE NOT INDEFINITE. ....3

A. The district court improperly required the claims to define the term AIBW. ....................................................................................................3

B. The claims and specification describe a specific dosing regimen for a specific ADC—with a single formula for AIBW that would work. .....5

C. The district court rejected this Court’s mandate and misinterpreted the prosecution history. ...........................................................................10

D. If any indefiniteness issue remains, the Court should remand the case for amendment...........................................................................13

II. THE CLAIMS OF THE ’809 APPLICATION ARE NOT OBVIOUS........14

A. The prior art does not teach the claimed dose....................................15

B. The Office doubles down on its incorrect position that “experimentation” would have led to the claimed dose......................20

C. There must a reasonable expectation in meeting the limitations of the claimed invention. ..........................................................................25

CONCLUSION ....................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bayer Schering Pharma AG v. Barr Laboratories Inc.*,
575 F.3d 1341 (Fed. Cir. 2009) ....................................................................28

*Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*,
752 F.3d 967 (Fed. Cir. 2014) ....................................................................20

*Burlington Industries, Inc. v. Quigg*,
822 F.2d 1581 (Fed. Cir. 1987) ..........................................................13, 14

*CardSoft, LLC v. Verifone, Inc.*,
807 F.3d 1346 (Fed. Cir. 2015) ....................................................................10

*In re Clark*,
809 F. App'x 787 (Fed. Cir. 2020) ...............................................................11

*Cochlear Bone Anchored Solutions AB v. Oticon Medical AB*,
958 F.3d 1348 (Fed. Cir. 2020) ......................................................................9

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*,
676 F.3d 1063 (Fed. Cir. 2012) ....................................................................28

*Forest Lab'ys, LLC v. Sigmapharm Lab'ys*,
918 F.3d 928 (Fed. Cir. 2019) ....................................................................21

*Freeman v. Pitts*,
503 U.S. 467 (1992)......................................................................................13

*Grunenthal GMBH v. Alkem Lab'ys Ltd.*,
919 F.3d 1333 (Fed. Cir. 2019) ..................................................22, 26, 27

*ImmunoGen Inc. v. Vidal*,
No. 21-1939, Dkt. 53-1 (Fed. Cir. July 11, 2022) ........................................19

*Immunogen, Inc., v. Hirshfeld*,
2022 WL 885774 ..................................................................................*passim*

*Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*,
821 F.3d 1359 (Fed. Cir. 2016) ....................................................25, 26

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007)....................................................................15, 20

*In re Kubin*,
561 F.3d 1351 (Fed. Cir. 2009) ....................................................*passim*

*Nature Stimulation Sys. Inc. v. Autodesk, Inc.*,
50 F.4th 1358 (Fed. Cir. 2002) .........................................................3

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
572 U.S. 898 (2014)..........................................................................5

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) .......................................................16

*In re Oelrich*,
666 F.2d 578 (C.C.P.A. 1981).....................................................17, 18

*PAR Pharm., Inc. v. TWI Pharms., Inc.*,
773 F.3d 1186 (Fed. Cir. 2014) .......................................................17

*Parker v. Flook*,
437 U.S. 584 (1978).....................................................................2, 24

*Pfizer, Inc. v. Apotex, Inc.*,
480 F.3d 1348 (Fed. Cir. 2007) .......................................................27

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) .................................4, 5, 12

*Reading & Bates Const. Co. v. Baker Energy Res. Corp.*,
748 F.2d 645 (Fed. Cir. 1984) .........................................................25

*Rolls-Royce, PLC v. United Techs. Corp.*,
603 F.3d 1325 (Fed. Cir. 2010) .......................................................20

*Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*,
948 F.3d 1342 (Fed. Cir. 2020) .........................................................9

*Sonix Tech. Co., v. Publ'ns Int'l*,
844 F.3d 1370 (Fed. Cir. 2017) ....................8

*In re Spormann*,
363 F.2d 444 (C.C.P.A. 1966) ....................18

*Tempo Lighting, Inc. v. Tivoli, LLC*,
742 F.3d 973 (Fed. Cir. 2014) ....................11, 12

*Teva Pharmaceuticals USA, Inc. v. Corcept Therapeutics, Inc.*,
18 F.4th 1377 (Fed. Cir. 2021) ....................28

*Texas Digital Systems, Inc. v. Telegenix, Inc.*,
308 F.3d 1193 (Fed. Cir. 2002) ....................4

*VirnetX Inc. v. Mangrove Partners Master Fund, Ltd.*,
778 F. App'x 897 (Fed. Cir. 2019) ....................11, 12

**Statutes**

35 U.S.C. § 145 ....................12, 13

## INTRODUCTION

Rather than grapple with the district court's decision, the Office instead runs away; it runs from the patent application's language, this Court's prior decision, the opinions of the experts, and the district court's own statements. But it cannot run from unconverted evidence.

As to indefiniteness, the experts all agree that the correct formula for dosing using AIBW is drug- and application-specific and can only be determined using clinical data. Appx13546 (100:11–14) (Figg). There is only one formula disclosed in the '809 application and only one formula that works to treat patients with IMGN853—by attacking cancer cells while reducing the chance of severe ocular toxicity—the one provided in Example 4. Appx13347 (118:3–7) (Shah). No one was confused over that fact, including the examiner, expert, and the Board during prosecution. Appx6631; Appx6232–6236; Appx6837. The district court only came to the opposite conclusion by erroneously requiring that the claims themselves define AIBW and by declining to consider evidence that this Court ordered should be considered.

As to obviousness, the Office's own expert agreed that it would not have been obvious to dose using the '809 application's formula for IBW—and thus the formula for AIBW in which it is incorporated. Appx13579 (133:2–17) (Figg) ("Q. In your opinion, as of the priority date, it would not have been obvious which

of the IBW calculations you should use that are out in the prior art. Right? A. Correct."). But the Office argues this is irrelevant because the "discovery claimed in the '809 [a]pplication is not the AIBW formula," i.e., ImmunoGen had not originally created the formula for AIBW. Office Br. 45 (cleaned up). It is worth pausing to appreciate how astonishing this is. The necessary implication of the argument made by the Director of the U.S. Patent & Trademark Office is that all formulas found in the prior art are automatically obvious to try in every potential application. *Contra Parker v. Flook*, 437 U.S. 584, 594 (1978) ("Even though a…mathematical formula may be well known, an inventive application of the principle may be patented.").

Indeed, the Office's (and district court's) entire obviousness analysis is based on its repeated assertion that experimentation would have led to the discovery of the problem (at 38), the use of AIBW to dose to solve that problem (at 42), the precise AIBW formula in the '809 application (at 45), and the precise dose of 6 mg/kg AIBW in the claims (at 49). This is the quintessential example of an erroneous application of the obvious-to-try analysis. *See In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009) ("where a defendant merely throws metaphorical darts at a board filled with combinatorial prior art possibilities, courts should not succumb to hindsight claims of obviousness"). This Court should reverse to correct the Office's and the district court's misunderstanding of the law.

# ARGUMENT

## I. THE CLAIMS OF THE '809 APPLICATION ARE NOT INDEFINITE.

### A. The district court improperly required the claims to define the term AIBW.

The Office argues (at 24) that the district court did not require the claims to define AIBW, but instead "[a]ll the district court did was *begin* with the language of the claims." (emphasis original). That is false: the district court began and *ended* with its belief that the claims must define the term. Specifically, the district court started from the premise that "*not one* of the claims in the '809 [a]pplication define AIBW... *Thus, based on the claims* of the '809 [a]pplication, a [skilled artisan] would not be reasonably certain of the metes and bounds of the claimed AIBW dosing regimen." Appx29 (initial emphasis original); Appx12. This was legal error. *See Nature Stimulation Sys. Inc. v. Autodesk, Inc.*, 50 F.4th 1358, 1364 (Fed. Cir. 2002) (for indefiniteness, it is improper to focus on the "[c]laim language, standing alone").[1]

The remainder of the court's analysis was devoted to explaining why that legally incorrect position was not overcome by the mountain of evidence to the contrary—including evidence that this Court directed it to consider but the district

[1] Despite ImmunoGen (at 20–21) explaining that *Nature Stimulation* is controlling, the Office ignores it, instead choosing to run away from what the district court actually said. *See* Office Br. 23–24.

court explicitly chose to ignore, *see infra* § I.C. For example, having started with the proposition that the claims must define the term, the district court noted that the definition in the specification does not "*eliminate* the uncertainty about the scope of the claimed dosing method." Appx30; Appx33 ("*otherwise indefinite* claims of the '809 [a]pplication should not be limited" by the specification) (emphasis added).

This error is akin to the flawed methodology in *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002), that this Court rejected in *Phillips v. AWH Corp.*, 415 F.3d 1303, 1319 (Fed. Cir. 2005) (en banc). Under *Texas Digital*, a court construed a claim term by giving the term the full scope of its dictionary definition and then consulted the specification and prosecution history "to determine if the patentee has used 'the words [of the claim] in a manner clearly inconsistent with the ordinary meaning.'" *Id*. The *Phillips* court rejected this methodology because it divorced claim terms from "the context of the patent." *Id.* at 1321. Instead, this Court held that "the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* The district court's methodology here falls into the same trap. The district court required that the claims define the term AIBW, held that it was presumptively indefinite, and then went to the specification and prosecution history to determine if the patentee

cured that indefiniteness. It did not consider the term as a skilled artisan would "after reading the entire patent." *Id.*

And the district court's own words explained that this was the precise course it took. Specifically, the district court ended where it started, stating "[i]n conclusion, the '809 [a]pplication is fatally indefinite *because* it fails to define AIBW or IBW anywhere in its claims." Appx35 (emphasis added). The Office does not and cannot defend the district court's erroneous assertions. That warrants reversal.

### B. The claims and specification describe a specific dosing regimen for a specific ADC—with a single formula for AIBW that would work.

As this Court previously held, "the claims and specification are drawn to a specific dosing regimen for a specific" ADC, IMGN853. *Immunogen, Inc., v. Hirshfeld*, 2022 WL 885774, at *3. That "is significant" because the experts uniformly agree that the correction factor used to calculate AIBW is drug and application specific. *Id.*; Appx13545 (99:10–12) (Figg).[2]

---

[2] This Court held that the appropriate standard in this case is that "a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Hirshfeld*, 2022 WL 885774 at *2 n.3, *quoting Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014). While the Office emphasizes (at 22) that the analysis is done under the broadest reasonable interpretation, it is unclear why this matters since the experts

That was true when this Court made that statement in its prior decision, and it remains true after trial. The evidence is uniform in that regard. The correction factor used in the AIBW formula varies between drugs "because that correction factor is based upon the ability of the drug to be distributed in a person's body fat." Appx13546 (100:11–14) (Figg). That ability to distribute in fat—and its related efficacy for a given application—is only determined experimentally. Appx13547 (101:4–14) (Figg); Appx13550 (104:12–14) (Figg). And, for the purpose of treating ovarian and peritoneal cancer, the '809 application discloses exactly one formula to calculate a patient's AIBW to obtain the appropriate dose of IMGN853. *See* Appx544–545, Appx579–580; Appx6749–6830; *see also* Appx13545 (99:10–12) (Figg). The AIBW formula is thus drug *and* application specific. *See Hirshfeld*, 2022 WL 885774, at *3.

The district court and Office's assertions to the contrary rely on omitting the second part of that undisputed fact. Namely, the court and Office assert that the AIBW formula is not drug specific. The district court noted that "some drugs have more than one reported correction factor in the literature." Appx30–31; Appx14. But the failure here is that, for IMGN853 and for the purposes of the treating ovarian and peritoneal cancer—as required by the claims—a person of skill would

all agree that there is only one formula for a given drug and application. Thus, there is only one reasonable interpretation of the claims.

understand there is only one AIBW formula: the one in the ’809 application. Indeed, there is no evidence that any other correction factor could be used with IMGN853. The following colloquy is informative. The district court attempted to elicit testimony from Dr. Figg to support the Office’s current argument here:

> Q. Okay. You would agree with me, though, that correction factors can vary between different drugs. Right?
> A. We’ve shown that. Yes.
> THE COURT: And indeed, there were different correction factors for this drug in other contexts?
> THE WITNESS: No, I don’t want to agree with that, sir. There were different correction factors for the same drugs. But for [IMGN]853, it has only been .4 that’s been used….

Appx13545–13546 (99:25–100:8) (Figg).

Thus, all the experts know exactly which AIBW formula ought to be used. Dr. Figg’s sole assertion as to why he “remained ‘confused over how to calculate’ AIBW” was “because the claims do not provide a definition” for AIBW—the same legal error made by the district court. Appx29; *see also* Appx13543 (97:8–11) (Figg) (“Q….Have you ever seen any AIBW dosing of IMGN853 that did not use the AIBW formula that is in the ’809 application? A. That is true. It is—all the protocols I’ve seen use the Example … from the ’809 patent [application].”).

The district court’s and Office’s only other argument (at 32) that a skilled artisan would not understand the AIBW formula in the claims to be the only one in the specification is that—in originally introducing the term AIBW—the ’809 application uses “for example” before providing the precise formula that would be

later used in Example 4 to treat ovarian and peritoneal cancer. *See* Office Br. 25; Appx29. But the use of those two words in initially describing AIBW do not trump what a skilled artisan would understand. *See Sonix Tech. Co., v. Publ'ns Int'l*, 844 F.3d 1370, 1379 (Fed. Cir. 2017).

The district court made clear that it—erroneously—thought otherwise in eliciting testimony on the issue from Dr. Figg:

> Q. So you're allowed to go to other places [in the application] in order to figure out what a certain word means?
> THE COURT: It isn't a certain word. It says, "for example." Do you have to be a pharmacologist or a Ph.D. to figure out what "for example" means?
> THE WITNESS: No.
> THE COURT: I didn't think so. Next question.

Appx13544 (98:10–18) (Figg).

The Office attempts (at 26–27) to support this error, suggesting that the phrase "for example" should be given weight because AIBW formulas, other than the one in the '809 application, might also work to treat ovarian and peritoneal cancer while minimizing ocular toxicity. There is certainly no evidence to back up this conjecture. On the contrary, as Dr. Shah testified, he had "no reason to believe" any other would work. Appx13347 (118:3–7) (Shah). And as the inventor, Dr. Ponte, noted "this is the formula that we used [for AIBW] that was the only one that worked." Appx13047 (62:10–15) (Ponte); *contra* Appx32 (district court's assertion without citation that "there are other potential correction factors claimed

by the ’809 [a]pplication”). That is because the AIBW formula that works can only be determined from human testing data. Appx13550 (104:12–14) (Figg). And the Office concedes (at 27) that “other formulas were not tested.”

Moreover, it is relevant that the district court itself knew exactly what AIBW meant in the context of the claims when conducting an obviousness analysis. Appx38. Citing *Cochlear Bone Anchored Solutions AB v. Oticon Medical AB*, 958 F.3d 1348 (Fed. Cir. 2020), the Office argues (at 34 n.7) that the district court was allowed to find a claim both indefinite and obvious. To be sure, sometimes this is true, as in *Cochlear*, where the claim was written in the disjunctive (using the phrase “and/or”), meaning that each of the three possibilities listed in the claim could be compared to the prior art. *See Cochlear* at 1359–60. But here there is only the formula for AIBW listed in the specification that can be used to dose IMGN853 to treat ovarian and peritoneal cancer. There is no other formula that meets the requirements of the claims; there is no disjunctive claiming. And it is that one-and-only formula that the district court used to find the claims obvious, which strongly suggests that the court *could* “ascertain the scope of a claim with reasonable certainty for purposes of assessing patentability.” *Samsung Elecs. Am., Inc. v. Prisua Eng’g Corp.*, 948 F.3d 1342, 1353 (Fed. Cir. 2020).

In sum, the specification makes clear which formula applies in the claims.

### C. The district court rejected this Court's mandate and misinterpreted the prosecution history.

As ImmunoGen argued in its opening brief (at 28–31), during prosecution, "neither the examiner nor the Board rejected the claims of the '809 [a]pplication for indefiniteness." *Hirshfeld*, 2022 WL 885774, at *2. This Court held that this is "intrinsic evidence a skilled artisan would consider in determining the scope of the claims" and "remand[ed] for proceedings consistent with this opinion." *Id.* at *3–*4. The district court, however, ignored the law of the case and expressly declined to consider that evidence. Appx34 ("ImmunoGen points to the fact that neither the patent examiner nor the PTAB ever raised an indefiniteness rejection," which "indicates that a skilled artisan would understand which AIBW formula to use." "This argument is plainly foreclosed by Federal Circuit caselaw…"). The Office does not defend this violation of law of the case, despite ImmunoGen's extensive arguments explaining why it was error. The Office therefore has abandoned any argument to the contrary. *See CardSoft, LLC v. Verifone, Inc.*, 807 F.3d 1346, 1353 (Fed. Cir. 2015) ("By failing to respond to [appellant] VeriFone's argument in the briefing, … [appellee] CardSoft has waived this argument."). This demands reversal.

The Office also asserts (at 31) that the district court correctly viewed the prosecution history by concluding that the examiner assumed the only AIBW formula in the specification was "included" in the claims but was not the same as

the AIBW recited in the claims. But the Office ignores the district court's reasoning *behind* that assertion. Namely, the district court believed that the examiner came to that understanding because he "merely applied the Example 4 AIBW formula in proposing a hypothetical." Appx34. This was no "hypothetical." Rather, the examiner used the Example 4 formula to reject the claims as anticipated. Appx6631. But for equating the AIBW formula in Example 4 with the AIBW recited in the claims, the examiner could not have made the rejection. *See id.* This demonstrates that the district court did not understand the import of the prosecution history, which is presumably why the Office does not actually defend the district court's analysis and merely trumpets its conclusion.

Finally, the Office argues (at 32) that—despite ImmunoGen putting the public on notice at trial that its patent claims are limited to a specific formula for AIBW—the claims are still indefinite. The Office argues that this result is compelled by *In re Clark*, 809 F. App'x 787 (Fed. Cir. 2020), and *Tempo Lighting, Inc. v. Tivoli, LLC*, 742 F.3d 973, 978 (Fed. Cir. 2014), which hold that the Office "is under no obligation to accept a claim construction proffered as a prosecution history disclaimer." This argument overreads these cases, as this Court has held in *VirnetX Inc. v. Mangrove Partners Master Fund, Ltd.*, 778 F. App'x 897, 909 (Fed. Cir. 2019).

In *VirnetX*, the Board ignored statements made by the patentee during reexamination, holding that *Tempo* required that patentees do not get the benefit of prosecution history disclaimer. *See id.* at 910. This Court disagreed, noting that the "meaning of a claim term does not change depending on the party that argues prosecution disclaimer." *Id.* Specifically, this Court held that *Tempo* meant only that the *Office* need not accept a claim construction. *See id.*[3] This makes sense during prosecution because the Office can always demand that the applicant amend the claims to eliminate any claim construction ambiguities. And, here too, the Office is not bound by ImmunoGen's clear disclaimers that the patent claims are limited to the AIBW formula of the specification; indeed, it was allowed to litigate indefiniteness for the first time in the § 145 action. But the district court should not have ignored ImmunoGen's public disclaimers. *See Phillips*, 415 F.3d at 1317 ("the prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be"). And that is particularly so since ImmunoGen cannot amend its claims during the trial.

[3] The Office's criticism (at 32) that ImmunoGen cited cases involving issued patents is a non sequitur. For both cases involving issued patents and § 145 actions, the district court can accept the applicant's disclaimer.

### D. If any indefiniteness issue remains, the Court should remand the case for amendment.

The Office argues that—while it only sprung an indefiniteness rejection on ImmunoGen at trial—this Court is barred from remanding the application to the Office to amend the claims to fix the indefiniteness problem. Specifically, the Office argues (at 33) that 35 U.S.C. § 145 dictates this result because it allows the district court to decide only whether "the claims involved in the decision of the Patent Trial and Appeal Board" are allowable. The statute contains no such limitation. Of course, § 145 provides that the district court may instruct that ImmunoGen is entitled to a patent. But that statute does not strip the district court (or this Court) of its "inherent capacity to adjust remedies in a feasible and practical way." *Freeman v. Pitts*, 503 U.S. 467, 468 (1992). The practical and feasible remedy would be to instruct the district court to remand the application to the Office to allow ImmunoGen to expressly recite the patented AIBW formula in the claims.

Finally, the Office's argument that amendment is not available is particularly unreasonable in light of the Office's frequent assertions (at 22, 28) that the claims ought to be given their broadest reasonable interpretation in assessing indefiniteness in § 145 actions. The only case from this Court that the Office cites (at 22) in support of the latter proposition is *Burlington Industries, Inc. v. Quigg*, 822 F.2d 1581 (Fed. Cir. 1987). But *Burlington* reasons that "[p]atent application

claims are given their broadest reasonable interpretation during examination proceedings, for the simple reason that before a patent is granted *the claims are readily amended* as part of the examination process." *Id.* at 1583 (emphasis added). This Court should reject the Office's attempt to have its cake and eat it too.

## II. THE CLAIMS OF THE '809 APPLICATION ARE NOT OBVIOUS.

Post-*KSR*, this Court has held that there are "two classes of situations where 'obvious to try' is erroneously equated with obviousness under § 103." *Kubin*, 561 F.3d at 1359. The first error is when a defendant argues that it would have been obvious to try by

> vary[ing] all parameters or try[ing] each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful.

*Id.* (quoting *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988)). The second error is when a defendant argues that it would have been obvious to try by

> explor[ing] a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.

*Id.* The Office's brief is rife with both errors.[4] In short, the district court's opinion fails to demonstrate that the invention is obvious to try, much less show that there would be a reasonable expectation to achieve it.

**A. The prior art does not teach the claimed dose.**

The Office commits both of the above errors in first arguing (at 36) that the prior art "teaches the claimed dose." But more importantly, the Office is flatly wrong on this point. Specifically, the Office quotes (at 36) Lutz '282's description of at least nine ranges of possible doses for IMGN853. But every one of those doses is calculated based on the total body weight (TBW) of the patient, as the Office admits. There is no overlap with the claimed AIBW dosing methodology. This point can be seen if one considers the formula for AIBW in the claims.

The calculation for ideal body weight is IBW= 0.9H – 88 (for males) and 0.9H – 92 (for females), where H is the height of the patient in centimeters. Appx193. The AIBW formula is then AIBW= IBW + 0.4 (TBW – IBW). *Id.* Thus, for a clinician to calculate the dose of 6 mg/kg AIBW for a patient, the doctor would need to know the patient's gender, height, and total body weight. And then

[4] The Office (at 34) states that the district court "did not clearly err" in finding the claims obvious but then asserts (at 52) that ImmunoGen's legal arguments are "inconsistent with *KSR*." To be clear, ImmunoGen has demonstrated that the district court made *legal* errors in finding the claims obvious. *See* ImmunoGen Br. 33–34.

the clinician would need to input those variables into the formulas and, only then, arrive at the appropriate dose to treat the cancer. That data would be needed for *every patient*. Simple administration based on TBW does not require that information. Thus, the claimed calculation is fundamentally different than just using the patient's total body weight.

The Office argues (at 36) that a person at their ideal body weight would receive the same amount of drug using the AIBW formula as just using their TBW and so renders the claimed dosage obvious. This reasoning is circular. Presumably, the Office is imagining a patient with a total body weight equal to the weight derived from the ideal body weight formula in the '809 application that the inventors discovered would work for dosing. But the only way a skilled artisan would know that a person is at their ideal body weight (as defined by the '809 application) is to obtain the person's gender and height and then use the formula in the application to calculate that ideal body weight. And the Office's own expert agreed that the ideal body weight formula to use was not obvious. Appx13579 (133:2–17) (Figg). In other words—for the Office to even make the assertion that the AIBW calculation leads to the same drug dosage as using the person's total body weight—requires using the patent application as a roadmap. *See In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) ("Care must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art

references, combining the right references in the right way so as to achieve the result of the claims in suit.'").

At heart, the Office essentially makes flawed inherency argument. The Office recognizes (at 36) that Lutz '282 does not actually teach dosing based on an AIBW calculation. But the Office argues (at 36–37) that—because there is theoretically some person who might be given a dose using Lutz '282 that is similar to the dose from the '809 application—the claims are obvious. However, this Court has cautioned that "use of inherency…must be carefully circumscribed in the context of obviousness." *PAR Pharm., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1195 (Fed. Cir. 2014). Specifically, "to establish the existence of a claim limitation in the prior art in an obviousness analysis—the limitation at issue necessarily must be present, or the natural result of the combination of elements explicitly disclosed by the prior art." *Id.* at 1196. Neither is the case here—and the Office does not even assert otherwise.

The decision in *In re Oelrich*, 666 F.2d 578 (C.C.P.A. 1981) is instructive. There, the claim included a "means for generating a carrier frequency… less than the minimum resonant frequency." *Id.* at 580. The Office argued that this low carrier frequency "may fall within the range of [high] carrier frequencies" in the prior art and was therefore inherent. *Id.* The court disagreed, stating that the limitation would not have been inherent, despite the theoretical overlap, because it

was not "inevitably present" in the prior art. *Id.* at 581–82. This makes sense because "[t]hat which may be inherent is not necessarily known. Obviousness cannot be predicated on what is unknown." *In re Spormann*, 363 F.2d 444, 448 (C.C.P.A. 1966). Here, at the time of the invention of the '809 application, it is undisputed that the use of AIBW to dose ADCs, like IMGN853, was unknown. Appx13564 (118:2–7) (Figg); *Hirshfeld*, 2022 WL 885774, at *1 ("It is undisputed that AIBW dosing had not previously been used for [IMGN853], let alone any other immunoconjugate."). Thus, the dose of 6 mg/kg AIBW was also unknown. As such, the Office's inherency argument fails.

In addition, the '809 application reported that 6 mg/kg AIBW dosing led to no Grade 3 ocular toxicity events in the confidential Phase I tests. *See* Appx194–195; Appx13062–13063 (77:14–78:13) (Ponte). Thus, the patent application reported that the change from TBW to AIBW dosing made a difference. *See Hirshfeld*, 2022 WL 885774, at *4 ("Similarly, the district court found that switching from 6 mg/kg of TBW dosing to 6 mg/kg AIBW does not significantly change the dose for patients who are not significantly overweight or underweight, even though the '809 [a]pplication and other evidence show that this switch to AIBW dosing reduced adverse ocular events in Phase 1 clinical trials.") (cleaned up).

In response, the Office repeatedly argues (at 1, 41, 50) that ImmunoGen waived or conceded that its AIBW formula does not actually work to reduce ocular toxicity. That argument is not well taken. *See* ImmunoGen Br. at 1, 3, 4, 5, 6, 7, 8, 9, 10, 17, 21, 22, 32, 50, 51, 52, 53, 54, 55 (explaining results of confidential tests—found in the ’809 application—demonstrating reduction in ocular toxicity and that the dose of 6 mg/kg AIBW provided that reduction). In any event, in approving that dose, the FDA found it was safe and effective. *Cf.* PTO Petition for Rehearing, *ImmunoGen Inc. v. Vidal*, No. 21-1939, Dkt. 53-1 at 9 (Fed. Cir. July 11, 2022) (“a skilled artisan in ImmunoGen’s shoes—having a promising anti-cancer drug—would continue experimenting to find a workable dose so that it could bring its drug to market”); *Hirshfeld*, 2022 WL 885774, at *1 (“ImmunoGen determined that a dose of 6 mg per kg of a patient’s AIBW successfully maintains exposure of the drug at a therapeutically effective level while keeping it below the ocular toxicity threshold.”) (cleaned up).

The Office is apparently referencing the fact that, while ImmunoGen demonstrated in its opening brief (at 33–55) why the district court’s motivation-to-combine and reasonable-expectation-of-success analysis was legally flawed, it did not need to reach the district court’s erroneous findings on the secondary indicia of unexpected results. The district court’s analysis of this secondary indicia—while flawed—relied exclusively on evidence that was created long after the priority

date. Appx57. Thus, it is irrelevant to a motivation-to-combine or reasonable-expectation-of-success analysis. *See Rolls-Royce, PLC v. United Techs. Corp.*, 603 F.3d 1325, 1338 (Fed. Cir. 2010) (court "seeks evidence from before the time of the invention" for motivation); *Bristol-Myers Squibb Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 976 (Fed. Cir. 2014) (reasonable expectation of success measured at time of invention).[5]

### B. The Office doubles down on its incorrect position that "experimentation" would have led to the claimed dose.

In the course of 15 pages of briefing (at 38–53), the Office states that a skilled artisan "would experiment" or "would test" to find the invention more than a dozen times. But simply arguing that experimentation would lead to the invented solution does not make that solution obvious to try. Rather, there must be "a finite number of identified, predictable solutions." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). Here the potential solutions were essentially limitless—particularly when patient parameters other than weight—such as height and gender

---

[5] In any event, the district court's analysis misunderstood ImmunoGen's argument about unexpected results. ImmunoGen asserted that AIBW dosing *reduced* ocular toxicity, not eliminated it. *See Hirshfeld*, 2022 WL 885774, at *4; Appx13582 (136:2–4) (Figg) (agreeing that ocular toxicities in the later study "were reduced"). After all, there was still ocular toxicity reported in the Phase I study. Appx194. In contrast, the district court incorrectly believed that ImmunoGen was arguing that AIBW dosing "unexpectedly eliminate[s] ocular toxicity." Appx58. But the Court need not reach this issue due to the district court's numerous precedent legal errors.

are included. Moreover, AIBW had never been identified before for dosing using an ADC. And the Office's own expert admitted that the mechanism of action by which ADCs cause ocular toxicity is not known and the side effect could not have been predicted. Appx13557 (111:7–15) (Figg). The Office's reliance on experimentation to fill every gap in the district court decision therefore fails.

**1.** The Office (at 39) first mischaracterizes ImmunoGen as arguing that "observ[ing] ocular toxicity is itself a patentable invention." Not so. ImmunoGen's point is that—regardless whether the unknown problem was obvious or not—the solution to an unknown problem is more likely to be nonobvious. *See Forest Lab'ys, LLC v. Sigmapharm Lab'ys*, 918 F.3d 928, 935 (Fed. Cir. 2019). The Office, however, argues (at 40) that *Forest* is not on point because there "ordinary artisans…would not have recognized the problem," where, here, skilled artisans would have been on the lookout for ocular toxicity. But that argument ignores the facts in *Forest*. In that case, skilled artisans *were* on the lookout for side effects; the inventors actually tested for and found them in secret clinical studies *just like here*. *See id.* at 935. The Office also argues (at 41) that, in *Forest*, the district court found non-obviousness and here the district court found obviousness. But it is unclear why there is a motivation to solve an unknown problem in one case but not the other. And there is none. The district court simply asserted that people would "monitor" or experiment to find the problem and then find the solution. Appx46.

That is nothing other than the assertion that one would "explore a new technology." *Kubin*, 561 F.3d at 1359. And, as a matter of law, it cannot supply a motivation to modify references where none exists.

Moreover, the fact that the problem was unknown is fatal to the Office's assertions that it would be obvious to try the invented dosing method. "To prove obviousness under an obvious to try theory, [the Office] must show [] a design or market need to solve a particular problem." *Grunenthal GMBH v. Alkem Lab'ys Ltd.*, 919 F.3d 1333, 1345 (Fed. Cir. 2019). This makes sense because a skilled artisan does not begin to try to find solutions—even obvious-to-try solutions—when not confronted with a problem to solve. Here, because skilled artisans did not know that IMGN853 resulted in ocular toxicity in humans—and indeed thought the use of a charged linker in Lutz '282 avoided this problem—the dosing solution to that problem was not obvious to try. Appx13079–13080 (94:16–95:15) (Lutz).

**2.** The Office compounds this error (at 42) by arguing that "a skilled artisan would have experimented with AIBW dosing." But this is literally no more than arguing that one would "vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result." *Kubin*, 561 F.3d at 1359. Even if the Office were correct (at 42) that the concept of AIBW was one of the "standard tools in the artisan's toolkits"—and it is hard to see how this is plausible

since it had admittedly never once been used to dose an ADC—the claimed AIBW dose was only one of many of "numerous possible choices."

Dr. Figg explicitly conceded that:

> THE COURT: But would it be obvious about exactly how you [would change the dosing regimen to solve the problem of side effects]?
> THE WITNESS: No. We use a lot of different ones. AIBW is just one tool in the tool box.
> THE COURT: But even under AIBW, there are different AIBWs to use.
> THE WITNESS: Correct.
> THE COURT: And don't you have to experiment to find out which one is the right one?
> THE WITNESS: Yes.

Appx13570–13571 (124:23–125:7) (Figg).

Moreover, the Office's reliance (at 42) on the fact that ImmunoGen's expert stated that "that the toxicity associated with the DM4 payload is usually dose-related" demonstrates a profound misunderstanding of how non-obvious AIBW dosing actually is. It was absolutely true that—normally—the more drug you gave, the higher the toxicity, as would be typical of using TBW dosing. Appx13356 (127:5–12) (Shah). What was surprising was that overall exposure to IMGN853 did *not* directly correlate with ocular toxicity. Appx13083–13084 (98:24–99:20) (Lutz). And it is this decoupling of overall exposure and ocular toxicity that the AIBW formula in the '809 application takes advantage of. Appx13047–13054 (62:20–63:2, 63:3–68:8, 69:2–5) (Ponte).

**3.** Next, the Office attempts to diminish the testimony of its own expert that the specific IBW—and thus AIBW—formula in the ’809 application was not obvious. Appx13579 (133:14–17) (Figg). The Office asserts (at 45) that the “discovery claimed in the ’809 [a]pplication is not the AIBW formula.” Again, this would relegate the use of any known formula to being automatically obvious—which is not the law. *See Parker*, 437 U.S. at 594. The Office nonetheless maintains (at 45) that Dr. Figg asserted that it would be obvious to try the AIBW formula disclosed in the ’809 application. What Dr. Figg actually said was:

> Q. Would a person of ordinary skill in the art experiment with the different ideal body weight formulas?
> THE COURT: As of 2013.
> Q. Of [sic] October of 2013.
> A. Probably pick one, see if it works. And then, if it did [sic] work, then they might manipulate through many.

Appx13604 (158:5–10) (Figg) (emphasis added). This is not obvious to try; it is throwing “darts at a board.” *Kubin,* 561 F.3d at 1359.

**4.** Finally, the Office argues (at 49) that it would have been obvious to try a 6 mg/kg AIBW dose because Lutz ’282 suggested (out of many possibilities) using a 6 mg/kg TBW dose. But AIBW and TBW are fundamentally different formulae. And, as explained in the opening brief (at 49), ImmunoGen *tried* to dose at 5 and 7 mg/kg TBW and failed due to resulting high levels of ocular toxicity in patients. Appx13104 (119:9–20) (O’Malley). Regardless, the Office simply asserts (at 46) that someone would have “test[ed]” 6 mg/kg AIBW, and (at 50) that a non-

enabling reference like Lutz can still qualify as prior art for obviousness. But again resort to "testing" without a reason to expect the testing would be successful is insufficient—particularly when testing with TBW demonstrated that it was not successful. *See Kubin*, 561 F.3d at 1359. And, while a non-enabling reference may count as prior art, it does so "only for what is disclosed in it." *See Reading & Bates Const. Co. v. Baker Energy Res. Corp.*, 748 F.2d 645, 652 (Fed. Cir. 1984). Lutz '282 disclosed only TBW dosing.

### C. There must a reasonable expectation in meeting the limitations of the claimed invention.

Finally, there still must be a reasonable expectation of success. "The reasonable expectation of success requirement refers to the likelihood of success in combining references to meet the limitations of the claimed invention." *Intelligent Bio-Sys., Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1367 (Fed. Cir. 2016). The best the Office can muster in response (at 38) is that "[g]iven that IMGN853 had shown promise, there would be a reasonable expectation of success." But the invention is not IMGN853; it is an extremely specific dose of that drug. Moreover, this argument runs headlong into the fallacy that it is obvious to try by "explor[ing] a new technology or general approach that seemed to be a promising field of experimentation." *Kubin*, 561 F.3d at 1359. The remainder of the Office's brief is simply a rationalization for why a reasonable expectation of success is unnecessary.

First, the Office attacks a straw man (at 46–47), arguing that reasonable expectation of success does not require absolute certainty of success. Of course not. But the district court did not find *any* "likelihood of success in combining references to meet the limitations of the claimed invention." *Intelligent Bio-Sys.*, 821 F.3d at 1367. Rather, the district court held only that there would be an expectation in being able to "*experiment[]* with dosing IMGN853 based on AIBW." Appx52, Appx54. This is an incorrect statement of law that the Office does not defend.

And the district court could not have found there was a likelihood of success in obtaining the claimed invention because it is undisputed that (1) the problem was unknown in the art, Appx12176 (¶ 27); (2) the development of an ADC is "remarkably challenging" and most fail due to side effects, Appx13550 (104:17–25) (Figg); (3) AIBW dosing had never been used with ADCs before, Appx13564 (118:2–7) (Figg); (4) the mechanism of action of ocular toxicity is unknown and it was impossible to know if there would be side effects without the data, Appx13579 (133:3–7) (Figg); (5) and there was not even pharmacokinetic data that could have suggested the correlation between early exposure and ocular toxicity. Appx12176 (¶ 28). The cases cited by the Office do not suggest any other result.

This Court's decision in *Grunenthal*, 919 F.3d 1333, is on point. There, the claim was directed to a polymorph of the chemical tapentadol hydrochloride. *See*

*id.* at 1336. Like the Office here, the defendant argued that there was no need to have "absolute predictability" in the field to have a reasonable likelihood of success and that skilled artisans would have known to screen for polymorphs. *See id.* at 1343. This Court held, to the contrary, that there was no likelihood of success because "there was (1) no known or expected polymorphism of tapentadol; (2) no evidence that the synthesis [results in a polymorph]; and (3) no guidance as to what particular solvents, temperatures, agitation rates, etc., were likely to result in [a polymorph]." *Id.* Here, there was (1) no known ocular toxicity, which is not predictable with ADCs, Appx13557 (111:7–9) (Figg); (2) no evidence that a dosing method would solve that problem, Appx13150 (165:9–21) (Tolcher); and (3) no guidance as to which dosing method, including what patient measurements would lead to success dose, Appx13570–13571 (124:16–125:4) (Figg). And similarly, there was no expectation of success.

In support of its expectation-of-success argument, the Office cites (at 47) *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348 (Fed. Cir. 2007). While that case states that "unpredictability" is not the same as "patentability," there was also strong evidence that there was some expectation that the claimed salts could be made and, indeed, specific prior art that taught that the claimed salt would work. *Id.* at 1364–65. There is nothing close to that kind of evidence here. No one had ever used AIBW dosing with an ADC, used the specific AIBW formula in the '809

application with an ADC, or used it to solve ocular toxicity. Appx13564 (118:8–14) (Figg).

And contrary to the Office's assertions (at 47), *Bayer Schering Pharma AG v. Barr Laboratories Inc.*, 575 F.3d 1341, 1348 (Fed. Cir. 2009), does not state that all "viable option[s]" are obvious to try. Rather, in *Bayer*, there were only "two known options," and the Court held that there was a reasonable expectation of success in both. *Id.* at 1350. The Court contrasted the situation to the one here, where a skilled artisan would "have been required to try all possibilities in a field unreduced by the prior art." *Id.*; *see supra* Section II.B.2.

Finally, the Office dismisses (at 48–49) such cases as *Teva Pharmaceuticals USA, Inc. v. Corcept Therapeutics, Inc.*, 18 F.4th 1377 (Fed. Cir. 2021), and *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Pat. Litig.*, 676 F.3d 1063 (Fed. Cir. 2012), as irrelevant because, here, the Court should "defer[] on factual findings" that differ from those cases. But, tellingly, not once does the Office (at 46–51) cite to a single fact in the record—not even to the testimony of its own expert—to argue any reasonable expectation of success. That is because there are no such facts. Rather, the district court committed an error of law by equating the possibility of experimentation with a reasonable expectation of success in actually achieving the claimed invention. They are not the same; only ImmunoGen's inventors actually achieved the invention.

## CONCLUSION

This Court should reverse the district court's holding that the '809 application's claims are unpatentable.

Dated: October 27, 2023

Respectfully submitted,

/s/ Michael E. Joffre
Michael E. Joffre
Anna G. Phillips
Eric K. Steffe
**STERNE KESSLER GOLDSTEIN & FOX PLLC**
1101 K Street, N.W.
10th Floor
Washington, DC 20005
202.371.2600

*Counsel for Appellant ImmunoGen, Inc.*

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1762

**Short Case Caption:** ImmunoGen, Inc. v, Katherine Vidal

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

☑ the filing has been prepared using a proportionally-spaced typeface and includes 6,996 words.

☐ the filing has been prepared using a monospaced typeface and includes ________ lines of text.

☐ the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 10/27/2023

Signature: /s/ Michael E. Joffre

Name: Michael E. Joffre

Save for Filing